# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Lisa Reed and Mary McDowell,⠀⠀⠀⠀⠀⠀)
On behalf of themselves and all others⠀)
similarly situated,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
Advocate Health Care; Children's Memorial )
Hospital; Evanston Northwestern Healthcare )
Resurrection Health Care; University⠀⠀⠀)
of Chicago Hospitals,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## PLAINTIFFS' MOTION TO QUASH SUBPOENA DIRECTED AT THE MINTZ GROUP

For the reasons articulated in the attached memorandum of law, Plaintiffs respectfully request that this Court quash the subpoena directed at the Mintz Group.[1]

Dated: November 4, 2007⠀⠀⠀⠀⠀⠀⠀Respectfully submitted,

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀By: _____

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Michael D. Hausfeld, Bar No. 15374
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Daniel A. Small
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Charles E. Tompkins, Bar No. 459854
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Shelly L. Friedland
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Kalpana Kotagal
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Sharon K. Robertson
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀COHEN, MILSTEIN, HAUSFELD &
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀TOLL P.L.L.C.

---

[1]⠀⠀⠀Pursuant to LCvR 7(m), counsel have conferred and have been unable to reach a resolution.  Plaintiffs expect that this motion will be opposed.

1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax:(202) 408-4699

Thomas P. Dove
Kimberly A. Kralowec
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

Mark A. Griffin
Raymond J. Farrow
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

Daniel E. Gustafson
Brian Williams
GUSTAFSON GLUEK PLLC
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

David P. Dean
Mary Joyce Carlson
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Arnold Levin
Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

**Attorneys for Plaintiffs**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Lisa Reed and Mary McDowell,<br>On behalf of themselves and all others<br>similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>Advocate Health Care; Children's Memorial<br>Hospital; Evanston Northwestern Healthcare<br>Resurrection Health Care; University<br>of Chicago Hospitals,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH SUBPOENAS DIRECTED AT THE MINTZ GROUP

INTRODUCTION ......................................................................................................... 1

SUMMARY OF FACTS ............................................................................................... 5

    A BACKGROUND OF THE LITIGATION: .......................................................... 5

    B. THE ALLEGATIONS OF THE COMPLAINT ............................................... 7

    C. THE SUBPOENAS ................................................................................................ 7

    D. THE STATUS OF THE COURTS' RESOLUTIONS OF UNDERLYING
        ISSUES IN NURSE COMPENSATION LITIGATIONS ..................................... 10

ARGUMENT ................................................................................................................. 11

    A. BACKGROUND OF THE WORK PRODUCT DOCTRINE ................................... 11

    B. DISCOVERY OF OPPOSING COUNSEL IS DISFAVORED ............................... 12

    C. THE VAST MAJORITY OF THE INFORMATION SOUGHT IS CORE
        PROTECTED WORK PRODUCT .......................................................................... 13

        1.    The Information Sought Is Work Product Even Where Created
                Prior to Retention Of Counsel By A Named Class Representative ......... 17

            a.    The Plain Language of Rule 26(b)(3) Protects The Information
                    Sought .......................................................................................... 17

            b.    Even if the documents at issue were not encompassed within
                    the plain language of Rule 26(b)(3), they are protected by the
                    federal common-law work product doctrine announced in
                    Hickman ...................................................................................... 18

            c.    Protection of the documents at issue is necessary for
                    meaningful private class-action enforcement of antitrust law .......... 19

    D. THE FEW MATERIALS SOUGHT THAT ARE NOT OPINION WORK
        PRODUCT ARE NOT SUFFICIENTLY RELEVANT TO JUSTIFY
        ENFORCEMENT OF THE SUBPOENAS .......................................................... 21

    E. DEFENDANTS CAN OBTAIN THIS INFORMATION THROUGH OTHER
        MEANS ............................................................................................................ 22

    F. THE INFORMATION SOUGHT IS NOT CRUCIAL TO THE
        PREPARATION OF DEFENDANTS' CASE .......................................................... 23

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdell v. City of New York,*
  2006 U.S. Dist. LEXIS 66114 ................................................................11, 18, 19

*Alabama v. Chevron USA, Inc.,*
  1980 U.S. Dist. LEXIS 10616 (M.D. Ala. Jan.11, 1980) .......................................19

*Amer. Tobacco Co. v. Patterson,*
  456 U.S. 63 (1982)...................................................................................................19

*Rockwell Int'l Corp. v. Dep't of Justice,*
  235 F.3d 598 (D.C. Cir. 2001).........................................................................11, 13

*Concord Boat Corp. v. Brunswick Corp.,*
  169 F.R.D. 44 (S.D.N.Y. 1996) .............................................................................13

*Coastal State Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980)................................................................................11

*Doubleday v. Ruh,*
  149 F.R.D. 601 (E.D. Cal. 1993) ...........................................................................19

*Evans v. Atwood,*
  No. CIV.A. 96-2746(RMU), 1999 WL 1032811 (D.C.C. Sept. 29, 1999).......................12, 13

*Green v. Saunder Moldings, Inc.,*
  223 F.R.D. 304 (E.D. Va. 2004) ...............................................................................5

*Haus v. City of New York,*
  2006 U.S. Dist. LEXIS 85225 (S.D.N.Y. Nov. 17, 2006) ......................................11

*Hawaii v. Standard Oil Co.*
  405 U.S. 251 (1972) ................................................................................................19

* *Hickman v. Taylor,*
  329 U.S. 495 (1947) (Jackson, J. concurring)............................................... passim

*Hughley v. Art Institute of Chicago,*
  981 F. Supp. 1123 (N.D. Ill. 1997) ........................................................................18

*In re Allen,*
  106 F.3d 582 (4th Cir. 1997), ................................................................................14

*In re Grand Jury Subpoenas,*
  318 F.3d 379 (2d Cir. 2003) ...................................................................................18

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ...................................................19, 20

*In re Rubber Chemicals Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ...............................................................19

*In re. Sealed Case*,
  146 F.3d 881 (D.C. Cir. 1998) ...................................................................14

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ...................................................................17

\* *In re Student Finance Corp.*,
  2006 U.S. Dist. LEXIS 86603 (E.D. Pa. Nov. 29, 2006)............................. passim

*In re Subpoenas Duces Tecum*,
  738 F.2d 1367 (D.C. Cir. 1984) .................................................................12

*Kaiser v. Mutual Life Ins. Co. of N.Y.*,
  161 F.R.D. 378  (S.D. Ind. 1994)................................................................12

*Minn. Sch. Bd. Ass'n Ins. Trust v. Employers Ins. Of Wausau*,
  183 F.R.D. 627 (N.D. Ill. 1999)............................................................4, 5, 6

*Ostrowski v. Holem*,
  No. 02-C-50281, 2003 U.S. Dist LEXIS 794 (N.D. Ill. Jan. 21, 2003) ...................19

*Plastic Cutlery*,
  1998 U.S. Dist. LEXIS 3628, at *2 (E.D. Pa. March 20, 1998) ...........................19

*Rockwell Int'l Corp. v. United States Dep't of Justice*,
  235 F.3d 598  (D.C. Cir. 2001) .............................................................12, 13

*Sec. & Exchange Comm'n v. R.J. Reynolds Tobacco, Holdings, Inc.*,
  2004 U.S. Dist. LEXIS 24545 (D.D.C. June 29, 2004) ........................................14

*Senate of Puerto Rico v. U.S. Dep't of Justice*,
  823 F.2d 574  (D.C. Cir. 1987) .................................................................14

*Shelter Realty Corp. v. Allied Maintenance Corp.*,
  75 F.R.D. 34 (S.D.N.Y. 1977) ...................................................................20

*Shelton v. American Motors Corp.*,
  805 F.2d 1323 (8th Cir.1986) ...............................................................12, 13

*Sporck v. Peil*,
  759 F.2d 312 (3d Cir. 1985)......................................................................12

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001) ................................................................1

*T.R. Coleman v. Cannon Oil Co.,*
   141 F.R.D. 516 (M.D. Ala. 1992) ........................................................20

*U.S. v. Arizona Hospital and Healthcare Association,*
   No. CV07-1030-PHX (D.Ariz.) .............................................................1

*United States v. Nobles,*
   422 U.S. 225 .......................................................................................13

*Westinghouse Elec. Corp. v. Republic of the Philippines,*
   951 F.2d 1414  (3d Cir. 1991) .............................................................14

## OTHER AUTHORITIES

Fed. R. Civ. P. 26(a)(2)(A) .....................................................................23

Fed. R. Civ. P.  26(b)(1) ..........................................................................23

* Fed. R. Civ. P. 26(b)(3) .................................................................. passim

Fed. R. Civ. P. 26(c) ...............................................................................22

Fed. R. Civ. P. 45(c)(1) ...........................................................................22

Fed. R. Civ. P. 45(c)(3)(A) ........................................................................4

Rule 26(b)(3) ..........................................................................................18

## INTRODUCTION

The subpoenas at issue in this motion arise from five separate lawsuits, filed in five separate cities in the United States, all of which allege that defendant hospitals in those actions conspired artificially to *deflate* the compensation paid to their Registered Nurse ("RN") employees.[1]  Specifically, the Plaintiffs in each of these putative class actions allege that Defendants regularly exchanged current, detailed, non-public information about their RN compensation, including future compensation levels, as part of an agreement to maintain RN compensation at artificially low levels, in violation of Section 1 of the Sherman Act and specific Department of Justice ("DOJ") and Federal Trade Commission ("FTC") guidelines issued to hospitals regarding exchanges of RN wage information. *See* Exhibit ("Ex.") C to Declaration of David Dean ("Dean Decl."), DOJ Guidelines; Ex. D to Dean Decl., Albany, Chicago, Detroit, Memphis and San Antonio Nurse Compensation Complaints.

Each of these cases was filed after months of investigation by Plaintiffs' counsel. Plaintiffs' counsel retained the James Mintz Group, Inc. ("Mintz"), a non-party private investigative firm that lead counsel for Plaintiffs Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") has hired on many occasions in the past, to investigate allegations of

---

[1]    The lawsuits are: *Fleischman v. Albany Medical Center* ("Albany"), No. 06-cv-0765 (JM/DRH) (N.D.N.Y); *Reed v. Advocate Health Care* ("Chicago"), No. 1:06-cv-03337 (N.D. Ill.); *Cason-Merendo v. Detroit Medical Center* ("Detroit")*,* No. 06-CV-15601-GER (W.D. Mich.); *Clarke, et al. v. Baptist Memorial Healthcare Corp. et al.* ("Memphis"), No. 2:06-cv-02377-JPM (W.D. Tenn.); and *Maderazo v. VHS San Antonio* ("San Antonio"), No. SA-06-CA-0535 OG (E.D. Tex., San Antonio Div). Additionally, the Department of Justice recently filed and simultaneously settled a case in Arizona involving a comparable claim of collusion in the setting of wages paid to agency nurses. *See U.S. v. Arizona Hospital and Healthcare Association*, No. CV07-1030-PHX (D. Ariz.). The Deposition subpoenas at issue here have been issued in connection with the Albany, Chicago and Detroit lawsuits. The issuing defendants are Albany Medical Center, Henry Ford Health System and Resurrection Healthcare, respectively (hereinafter "Defendants").

collusion in the setting of RN wages.[2]  Mintz, using a script developed by Cohen Milstein and

co-counsel, interviewed witnesses in each of the cities in question, including former management

employees at certain of the Defendant hospitals, to determine whether there was sufficient

evidence of collusion to merit Cohen Milstein's investment of the substantial time and resources

required to litigate multiple complex antitrust class actions on a wholly contingent basis on

behalf of putative classes of affected nurses in each city.  In addition to the work of Mintz,

economic analysis was conducted by Dr. Hank Farber of Princeton University to determine

whether the supply and demand indicators in the markets where lawsuits were contemplated

were consistent with a conspiracy to suppress wages.[3]  Only four of the over twenty-five

defendants in these actions even bothered to seek dismissal of the complaints filed based on

these investigations, and this motion was denied.[4]  Discovery in each of the actions is thus

underway.

     In what is essentially an effort to seek discovery from opposing counsel, Defendants now

seek to depose the investigative firm that conducted the above investigation for Plaintiffs'

---

[2]  Counsel's investigation began after receiving information from the Service Employees International Union ("SEIU") that the SEIU had, in the course of its organizational and collective bargaining activities on behalf of RNs, uncovered substantial evidence of collusion in the market for RN compensation.

[3]  Dr. Farber is a Hughes-Rogers Professor of Economics at Princeton University, where he has served on the faculty since 1991.  Dr. Farber has also served on the faculty of the Department of Economics of the Massachusetts Institute of Technology.  Among other topics, he teaches courses in labor economics (the analysis of wages, hours, and other topics related to the workforce) and econometrics (the application of mathematical statistics to problems in economics).  He has written numerous scholarly articles in both of these subject areas, and his research has been widely published in academic and professional journals.  He is a Research Associate of the National Bureau of Economic Research and a Fellow of the Econometric Society and the Society of Labor Economists.  He is also a member of the Statistics Canada Labour and Income Statistics Advisory Committee of the Canadian Government.

[4]  *See* Order Denying Defendants' Motion to Dismiss, *Clarke, et al. v. Baptist Memorial Healthcare Corp. et al.*, No. 2:06-cv-02377-JPM (W.D. Tenn.) (Docket No. 96).

counsel. This effort should be rejected. All of Mintz's knowledge relevant to these actions was gained as a result of its role as an agent of Plaintiffs' counsel retained to develop the evidence to support the litigations that followed. Such information, which includes, for example, candid assessments of the relevance and reliability of various witnesses' allegations, as well as their likely impact on Plaintiffs' case, is core work product not subject to disclosure under any circumstances. More broadly, a deposition of counsel's agent would necessarily afford Defendants, many of whom are represented by firms that routinely defend antitrust actions, a forum in which to uncover the investigative approach of Cohen Milstein and our co-counsel when evaluating allegations of collusion. This effort by Defendants to borrow from the wits of their adversary should not be countenanced. To the extent there is some limited information to which Defendants are entitled -- for example, the terms of the retainer agreement between counsel for Plaintiffs and Mintz -- that information either has been produced or can be provided through a less burdensome and intrusive means than a deposition. The subpoenas should therefore be quashed in their entirety.

That was precisely the conclusion recently reached in a very instructive opinion from the Eastern District of Pennsylvania under circumstances strikingly similar to those at issue here. *See In re Student Finance Corp.*, No. 02-11620, 2006 U.S. Dist. LEXIS 86603, at *14 (E.D. Pa. Nov. 29, 2006). In *Student Finance*, the attorneys of the largest creditor in a bankruptcy action hired Mintz to conduct an investigation into potential fraud by other players in the bankruptcy, in anticipation of litigation against those players, including Career Path. Career Path, the defendant in an adversarial action connected to the original bankruptcy, subpoenaed Mintz seeking the documents generated during the investigation. The Court rebuffed the request, finding that the creditor and its attorneys could claim the work product privilege because the subpoena sought

"an investigative file prepared by [creditor's] attorneys in anticipation of litigation." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at \*35. Similarly, here, the requested information was uncovered specifically for the purpose of the underlying litigations that followed, and thus is core opinion work product that is not subject to production.

Plaintiffs understand that Defendants' sole argument in support of their contention that the information sought is discoverable and should not be considered work product, is that the information was uncovered prior to the retention of Cohen Milstein and James & Hoffman, P.C. ("J&H"), by a named class representative. This argument, however, is contrary to the plain language of Fed. R. Civ. P. 26(b)(3), which protects information created "in anticipation of litigation by or for another party *or by or for that other party's representative*." *Id.* (emphasis added). The information at issue here was developed by Mintz, an agent of Plaintiffs' counsel, in anticipation of the litigations that eventually ensued. It is thus protected under the plain language of the rule.

Protecting the information here from disclosure is also consistent with the purpose of the work product doctrine, which is to prevent inquiry into the mind of opposing counsel from serving as a substitute for discovery and preparation by each side, such protection is also vital for private enforcement of the antitrust laws, which requires investigation into potential conspiracies by counsel and their agents prior to retention by named representatives. The subpoenas should thus be quashed in their entirety.[5]

---

[5]    Plaintiffs have standing to move to quash Defendants' subpoenas of Mintz. Fed. R. Civ. P. 45(c)(3)(A) (stating that the court "shall quash or modify the subpoena if it requires disclosure of privileged or other protected matter...."); 9A Fed. Prac. & Proc. Civ. § 2459 (2006) (noting that one may challenge a subpoena where there is a personal right or privilege with respect to the subject matter sought by the subpoena); *accord Green v. Saunder Moldings, Inc.*, 223 F.R.D. 304, 306 (E.D. Va. 2004) (affirming the rule that a party may challenge the subpoena of a third party where it has some personal right or privilege to the documents sought); *Minn. Sch. Bds.*

## SUMMARY OF FACTS

**A.    Background of the Litigation.**

In or about July 2004, the Service Employees International Union received a draft article by Professor Barbara Bergmann, an economist at American University,[6] arguing that the continuing nurse shortage in the U.S. was likely the result of collusion on nurse wages among hospitals, facilitated by certain area hospital organizations.   Ex. A to Dean Decl., Revised Declaration of Mary Joyce Carlson ¶ 6, filed on July 13, 2007, in *Fleishman v. Albany Medical Center*, No. 06-cv-0765 (JM/DRH) (N.D.N.Y).   The Nurse Alliance of SEIU ("Nurse Alliance"), a national organization of nurses, found Professor Bergmann's thesis credible based on the experiences of its staff and members.   *Id.* ¶ 7.   The Nurse Alliance thus began both a public communication and organizing campaign focused generally on nurse wages, carried out by the Nurse Alliance and SEIU's organizing and research departments, and separately supported a pre-filing investigation into whether collusion in certain markets was responsible for persistent low wages in the face of RN shortages in those markets.   SEIU retained the law firm of J&H to conduct the latter investigation.   *Id.* ¶ 8.

In October 2005, after receiving the analyses of expert economic consultant Dr. Hank Farber, and after receiving the fruits of an internal fact-investigation conducted by SEIU itself, J&H retained an investigative firm, Mintz, expressly to "provide investigative services to assist J&H in rendering legal advice to SEIU on possible collusion by hospital employers in violation

---

*Ass'n Ins. Trust v. Employers Ins. Co. of Wausau*, 183 F.R.D. 627 (N.D. Ill. 1999) (holding that a party has standing to object to the subpoena of a third party where the party asserts that the documents sought are protected work product).

[6]     Professor Barbara Bergmann is a distinguished professor emerita of economics at American University.  She is co-author of *America's Childcare Problem: The Way Out* (Winter, 2002), and author of *Is Social Security Broke?: A Cartoon Guide to the Issues* (2000) and *In Defense of Affirmative Action* (1996).

of the antitrust laws, and also in anticipation of class action litigations on behalf of nurses in several labor markets against hospital employers, utilizing the results of the investigation."[7] Dean Decl. ¶ 7; Ex. B to Dean Decl., Declaration of Christopher Weil ("Weil Decl.") ¶2; Ex. E to Dean Decl., Mintz Retainer Agreement. Mintz conducted its investigation under the direction and control of J&H and, beginning in or about November 2005, also Cohen Milstein. *Id.*, ¶ 6. This investigation continued until shortly before the lawsuits underlying these subpoenas were filed in June of 2006. *Id.* ¶ 7. Prior to those filings, but after the Mintz investigation had begun, Cohen Milstein and J&H were retained by representative plaintiffs in each of the jurisdictions where the investigation uncovered substantial evidence of a conspiracy to suppress nurse wages.[8] *Id.*

The materials generated in connection with the Mintz investigation embody substantial attorney work product. Plaintiffs' counsel developed the scripts that Mintz utilized to interview hospital employees. *Id.* ¶ 9; *see also* Ex. B to Dean Decl., Weil Decl. ¶ 4. Moreover, the interview notes and memos created by Mintz were not transcriptions. *See* Dean Decl. ¶ 9. Rather, Mintz determined, based on Plaintiffs' counsel's instruction, what information would be relevant and useful in light of the ongoing investigation and potential lawsuits, and documented that information in contemporaneous summaries of the interviews, which include bullet points highlighting facts the investigators deemed particularly relevant, and candid assessments of

---

[7]    Although Mintz began its investigation in late October, the parties reached agreement on final terms of the engagement in February 2006, when they signed a formal retainer. *Id.* ¶ 8; *see* Ex. E to Dean Decl., Mintz Retainer Agreement. Moreover, although this investigation was conducted on behalf of J&H, it was co-financed by the SEIU and Cohen Milstein.

[8]    Specifically, Plaintiffs' Counsel was retained by: Marjory Unger, former representative of the Albany class, on May 9, 2006; Cindy Digiannotonio, representative of the Chicago class, on July 11, 2006; and Patricia Cason-Merenda, representative of the Detroit class, on October 10, 2006.

witness credibility, motivations, and interest in assisting the Plaintiffs. *Id.* Mintz's interviews and documents were intended to be used – and actually have been used – only in connection with these litigations. *See id.*

### B.    The Allegations of the Complaint.

The Complaint contains two counts, which present two separate claims.[9]  Count I alleges a conspiracy among Defendants and their co-conspirators to depress the compensation they paid to their RN employees. *See* Ex. D to Dean Decl., Albany Complaint at ¶ 39.[10]  Count II alleges a conspiracy among the Defendants and their co-conspirators to exchange RN compensation information. *See id.* at ¶ 43.  These conspiracies were carried out through Human Resource employees working at defendant and co-conspirator hospitals, who regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. *See id.* at ¶ 29.  These information exchanges would increase in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. *See id.*  Hospital administrators used this information to set and depress RN compensation. *See id.*

### C.  The Subpoenas.

All three subpoenas are identical, and all three seek information that is either protected from disclosure or wholly irrelevant to the claims at issue in these lawsuits. *See* Ex. F to Dean

---

[9]    In the interest of convenience, Plaintiffs reference only the Albany complaint.  However, each of the five complaints raise identical claims based on similar factual allegations. *See* Ex. D to Dean Decl., Albany Complaint.

[10]    Essentially, the Plaintiffs allege a price-fixing conspiracy.  Because the defendants are employers rather than sellers, the conspiracy depressed wages rather than to raising prices.  Such a conspiracy is, of course, a *per se* violation of the antitrust laws. *See Todd v. Exxon Corp.,* 275 F.3d 191, 201 (2d Cir. 2001) (finding that a horizontal conspiracy among sellers to raise prices to supracompetitive levels is a *per se* violation of antitrust law).

Decl., Mintz Deposition Subpoenas at Schedule A, Topics 7-9, 11-12 and 14.[11] The topics of the

subpoenas which seek protected material include:

- "Any surveys, polls, questionnaires, or statements of opinion or fact solicited from or provided by the Named Plaintiffs or any member of the putative class in the . . . lawsuit to The Mintz Group, SEIU, J&H or Plaintiffs' Counsel…" *Id.* at Topic 7. This topic seeks information regarding privileged communications between the Class and Plaintiffs' counsel and/or their investigative team.

- "Any studies, reports, surveys, or other information collected, compiled, commissioned or created by The Mintz Group relating to the registered nurses . . . including but not limited to, union density, registered nurse wages, registered nurse benefits, mobility of registered nurses, or employment options available to registered nurses." *Id.* at Topic 8. This topic seeks information protected by the work product doctrine.

- "Any efforts to investigate the allegations or issues in the lawsuit prior to the filing of the Complaint, including, but not limited to, all notes or memorandum relating to any interview of or meeting with any registered nurse, human resource employee or health care official…" *Id.* at Topic 9. Information relevant to this topic is protected attorney work product.

- "Any assistance or information that The Mintz Group offered or provided to the Named Plaintiffs, J&H or Plaintiffs' Counsel that relates to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the … lawsuit, (iv) compensation for registered nurses employed or living in the [relevant area], (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendant or any other employer of registered nurses employed in the [relevant area]. *Id.* at Topic 11. These topics both seek work product (communications between Mintz and counsel) and are overbroad (seeking information that has nothing to do with this lawsuit).

- "Any communications between The Mintz Group and the SEIU, The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the … Lawsuit, J&H or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the . . . lawsuit, (iv) compensation for registered nurses employed in or living in the [relevant area], (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital

---

[11]    Several of Defendants' requests appear to seek information that does not exist. Mintz never communicated with the SEIU, The Feldman Group, Global Strategy Group or the Institute for Women's Policy Research in connection with these lawsuits. *See, e.g.,* Ex. F to Dean Decl., Topic 12.

Defendants or any other employer of registered nurses employed in the [relevant area]." *Id.* at Topic 12. This request seeks information that is protected from disclosure under the work product doctrine.

- "Any facts supporting or undermining the allegations in the Complaint, including, but not limited to, the alleged collusion by or among Hospital Defendants." *Id.* at Topic 14. This request seeks information that is protected work product.

The remaining specifications seek information about the organizing activities of the SEIU that is largely irrelevant to this lawsuit, and about which Mintz does not have any significant information.

- "*Any* communications between the SEIU and The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or members of the putative class in the . . . lawsuit, or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the . . . lawsuit, (iv) compensation for registered nurses employed in or living in the [relevant area], (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the [relevant area]." *Id.* at Topic 13. (emphasis added). This request seeks information that do not even involve Mintz. Mintz could not and should not be required to testify about this topic. Moreover, the request for communications regarding "any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the [relevant area]" seeks information that has no relevance to the claims in these lawsuits.

- "*Any* plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the [relevant area] and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital with the [relevant area]." *Id.* at Topic 15. (emphasis added). Any information regarding this topic is within the exclusive control of Defendants and/or the SEIU. Mintz is not competent to testify about this topic. Moreover, this information has no conceivable relevance to the claims or defenses issue in these cases.

- "The actual, potential or anticipated impact of or benefit from the filing of the . . . lawsuit on the SEIU, including the . . . lawsuit's impact or benefit on the SEIU's membership, organizing campaigns, publicity campaigns, visibility or status among registered nurses in the [relevant area]." *Id.* at Topic 16. This information is not within Mintz's custody and/or control. Nor does Mintz

have the requisite knowledge to testify to such facts.    Moreover, this information is irrelevant to the claims in these lawsuits.[12]

**D.  The Status of Courts' Resolutions of Underlying Issues In Nurse Compensation Litigations.**

Each of the five litigations alleging collusion in the setting of nurse compensation are at various stages in the discovery process.  In several of these jurisdictions, issues relating to the production of Mintz documents are in the process of being litigated.

In Albany, the Court ordered bifurcation of class certification and merits discovery. Thereafter, defendants sought production of Mintz documents, arguing that they were relevant to class certification.  On May 16, 2007, Magistrate Judge Homer conducted a hearing regarding whether Plaintiffs would be required to produce Mintz documents.  The Court reserved judgment on the issue and has yet to rule.  *See* Ex. G to Dean Decl., Transcript of Proceedings before Magistrate Judge Homer at p. 52, held on May 16, 2007 in the matter of *Fleischman v. Albany Medical Center*, No. 06-cv-0765 (JM/DRH) (N.D.N.Y.).

Similarly, in Chicago, defendants requested production of the Mintz documents. Plaintiffs refused on the grounds that such documents were protected from disclosure under the work product doctrine.  Unable to resolve this issue on their own, that dispute has now developed into a fully briefed motion to compel, which is before the Court for consideration.  *See Reed v. Advocate Health Care* ("Chicago"), No. 1:06-cv-03337 (N.D. Ill.) (Docket Nos. 364, 368, 371, 375 and 384).

---

[12]    The remaining requests seek information that this Court may deem to be of limited relevance.  *See, e.g.* Ex. F to Dean Decl., Schedule A, Topic 1 (the organizational structure of Mintz); Topic 3 (the relationship between Mintz and J&H); Topic 4 (the relationship between Mintz and Plaintiffs' counsel); Topic 5 (the relationship between Mintz and any Named Plaintiffs).  However, given Mintz's status as an agent of counsel for the Plaintiffs, Defendants should be required to obtain this information through less intrusive means, such as a request for production of documents, interrogatories, or depositions on written questions.  *See* Fed. R. Civ. P. 26(c)(3).

# ARGUMENT

## A. Background Of The Work Product Doctrine.

The work-product privilege has two sources: Fed. R. Civ. P. 26(b)(3) and the Supreme Court's seminal analysis in *Hickman*. *Hickman v. Taylor*, 329 U.S. 495 (1947). Rule 26(b)(3) states that:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of that party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed. R. Civ. P. 26(b)(3).[13] In protecting opinion work product, the court shall avoid the "disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3).

Underpinning the work-product privilege is a commitment to "the integrity of our system," which would be undermined "if adversaries were entitled to probe each other's thoughts and plans concerning the case." *Coastal State Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980). The doctrine is intended to allow attorneys "to prepare for litigation 'free from unnecessary intrusion by opposing parties and their counsel.'" *In re Student Finance Corp.*, 2006 U.S. Dist. LEXIS 86603, at *14 (quoting *Hickman*, 329 U.S. at 510-11). The privilege is

---

[13]     While Rule 26 (b)(3) technically protects only "documents and tangible things," federal courts have extended the privilege to both tangible and intangible work product, such as information that would otherwise be obtained through deposition. *See, e.g.*, *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at * 21-22.

designed to protect both attorneys and "the adversary trial process itself." *Coastal State*, 617 F.2d at 864, *cited by Rockwell Int'l Corp. v. United States Dep't of Justice*, 235 F.3d 598, 604-05 (D.C. Cir. 2001); *accord In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1371 (D.C. Cir. 1984).

### B. Discovery Of Opposing Counsel Is Disfavored.

Over sixty years ago, Justice Jackson observed that "[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Hickman*, 329 U.S. at 516 (Jackson, J. concurring). Accordingly, it is well-known that depositions of opposing counsel are disfavored.[14] *See Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir.1986). *See also Hickman*, 329 U.S. at 513 (discovery of opposing counsel would cause the "standards of the profession to suffer."). Discovery of opposing counsel "disrupts the adversarial system" and increases the "already burdensome time and costs of litigation." *Shelton*, 805 F.2d at 1327. "The time involved in preparing for and undergoing such depositions will disrupt counsels' preparation of parties' cases and thus decrease the overall quality of representation." *Evans v. Atwood*, No. CIV.A. 96-2746(RMU), 1999 WL 1032811, *3 (D.D.C. Sept. 29, 1999) (quoting *Kaiser v. Mutual Life Ins. Co. of N.Y.*, 161 F.R.D. 378, 381 (S.D. Ind. 1994)). Moreover, an attorney should be able to "prepare for litigation 'free from unnecessary intrusion by opposing parties and their counsel.'" *In re Student Finance Corp.*, 2006 U.S. Dist. LEXIS 86603, at *14 (quoting *Hickman*, 329 U.S. at 510-11).

In recognition of the presumption against discovery of opposing counsel, courts erect significant barriers to prevent the improper and unnecessary depositions of an adversary. *See*

---

[14]    Here, Defendants seek depositions of Plaintiffs' counsel's investigators. These agents of Plaintiffs' counsel enjoy enjoy the same protections from discovery by their opponents as counsel themselves. *United States v. Nobles*, 422 U.S. 225, 238-39 ("[A]ttorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents of the attorney as well as those prepared by the attorney himself.").

*Evans*, 1999 WL 1032811, *2.  The Eight Circuit has developed, and this Circuit follows, a three part test to determine whether the deposition of opposing counsel should even be permitted. The party seeking such discovery must demonstrate that (1) no other means exist to obtain the information; (2) the information sought is relevant and non-privileged; *and* (3) the information is crucial to the preparation of the case. *See Shelton,* 805 F.2d at 1327; *Evans*, 1999 WL 1032811, *2.

Defendants come before the Court requesting exactly what *Hickman* forbade: deposition testimony regarding information created by Plaintiffs' attorneys and their agents in investigating the facts underlying this case, including the facts contained in contemporaneous summaries and analyses of interviews with witnesses who purported to have knowledge of the conspiracy alleged in this action.  Defendants cannot meet any aspect of the three part test applicable to such an effort.  Here, all of the information sought is either protected work product or not sufficiently relevant to justify enforcement of the subpoenas.  They should thus be quashed.[15]

### C.  The Vast Majority Of The Information Sought is Core Protected Work Product.

Most of the subpoenas' specification should be quashed because they seek protected attorney work product.[16]  "The attorney work product privilege protects 'the files and the mental impressions of an attorney ... reflected, of course, in interviews, statements, memoranda, correspondence, briefs ..., and countless other tangible and intangible ways.'"  *Rockwell Int'l Corp.*, 235 F.3d at 604-05 (quoting *Hickman*, 329 U.S. at 510-11).  This privilege encompasses

---

[15]    Where a subpoena, such as this one, manifestly seeks information that is not subject to disclosure, the Court is well within its discretion to quash the subpoena in its entirety rather than attempt to excise a few permissible portions from the offensive whole. *See Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 54-5 (S.D.N.Y. 1996) (quashing a subpoena in its entirety, rather than modifying it, where more than half the requests were "vague, inexplicit and overbroad").

[16]    Specifically, topics 7-9, 11-12 and 14 should not be enforced on this basis.

"the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at * 13-14 (quoting *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991)).

The key question in the work product analysis is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re. Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (quoting *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987)). If the document was "prepared or obtained" in anticipation of litigation, and "the document embodies the mental impressions and thoughts of the attorney," the court should prevent discovery of that information. *Sec. & Exch. Comm'n v. R.J. Reynolds Tobacco, Holdings, Inc.*, No. 03-1651, 2004 U.S. Dist. LEXIS 24545, at *11 (D.D.C. June 29, 2004) (citing *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997)). Here, there can be no serious dispute that the information requested meets this standard.

It is undisputed that J&H and Cohen Milstein are representatives of the putative classes and the named Plaintiffs in this action. Moreover, the information was generated by investigators working on behalf of J&H and Cohen Milstein in preparation for the underlying litigations. The information is thus core work product not subject to disclosure.

*Student Finance* addresses circumstances strikingly similar to those at issue here. In *Student Finance*, the attorneys in a bankruptcy action hired Mintz to conduct an investigation into potential fraud by other players in the bankruptcy, in anticipation of litigation against those players. Career Path, the defendant in an adversarial action connected to the original bankruptcy, subpoenaed Mintz seeking those documents. Mintz, the attorneys who hired Mintz, and their

creditor client all moved for a protective order, arguing that the documents sought were protected work product.

The district court held that the documents prepared by The Mintz Group at the behest of the creditor's attorneys were protected work product. *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *35. The court held that the creditor and its attorneys could claim the work-product privilege because the subpoena sought "an investigative file prepared by [creditor's] attorneys in anticipation of litigation." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *35. "In essence, the subpoena seeks to compel discovery of an adversary's work product prepared in anticipation of litigation against the very party issuing the subpoena." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *35. The court reached this conclusion by considering the purposes of the work-product privilege articulated by the Supreme Court in *Hickman*: (1) "preventing discovery from chilling attorneys' ability to formulate their legal theories and prepare their cases"; (2) "preventing opponents from free-loading off their adversaries' preparation"; and (3) "preventing disruption of ongoing litigation." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *36.

Career Path's subpoena of Mintz, like the subpoenas at issue here, implicated all three *Hickman* factors. First, "[a]llowing a defendant in an adversary action ... to discover creditors' attorney work product would impair those attorneys' ability to investigate their clients' potential claims and to develop legal strategies." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *36. Second, "such discovery would also enable a defendant to utilize the creditors' investigation as his own and thereby free-ride on 'wits borrowed from the adversary.'" *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *36 (quoting *Hickman*, 329 U.S. at 517. Third, allowing discovery of this work product could disrupt the ongoing litigation by "sidetracking adversary actions into collateral proceedings...." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *36.

The reasoning of the court in *Student Finance* is persuasive, and compels the conclusion that the vast majority of the information at issue here is not subject to discovery. As in *Student Finance*, Plaintiffs' attorneys hired Mintz to investigate whether the facts supported filing lawsuits against the Defendants. Pursuant to this retention, and in anticipation of this litigation, Mintz gained extensive insight into Plaintiffs' case, including insight into the strengths and weaknesses of potential witnesses. These insights are ones the Defendants should have to develop themselves, after their own efforts to obtain facts from these witnesses, whose names they have been provided. To require Mintz to provide the knowledge about Plaintiffs' case that it has developed in its role as Plaintiffs' counsel's paralegal would turn the adversary system on its head, and "impair" counsels' "ability to investigate their clients' potential claims and to develop legal strategies." *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *36.

In addition, allowing discovery into Mintz's efforts would violate the first purpose of the work-product privilege as articulated in *Hickman*: it would chill attorneys' candor in discussing potential theories of the case with the agents they have hired to help them develop the strongest case for their clients. Moreover, the *Hickman* Court's well-documented concerns regarding potential free-riding are even more starkly presented here than in *Student Finance*, in which the party seeking to quash the subpoena was a creditor and the party seeking the documents was in litigation that might make it liable to the estate from which the creditor would be paid. *Student Finance*, 2006 U.S. Dist. LEXIS 86603, at *35. Defendants in these litigations seek information about an investigation that formed the basis for the lawsuits against them. If depositions into such subject matter were permitted to proceed, Defendants would have no incentive to conduct their own investigation, develop their own facts, and make their own credibility and relevance

16

determinations. Such a result is entirely inconsistent with an adversarial system of litigation and should not be permitted.

    1.    **The Information Sought Is Work Product Even Where Created Prior to Retention Of Counsel By A Named Class Representative.**

Defendants' sole argument in response to this straightforward work product analysis, presented during negotiations on this issue and in briefing before other courts, is that, because some of the information at issue was developed prior to a named plaintiff's retention of counsel in these litigations, it cannot be considered work product.

    a.    **The Plain Language of Rule 26(b)(3) Protects The Information Sought.**

Defendants' argument fails, first & foremost, because the information sought falls under the literal language of Rule 26(b)(3). Rule 26(b)(3) protects materials created "in anticipation of litigation by or for another *party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)*[.]" Fed. R. Civ. P. 26(b)(3) (emphasis added). J&H and Cohen Milstein are attorneys for "another party" (the named plaintiffs), and all of the information generated by Mintz was created "by or for" J&H and/or Cohen Milstein in anticipation of these very cases. The information is thus protected from disclosure under the plain text of the rule.

While the Court need go no further than the plain language of the Rule to reject Defendants' arguments, it bears noting that Plaintiffs' position, unlike Defendants' interpretation of the rule, is entirely consistent with the well-established proposition that the work product doctrine protects the interests of attorneys and the adversary system itself, in addition to – and separately from – the interests of parties. The doctrine protects "a complex of individual interests particular to attorneys that their clients may not share" including "the interests of

attorneys in their own intellectual product." *In re Sealed Case*, 676 F.2d 793, 809, n.56 (D.C. Cir. 1982).[17] Here, Cohen Milstein and J&H share an interest in protecting their investigative tactics and approaches from intrusion by opposing lawyers – many of whom, of course, are repeat adversaries in price-fixing litigation – and those lawyers' clients, who are our Plaintiffs' opponents in this litigation. This interest overlaps with, but is distinct from, that of the classes at issue. This interest merits withholding the information requested.

> **b.    Even if the documents at issue were not encompassed within the plain language of Rule 26(b)(3), they are protected by the federal common-law work product doctrine announced in *Hickman*.**

The policies articulated in *Hickman* also strongly support Plaintiffs' work product claim, and courts have expressed a willingness to apply the federal common-law work product doctrine announced in *Hickman* directly where Rule 26(b)(3)'s literal text proves insufficient to protect those policies. Indeed, it is widely recognized that the federal work-product doctrine announced by *Hickman* is only "*partially* codified into [Rule 26(b)]." *Hughley v. Art Institute of Chicago*, 981 F. Supp. 1123, 1128 (N.D. Ill. 1997). *Accord, In re Grand Jury Subpoenas*, 318 F.3d 379, 383 (2d Cir. 2003) ("codifies in part"); *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("partially codified").

The rationale of *Hickman* manifestly supports application of the work product doctrine to the information requested in Defendants' subpoenas. The information sought undoubtedly would reveal the investigative methods of Plaintiffs' counsel, and would permit Defendants' discovery into, among other things, Plaintiffs' counsel's opinion regarding the credibility of

---

[17]    Nor can Defendants' position be reconciled with the fact that the Supreme Court initially embraced the work product doctrine in part because Justices Jackson and Frankfurter could "conceive of no practice more demoralizing to the Bar than to require a lawyer to write out and deliver to his adversary an account of what witnesses have told him." *Hickman*, 329 U.S. at 516.

witnesses and the accuracy of their asserted knowledge of the facts alleged in the complaint.

Permitting this discovery also would allow Defendants to free-ride on Plaintiffs' efforts, rather

than conduct an investigation of their own. The rationale of *Hickman* is directly contrary to such

a result.

c.    **Protection of the documents at issue is necessary for meaningful private class-action enforcement of antitrust law.**

"Statutes should be interpreted to avoid untenable distinctions and unreasonable results

whenever possible." *Amer. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982). Here, if

Defendants' theory of the work product doctrine were accepted, private enforcement of the

antitrust laws on behalf of ordinary employees and consumers would be greatly impaired. This

result should not be permitted.

As the Supreme Court emphasized in *Hawaii v. Standard Oil Co.*:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. . . . By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'. . . Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

405 U.S. 251, 262, 266 (1972) (citation omitted).[18] Effective enforcement of the antitrust laws

by putative classes, however, requires that counsel be permitted to investigate antitrust violations

---

[18]    Other courts have commented on the central role class-action suits play in antitrust enforcement. *See, e.g. In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 238 (E.D.N.Y. 1998) ("Antitrust claims are well suited for class actions."); *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 38 (S.D.N.Y. 1977) (Clayton Act's "objectives cannot be fully realized if large numbers of potential claimants are not afforded an efficient and cost-effective method of vindicating their claims. The class action device is well-suited to afford the desired access."). This is particularly true where, as here, a price-fixing conspiracy is alleged. *See, e.g., In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005); *Plastic Cutlery*, 1998 U.S. Dist. LEXIS 3628, at *2 (E.D. Pa. March 20, 1998) ("Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing

on behalf of a putative class before a particular representative of that class is identified. This approach is necessary because, in many cases, the individuals harmed by a conspiracy – *i.e.*, the members of the putative class – are unaware that they have been victimized by a conspiracy prior to an investigation by counsel. Declaration of Michael Hausfeld ("Hausfeld Decl.") at ¶ 10.

As common sense suggests, most victims do not have the resources, expertise or incentive to investigate a suspected cartel. This is particularly so when the claim of a small business or a consumer has a potential value of just hundreds or thousands of dollars, but a sufficient investigation would cost many thousands or tens of thousands of dollars. *See* Hausfeld Decl. ¶ 8; *see, e.g., In re Playmobil*, 35 F. Supp. 2d at 238. In fact, sometimes a class-action lawsuit is the only way in which consumers would know of their rights at all, let alone have a forum for their vindication.") (citing *T.R. Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 520 (M.D. Ala. 1992)).

Here, the need for investigation by counsel prior to representation by a named representative is not mere conjecture. As Plaintiff Lisa Reed (the named plaintiff in the Chicago nurse wages compensation case) testified: "I had previously felt that something was happening. I had no concept of wage collusion going on, but I knew that for some reason our wages had been stagnated over the past several years. And I felt that was wrong. And I wanted to try to correct that." *See* Ex. H to Dean Decl., Excerpt from Deposition Transcript of Lisa Reed at p. 175. But for the investigation Plaintiffs' counsel directed, which is embodied in the information Defendants now seek, it is unlikely that Ms. Reed, or any other RN in the jurisdictions in question, would ever have learned that the reason their compensation levels remained low,

conspiracy[.]"); *Alabama v. Chevron USA, Inc.*, 1980 U.S. Dist. LEXIS 10616, at *3 (M.D. Ala. Jan.11, 1980) ("it is widely recognized that antitrust price-fixing cases are particularly suitable for class action treatment").

despite the serious shortage of RNs nationwide, is due to an illegal antitrust conspiracy by their employers.

Of course, these essential investigations into the claims of potential classes routinely generates significant work product before counsel formally is retained by a putative class representative.  In order to meaningfully conduct such investigations, the attorneys, investigators and economists conducting the investigation must be able to (a) promptly and confidentially record their information, thoughts and analysis in writing, so that the information can be reported to the firm accurately and in detail, and (b) record their information, thoughts and analysis completely, including in particular by spelling out both the favorable and unfavorable information and analysis.  Hausfeld Decl. ¶ 13.   Permitting discovery of this material would effectively prevent counsel from generating and retaining it, and thus as a practical matter make comprehensive and effective investigations of potential antitrust actions impossible.  Hausfeld Decl. ¶ 14.  This would significantly undermine the vital role that private class action suits play in the enforcement of the antitrust laws by chilling the ability of class counsel to conduct such investigations.  This Court should not adopt an interpretation of the work product doctrine that leads to such a result.

### D. The Few Materials Sought That Are Not Opinion Work Product Are Not Sufficiently Relevant to Justify Enforcement of The Subpoenas.

The few subpoena topics that do not seek protected work product are of insufficient relevance to justify the extraordinary intrusion of a subpoena to opposing counsel.[19]  For example, Defendants seek information regarding: "*Any* plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the [relevant area]

---

[19]    Specifically, topics 1-6, 13 and 15-17 should be quashed because they are of insufficient relevance to justify a subpoena to opposing counsel.

and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital with the [relevant area]." *See id.*, Topic 15 (emphasis added). Mintz does not appear to possess information on this topic and, to the extent it did, the organizational activities of the SEIU are irrelevant to the underlying question in these litigations, which is whether the Defendants conspired artificially to reduce the wages of their RNs.

Similarly, Defendants request information relating to "any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the [relevant area]." Ex. F to Dean Decl., Topics 11-13. As with the prior topic, while it is unlikely that the Mintz Group even possesses information regarding this issue, it also is unclear what possible relevance *other* potential legal actions against *other* defendants could possible have to the question whether Defendants fixed their RNs' wages. Information of such dubious relevance is not sufficiently essential to justify the extraordinary measure of a deposition of adversarial counsel.

### E. Defendants Can Obtain This Information Through Other Means.

Even if some small measure of the information here were not protected work product and were somehow relevant to the claim or defense of a party, Defendants have not and cannot demonstrate that the information cannot be obtained through less intrusive means than a deposition of counsel's investigators. Plaintiffs in all of the underlying actions have identified, to the extent required under any applicable orders bifurcating class and merits discovery, all of the witnesses with knowledge of the allegations of the complaints, including all of the witnesses interviewed by Mintz. Further, in jurisdictions where appropriate interrogatories have been propounded, Plaintiffs have identified the factual basis for their allegations, again including

whatever facts were obtained from the Mintz interviews. Plaintiffs also have identified the economic expert on which they have relied, Dr. Hank Farber, and will provide both his opinion and the materials underlying it in accordance with the schedule set by the Courts in the various jurisdictions, the requirements of Fed. R. Civ. P. 26(a)(2)(A), and a stipulation regarding the disclosure of expert evidence reached by the parties.

Defendants thus have all the tools necessary to conduct their own investigation. They can attempt to contact, interview or depose witnesses to the extent permitted by the Federal Rules. They can investigate the facts identified in Plaintiffs' interrogatory answers and develop their own view as to the strengths and weaknesses of Plaintiffs' case. They can, and surely will, depose Plaintiffs' economic expert and draw whatever conclusions regarding his work they deem appropriate. There simply is no basis for Defendants' request that they be permitted to use a deposition of Plaintiffs' investigators to short-cut their own counsel's preparation and piggyback on Plaintiffs' counsel's efforts. Defendants' subpoenas thus cannot meet the second prong of the test applicable to obtain discovery from opposing counsel any more than they can meet the first.

### F. The Information Sought Is Not Crucial to The Preparation Of Defendants' Case.

Defendants seek much information with little to no relevance to the claims or defenses in these lawsuits. *See* Fed. R. Civ. P. 26(b)(1) (defining scope of permissible discovery). Such information cannot be said to be so crucial to the preparation of Defendants' case that it justifies the intrusive subpoenas Defendants propose. For example, Defendants seek a significant amount of information relevant to the internal workings of the Mintz group, such as its structure and methodologies. *See, e.g.*, Ex. F to Dean Decl., Schedule A at Topic 1. They also seek information regarding the SEIU's organizational activities and any relationship between the SEIU and the nurse compensation litigations. *Id.* at Topics 15-16. Such information is not

relevant to whether Defendants' fixed RN wages, let alone crucial to the preparation of Defendants' case. To the extent Defendants insist that they need such information, they have demonstrated that they can obtain it from other means. Defendants have undertaken an extensive discovery campaign against the SEIU, including noticing nearly a dozen depositions of SEIU local and international officials and demanding the production of tens of thousands of documents from the SEIU international and affiliated locals around the country. Against this backdrop, there simply is no basis for discovery of such matters from counsel's investigators, who worked solely on behalf of Plaintiffs' counsel in anticipation of these litigations.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion to Quash should be granted.

Dated: November 4, 2007

Respectfully submitted,

Michael D. Hausfeld
Daniel A. Small
Charles E. Tompkins
Shelly L. Friedland
Kalpana Kotagal
Sharon K. Robertson
COHEN MILSTEIN HAUSFELD & TOLL,
P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: 202-408-4600; Fax: 202-408-4699

David P. Dean
Mary Joyce Carlson
JAMES & HOFFMAN
1101 17th Street, NW, Suite 510
Washington, D.C. 20036-4748
Tel: 202-496-0500; Fax: 202-496-0555

Thomas P. Dove

Kimberly A. Kralowec
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: 415-433-2070; Fax: 415-982-2076

Arnold Levin
Charles Schaffer
LEVIN,    FISHBEIN,    SEDRAN    &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Tel: 215-592-1500; Fax: 215-592-4663

Daniel E. Gustafson
Brian Williams
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: 612-333-8844; Fax: 612-339-6622

Mark Griffin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: 206-623-1900; Fax: 206-623-3384

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Lisa Reed and Mary McDowell, | ) |
| On behalf of themselves and all others | ) |
| similarly situated, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Advocate Health Care; Children's Memorial | ) |
| Hospital; Evanston Northwestern Healthcare | ) |
| Resurrection Health Care; University | ) |
| of Chicago Hospitals, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CERTIFICATE OF SERVICE

This is to certify that on this 4th day of November 2007, I served the foregoing upon the following via electronic mail or U.S. mail to the following:

**Edward W. Feldman**
Miller Shakman & Beem LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel: (312) 263-3700
efeldman@millershakman.com

**Michael L. Shakman**
Miller Shakman & Beem LLP
180 N. LaSalle St.
Suite 3600
Chicago, IL 60601
Tel: (312) 263-3700
mlshak@aol.com

**Martin T. Tully**
Katten Muchin Rosenman LLP
525 West Monroe Street
Suite 1600
Chicago, IL 60661
Tel: (312) 902-5200
martin.tully@kattenlaw.com

**Timothy F. Haley**
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
Tel: (312) 460-5000
thaley@seyfarth.com

**Tom H. Luetkemeyer**
Hinshaw & Culbertson LLP
222 North LaSalle Street
Suite 300
Chicago, IL 60601
Tel: (312) 704-3000
tluetkemeyer@hinshawlaw.com

**David Marx**
McDermott, Will & Emery LLP
227 West Monroe Street
#4400
Chicago, IL 60606-5096
Tel: (312) 372-2000
dmarx@mwe.com

**Margo L. Weinstein**
Sonnenschein, Nath & Rosenthal, LLP
233 South Wacker Drive
7800 Sears Tower
Chicago, IL 60606
Tel: (312)876-8000
mweinstein@sonnenschein.com

Shubha Chandra

# DECLARATION OF MICHAEL D. HAUSFELD

I, Michael D. Hausfeld, declare that I am a named partner in the law firm of

Cohen, Milstein, Hausfeld & Toll ("CMHT"). I am admitted to practice in the District of

Columbia. CMHT has been prosecuting five actions on behalf of plaintiffs and proposed

classes of Registered Nurses (RNs) in Albany, Chicago, Detroit, Memphis, and San

Antonio.[1] I submit this declaration in support of plaintiffs' Motion to Quash the

Subpoenas Directed at the James Mintz Group. Defendants seek, through these

subpoenas, to compel production of information that plaintiffs believe is protected from

discovery by the work product doctrine. I address the adverse consequences I would

expect to occur if counsel investigating potential antitrust violations before being retained

by a plaintiff could not protect their investigation from discovery in an ensuing lawsuit.

The statements contained herein are based upon my personal knowledge, and if called as

a witness I could testify competently thereto.

1.      I have 36 years of experience litigating class actions and other complex

litigation on behalf of plaintiffs and plaintiff classes, primarily in the antitrust area. I

have been appointed lead counsel by the court in numerous antitrust class actions. I am

the senior lawyer in CMHT's antitrust practice group and have been since the end of

1995.

2.      My work has been favorably recognized on many occasions. For

example, Chief Judge Edward Korman (E.D.N.Y.) described me as one of the two

"leading class action lawyers in the United States." I was named one of thirty master

---

[1]        These cases are captioned: *Fleischman v. Albany Medical Center* ("Albany"), No. 06-cv-0765
(JM/DRH) (N.D.N.Y); *Reed v. Advocate Health Care* ("Chicago"), No. 06-C-3569 (N.D. Ill.); *Cason-
Merendo v. Detroit Medical Center* ("Detroit"), No. 06-CV-15601-GER (W.D. Mich.); *Clarke, et al. v.
Baptist Memorial Healthcare Corp. et al.* ("Memphis"), No. 2:06-cv-02377-JPM (W.D. Tenn.); and
*Maderazo v. VHS San Antonio* ("San Antonio"), No. SA-06-CA-0535 OG (E.D. Tex., San Antonio Div).

negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiatiors*,
by Michael Benoliel, Ed.D. I have been recognized by *The National Law Journal* as one
of the "Top 100 Influential Lawyers in America." *The New York Times* referred to me as
one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has
listed me in several surveys as one of Washington's 75 best lawyers, saying that I
"consistently bring[] in the biggest judgments in the history of law" and that I am "a
Washington lawyer determined to change the world -- and succeeding." Most recently, I
was named by *Lawdragon* magazine as one of the 500 leading trial lawyers in the United
States.

3.     CMHT employs approximately 65 lawyers, about 25 of whom work in its
antitrust practice group. CMHT has been counsel of record, often in a leadership role, in
nearly all of the major antitrust class actions filed in the last two decades.

4.     I have been involved, directly or in a supervisory capacity, in hundreds of
pre-filing investigations in which CMHT, sometimes working with an economist and/or
investigators, attempts to determine whether sufficient information concerning a
suspected antitrust violation exists to warrant the filing of an antitrust claim.

5.     Most of the antitrust cases CMHT has brought allege collusion among
competitors, usually to fix prices and/or allocate markets. Because such collusion can
violate the antitrust laws and subject the perpetrators to criminal sanctions, including
incarceration, as well as civil penalties, treble damages, and harm to their relationship
with customers and others, conspirators have every reason to keep their conspiracy secret.
In my experience, they have in fact gone to great lengths to do so. Thus, antitrust
conspiracies are difficult to detect.

6.      My firm learns of suspected conspiracies in a few different ways. Often, we become aware of a potential antitrust violation through government action. When the Antitrust Division of the Department of Justice or another government enforcement authority launches an investigation, indicts a defendant or files a civil action, it publicly announces the event, and CMHT often then commences its own investigation. Potential violations are also brought to our attention through private litigation by one type of plaintiff (such as a competitor of the defendant), leaving open the possibility that the firm might represent another type of plaintiff (such as customers of the defendant). Occasionally, academic articles studying a market identify the possibility of collusion. On other occasions, participants in a market who suspect or know of collusion in that market will disclose their information to CMHT. And, from time to time, other law firms with information about a suspected cartel will approach us to assist in the investigation and/or litigation of the matter.

7.      Thus, just to learn of the *possibility* of collusion requires CMHT (a) to carefully monitor government enforcement activities, civil dockets and antitrust and economics literature, and (b) to develop and maintain a reputation as an effective antitrust class action law firm, so as to attract approaches from other law firms and from lay persons with knowledge of suspected antitrust violations. I believe that most victims of price-fixing conspiracies, especially victims who are individuals or small businesses, do not engage in such efforts, for two interrelated reasons. First, the chances are small that anyone has detected or even suspected the conspiracy. Second, the benefit to victims of engaging in the kind of efforts CMHT engages in are also small, given that most of them have small claims relative to the cost of attempting to identify potential collusion.

8.    Once a suspected cartel is brought to our attention, CMHT often undertakes a substantial investigation to determine whether Fed. R. Civ. P. 11 is satisfied and whether the case is worth the investment required to litigate it. As mentioned above, CMHT commonly retains an expert or an investigator to assist in its investigation, and assigns one or more paralegals and attorneys to the investigation. Common sense suggests that most victims do not have the resources, expertise or incentive to investigate a suspected cartel. This is particularly so when the claim of a small business or a consumer has a potential value of just tens or hundreds or thousands of dollars, but a sufficient investigation would cost many thousands or tens of thousands of dollars.

9.    If, after investigating a suspected antitrust violation, CMHT concludes that the facts and law would support the filing of a claim, CMHT normally then so advises lawyers who may have clients or family or friends who were injured by the violation. If a client or clients of the contact lawyer express interest, the lawyer then discusses the pros and cons of proceeding with a lawsuit, and the client makes the ultimate decision whether to initiate an action.

10.    In sum, my experience indicates that most antitrust conspiracies are discovered through investigation by the government or by plaintiffs' class action firms, but not by victims of the conspiracy. Thus, I believe class action firms, along with the government, serve the public good by discovering conspiracies that harm our free enterprise systems, so that litigation can be brought to end the conspiracy, compensate the victims and deter future antitrust violations.

11.    As described above, CMHT's goal in conducting an antitrust investigation is to determine whether the facts and law support the filing of a claim. That

determination is critical to the firm, which in addition to paying for the pre-filing

investigation, advances the time and out-of-pocket expenses of representing plaintiff

classes on a contingent basis. The firm often expends well over a million dollars, and

sometimes several millions of dollars, in time and out-of-pocket costs to litigate an

antitrust case, even when it associates with co-counsel. The cost of investigating a

potential claim can only be recovered if a case is brought and a classwide recovery is

achieved, and the huge additional cost of litigating a class action can only be recovered if

the class obtains a recovery.

      12.     In addition to being critical, the decision whether to recommend the filing

of an antitrust action is often difficult, requiring efforts to understand a complex industry

and sometimes conflicting or incomplete information, as well as possibly difficult legal

or economic issues.

      13.     Because of the importance and difficulty of deciding whether to

recommend the commencement of an antitrust action, it is essential that the investigating

firm get the full benefit of all investigative efforts. That means that the attorneys,

investigators and economists conducting the investigation must be able to (a) promptly

and confidentially record their information, thoughts and analysis in writing, so that the

information can be reported to the firm accurately and in detail, and (b) record their

information, thoughts and analysis *completely*, including in particular by spelling out

both the favorable and unfavorable information and analysis. Receiving and evaluating

all favorable and unfavorable information is the best means to assure that the most

sensible and supportable decision will have been made in connection with any litigation

recommendation.

14.    If CMHT knew or believed that the information obtained and analysis performed by its investigators, attorneys and economists in the course of an antitrust investigation would -- or likely would -- be subject to discovery by the defendants in a resulting lawsuit, CMHT would need to alter this practice. The prospect that such investigatory materials would be subject to discovery by defendants would chill the entire process. Potential witnesses who would otherwise be willing to provide information would probably hesitate or decline to do so. Investigators might be prone to selectively incorporate into their reports only that information which they believed would be favorable to the investigation, and economists would be prone to being less candid in examining different market iterations, both as to liability and damages, for fear that works or thoughts in progress might be used against them.

15.    In all, the potential for pre-filing investigatory work being made available to defense counsel and defendants after the filing of a complaint would almost certainly result in less candid disclosures, examinations and evaluations. This would inevitably lead to having less, rather than more, accurate information about the merits of a potential claim and impede appropriate recommendations on litigation filings.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on November 2, 2007 in Washington, D.C.

Michael D. Hausfeld

## DECLARATION OF DAVID P. DEAN

I, David Palmer Dean, declare as follows,

1.      I am a member of the law firm of James & Hoffman, P.C. ("J&H") and have served as co-lead counsel for Plaintiffs in the lawsuits in which the subpoenas addressed herein have issued. I submit this Declaration, together with the attached exhibits, in support of Plaintiffs' Motion to Quash Subpoenas Directed at the Mintz Group.  This Declaration supplements certain facts set forth in the Revised Declaration of Mary Joyce Carlson ("Carlson Declaration") filed on July 13, 2007, in *Fleishman v. Albany Medical Center*, No. 06-cv-0765 (JM/DRH) (N.D.N.Y), attached as Exhibit A to this Declaration.

2.      Beginning in or about January 2005, J&H undertook a litigation project under J&H's direction and control, but financed by and in collaboration with the Service Employees International Union ("SEIU"), to develop potential class action law suits by nurses in multiple regional markets challenging hospitals for colluding to suppress nurse wages.

3.      In May 2005, SEIU financed the retention of an economic consulting firm, Ashenfelter & Ashmore ("A&A"), to perform econometric analyses identifying the nurse labor markets most strongly exhibiting the indices of employer collusion, a supporting project directed by Princeton economics Dr. Henry Farber.  Dr. Farber's expert analysis was carried out under J&H's direction and control as part of the litigation project.

4.      In October 2005, after receiving the work of the expert economic consultants, J&H retained an investigative firm, the James Mintz Group, Inc. ("Mintz"), on behalf of the SEIU expressly to provide investigative services to assist J&H in rendering legal advice to the SEIU on possible collusion by hospital employers in violation of the antitrust laws, and also in anticipation of class action litigations on behalf of nurses in several labor markets against hospital employers, utilizing the results of the investigation.

5.      Although Mintz began its investigation in late October, the parties only reached agreement on final terms for the engagement in February 2006, when they signed a formal retainer.

6.      Mintz conducted its investigation under the direction and control of J&H and, beginning in or about November 2005, also Cohen Milstein, Hausfeld and Toll ("Cohen Milstein").    Attached as Exhibit B is the Declaration of Chris Weil, the senior investigator at Mintz responsible for the investigation, previously filed in opposition to a motion to compel production of Mintz materials in *Reed v. Advocate Health Care* ("Chicago"), No. 06-C-3569 (N.D. Ill.).

7.      This Mintz investigation continued until shortly before the filing of the lawsuits underlying these subpoenas in June 2006.  Prior to those filings, but after the Mintz investigation was begun, Cohen Milstein and J&H were retained by representative plaintiffs in each of the jurisdictions where substantial evidence of a conspiracy to suppress nurse wages uncovered by the investigation has led to litigation.  .

8.      In concert with Mintz personnel, Plaintiffs' counsel developed and approved the scripts that Mintz utilized when interviewing hospital employees.

9.      The interview notes and memos created by Mintz were not transcriptions.  Rather, Mintz determined, based on Plaintiffs' counsel's instruction, what information would be relevant and useful in light of the ongoing investigation and potential lawsuits.

10.     Mintz's interviews and documents were intended to be used – and actually have been used – only in connection with these litigations.  Mintz assisted J&H in providing legal advice to the SEIU simply by providing a basis for advising SEIU as a third party payor on whether and where to support sound litigation.

11.      Attached as Exhibit A is a true and correct copy of the Revised Declaration of Mary Joyce Carlson filed on July 13, 2007, in *Fleishman v. Albany Medical Center*, No. 06-cv-0765 (JM/DRH) (N.D.N.Y.).

12.      Attached as Exhibit B is a true and correct copy of the Declaration of Chris Weil filed on October 29, 2007 in *Reed v. Advocate Health Care* ("Chicago"), No. 06-C-3569 (N.D. Ill.).

13.      Attached to as Exhibit C is a true and correct copy of the Department of Justice Guidelines.

14.      Attached as Exhibit D are true and correct copies of the Albany, Chicago, Detroit, Memphis and San Antonio Complaints.

15.      Attached as Exhibit E is a true and correct copy of the Mintz Retainer Agreement.

16.      Attached as Exhibit F are true and correct copies of the Mintz Deposition Subpoenas.

17.      Attached as Exhibit G is a true and correct copy of the Transcript of Proceedings before Magistrate Judge Homer on May 16, 2007 in the matter of *Fleischman v. Albany Medical Center*, No. 06-cv-0765 (JM/DRH) (N.D.N.Y.).

18.      Attached as Exhibit H is a true and correct copy of excerpts from the Redacted Deposition Transcript of Lisa Reed, Named Plaintiff in *Reed v. Advocate Health Care*, No. 06-C-3569 (N.D. Ill.), dated June 25, 2007.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on ___11\2___, 2007 at ___Worly___, ___DC___

David Palmer Dean

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| Wendy Fleischman and Cindy Cullen, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. : 06-CV-765 |
| v. | ) | (THM/DRH) |
| | ) | |
| Albany Medical Center; Ascension Health, Inc.; Catholic Health East; Ellis Hospital; Northeast Health; Seton Health System; St. Peter's Health Care System, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>Revised Declaration of Mary Joyce Carlson</u>

I, Mary Joyce Carlson, declare as follows,

1.     I am of counsel to the law firm of James & Hoffman, P.C. ("J&H") and counsel for

Plaintiffs in the above captioned litigation. J&H partner David Dean is a lead counsel.

2.     Defendant hospitals have filed with the Court a ten page letter dated May 10 requesting

that the Court order the production of certain documents from Plaintiffs' privilege log

that are designated as attorney work product. Defendants' letter appends various highly

selective documents (including drafts not identified as such) from the document

productions in several related litigations, without offering testimonial support or

accurate factual context for the documents. Defendants also request an order that

Plaintiffs' attorneys cease instructing the Service Employees International Union

("SEIU"), the Mintz Group and Barbara Bergmann to withhold certain documents based

on the attorney work product privilege (even though Plaintiffs' attorneys have not

instructed Ms. Bergmann to withhold any documents from production in this litigation

on that basis). I offer this Declaration in support of Plaintiffs' Opposition to those requests and to provide the necessary factual context to evaluate Defendants' requests and appended documents.

3.    In short, as detailed below, each of the documents or relevant portions of documents designated attorney work product and listed on Plaintiffs' Privilege Log (attached as Exhibit 1 to this Declaration) was created by or for attorneys currently seeking to represent the class of Albany-area hospital Registered Nurses (RNs) in the above captioned litigation. Each designated document or document portion was created exclusively because of this anticipated litigation in Albany, or because of anticipated nurse wage-fixing litigations in several metropolitan areas collectively that included Albany.

4.    In general, the documents sought by Defendants comprise the pre-filing investigation, including legal, economic and factual analysis and research, for claims under the Sherman Act on behalf of a class of hospital RNs who were employed by colluding hospitals in the Albany metropolitan labor market. None of the documents would have been created in substantially similar form (or at all) but for the prospect of nurse wage-fixing litigations against those hospitals, and colluding hospitals in other jurisdictions, for agreeing to exchange detailed nurse wage information and agreeing to fix nurse wages.

5.    Defendants fail to mention that Plaintiffs, the SEIU and Professor Bergmann have already produced to defendants in these nurse wage litigations many thousands of pages of documents and databases created by the SEIU, by the Institute for Women's Policy Research ("IWPR"), by the Feldman Group and by Professor Bergmann. Many of those documents were created in preparation for and in pursuit of a parallel SEIU public

communications campaign on nurse wages. The difference between those documents and the ones at issue here are simply that the documents currently designated work product on the Albany Log exist only because of the anticipated litigation.

HISTORY OF THE DEVELOPMENT OF THE NURSE WAGE LITIGATIONS:

6.    In or about July 2004, SEIU received a copy of a draft article by Professor Barbara Bergmann, "Mystery of the Nurse Shortage" (attached as Exhibit 2). The article argued that the continuing nurse shortage in the U.S. was likely the result of collusion on nurse wages among hospitals in metropolitan areas, facilitated by area hospital organizations. Professor Bergman focused in part on a consent decree from a 1996 federal antitrust case in Utah concerning hospital exchanges of nurse wage information and subsequent Department of Justice ("DOJ") and Federal Trade Commission guidelines nationalizing the consent decree.

7.    The Nurse Alliance of SEIU, a national organization of nurses that was at that time focused on legislative and lobbying work to improve professional and patient care standards, found Professor Bergmann's thesis credible -- based on nurses' own experience of flat, relatively stagnant wages within some metropolitan areas, even in the face of the nurse shortage; based on comments made by hospital management across the table in some collective bargaining situations; based on industry "scuttlebutt" indicating that hospital exchanges of detailed wage information was commonplace despite the DOJ guide lines; and based on Professor Bergmann's own anecdotal accounts.

8.    After a period of analysis and review, the Nurse Alliance decided to follow up on Ms. Bergmann's thesis in two distinct ways: (1) through a public communication campaign, carried on by the Nurse Alliance and the Union's organizing department in the normal course of their activities; and (2) through separately supporting the development of

potential class action law suits by nurses in regional markets challenging hospitals for colluding to suppress nurse wages, initially through legal and economic analysis and then factual research, all under the direction and control of J&H.

9.    In February 2005, J&H, on SEIU's behalf, entered into negotiations with IWPR, on whose advisory Board Professor Bergmann sits, to explore whether IWPR should be engaged on two distinct but related research projects:  (1) research to support a national communication campaign on nurse wage issues; and (2) research to support a series of nurse-wage class-action antitrust litigations.   J&H, on SEIU's behalf, entered into a letter agreement with IWPR on February 4' 2005 to preserve the confidentiality of those negotiations (attached as Exhibit 3).   While the parties reached agreement on the former project, IWPR was not engaged to do research in support of the latter, litigation project.

10.    In or about April 2005, SEIU signed a retainer agreement with IWPR directly (attached as Exhibit 4) that provided for a comprehensive public communications report on nurse wages and an economic analysis focusing on the relation between unionization and nurse wages.   The retainer also incorporated the possibility that IWPR might confidentially comment on separate economic research undertaken by another firm in anticipation of antitrust litigations, under the direction and control of J&H.   Although the parties had ultimately rejected the possibility that IWPR provide primary research in support of antitrust litigations, the earliest documents on Plaintiffs' Privilege Log stem from J&H's proposal to IWPR outlining its legal analysis and specifying the required research tasks flowing from J&H's own conceptualization of the likely claims and evidence in the case, along with IWPR's detailed responses and proposals.   See Exhibit 1, Item Nos. 82, 86, 115, 116 and 117.

11.   In April 2005, J&H entered into negotiations with another group of economists to provide the required litigation support, reaching agreement on preliminary terms on April 15 (attached as redacted pursuant to the parties' stipulation on experts as Exhibit 5) -- and resulting in a retainer agreement between SEIU and that firm in May 2005 for a "Nurse Wage Litigation Support Project." This firm of experts was engaged to perform economic analyses exploring evidence of antitrust conspiracies in certain Metropolitan Statistical Areas, including Albany. Pursuant to the retainer, the work was carried out under the direction and control of J&H and SEIU in anticipation of antitrust litigations on behalf of nurses in the affected markets and, secondarily, to assist J&H in providing legal advice to the SEIU on the viability of these litigations in SEIU's role as third party payor for some suit fees and expenses. The SEIU allowed IWPR to use one underlying calculation by these experts in a table in the IWPR's public Report, citing an "unpublished [SEIU] analysis of 2003 data from the American Hospital Association's Annual Survey of Hospitals and the Center for Medicare and Medicaid Medicare Cost Reports and Historical Impact Files." (IWPR's report is attached as Exhibit 11). In addition, SEIU apparently considered a ranking of cities by the experts in prioritizing cities for its own internal research in support of its public campaign on nurse wages and of this litigation.

12.   Plaintiffs have currently retained these experts as consultants and, potentially, as testifying experts and so, pursuant to a stipulation among the parties concerning expert discovery, the documents created by the firm in 2005 and 2006 under the May 2005 agreement are not listed on Plaintiffs' privilege log. However, comments for J&H by IWPR on a draft report by these experts is listed on the Log at 141. Documents created by J&H but incorporating the expert's analysis are listed at 113 and 114 on the Log.

13.    Professor Bergmann also commented on these experts' work as listed at item 81 on the

Log.   In November 2004 and June 2005, the SEIU had entered formal retainer

agreements with Professor Bergmann to assist the SEIU in publicizing the artificial

ceiling on nurse wages through its national communication campaign, and also in

further developing facts and avenues of research in support of litigation to end the

artificial ceiling on nurse wages (attached as Exhibits 6 and 7).   The initial retainer

provided that her work would occur under my guidance; the second agreement provided

that an SEIU official would provide general guidance but that any portion of her work

that exclusively involved litigation development would be carried out under the

direction and control of J&H.   Aside from commenting on proposals or work from the

expert firm, Ms. Bergmann's only work that occurred under the direction and control of

J&H occurred in connection with J&H's retention of private investigators in October

2005, discussed below, to follow up on the work by the expert economic consultants and

SEIU's earlier research.   Documents authored by her in this role are listed as Items 87

and 88 on the Log.   Professor Bergmann continued to consult with J&H in this role

through approximately April 2006.   Plaintiffs have not directed Professor Bergmann to

withhold any documents in Albany.   Rather, the SEIU and Bergmann productions in

Chicago appear to contain multiple documents concerning her role consulting on

SEIU's public campaign, factual research and publications.

14.    In October 2005, after receiving the work of the expert economic consultants, J&H

retained an investigative firm, the Mintz Group, on behalf of the SEIU expressly "to

provide investigative services to assist J&H in rendering legal advice to the SEIU on

possible collusion by hospital employers in violation of the antitrust laws, and also in

anticipation of class action litigations on behalf of nurses in several labor markets

against hospital employers, utilizing the results of the investigation." Although the Mintz Group began its investigation in late October, the parties only reached agreement on final terms for the engagement in February 2006, when they signed a formal retainer (attached as Exhibit 8).

15.    The Mintz Group conducted its investigation under the direction and control of J&H and, beginning in or about November 2005, also Cohen Milstein, Hausfeld and Toll ("CMHT"). Documents generated by the Mintz Group during its investigation are listed on the privilege log at 9-31, 50, 55, 84, 118-24. As noted by Defendants, the Mintz Group misdirected its first bill to me at an SEIU address. But, as Defendants well know but omit mentioning (since SEIU produced redacted versions of all the Mintz bills in its Chicago production), every subsequent bill was sent directly to J&H.

16.    The work product of the Mintz Group has been utilized exclusively for the nurse wage litigations. Plaintiffs' counsel shared none of the Mintz work product listed on Plaintiff's Privilege log with SEIU personnel before filing the Complaint in this case. Only after SEIU received a subpoena from Defendants in this case did J&H provide SEIU's outside counsel for responding to discovery in this litigation, Bredhoff & Kaiser ("BK"), copies of Mintz work product generated before any representative plaintiff had retained J&H -- with the understanding that SEIU and BK would protect the documents as work product. The DC ethical rules have been construed by the DC Bar very broadly to require a lawyer to provide a former client a "copy [of] any document possessed by the lawyer *relating to the representation*, unless substantial grounds exist to refuse". See, e.g., D.C. Bar Op. 333. Because the Mintz work product informed J&H's advice to SEIU on the viability of the litigations in its role as third party payor; because SEIU and BK were willing to treat the material as Plaintiffs' counsel's work product; and because

J&H did not wish to frustrate legitimate discovery in this case, J&H disclosed the documents to BK.

17.    As counsel began drafting a complaint, counsel made specific inquiries to the SEIU research department concerning the interpretation of certain public data sources. Plaintiffs are withholding those inquires and certain responses to those inquires to the extent those responses tend to reveal the inquiring attorney's legal analysis or opinion. Ex. 1 Items 39, 53-4, 92, 96-7, 99.    Plaintiffs did not withhold responses from SEIU's research department that do not reveal an attorney's legal analysis or opinion.

18.    As individual representative nurse plaintiffs retained J&H and CMHT in March through October 2006, SEIU became solely a third party payor as to some fees and expenses for litigations in San Antonio, Chicago, Memphis, Albany and Detroit.    That relationship was later confirmed and generally formalized in an October 2006 letter agreement (attached as Exhibit 9).    Such support is fully consistent with J&H's representation of the Plaintiffs and other members of the putative nurse class.    The SEIU has agreed not to make any demands on J&H concerning the litigations or otherwise interfere with J&H's professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. If the Plaintiff class prevails, J&H will reimburse SEIU for its payments and pay a certain share of its fees into a segregated litigation fund maintained at the SEIU by its General Counsel and Associate General Counsel and dedicated by the SEIU Executive Board by resolution dated January 11, 2006, to the sole purpose of providing legal representation as permitted by applicable laws and legal ethics. See Exhibit 10.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on _7/13_, 2007 at _Washington, DC_

_Mary Joyce Carlson_
Mary Joyce Carlson

# EXHIBIT B

## DECLARATION OF CHRISTOPHER WEIL

1.    My name is Christopher Weil.  I am employed as a senior investigator
      for the James Mintz Group, Inc. ("The Mintz Group") and have worked
      for The Mintz Group for over seven years.

2.    In October 2005, The Mintz Group was retained by the law firm James
      & Hoffman to conduct a pre-filing investigation into possible collusion
      on nurse wages among hospitals in various metropolitan areas, in
      anticipation of class action litigations on behalf of nurses against
      hospital employers in those markets and to assist the law firm in
      rendering legal advice to the Service Employees International Union
      with respect to its decision whether to fund the anticipated litigation.

3.    Beginning in November 2005, James & Hoffman involved the law firm
      Cohen, Milstein, Hausfeld and Toll ("Cohen Milstein") in the
      investigation.  Cohen Milstein lawyers thereafter participated in
      supervising the Mintz Group's efforts  to acquire information.

4.    This Mintz Group nurse wage investigation was conducted exclusively
      under the direction and supervision of lawyers from the law firms James
      & Hoffman and/or Cohen Milstein.  The Mintz Group's nurse wage
      investigation was conducted for the lawyers in anticipation of class
      action litigation on behalf of nurses against hospital employers.

5.    In my capacity as case manager for The Mintz Group's nurse wage
      investigation, I took direction from and reported to David Dean of

James & Hoffman and, to a lesser extent, other lawyers from James & Hoffman and Cohen Milstein.

6.    Throughout The Mintz Group's pre-filing nurse wage investigation, I communicated and discussed The Mintz Group's findings solely with (1) David Dean at James & Hoffman and Professor Barbara Bergmann in meetings where Mr. Dean was present; and (2) on occasion other counsel at James & Hoffman and Cohen Milstein, including Mary Joyce Carlson of James & Hoffman and Dan Small of Cohen Milstein.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER THIS AFFIANT SAYETH NOT

Christopher Weil

October 26 2007

# EXHIBIT C

## 6. STATEMENT OF DEPARTMENT OF JUSTICE AND FEDERAL TRADE COMMISSION ENFORCEMENT POLICY ON PROVIDER PARTICIPATION IN EXCHANGES OF PRICE AND COST INFORMATION

### Introduction

Participation by competing providers in surveys of prices for health care services, or surveys of salaries, wages or benefits of personnel, does not necessarily raise antitrust concerns. In fact, such surveys can have significant benefits for health care consumers. Providers can use information derived from price and compensation surveys to price their services more competitively and to offer compensation that attracts highly qualified personnel. Purchasers can use price survey information to make more informed decisions when buying health care services. Without appropriate safeguards, however, information exchanges among competing providers may facilitate collusion or otherwise reduce competition on prices or compensation, resulting in increased prices, or reduced quality and availability of health care services. A collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel.

This statement sets forth an antitrust safety zone that describes exchanges of price and cost information among providers that will not be challenged by the Agencies under the antitrust laws, absent extraordinary circumstances. It also briefly describes the Agencies' antitrust analysis of information exchanges that fall outside the antitrust safety zone.

### A. *Antitrust Safety Zone:* Exchanges Of Price And Cost Information Among Providers That Will Not Be Challenged, Absent Extraordinary Circumstances, By The Agencies

The Agencies will not challenge, absent extraordinary circumstances, provider participation in written surveys of (a) prices for health care services,[15] or (b) wages, salaries, or benefits of health care personnel, if the following conditions are satisfied:

(1) the survey is managed by a third-party (*e.g.*, a purchaser, government agency, health care consultant, academic institution, or trade association);

(2) the information provided by survey participants is based on data more than 3 months old; and

(3) there are at least five providers reporting data upon which each disseminated statistic is based, no individual provider's data represents more than 25 percent on a weighted basis of that statistic, and any information disseminated is sufficiently aggregated such that it would not allow recipients to identify the prices charged or compensation paid by any particular provider.

The conditions that must be met for an information exchange among providers to fall within the antitrust safety zone are intended to ensure that an exchange of price or cost

data is not used by competing providers for discussion or coordination of provider prices or costs. They represent a careful balancing of a provider's individual interest in obtaining information useful in adjusting the prices it charges or the wages it pays in response to changing market conditions against the risk that the exchange of such information may permit competing providers to communicate with each other regarding a mutually acceptable level of prices for health care services or compensation for employees.

## B. The Agencies' Analysis of Provider Exchanges Of Information That Fall Outside The Antitrust Safety Zone

Exchanges of price and cost information that fall outside the antitrust safety zone generally will be evaluated to determine whether the information exchange may have an anticompetitive effect that outweighs any procompetitive justification for the exchange. Depending on the circumstances, public, non-provider initiated surveys may not raise competitive concerns. Such surveys could allow purchasers to have useful information that they can use for procompetitive purposes.

Exchanges of future prices for provider services or future compensation of employees are very likely to be considered anticompetitive. If an exchange among competing providers of price or cost information results in an agreement among competitors as to the prices for health care services or the wages to be paid to health care employees, that agreement will be considered unlawful per se.

<p style="text-align:center">***</p>

Competing providers that are considering participating in a survey of price or cost information and are unsure of the legality of their conduct under the antitrust laws can take advantage of the Department's expedited business review procedure announced on December 1, 1992 (58 Fed. Reg. 6132 (1993)) or the Federal Trade Commission's advisory opinion procedure contained at 16 C.F.R. 1.1-1.4 (1993). The Agencies will respond to a business review or advisory opinion request on behalf of providers who are considering participating in a survey of price or cost information within 90 days after all necessary information is submitted. The Department's December 1, 1992 announcement contains specific guidance as to the information that should be submitted.

---

[15.] The "prices" at which providers offer their services to purchasers can take many forms, including billed charges for individual services, discounts off billed charges, or per diem, capitated, or diagnosis related group rates.

# EXHIBIT D

Receipt Number

55 1967

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDO and
JEFFREY A. SUHRE on behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

DETROIT MEDICAL CENTER, HENRY FORD HEALTH
SYSTEM, MCLAREN HEALTH CARE CORP, d/b/a
Mount Clemens Regional Medical Center, f/k/a
Mount Clemens General Hospital,
ST. JOHN HEALTH PARTNERS, OAKWOOD
HEALTHCARE INC., BON SECOURS COTTAGE
HEALTH SERVICES,

Defendants.

Case: 2:06-cv-15601
Assigned To: Rosen, Gerald E
Referral Judge: Majzoub, Mona K
Filed: 12-15-2006 At 08:37 AM
cmp CASON-MERENDO, ET AL V. DETROIT
MEDICAL CENTER, ET AL (TAM)

**CLASS ACTION COMPLAINT**
**JURY TRIAL REQUESTED**

Plaintiffs Pat Cason-Merendo and Jeffrey A. Suhre ("Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

*Nature of the Action*

1.     Defendants, which own and operate hospitals in the Detroit-Warren-Livonia Metropolitan Statistical Area ("Detroit MSA" or "Detroit area"), have for years conspired among themselves and with other hospitals in the Detroit MSA to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation

each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Detroit-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.     Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Detroit-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Detroit MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Detroit MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.     Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

*PARTIES*

7.     Plaintiff Pat Cason-Merendo is an RN who has been employed by Detroit Medical Center since November 2002 and currently resides within the Detroit MSA.

8.     Plaintiff Jeffrey A. Suhre is an RN who has been employed by Providence Hospital since November of 2002 and currently resides within the Detroit MSA.

9.     St. John HealthPartners ("St. John Health") is a member of Ascension Health and is comprised of numerous hospitals and medical facilities in southeast Michigan.  St. John Health's principal place of business is located at 28000 Dequindre, Warren, Michigan 48092.

10.     Ascension Health is a Missouri corporation with its principal place of business located at 4600 Edmundson Road, St. Louis, Missouri 63134.  Ascension Health is a parent corporation for health care systems and hospitals throughout the United States. It has affiliate hospitals and hospital systems throughout the United States and within the Detroit MSA, including St. John HealthPartners.

11.     St. John HealthPartners is a Michigan Corporation which owns and operates a number of hospitals located in the Detroit MSA including, but not limited to:  St. John Detroit Riverview Hospital, a 285 bed hospital located at 7733 East Jefferson, Detroit, Michigan 48214; St. John Hospital and Medical Center, a 607 bed facility located at 22101 Moross Road, Detroit, Michigan 48236; St. John River District Hospital, a 68 bed facility located at 4100 South River Road, East China, Michigan 48054; St. John North Shores Hospital, a 96 bed facility located at 26755 Ballard Street, Harrison Township, Michigan 48045; St. John Oakland Hospital, a 210 bed hospital located at 27351 Dequindre Road, Madison Heights, Michigan 48071; Providence Hospital, a 384 bed hospital located at 16001 West Nine Mile Road, Southfield, Michigan 48075; Brighton Hospital, a 92 bed hospital located at 12851 East Grand River Avenue, Brighton, Michigan 48116; and St. John Macomb Hospital, a 376 bed facility located at 11800 East Twelve Mile, Warren, Michigan 48093.  It is estimated that over 3,000 RNs are employed through St. John Health hospitals.

- 3 -

12.    Defendant Henry Ford Health System ("Henry Ford Health") is a Michigan corporation with its principal place of business located at 1 Ford Place, Detroit, MI 48202. Henry Ford Health earns $3.05 billion in revenues annually, and $112 million in net income in 2005. *See* http://www.henryford.com/body.cfm?id=37460&oTopID=0.  Henry Ford Health owns and operates health care facilities within the Detroit MSA which include, but are not limited to:  Henry Ford Hospital, a 903 bed hospital located at 2799 W. Grand Blvd., Detroit, Michigan 48202; Henry Ford Wyandotte Hospital, a 344 bed hospital located at 2333 Biddle Avenue, Wyandotte, Michigan 48192; Henry Ford Bi-County Hospital, a 203 bed hospital located at 13355 East Ten Mile Road, Warren, Michigan 48089; Kingswood Hospital, a 100 bed hospital located at 10300 West Eight Mile Road, Ferndale, Michigan 48220.

13.    Henry Ford Health represents that it employs over 3,000 RNs in its various hospitals. http://www.henryford.com/body.cfm?id=38768.

14.    Bon Secours Cottage Health Services is a joint venture between Bon Secours Health System of Marrriottsville, MD, and the Henry Ford Health System.  Bon Secours Cottage Health System is headquartered at 468 Cadieux Road, Grosse Pointe, MI 48230. Bon Secours Cottage Health Services, operates Cottage Hospital located at 159 Kercheval Avenue, Grosse Pointe Farms, Michigan 48236 and Bon Secours Hospital located at 468 Cadieux Road, Grosse Pointe, Michigan 48230.  These hospitals have a collective 175 bed capacity.

15.    Defendant Detroit Medical Center ("Detroit Medical") is a Michigan corporation with its principal place of business located at 3663 Woodward Avenue, Suite 200, Detroit, Michigan 48201 and Corporate Offices at DMC Corporate Offices, 3990 John R, Detroit, MI 48201.  Detroit Medical represents itself as the largest health care provider in southeast Michigan and has more than 2,000 licensed beds.  *See* http://www.dmc.org/org_profile/. Detroit Medical owns and operates numerous health care facilities within the Detroit MSA which include, but are not limited to:  Harper University Hospital located at 3990 John R, Detroit, Michigan 48201; Sinai-Grace Hospital located at 6071 W. Outer Drive, Detroit, Michigan 48235; Children's Hospital of Michigan located at 3901 Beaubien, Detroit, Michigan 48201;

- 4 -

Rehabilitation Institute of Michigan located at 261 Mack Avenue, Detroit, Michigan 48201; Detroit Receiving Hospital/University Health Center located at 4201 St. Antoine Blvd, Detroit, Michigan 48201; Huron Valley-Sinai Hospital located at 1 William Carls Drive, Commerce, Michigan 48382; and The Orthopaedic Specialty Hospital located at 30671 Stephenson Highway, Madison Heights, Michigan 48071. Approximately 2,300 RNs are employed through these hospitals.

16.    Defendant Oakwood Healthcare Inc. ("Oakwood") is a Michigan corporation with its principal place of business located at 23400 Michigan Avenue, Dearborn, Michigan 48124. Oakwood owns and operates hospitals within the Detroit MSA including Oakwood Annapolis Hospital, a 259 bed hospital located at 33155 Annapolis Street, Wayne, Michigan 48184; Oakwood Heritage Hospital, a 233 bed hospital located at 10000 Telegraph Road, Taylor, Michigan 48180; Oakwood Hospital & Medical Center, a 632 bed facility located at 18101 Oakwood Blvd, P.O. Box 2500, Dearborn, Michigan 48124; and Oakwood Southshore Medical Center, a 183 bed hospital located at 5450 Fort Street, Trenton, Michigan 48183. In 2005, Oakwood recorded $2.0 billion in gross revenues and $902 million in total operating revenues. *See* http://www.oakwood.org/About/about_detail.asp?ContentId=272.    Oakwood employs approximately 1,500 RNs through these hospitals.

17.    Defendant McLaren Health Care Corp ("McLaren") is a Michigan Corporation located at G-3255 Beecher Rd. Flint, MI 48532. McLaren operates hospitals throughout the state of Michigan. In approximately July of 2006, McLaren merged with Mount Clemens General Hospital, now known as Mount Clemens Regional Medical Center ("Mount Clemens"). Mount Clemens is located at 1000 Harrington Street, Mount Clemens, Michigan 48043. Mount Clemens is a 288 bed facility and employs over 300 RNs.

## CO-CONSPIRATORS

18.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

- 5 -

## CLASS ACTION ALLEGATIONS

19.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Detroit MSA as an RN at any time from December 12, 2002 until the present.

20.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005, there were at least thousands of full-time-equivalent RNs employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

21.    Questions of law and fact that are common to Plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.    Whether Detroit-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.    Whether the alleged conspiracy has been effective in depressing RN compensation;

c.    Whether Detroit-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.    Whether defendants and the other Detroit-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.    Whether the exchange of such information suppressed competition among Detroit-area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f.     The formula and data for estimating the amount by which Class members' compensation was depressed.

22.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, like all Class members, are RNs who have been employed by one or more of the Detroit-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

23.    Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between Plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for Plaintiffs are experienced in antitrust class actions, and will vigorously assert Plaintiffs' claims and those of the other Class members.

24.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

### INTERSTATE TRADE AND COMMERCE

25.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Michigan.

26.    Each defendant named herein compensates the RNs it employs within the Detroit MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Michigan. These carriers and providers render payments to each named defendant by mailing funds across state lines.

27.    Each defendant named herein also compensates the RNs it employs within the Detroit MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

28.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Detroit MSA Hospital RN Market

29.    The Detroit MSA is comprised of Detroit, Michigan, Warren, Michigan, Livonia, Michigan and their immediately surrounding towns and cities.

30.    Hospitals in the Detroit MSA employ approximately ten thousand full-time-equivalent RNs.

31.    This market is heavily concentrated.    The named defendants employ approximately 55 % of the hospital RNs in the Detroit MSA.

### Conspiracy to Suppress RN Compensation

32.    Beginning before November 2002 and continuing to the present, defendants have conspired with each other and with other Detroit-area hospitals to depress the compensation paid to RNs employed at hospitals within the Detroit MSA.

33.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a.    Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

b.    Agreeing not to compete, and not competing, with each other in the setting or RN employee compensation;

c.     Paying RN employees at the same or nearly the same rate as each other; and

d.     Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

34.     In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

35.     Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned and/or surveyed each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation.    These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Detroit MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

36.     Several of the defendants and their co-conspirators conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs.

37.     Several of the defendants and their co-conspirators retained consultants such as Watson Wyatt Worldwide and Sullivan, Cotter and Associates, Inc. to conduct surveys of other hospitals in order to determine what wages those entities were providing to RNs.

38.     Hospitals that cooperated in compiling these consultants' surveys would receive free copies of reports commissioned by their supposed rival hospitals.

39.     The Michigan Health and Hospital Association ("MHA") releases periodic reports relating to benefits and salaries of Detroit areas hospitals, and the human resource departments of several of the defendants and their co-conspirators obtain and review these reports.    Human resources employees can readily identify each surveyed hospital from identifying information contained therein including identification of the number of beds

- 9 -

provided for each listed hospital. Hospital administrators in the Detroit MSA have used this information to set RN compensation.

40.    Hospital recruiters and other hospital human resource personnel of the defendants and their co-conspirators met periodically in both formal and informal settings to discuss and exchange wage information for RNs in the Detroit area.

41.    Hospital recruiters attended meetings of various organizations in the Detroit area at which current wage information is shared. One example is the Health Care Recruiters Associations of Metro Detroit ("HCRAMD"). According to the HCRAMD website, since "the early 80's a group of Nurse Recruiters from local hospitals in the metropolitan Detroit area began meeting on a regular basis to share information and offer support and direction to each other. . . . Today, HCRAMD functions with over 50 members from 32 facilities", and meetings are held monthly. http://hcramd.hodes.com/index.asp. Hospital recruiters and administrators in the Detroit MSA exchanged wage information for RNs in the Detroit area, and used this information to set RN compensation.

42.    Through HCRAMD, defendant hospitals and other unnamed conspirators agreed that it would be in the interests of HCRAMD members to limit the use of recruitment incentives, such as sign-on bonuses, because such incentives financially hurt hospitals and led to "churning" of their nurses.

43.    Nurse wage data was also shared at meetings of the Michigan Organization of Nurse Executives ("MONE").

44.    During the class period, hospitals within the Detroit MSA have paid very similar RN compensation.

45.    Defendants' unlawful conspiracy has had the following effects, before and after the Class period:

a.  Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Detroit area has been restrained;

b.  Compensation for hospital RN employees in the Detroit MSA has remained at artificially low levels; and

c.  Detroit area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

46.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and morality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to achieve it – they have not offered RNs competitive wages.

*Injury to Plaintiffs and the Class*

47.    During the Class Period (and before), plaintiff has suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

*COUNT I:*
*CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF*
*SECTION 1 OF SHERMAN ANTITRUST ACT*

48.    Plaintiffs re-allege the allegations in paragraphs 1-47 as if set forth fully herein.

- 11 -

49. Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Detroit MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50. Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Detroit MSA at artificially low levels.

51. As a result of the unlawful conspiracy alleged in this Count, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### COUNT II
### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

52. Plaintiff re-alleges the allegations in paragraphs 1-51 as if set forth fully herein.

53. Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

54. This information-exchange agreement has reduced competition among Detroit-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

55. The relevant geographic market for the claim alleged in this Count is the Detroit MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

56.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Detroit MSA without causing too many RNs to move to non-hospital employers within the Detroit MSA or to employers outside the Detroit MSA.

57.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

58.    Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

59.    Detroit-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Detroit MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Detroit MSA. Detroit-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Detroit area.

60.    Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

61.    The information-exchange agreement has had the effect of suppressing competition among Detroit-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

62.    The information regularly exchanged by Detroit-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

63.    Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

64.    The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

65.    The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and

- 14 -

their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

66.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

67.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. § 15(a);

D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

STEPHEN F. WASINGER PLC

By: _____
Stephen Wasinger (P25963)
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, MI 48073
Tel: (248) 554-6300
sfw@sfwlaw.com

Co-Counsel for Plaintiffs

Mark A. Griffin
Raymond Farrow
KELLER ROHRBACK L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA 98101
206) 623-1900

Charles P. Tompkins
COHEN MILSTEIN HAUSFELD & TOLL PLLC
1100 New York Avenue, NW,
Suite 500, West Tower
Washington D.C. 2005
(202) 408-4600

David P. Dean
JAMES & HOFFMAN
1101 17th Street, NW
Suite 510
Washington, DC 20036-4748
(202) 496-0500

Co-Counsel For Plaintiffs

Dated: December 13, 2006
KH091606

- 16 -

CIVIL COVER SHEET    COUNTY IN WHICH THIS ACTION AROSE: Wayne

JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PAT CASON-MERENDO and JEFFREY A. SUHRE | DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MCLAREN HEALTH CARE CORP, ST. JOHN HEALTH PARTNERS, OAKWOOD HEALTH |

(b) County of Residence of First Listed    Wayne    26d63

County of Residence of First Listed    Wayne

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(C) Attorney's (Firm Name, Address, and Telephone Number)

Stephen Wasinger (P25963)
300 Balmoral Centre, 32121 Woodward Ave,
Royal Oak, MI 48073    (248) 554-6306

Attorneys (if Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PLA | DEF |  | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE / PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| [ ] 110 Insurance | [ ] 310 Airplane | [ ] 362 Personal Injury- Med. Malpractice | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [X] 410 Antitrust |
| [ ] 130 Miller Act | | | [ ] 625 Drug Related Seizure of Property 21:881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault Libel And Slander | | [ ] 630 Liquor Laws | | [ ] 450 Commerce/ICC |
| [ ] 150 Recovery of Overpayment and Enforcement of Judgment | | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 640 R.R. & Truck | PROPERTY RIGHTS | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability | | | | [ ] 470 Racketeer Influenced ... ions |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 340 Marine | PERSONAL PROPERTY | | | ... vice |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | | | ... mod lise! |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | | | ...allenge |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | | | ...ota |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | | | ...istration Act |
| | | | | | ...Matters |
| | | | | | ...tion Act |

Case: 2:06-cv-15601
Assigned To: Rosen, Gerald E
Referral Judge: Majzoub, Mona K
Filed: 12-15-2006 At 08:37 AM
cmp CASON-MERENDO, ET AL V DETROIT
MEDICAL CENTER, ET AL (TAM)

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | | FEDERAL TAX SUITS | |
|---|---|---|---|---|---|
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | ...& Disclosure Act | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 220 Foreclosure | [ ] 442 Employment | Habeas Corpus: | [ ] 740 Railway Labor Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | [ ] 950 Constitutionality of State Statutes |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 790 Other Labor Litigation | [ ] 871 IRS-Third Party 26 USC 7609 | [ ] 890 Other Statutory Actions |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | [ ] 791 Empl. Ret. Inc. Security Act | | |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multi district Litigation
- [ ] 7 Appeal to District Judge from Magistrate

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for violations of the Sherman Act, 15 U.S.C. Section 1 for conspiracy to depress compensation of registered nurses employed by the conspiring hospital

**VII. REQUESTED IN COMPLAINT:**
[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND
Greater than $75,000

CHECK YES only if demanded in complaint
JURY DEMAND: [X] Yes [ ] No

**VIII. RELATED CASE(S):** (See instructions)
IF ANY    JUDGE ____    DOCKET NUMBER ____

DATE
December 12, 2006

SIGNATURE OF ATTORNEY OF RECORD
_(signature)_

SUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.        Other than stated above, are there any pending or previously
         discontinued or dismissed companion cases in this or any other
         court, including state court? (Companion cases are matters in which
         it appears substantially similar evidence will be offered or the same
         or related parties are present and the cases arise out of the same
         transaction or occurrence.)

☐ Yes
☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
MEMPHIS DIVISION**

|  |  |
|---|---|
| Suzanne C. Clarke and<br>Conise P. Dillard,<br>on behalf of themselves and all others<br>similarly situated,<br>               Plaintiffs,<br>v.<br><br>Baptist Memorial Healthcare Corporation;<br>Methodist Healthcare<br><br>               Defendants. | **Civil Action No. ___<br>CLASS ACTION COMPLAINT<br>JURY TRIAL REQUESTED** |

Plaintiffs, by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

## NATURE OF THE ACTION

1. Defendants, which own and operate hospitals in the Memphis Metropolitan Statistical Area ("Memphis MSA" or "Memphis area"), have for years conspired among themselves and with other hospitals in the Memphis MSA to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and

enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Memphis-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.       Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Memphis-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Memphis MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Memphis MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.       Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Memphis-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.     Plaintiff Suzanne C. Clarke is an RN who worked as an RN at hospitals operated by Methodist Healthcare from 1979 until 2006. She resides in Memphis, Tennessee.

8.     Plaintiff Conise P. Dillard is an RN who worked as an RN at Baptist Memorial Hospital in Memphis from 1998 until 2004 and from 2005 until March 2006. She resides in Cordova, Tennessee.

9.     Defendant Baptist Memorial Healthcare Corporation ("Baptist Memorial") is a Tennessee corporation with its principal place of business located at 350 North Humphreys Boulevard, Memphis, Tennessee 38120. Baptist Memorial is a healthcare system that operates hospitals and health care facilities within the Memphis MSA, including the following hospitals: Baptist Memorial Hospital – Memphis ("Baptist Hospital"), located at 6019 Walnut Grove Road, Memphis, Tennessee 38120, which has a 625 bed capacity and employs approximately 840 RNs; Baptist Memorial Hospital for Women ("Baptist for Women"), located at 6255 Humphreys Boulevard, Memphis, Tennessee 38120, which has a 140 bed capacity and employs approximately 203 RNs; Baptist Memorial Hospital – DeSoto ("Baptist DeSoto"), located at 7601 Southcrest Parkway, Southaven, Mississippi 38671, which has a 199 bed capacity and employs

3

approximately 284 RNs; Baptist Rehabilitation – Germantown ("Baptist Germantown"), located at 2100 Exeter Road, Germantown, Tennessee 38131, which has a 51 bed capacity and employs approximately 50 RNs; Baptist Memorial Hospital – Tipton, ("Baptist Tipton") located at 1995 Highway 51 South, Covington, Tennessee 38019, which has a 54 bed capacity and employs approximately 98 RNs.

10.    Defendant Methodist Healthcare is a Tennessee corporation with its principal place of business located at 1265 Union Avenue, Suite 700, Memphis, Tennessee 38104. Methodist Healthcare is a healthcare system, which operates hospitals within the MSA, including Methodist University Hospital ("Methodist Hospital"), which is located at 1265 Union Avenue, Suite 700, Memphis, Tennessee 38014. Methodist Hospital is a private hospital located within the Memphis MSA. It has a 1281 bed capacity and employs approximately 2676 RNs. Methodist Healthcare also operates other hospitals within the Memphis MSA, including the following hospitals: Methodist North Hospital ("Methodist North"), located at 3960 New Convington Pike, Memphis, Tennessee 38128; Methodist South Hospital ("Methodist South"), located at 1300 Wesley Drive, Memphis, Tennessee 38116; and Methodist LeBonheur Germantown Hospital ("Methodist Germantown"), located at 7691 Poplar Avenue, Germantown, Tennessee 38138; and Methodist Fayette Hospital ("Methodist Fayette"), located at 214 Lakeview Drive, Somerville, Tennessee 38068.

<div align="center">**CO-CONSPIRATORS**</div>

11.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

<div align="center">4</div>

## CLASS ACTION ALLEGATIONS

12.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Memphis MSA as an RN at any time from June 20, 2002 until the present.

13.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005, there were more than 6,000 full-time-equivalent RNs employed by Memphis area hospitals.

14.    Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.    Whether Memphis-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.    Whether the alleged conspiracy has been effective in depressing RN compensation;

c.    Whether Memphis-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.    Whether defendants and the other Memphis-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

    e.  Whether the exchange of such information suppressed competition among

       Memphis-area hospitals in the compensation of RN employees, and depressed

       the compensation paid to such employees; and

    f.  The formula and data for estimating the amount by which Class members'

       compensation was depressed.

    15.   Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who have been employed by one or more of the Memphis-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

    16.   Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

    17.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

18.     Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Tennessee.

19.     Each defendant named herein compensates the RNs it employs within the Memphis MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Tennessee.  These carriers and providers render payments to each named defendant by mailing funds across state lines.

20.     Each defendant named herein also compensates the RNs it employs within the Memphis MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

21.     The defendants named herein also operate hospitals in states other than Tennessee.

22.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Memphis MSA Hospital RN Market

23.     The Memphis MSA is comprised of Fayette County, Tennessee, Shelby County, Tennessee, and Tipton County Tennessee, as well as neighboring counties in Arkansas and Mississippi.

24.     Hospitals in the Memphis MSA currently employ more than 6,000 full-time-equivalent RNs.

25.     This market is heavily concentrated.  The named defendants employ approximately 68% of the hospital RNs in the Memphis MSA.

7

### Conspiracy to Suppress RN Compensation

26.     Beginning before June 2002 and continuing to the present, defendants have conspired with each other and with other Memphis-area hospitals to depress the compensation paid to RNs employed at hospitals within the Memphis MSA.

27.     In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

    a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

    b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

    c.  Paying RN employees at the same or nearly the same rate as each other; and

    d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

28.     In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

29.     Human resources employees working at defendant and co-conspirator hospitals have regularly surveyed each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Memphis MSA have used this information

8

to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

30.    During the class period, hospitals within the Memphis MSA have paid very similar RN compensation.

31.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

    a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Memphis area has been restrained;

    b.    Compensation for hospital RN employees in the Memphis MSA has been at artificially low levels; and

    c.    Memphis-area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

32.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken

the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

33.    During the Class Period (and before), plaintiffs have suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

34.    Plaintiffs re-allege the allegations in paragraphs 1-33 as if set forth fully herein.

35.    Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Memphis MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

36.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Memphis MSA at artificially low levels.

37.    As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II

**CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN
VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT**

38.    Plaintiffs re-allege the allegations in paragraphs 1-37 as if set forth fully

herein.

39.    Beginning before June 2002 and continuing until the present, defendants

and their co-conspirators have engaged in a continuing agreement to regularly exchange

detailed and non-public information about the compensation being paid or to be paid to

their RN employees.  This agreement is an unreasonable restraint of trade in violation of

Section 1 of the Sherman Act, 15 U.S.C. §1.

40.    This information-exchange agreement has reduced competition among

Memphis-area hospitals in the compensation of their RN employees and has depressed

the compensation of such employees.

41.    The relevant geographic market for the claim alleged in this Count is the

Memphis MSA, and the relevant service market consists of the services provided to

hospitals by RN employees.

42.    A slight decrease in RN compensation from a competitive level could be

imposed collectively by the conspiring hospitals in the Memphis MSA without causing

too many RNs to move to any non-conspiring hospitals within the Memphis MSA, to

non-hospital employers within the Memphis MSA or to employers outside the Memphis

MSA.

43.    RNs often are constrained from moving to another geographic area

because of region-specific licensing requirements, as well as other professional and

familial obligations.

11

44.     Hospital RNs possess unique skill sets and gain industry-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

45.     Memphis-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Memphis MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Memphis MSA. Memphis-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Memphis area.

46.     Defendants and their co-conspirators comprise nearly 100% of the hospitals within the Memphis MSA. Collectively, they have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

12

47.    The information-exchange agreement has had the effect of suppressing competition among Memphis-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a.    The information regularly exchanged by Memphis-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.    Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

13

c. The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d. The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

48. For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

49. As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

A. The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

14

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 5 U.S.C. §15(a);

D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded interest at the highest legal rate from and after the date of service of this Complaint;

E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: June 20, 2006

<div style="text-align:right">

s/Gary K. Smith (#1824)
GARY K. SMITH (#1824)
GARY K. SMITH & ASSOCIATES
100 Peabody Place, Suite 1300
Memphis, Tennessee 38103
Tel.: (901) 544-6399
Fax: (901) 544-6398

</div>

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES P. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699


DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

Attorneys for Plaintiffs

16

FILED

## IN THE UNITED STATES DISTRICT COURT 2006 JUN 20 P 12: 49
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

CLERK, US DIST. COURT
WESTERN DIST. OF TEXAS

BY _____

|  |  |
|---|---|
| Marissa Maderazo, on behalf of herself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| Vanguard Health Systems a/k/a Baptist Health Systems, VHS Acquisition Subsidiary Number 5, Inc. Hospital Corporation of America, Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd. L.L.P., Christus Santa Rosa Health Care Corp., | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**SA06CA0535 OG**

Civil Action No. ___

**CLASS ACTION COMPLAINT**

**JURY TRIAL REQUESTED**

## ORIGINAL COMPLAINT

Plaintiff Marissa Maderazo, by and through counsel, on behalf of herself and all others similarly situated, brings this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

## NATURE OF THE ACTION

1.     Defendants, which own and operate hospitals in the San Antonio Metropolitan Statistical Area ("San Antonio MSA" or "San Antonio area"), have for years conspired among themselves and with other hospitals in the San Antonio MSA to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.    In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among San Antonio-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.    Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, San Antonio-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the San Antonio MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the San Antonio MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.    Plaintiff, on her own behalf and on behalf of the Class defined below, seeks to recover for the compensation properly earned by RNs employed at San Antonio-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy

2

alleged herein. Plaintiff also seeks costs, including reasonable attorneys' fees and

interest, as allowed by law.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1337(a).

6.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and

28 U.S.C. § 1391(b), (c).

## PARTIES

7.    Plaintiff Marissa Maderazo is an RN who has been employed at Methodist

Children's Hospital of South Texas since before June 2002; she currently resides in San

Antonio, Texas.

8.    Defendant Hospital Corporation of America, Inc., ("HCA") is a Delaware

corporation with its principal place of business at One Park Plaza, Nashville, Tennessee.

This Defendant may be served with process through its registered agent, The Corporation

Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware

19801. HCA is a holding company whose affiliates own and operate hospitals throughout

the United States, England and Switzerland. HCA, through its affiliated entities, operates

four hospitals in the San Antonio MSA.

9.    Defendant Methodist Healthcare System of San Antonio, Ltd. L.L.P. is an

affiliate or subsidiary of Defendant "HCA." Defendant Methodist Healthcare System of

San Antonio, Ltd. L.L.P. can be served with process by serving its registered agent John

E. Hornbeak, 8109 Fredericksburg Road, 2nd Floor, San Antonio, Texas 78229.

10. Defendants HCA And Methodist Healthcare System of San Antonio, Ltd. L.L.P. own and/or operate the following hospitals in the San Antonio MSA: (a) Methodist Hospital, located at 7700 Floyd Curl Drive, San Antonio, TX, 78229; (b) the San Antonio Metropolitan Methodist Hospital, located at 1310 McCullough Ave. San Antonio, TX 78212;  (c) the Methodist Children's Hospital of South Texas, located at 7700 Floyd Curl Drive, 520 Madison Oak Drive, San Antonio, TX 78258; (d) the Methodist Ambulatory Surgery Hospital Northwest, located at 9150 Huebner Road, Ste 100, San Antonio, TX 78240; and other facilities within the San Antonio MSA.   HCA's hospitals in the San Antonio MSA have a capacity of over 1,700 beds and through these hospitals HCA employs over 2,700 RNs, or approximately 28% of the RNs employed by hospitals in the San Antonio MSA.

11. Defendant Vanguard Health Systems, Inc., (a/k/a.Baptist Health Systems) ("Vanguard") is a Delaware corporation with its principal place of business at 20 Burton Hills Boulevard, Suite 100, Nashville, TN 37215.  This Defendant can be served with process through its registered agent, National Registered Agents, Inc., 1614 Sidney Baker Street, Kerrville, Texas 78028.  Vanguard owns and operates hospitals in multiple states including Texas, Illinois, Arizona, California and Massachusetts, within the San Antonio MSA.

12. Defendant VHS Acquisition Subsidiary Number 5, Inc., a Delaware Company, is an affiliate or wholly owned subsidiary of Vanguard.  VHS Acquisition Subsidiary Number 5, Inc. can be served with process through service upon its registered agent, National Registered Agents, Inc., 1614 Sidney Baker Street, Kerrville, Texas 78028.

4

13.    Vanguard and/or VHS Acquisition Subsidiary Number 5, Inc. own or operate five hospitals, jointly referred to as the Baptist Health System: (a) Northeast Baptist Hospital, 8811 Village Drive, San Antonio, TX 78217; (b) Baptist Medical Center, 111 Dallas St. San Antonio, TX, 78205; (c) St. Luke's Baptist Hospital, 7930 Floyd Curl Drive, San Antonio, TX 78229; (d) North Central Baptist Hospital, 520 Madison Oak Drive, San Antonio, TX 78258; and (e) Southeast Baptist Hospital, 4214 East Southcross Blvd., San Antonio, TX, 87222. Through these hospitals Vanguard has 1,495 licensed beds and employs over 1,400 RNs, or approximately 14% of the RNs employed by hospitals in the San Antonio MSA.

14.    Defendant Christus Santa Rosa Health Care Corp. ("Christus") is a Texas non-profit corporation with its principal place of business at 5121 Steadmont, Houston, TX 77040. This Defendant can be served with process through its registered agent, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

15.    Christus owns and/or operates the Christus Santa Rosa Hospital and the Christus Santa Rosa Children's Hospital, both located at 333 North Santa Rosa Street, San Antonio, TX 78207 and an additional facility at 2827 Babcock Road, San Antonio, TX 78229. Through its Hospitals, Christus employs over 1,400 RNs, or approximately 14% of the RNs employed by hospitals in the San Antonio MSA.

## CO-CONSPIRATORS

16.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

17.

5

## CLASS ACTION ALLEGATIONS

18.   Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) on her own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the San Antonio MSA as an RN at any time from June 20, 2002 until the present.

19.   Plaintiff does not know the exact number of Class members because such information is in the exclusive control of defendants. Approximately 9,800 full time equivalent RNs were employed by San Antonio MSA hospitals in 2005. Thus, the Class is so numerous that joinder of all Class members is impracticable.

20.   Questions of law and fact that are common to the plaintiff and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.   Whether San Antonio-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.   Whether the alleged conspiracy has been effective in depressing RN compensation;

c.   Whether San Antonio-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.   Whether defendants and the other San Antonio-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

6

  e. Whether the exchange of such information suppressed competition among San

    Antonio-area hospitals in the compensation of RN employees, and depressed the

    compensation paid to such employees; and

  f. The formula and data for estimating the amount by which Class members'

    compensation was depressed.

  21. Plaintiff's claims are typical of the claims of the members of the Class

because plaintiff is an RN who has been employed by one of the San Antonio-area

hospitals during the Class period and has been damaged by the unlawful conduct alleged

herein. Plaintiff, by advancing her own claims, will also advance the claims of all

members of the Class.

  22. Plaintiff and her counsel will fairly and adequately protect the interests of

all Class members. There are no material conflicts between plaintiff's interests in this

litigation and those of Class members that would make class certification inappropriate.

Counsel for plaintiff are experienced in antitrust class actions, and will vigorously assert

plaintiff's claims and those of the other Class members.

  23. Class action treatment is superior to the alternatives for the fair and

efficient adjudication of the causes of action alleged herein. Such treatment will permit a

large number of similarly situated persons to prosecute their common claims in a single

forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would entail. No difficulties are likely to be encountered in

the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

24.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Texas.

25.    Each defendant named herein compensates the RNs it employs within the San Antonio MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Texas. These carriers and providers render payments to each named defendant by mailing funds across state lines.

26.    Each defendant named herein also compensates the RNs it employs within the San Antonio MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

27.    Both HCA and Vanguard have their primary places of business in states other than Texas and operate hospitals in states other than Texas.

28.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The San Antonio MSA Hospital RN Market

29.    The San Antonio MSA is comprised of San Antonio, TX, and the immediately surrounding towns and cities.

30.    Hospitals in the San Antonio MSA employ approximately 9,800 full-time-equivalent RNs.

31.    This market is heavily concentrated. The defendant hospitals employ approximately 56% of the hospital RNs in the San Antonio MSA.

## Conspiracy to Suppress RN Compensation

32.     Beginning before June 2002 and continuing to the present, defendants have conspired with each other and with other San Antonio-area hospitals to depress the compensation paid to RNs employed at hospitals within the San Antonio MSA.

33.     In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

  a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

  b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

  c.  Paying RN employees at the same or nearly the same rate as each other; and

  d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

34.     In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

35.     Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

9

36.    Hospital human resource departments purchase third party surveys of the benefits and salaries of San Antonio hospitals. Human resources employees can readily identify each surveyed hospital from identifying information contained therein. Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

37.    Hospital recruiters attend meetings of the San Antonio Health Care Human Resources Administrators Association and other like organizations at which current wage information is shared. Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

38.    Hospitals in the San Antonio MSA have paid very similar RN compensation. For example, during the class period, all or nearly all San Antonio-area hospitals have compensated entry-level RN employees at an hourly rate that has differed from one another by no more than $1.

39.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

   a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the San Antonio area has been restrained;

   b.    Compensation for hospital RN employees in the San Antonio MSA has been at artificially low levels; and

   c.    San Antonio-area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

40.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

### Injury to Plaintiff and the Class

41.    During the Class Period (and before), plaintiff has suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

42.    Plaintiff re-alleges the allegations in paragraphs 1-41 as if set forth fully herein.

43.    Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the San Antonio MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

11

44.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the San Antonio MSA at artificially low levels.

45.    As a result of the unlawful conspiracy alleged in this Count, plaintiff and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

46.    Plaintiff re-alleges the allegations in paragraphs 1-45 as if set forth fully herein.

47.    Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

48.    This information-exchange agreement has reduced competition among San Antonio-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

49.    The relevant geographic market for the claim alleged in this Count is the San Antonio MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

50.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the conspiring hospitals in the San Antonio MSA without

12

causing too many RNs to move to any non-conspiring hospitals within the San Antonio

MSA, non-hospital employers within the San Antonio MSA or to employers outside the

San Antonio MSA.

51.    RNs often are constrained from moving to another geographic area

because of region-specific licensing requirements, as well as other professional and

familial obligations.

52.    Hospital RNs possess unique skill sets and gain industry-specific and

employer-specific experience as they work, which renders them more valuable to

hospitals than to non-hospital RN employers.  As they gain experience, hospitals become

the only practical outlets for hospital RNs to sell their services at an amount reflecting

their skills and knowledge.  Other potential employers, such as doctors' offices, nursing

homes and outpatient clinics, offer RNs compensation substantially below that offered by

hospitals.

53.    San Antonio-area hospitals expend significant resources accumulating

information about compensation paid to RNs at other hospitals in the San Antonio MSA,

but not about compensation paid to non-hospital RNs or RNs working outside the San

Antonio MSA.  San Antonio-area hospitals rely on this compensation information to set

RN compensation levels, reflecting their own understanding that the relevant market

involves only hospital RN employees in the San Antonio area.

54.    Defendants and their co-conspirators comprise nearly 100% of the

hospitals within the San Antonio MSA.  Collectively, they have substantial market power

within the relevant market, including the power jointly to set hospital RN employee

compensation below competitive levels.  This joint power clearly exists because it in fact

13

has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

55.    The information-exchange agreement has had the effect of suppressing competition among San Antonio-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a.    The information regularly exchanged by San Antonio-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors.

Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.   Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.   The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages.  With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d.   The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

56.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

57.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiff and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays that:

      A.    The Court declare, adjudge, and decree this action to be a proper class

action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class

defined herein;

      B.    Defendants' actions alleged herein be adjudged and decreed to be in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

      C.    Plaintiff and the other members of the Class recover their damages against

each defendant, jointly and severally, in an amount to be determined, and that this

damage amount be trebled pursuant to 5 U.S.C. §15(a);

      D.    Plaintiff and the other members of the Class, to the greatest extent allowed

by law, be awarded interest at the highest legal rate from and after the date of service of

this Complaint;

      E.    Plaintiff and the other members of the Class recover their costs of this suit,

including reasonable attorneys' fees, as provided by law; and

      F.    Plaintiff and the other members of the Class be granted such other relief

deemed proper to this Court.

## JURY TRIAL DEMAND

    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury of all issues so triable in this case.

Dated: June 20, 2006

PERRY & KELLOGG, L.L.P.

By _Luke C. Kellogg_
LUKE C. KELLOGG
State Bar No. 11212700
7801 Broadway, Suite 200
San Antonio, Texas 78209
Tel.: (210) 821-3377
Fax: (210) 821-3388

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES P. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402

17

Tel.: (612) 333-8844
Fax: (612) 339-6622


MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384


Attorneys for Plaintiffs

JH

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA REED and MARY McDOWELL, on behalf of themselves and all others similarly situated, | 06CV3337 |
| | JUDGE SHADUR |
| | MAGISTRATE DENLOW |
| Plaintiffs, | |
| v. | **Civil Action No.** |
| | **CLASS ACTION COMPLAINT** |
| ADVOCATE HEALTH CARE, | **JURY TRIAL DEMANDED** |
| CHILDREN'S MEMORIAL HOSPITAL, | |
| EVANSTON NORTHWESTERN | |
| HEALTHCARE. | **FILED** |
| MICHAEL REESE HOSPITAL, | |
| RESURRECTION HEALTH CARE, and | JUN 2 0 2006 |
| UNIVERSITY OF CHICAGO HOSPITALS, | Jun 20, 2006 |
| | **MICHAEL W. DOBBINS** |
| Defendants. | **CLERK, U.S. DISTRICT COURT** |

Plaintiffs Lisa Reed and Mary McDowell, by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

## NATURE OF THE ACTION

1.    Defendants, which own and operate hospitals in the Chicago Metropolitan Area comprised of metropolitan Chicago and immediately surrounding towns and cities ("Chicago area"), have for years conspired among themselves and with other hospitals in the Chicago area to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.    In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the

compensation each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement, defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written or oral surveys that fall outside the antitrust safety zone identified in the Antitrust Division of the United States Department of Justice's Healthcare Antitrust Guidelines. The exchange of this information itself has suppressed competition among Chicago area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.    Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Chicago area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Chicago area, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Chicago area has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.    Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover the compensation properly earned by RNs employed at Chicago area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged

herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.     Plaintiff Lisa Reed is an RN employed at Advocate South Suburban Hospital, where she has worked for over ten years. She currently resides in Country Club Hills, Illinois.

8.     Plaintiff Mary McDowell is an RN who was employed by Advocate Christ Medical Center as an RN from 1992 through 2005. She currently resides in Matteson, Illinois.

9.     Defendant Advocate Health Care ("Advocate") has its headquarters at 2025 Windsor Drive in Oak Brook, Illinois 60523. According to its website, Advocate "is the largest fully integrated not-for-profit health care delivery system in metropolitan Chicago." < http://www.advocatehealth.com/system/about/overview.html>. It was created in 1995 through the merger of Evangelical Health Systems Corporation and Lutheran General HealthSystem. According to its 2004 Annual Report, Advocate had $3.57 billion in total assets in 2004. Among the hospitals Advocate operates in the Chicago area are: (a) Advocate Illinois Masonic Medical Center, a 527 bed teaching hospital located in the Lake View community that serves Chicago's north and northwest

3

sides; (b) Advocate Trinity Hospital, a 263 bed facility located on Chicago's southeast side; (c) Advocate Lutheran General Hospital, a 513 bed facility located in Park Ridge, Illinois; (d) Advocate Good Shepard Hospital, a 156 bed facility located in Barrington, Illinois; (e) Advocate Christ Medical Center, a 598 bed facility located in Oak Lawn, Illinois; (f) Advocate South Suburban Hospital, a 291 bed facility located in Hazel Crest, Illinois; (g) Advocate Good Samaritan Hospital, a 302 bed facility located in Barrington, Illinois; and (h) Advocate Bethany Hospital, located in Chicago. *See* <http://www.advocatehealth.com/system/about/news/factsheets.html> . These and other Advocate hospitals are members of the Metropolitan Chicago Healthcare Council ("MCHC").

10.    Defendant Children's Memorial Hospital ("CMH") is a 270 bed pediatric hospital located at 2300 Children's Place, Chicago, Illinois 60614-3394. CMH is a member of the MCHC.

11.    Defendant Evanston Northwestern Healthcare ("ENH") has its headquarters at 2650 Ridge Avenue, Evanston, Illinois 60201. ENH is an academic health system affiliated with Northwestern University and, according to its 2005 annual report, has $2.47 billion in assets. ENH operates three hospitals in the Chicago area: (a) the 645 bed Evanston Hospital, its flagship operation; (b) Glenbrook Hospital, a 143 bed facility; and (c) Highland Park Hospital, a 239 bed facility. *See* <http://www.enh.org/aboutus/organization/ >. All three of these hospitals are members of the MCHC.

12.    Defendant Michael Reese Hospital ("MRH") is a 450 bed facility located at 2929 Ellis Avenue, Chicago, Illinois. MRH is a member of the MCHC.

4

13.    Defendant Resurrection Health Care ("Resurrection") is a not-for-profit corporation sponsored by the Sisters of the Holy Family of Nazareth and the Sisters of the Resurrection. It is the parent corporation of entities that operate nine hospitals in the Chicago area, including Our Lady of the Resurrection Medical Center (a 291 bed facility in northwestern Chicago), Resurrection Medical Center (a 434 bed facility near O'Hare Airport), St. Joseph Hospital (serving Chicago's north side), Saint Elizabeth Hospital (a 276 bed facility in Chicago), and Saint Mary of Nazareth Hospital Center. *See* <http://www.reshealth.org/locations/default.cfm >.  All these hospitals are members of the MCHC.

14.    Defendant University of Chicago Hospitals ("UCH") is an academic medical center based in Hyde Park on the campus of the University of Chicago. Its headquarters are located at 5841 S. Maryland Avenue, Chicago, Illinois 60637. UCH is a not-for-profit corporation that operates Bernard A. Mitchell Hospital (a primary adult patient care facility), the University of Chicago Comer Children's Hospital, and the Chicago Lying-in Hospital (a maternity facility). UCH is, according to its website (<http://www.uchospitals.edu/about/fact/hospitals-sheet.html>), the largest employer on Chicago's south side and earned $869 million in revenues during the 2005 fiscal year. UCH is a member of the MCHC.

## CO-CONSPIRATORS

15.    Various other hospitals and individuals not presently named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein. Plaintiffs are not including any federal, state, county or municipal entities among these co-conspirators.

## CLASS ACTION ALLEGATIONS

16.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Chicago area as an RN at any time from June 20, 2002 until the present.

17.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants.  Plaintiffs believe that at least thousands of RNs have been or are employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

18.    Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

    a.  Whether Chicago area hospitals, including those operated by defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

    b.  Whether the alleged conspiracy has been effective in depressing RN compensation;

    c.  Whether Chicago area hospitals, including those operated by defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d. Whether defendants and the other Chicago area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e. Whether the exchange of such information suppressed competition among Chicago area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f. The formula and data for estimating the amount by which Class members' compensation was depressed.

19.     Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who have been employed by one or more of the Chicago hospitals during the Class period and have been damaged by the unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

20.     Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

21.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

7

numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

22.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Illinois.

23.    Each defendant named herein compensates the RNs it employs within the Chicago area in part with funds provided by insurance carriers and other health care providers that are located in states other than Illinois. These carriers and providers render payments to each named defendant by mailing funds across state lines.

24.    Each defendant named herein also compensates the RNs it employs within the Chicago area in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

25.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Chicago Area Hospital RN Market

26.    The Chicago area, as noted above, is comprised of metropolitan Chicago and immediately surrounding towns and cities.

27.    Hospitals located in the Chicago area currently employ tens of thousands of full-time equivalent RNs.

8

### Conspiracy to Suppress RN Compensation

28.    Beginning before June of 2002 and continuing to the present, defendants have conspired with each other and with other Chicago area hospitals to depress the compensation paid to RNs employed at hospitals within the Chicago area.

29.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

   a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

   b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

   c.  Tacitly agreeing not to hire directly RNs employed at other hospitals by offering a higher wage;

   d.  Paying RN employees at the same or nearly the same rate as each other; and

   e.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

30.    In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

31.    Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation contained in operating plans or projected budgets.  These information exchanges have increased in

9

frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Chicago area have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

32.    Several of the defendants and their co-conspirators conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs.

33.    Hospital recruiters and other hospital human resource personnel of the defendants and their co-conspirators met at job fairs and at annual events sponsored by *Nursing Spectrum* magazine and exchanged wage information for RNs in the Chicago area.

34.    Similar types of information were exchanged by representatives of the defendants and their co-conspirators at meetings of various third-party organizations, including, but not limited to, the Chicago Health Executives Forum, the Human Resources Management Association of Chicago, and the Chicago chapter of the American Society for Healthcare Human Resources Administration.

35.    The great majority of hospitals in the Chicago area, including those operated by defendants, are members of MCHC. MCHC on its website touts its "human resource services" that include "HRS Surveys [that] provide members with valuable benchmarking data to assist them in developing best practices in the areas of recruiting, retention, compensation and benefits." Among the compensation surveyed is that earned by Chicago area RNs. The resulting data, though ostensibly blinded, readily can be

disaggregated on a hospital-by-hospital basis due to other identifying and descriptive information that MCHC provides, such as data on licensed beds and institutional revenue.

36.    MCHC conducted meetings for Chicago area hospital recruiters of RNs where compensation was both an agenda item for discussion and the subject of informal discussion.

37.    Hospitals in the Chicago area have paid RN compensation within a narrow band of wages.

38.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

    a.  Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Chicago area has been restrained;

    b.  Compensation for hospital RN employees in the Chicago area has remained at artificially low levels; and

    c.  Chicago area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

39.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the United States Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per

patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

40.    During the Class Period (and before), plaintiffs suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

41.    Plaintiffs re-allege the allegations in paragraphs 1-40 as if set forth fully herein.

42.    Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Chicago area, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

43.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Chicago area at artificially low levels.

44.    As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

12

## COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

45.    Plaintiffs re-allege the allegations in paragraphs 1-44 as if set forth fully herein.

46.    Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

47.    This information-exchange agreement has reduced competition among Chicago area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

48.    The relevant geographic market for the claim alleged in this Count is the Chicago area, and the relevant service market consists of the services provided to hospitals by RN employees.

49.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Chicago area without causing too many RNs to move to any non-conspiring hospitals in the Chicago area, to non-hospital employers within the Chicago area or to employers outside the Chicago area.

50.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

51.    Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers.  As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge.  Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

52.    Chicago area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Chicago area, but not about compensation paid to non-hospital RNs or RNs working outside the Chicago area.   Chicago area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Chicago area.

53.    Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels.  This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation.  Moreover, RNs, like most laborers, generally cannot withhold their services until a later date as a means of negotiating for a higher compensation rate.  They depend on a regular income.  This weakens their negotiating position with hospitals and enhances the hospitals' market power.

54.    The information-exchange agreement has had the effect of suppressing competition among Chicago area hospitals in the compensation of their RNs.  The agreement's anticompetitive effect is apparent from the following facts, among others:

14

a.  The information regularly exchanged by Chicago area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.  Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.  The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants,

15

who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d. The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

55.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

56.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

16

C.    Plaintiff and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 5 U.S.C. §15(a);

D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: June 20, 2006                    By _____

JOSEPH M. VANEK
SCOTT A. RUKSAKIATI
DAVID P. GERMAINE
VANEK, VICKERS & MASINI, P.C.
225 W. Washington, 18th Floor
Chicago, IL 60606
T: (312) 224-1500
F: (312) 224-1510

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW, Suite 510
Washington, D.C. 20036-4748
T: (202) 496-0500
F: (202) 496-0555

17

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES P. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
T: (202) 408-4600
F: (202) 408-4699

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
T: (415) 433-2070
F: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
T: (612) 333-8844
F: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
T: (206) 623-1900
F: (206) 623-3384


Attorneys for Plaintiffs

N:\06-0108\pleadings\complaint.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Marjory Unger,

on behalf of herself and all others
similarly situated,

Plaintiff,

v.

Albany Medical Center; Ascension Health,
Inc.; Catholic Health East; Ellis Hospital;
Northeast Health; Seton Health System;
St. Peter's Health Care Service,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. ____
CLASS ACTION COMPLAINT
JURY TRIAL REQUESTED

Plaintiff Marjory Unger, by and through counsel, on behalf of herself and all

others similarly situated, brings this action against defendants for damages, and demands

a trial by jury, complaining and alleging as follows:

## NATURE OF THE ACTION

1.      Defendants, which own and operate hospitals in the Albany-Schenectady-

Troy Metropolitan Statistical Area ("Albany MSA" or "Albany area"), have for years

conspired among themselves and with other hospitals in the Albany MSA to depress the

compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      In furtherance of their conspiracy, defendants and their co-conspirators

also agreed to regularly exchange detailed and non-public information about the

compensation each is paying or will pay to its RN employees.  The agreement to

exchange such information has facilitated the formation, implementation and

enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Albany-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.     Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Albany-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Albany MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Albany MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.     Plaintiff, on her own behalf and on behalf of the Class defined below, seeks to recover for the compensation properly earned by RNs employed at Albany-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiff also seeks costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

2

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.      Plaintiff Marjory Unger is an RN who worked at Albany Medical Center as an RN from 2002 until 2005. Ms. Unger currently resides in Catskill, New York.

8.      Defendant Albany Medical Center ("Albany Medical") is a New York corporation with its principal place of business located at 43 New Scotland Avenue, Albany, New York 12208. Albany Medical is a hospital located within the Albany MSA. It has a 584 bed capacity and employs approximately 859 RNs.

9.      Defendant Ascension Health, Inc. ("Ascension") is a Missouri corporation with its principal place of business located at 4600 Edmunson Road, St. Louis, Missouri 63134. Ascension is a parent corporation for healthcare systems and hospitals throughout the United States. It has affiliate hospitals and hospital systems throughout the United States and within the Albany MSA, including Defendant Seton Health System.

10.     Defendant Seton Health System ("Seton Health") is a New York Corporation with its principal place of business located at 1300 Massachusetts Avenue, Troy, New York 12180. Seton Health is a healthcare system that owns and operates hospitals within the Albany MSA, including St. Mary's Hospital ("St. Mary's"), which is located at 427 Guy Park Avenue, Amsterdam, New York 12010. St. Mary's has a 179 bed capacity, and employs approximately 256 RNs.

3

11.     Defendant Catholic Health East ("CHE") is a Pennsylvania corporation with its principal place of business located at 14 Campus Boulevard, Suite 300, Newtown Square, Pennsylvania 19073. CHE is a healthcare system that operates hospitals and health care facilities throughout the East Coast, including Defendant St. Peter's Health Care Service ("St. Peter's"), which is located within the Albany MSA.

12.     Defendant St. Peters is a New York corporation with its principal place of business located at 315 South Manning Boulevard, Albany, New York 12208. St. Peters is a hospital that has a 442 bed capacity and employs approximately 695 RNs.

13.     Defendant Ellis Hospital ("Ellis) is a New York corporation with its principal place of business located at 1101 Nott Street, Schenectady, New York 12308. Ellis is located within the Albany MSA and has a 351 bed capacity and employs approximately 379 RNs.

14.     Defendant Northeast Health, Inc. ("Northeast") is a New York corporation with its principal place of business located at 2212 Burdett Avenue, Troy, New York 12180. Northeast is a health care network that owns and operates hospitals and health care facilities within the Albany MSA, including two hospitals: Samaritan Hospital ("Samaritan"), located at 2215 Burdett Avenue, Troy, New York 12180, has a 238 bed capacity and employs approximately 259 RNs; and Albany Memorial Hospital ("Albany Memorial"), located at 600 Northern Medical Boulevard, Albany, New York, has a 165 bed capacity and employs approximately 156 RNs.

## CO-CONSPIRATORS

4

15.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Albany MSA as an RN at any time from June 20, 2002 until the present.

17.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005 there were more than 2,300 full-time-equivalent RNs employed by Albany-area hospitals. Thus, the Class is so numerous that joinder of all Class members is impracticable.

18.    Questions of law and fact that are common to the plaintiff and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.    Whether Albany-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.    Whether the alleged conspiracy has been effective in depressing RN compensation;

c.    Whether Albany-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

5

d.  Whether defendants and the other Albany-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.  Whether the exchange of such information suppressed competition among Albany-area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f.  The formula and data for estimating the amount by which Class members' compensation was depressed.

19.    Plaintiff's claims are typical of the claims of the members of the Class because plaintiff, like all Class members, is an RN who has been employed by one or more of the Albany-area hospitals during the Class period and has been damaged by the unlawful conduct alleged herein.  Plaintiff, by advancing her own claims, will also advance the claims of all members of the Class.

20.    Plaintiff and her counsel will fairly and adequately protect the interests of all Class members.  There are no material conflicts between plaintiff's interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiff is experienced in antitrust class actions, and will vigorously assert plaintiff's claims and those of the other Class members.

21.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein.  Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

6

numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

22.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than New York.

23.    Each defendant named herein compensates the RNs it employs within the Albany MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than New York. These carriers and providers render payments to each named defendant by mailing funds across state lines.

24.    Each defendant named herein also compensates the RNs it employs within the Albany MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

25.    Two of the defendants named herein – Ascension and CHE – have their primary places of business in states other than New York, and operate hospitals in states other than New York.

26.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Albany MSA Hospital RN Market

27.    The Albany MSA is comprised of Albany, New York, Schenectady, New York and Troy, New York and their immediately surrounding towns and cities.

28.    Hospitals in the Albany MSA currently employ more than 2,300 full-time-equivalent RNs.

29.    This market is heavily concentrated. The five named defendants employ approximately 73% of the hospital RNs in the Albany MSA.

## Conspiracy to Suppress RN Compensation

30.    Beginning before June 2002 and continuing to the present, defendants have conspired with each other and with other Albany-area hospitals to depress the compensation paid to RNs employed at hospitals within the Albany MSA.

31.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

c.  Paying RN employees at the same or nearly the same rate as each other; and

d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

32.    In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

33.    Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal

8

year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Albany MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

34.    The great majority of hospitals in the Albany MSA, including defendants, are members of the Iroquois Healthcare Association ("Iroquois"). Iroquois conducts and publishes an annual survey of the benefits and salaries of approximately 100 upstate hospitals. The published survey includes hospital-by-hospital data from as little as a month before. Although the published survey does not identify hospitals by name, human resources employees can readily identify each surveyed hospital from identifying information such as the numbers of different types of employees and the size of the operating budget. On request from individual members, Iroquois publishes survey reports providing selected information on selected hospitals (e.g., a hospital's top five competitors), making identification of the included hospitals even easier.

35.    Hospitals in the Albany MSA have paid very similar RN compensation. For example, during the class period, all or nearly all Albany-area hospitals have compensated entry-level RN employees at an hourly rate that has differed from one another by no more than $1.

36.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Albany area has been restrained;

9

b. Compensation for hospital RN employees in the Albany MSA has been at artificially low levels; and

c. Albany-area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

37.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

**Injury to Plaintiff and the Class**

38.    During the Class Period (and before), plaintiff has suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

## COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

10

39.    Plaintiff re-alleges the allegations in paragraphs 1-8 as if set forth fully
herein.

40.    Beginning before June 2002 and continuing until the present, defendants
and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to
depress the compensation of RNs employed at hospitals in the Albany MSA, in violation
of Section 1 of the Sherman Act, 15 U.S.C. §1.

41.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators
have set the compensation of RNs employed at hospitals in the Albany MSA at
artificially low levels.

42.    As a result of the unlawful conspiracy alleged in this Count, plaintiff and
the other members of the Class have been injured in their business or property by
receiving artificially depressed compensation during and before the Class period.

## COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

43.    Plaintiff re-alleges the allegations in paragraphs 1-42 as if set forth fully
herein.

44.    Beginning before June 2002 and continuing until the present, defendants
and their co-conspirators have engaged in a continuing agreement to regularly exchange
detailed and non-public information about the compensation being paid or to be paid to
their RN employees.  This agreement is an unreasonable restraint of trade in violation of
Section 1 of the Sherman Act, 15 U.S.C. §1.

11

45.    This information-exchange agreement has reduced competition among Albany-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

46.    The relevant geographic market for the claim alleged in this Count is the Albany MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

47.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the conspiring hospitals in the Albany MSA without causing too many RNs to move to any non-conspiring hospitals within the Albany MSA, to non-hospital employers within the Albany MSA or to employers outside the Albany MSA.

48.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

49.    Hospital RNs possess unique skill sets and gain industry-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers.  As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge.  Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

50.    Albany-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Albany MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Albany MSA.  Albany-area hospitals rely on this compensation information to set RN

compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Albany area.

51.    Defendants and their co-conspirators comprise 100% or nearly 100% of the hospitals within the Albany MSA. Collectively, they have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

52.    The information-exchange agreement has had the effect of suppressing competition among Albany-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

    a.    The information regularly exchanged by Albany-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a

13

hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b. Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c. The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d. The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

53.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

54.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiff and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the Class, prays that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiff and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 5 U.S.C. §15(a);

D.    Plaintiff and the other members of the Class, to the greatest extent allowed by law, be awarded interest at the highest legal rate from and after the date of service of this Complaint;

E.    Plaintiff and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

15

F.    Plaintiff and the other members of the Class be granted such other relief

deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury of all issues so triable in this case.

Dated: June 20, 2006                                        By _____
                                                            MICHAEL D. HAUSFELD
                                                            DANIEL A. SMALL
                                                            JOSEPH M. SELLERS
                                                            CHARLES E. TOMPKINS
                                                            ALLYSON B. BAKER
                                                            COHEN MILSTEIN HAUSFELD
                                                            & TOLL, P.L.L.C.
                                                            1100 New York Ave., NW
                                                            Suite 500, West Tower
                                                            Washington, D.C. 20005
                                                            Tel: (202) 408-4600
                                                            Fax: (202) 408-4699

                                                            DAVID P. DEAN
                                                            MARY JOYCE CARLSON
                                                            JAMES & HOFFMAN
                                                            1101 17th St., NW
                                                            Suite 510
                                                            Washington, D.C. 20036 -4748
                                                            Tel: (202) 496-0500
                                                            Fax: (202) 496-0555

                                                            MICHAEL P. LEHMANN
                                                            THOMAS P. DOVE
                                                            KIMBERLY A. KRALOWEC
                                                            THE FURTH FIRM LLP
                                                            225 Bush Street, 15th Floor
                                                            San Francisco, CA 94104
                                                            Tel: (415) 433-2070
                                                            Fax: (415) 982-2076

                                                            DANIEL E. GUSTAFSON
                                                            JASON S. KILENE
                                                            Gustafson Gluek PLLC
                                                            650 Northstar East
                                                            608 Second Avenue South
                                                            Minneapolis, MN 55402

16

Tel.: (612) 333-8844
Fax:  (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

Attorneys for Plaintiffs

# EXHIBIT E

# JAMES & HOFFMAN

A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4748

(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Feiock

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* Not Admitted in DC

cjames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
kbfeiock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

February 9, 2006

VIA E-MAIL & FIRST CLASS MAIL

Andrew B. Melnick, Esq.
James Mintz Group, Inc.
32 Avenue of the Americas, 21st Floor
New York, NY 10013

Re: Nurse Pay Matter

Dear Mr. Melnick:

This letter constitutes written confirmation of our firm's engagement of the James Mintz Group, Inc. ("JMG"), on the terms set forth below. As you know, James & Hoffman, PC (J&H), acting on behalf of the Service Employees International Union (SEIU), retained JMG last October. J&H retained JMG at that time to provide investigative services to assist J&H in rendering legal advice to the SEIU on possible collusion by hospital employers in violation of the antitrust laws, and also in anticipation of class action litigations on behalf of nurses in several labor markets against hospital employers, utilizing the results of the investigation.

J&H and JMG have agreed that JMG bills for services on an hourly basis. JMG's investigators' normal hourly rates range from $120 to $375 per hour. Most of the work in this matter has been, and will be, performed by investigators who usually work at rates between $200 and $275 per hour. JMG has agreed to bill J&H at a 15% reduction from these normal JMG hourly rates. JMG also bills J&H for any charges and disbursements such as computer databases, copies, fax, telephone, and overnight mail. JMG has agreed to send bills on at least a monthly basis, and that the bills will include a breakdown of JMG's work, by service rendered and quarter hour. J&H has agreed to arrange payment of JMG's bills within 30 days of receiving them.

JMG has agreed to undertake only such work as is authorized by J&H, and to work under J&H's direction and control. JMG understands that various state laws and ethical standards govern investigations by attorneys within each state and JMG has specifically agreed to closely adhere to all directives by J&H to ensure compliance with such laws and standards and to achieve the parties' mutual intent of full compliance with applicable laws, rules, regulations and standards. JMG warrants that it has or will procure any licenses, permits or other legal instruments required to perform its investigative services, and will comply with all laws, regulations or other legal rules applicable to such services.

Andrew B. Melnick
February 9, 2006
Page 2

JMG will report the information obtained in the course of its work only to J&H, or to such other firms, working as co-counsel with J&H, as J&H specifically directs. All documents, regardless of their source or nature, obtained or created by JMG in connection with this matter, shall be held by JMG solely for J&H's convenience and subject to J&H's absolute right to instruct JMG with respect to possession and control. This information will be provided to J&H for its exclusive use, and neither JMG nor J&H assumes liability in the event the other party misuses the information.

To the extent JMG is permitted under law to do so, JMG will promptly notify J&H of and follow J&H's direction with respect to any third-party effort, by subpoena or otherwise, to gain access to any document or information pertaining to this matter. J&H agrees to reimburse JMG for any reasonable fees or expenses JMG incurs as a result of or in the course of such response as J&H directs, including but not limited to JMG's fees for time spent by JMG employees, JMG's out of pocket expenses and the cost of legal representation for JMG, as approved by J&H.

All communications between JMG and J&H, between JMG and J&H's co-counsel in the nurse wage matter, as well as between JMG and any J&H's client in the nurse wage matter, shall be privileged and confidential and made solely for the purpose of assisting J&H in rendering legal advice to the client and in anticipation of litigation.

Please return an executed copy of this letter to me. We look forward to our continued working together on this matter.

Sincerely,

David P. Dean

BY: _____
Andy Melnick. Esq.
James Mintz Group, Inc.

2

# EXHIBIT F

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Nicole L. Castle
Associate
ncastle@mwe.com
202.756.8158

October 12, 2007

VIA EMAIL & HAND DELIVERY

Kerrie C. Dent, Esq.
Stein, Mitchell & Mezines
1100 Connecticut Avenue, NW
Washington, D.C. 20036

Re:     *Cason-Merenda, et al. v. Detroit Medical Center, et al., Civil Action No. 06-15601
(E.D. Mich.); Fleishman, et al. v. Albany Medical Center, et. al., Civil Action No. 06-cv-
0765 (N.D.N.Y.); Reed, et al. v. Advocate Health Care, et. al., Civil Action No. 06-C-
3337 (N.D. Ill.)*

Dear Ms. Dent:

I understand that you have agreed to accept service of the enclosed subpoenas, issued in
connection with the above-referenced matters. I will forward the original subpoenas and
accompanying witness attendance fees by courier on Monday.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

*[signature]*

Nicole L. Castle

Enclosures

U.S. practice conducted through McDermott Will & Emery LLP.

600 Thirteenth Street, N.W. Washington, D.C. 20005-3096   Telephone: 202.756.8000   Facsimile: 202.756.8087   www.mwe.com
WDC99 1476369-1.070881.0012

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS,<br><br>Defendants. | **SUBPOENA IN A CIVIL CASE**<br><br>Civil Action No. 06-C-3337 (JFG) (N.D. Ill.) |

TO:    James Mintz Group, Inc.
       1150 18th Street, NW
       Suite 500
       Washington, DC 20036

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>McDermott Will & Emery LLP<br>600 13th Street, N.W.<br>Washington, D.C. 20005<br>(See Schedule A) | DATE AND TIME<br><br>October 30, 2007 at 9:00 a.m. |
|---|---|

☐    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Carla Hine* | 11 October 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Carla A. Hine
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
(202) 756-8000
Counsel for Defendant Resurrection Health Care

AO 88 (Rev. 1/94) Subpoena in a Civil Case          (See Rule 45, Federal Rules of civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                  DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

## Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A TO SUBPOENA -- DEPOSITION TOPICS

Pursuant to Rules 45 and 30(b)(6) of the Federal Rules of Civil Procedure, Defendants will take the testimony upon oral examination of The James Mintz Group ("The Mintz Group"). The deposition will be taken by stenographic and/or videographic means before a notary public or other officer authorized by law to administer oaths, at the offices of McDermott Will & Emery LLP, located at 600 13th Street, N.W., Washington, D.C. 20005, commencing at 9:00 a.m. on October 30, 2007, and will continue from day to day, as necessary, until completed.

## TOPICS

Testimony will cover the following subjects:

1.  The organizational structure and personnel hierarchy of The Mintz Group.

2.  The business, contractual, or other relationship between The Mintz Group and the SEIU relating to the Chicago Lawsuit.

3.  The business, contractual, or other relationship between The Mintz Group and James & Hoffman, P.C. ("J&H") relating to the Chicago Lawsuit.

4.  The business, contractual, or other relationship between The Mintz Group and Plaintiffs' Counsel relating to the Chicago Lawsuit.

5.  The business, contractual, or other relationship between The Mintz Group and any Named Plaintiff relating to the Chicago Lawsuit.

6.  The business, contractual or other relationship between The Mintz Group and any consultant retained by the Named Plaintiffs, the SEIU or their counsel, including J&H, to analyze, discuss or investigate nurse compensation, the nurse shortage, or any of the allegations in the Complaint, including, but not limited to, the Institute for Women's Policy Research, the Feldman Group, Barbara Bergmann, and the Global Strategy Group.

7.    Any surveys, polls, questionnaires, or statements of opinion or fact solicited from or provided by the Named Plaintiffs or any member of the putative class in the Chicago Lawsuit to The Mintz Group, SEIU, J&H or Plaintiffs' Counsel including, without limitation, the following:

a. The National Nurses Wage Survey commissioned by the SEIU and conducted by the Feldman Group from approximately August to September 2005;

b. The survey of registered nurses commissioned by the SEIU Nurse Alliance in connection with the report entitled "The Shortage of Care," including, without limitation, telephone interviews of nurses conducted by The Feldman Group in December 2000 and January 2001;

c. The field research regarding nurse wages and the nursing shortage conducted by the SEIU in approximately August or September 2005; and

d. The work performed or interviews conducted as follow-up to the information obtained or collected through the work described in (a), (b) or (c).

8.    Any studies, reports, surveys, or other information collected, compiled, commissioned or created by The Mintz Group relating to the registered nurses in the Chicago-Naperville-Joliet, IL-IN-WI MSA including, but not limited to, union density, registered nurse wages, registered nurse benefits, mobility of registered nurses, or employment options available to registered nurses.

9.    Any efforts to investigate the allegations or issues in the Chicago Lawsuit prior to the filing of the Complaint, including, but not limited to, all notes or memoranda relating to any interview of or meeting with any registered nurse, human resource employee or health care official in the Chicago-Naperville-Joliet, IL-IN-WI MSA.

10.   Any efforts to identify individuals to serve as Named Plaintiffs for the Chicago Lawsuit.

11.   Any assistance or information that The Mintz Group offered or provided to the Named Plaintiffs, J&H or Plaintiffs' Counsel that relates to (i) the Named Plaintiffs, (ii) the

Hospital Defendants, (iii) the Chicago Lawsuit, (iv) compensation for registered nurses employed in or living in the Chicago-Naperville-Joliet, IL-IN-WI MSA, (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Chicago-Naperville-Joliet, IL-IN-WI MSA.

12.    Any Communications between The Mintz Group and the SEIU, The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Chicago Lawsuit, J&H or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Chicago Lawsuit, (iv) compensation for registered nurses employed in or living in the Chicago-Naperville-Joliet, IL-IN-WI MSA, (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Chicago-Naperville-Joliet, IL-IN-WI MSA.

13.    Any Communications between the SEIU and The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Chicago Lawsuit, or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Chicago Lawsuit, (iv) compensation for registered nurses employed in or living in the Chicago-Naperville-Joliet, IL-IN-WI MSA, or (v) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Chicago-Naperville-Joliet, IL-IN-WI MSA.

14.    Any facts supporting or undermining the allegations in the Complaint, including, but not limited to, the alleged collusion by or among Hospital Defendants.

15.   Any plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the Chicago-Naperville-Joliet, IL-IN-WI MSA and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital within the Chicago-Naperville-Joliet, IL-IN-WI MSA.

16.   The actual, potential or anticipated impact of or benefit from the filing of the Chicago Lawsuit on the SEIU, including the Chicago Lawsuit's impact or benefit on the SEIU's membership, organizing campaigns, publicity campaigns, visibility or status among registered nurses in the Chicago-Naperville-Joliet, IL-IN-WI MSA or elsewhere.

17.   The Mintz Group's collection, preservation, and production of documents in response to the subpoena *duces tecum* issued by Defendant Resurrection Health Care on November 21, 2006, including, without limitation:

   a.  The scope of the search performed; and

   b.  The identification of the individual employees, files, computers, location, and divisions within The Mintz Group that were searched for responsive documents; and

   c.  Identification, by specific Bates ranges, of the individual custodians or sources for the documents that have been produced by The Mintz Group.

## INSTRUCTIONS AND DEFINITIONS

The following definitions and instructions apply to the topics listed above:

1.   "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.   "Complaint" means the Second Amended Complaint (attached as Exhibit A) filed by the Named Plaintiffs on or about February 28, 2007.

3.    "Plaintiffs' Counsel" means any attorney or firm representing a Named Plaintiff including, but not limited to, any partner, of counsel, associate, member, shareholder, affiliate, employee, agent, or representative of that attorney or firm.

4.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure.

5.    "Hospital Defendant" means any defendant named in the Chicago Lawsuit, including Advocate Health Care, Children's Memorial Hospital, Evanston Northwestern Healthcare, Michael Reese Medical Center Corporation, Doctors Community Healthcare Corporation, Resurrection Healthcare and University of Chicago Hospitals.

6.    "Chicago Lawsuit" means the action entitled Reed, et al. v. Advocate Health Care, et al., Civil Action No. 06-C-3337-JFG, pending in the United States District Court for the Northern District of Illinois, and includes any of the allegations made in the Third Amended Complaint and in previous complaints filed by the Named Plaintiffs.

7.    "Named Plaintiffs" means current named plaintiffs in the Chicago Lawsuit (Lisa Reed and Cindy DiGiannantonio) and any additional plaintiffs subsequently named in any amended complaints.

8.    "Relating To" means consisting of, referring to, reflecting, describing, concerning, or evidencing.

9.    "Chicago-Naperville-Joliet, IL-IN-WI MSA" means the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area as that term is defined in paragraphs 1 and 27 of the Complaint.

10.   "The Mintz Group" means The James Mintz Group, Inc. and any of its officers, employees, attorneys, agents, or other representatives and includes any of its offices.

11.    "SEIU" means the Service Employees International Union and its officers, agents, employees, representatives, members, affiliates, attorneys (in-house and outside counsel) and representatives, including, but not limited to, the SEIU Nurse Alliance.

12.    The definitions of "Named Plaintiffs," "Hospital Defendants," "SEIU," and "The Mintz Group" further include their past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors, and successors.

13.    RHC requests that you, at least by October 23, 2007, designate by service upon counsel for RHC, the person or persons who will testify on The Mintz Group's behalf regarding the topics set forth above, and identify for each person so designated those topics or parts thereof to which (s)he will testify.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

LISA REED and, CINDY
DIGIANNANTONIO, on behalf of
themselves and all others similarly
situated,

               Plaintiffs.

   v.

ADVOCATE HEALTH CARE,
CHILDREN'S MEMORIAL HOSPITAL,
EVANSTON NORTHWESTERN
HEALTHCARE, MICHAEL REESE
MEDICAL CENTER CORPORATION,
DOCTORS COMMUNITY
HEALTHCARE CORPORATION,
RESURRECTION HEALTH CARE, and
UNIVERSITY OF CHICAGO
HOSPITALS,

               Defendants.

Civil Action No. 06 C 3337

JURY TRIAL REQUESTED

JUDGE JOHN F. GRADY

THIRD AMENDED COMPLAINT

    Plaintiffs Lisa Reed and Cindy Digiannantonio, by and through counsel, on behalf

of themselves and all others similarly situated, bring this action against defendants for

damages, and demand trial by jury, complaining and alleging as follows:

NATURE OF THE ACTION

    1.    Defendants, which own and operate hospitals in the Chicago-Naperville-

Joliet, IL-IN-WI Metropolitan Statistical Area as defined by the United States Office of

Management and Budget as of December 2005 ("Chicago area"), have for years

conspired among themselves and with other hospitals in the Chicago area to depress the

compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.     In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement, defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written or oral surveys that fall outside the antitrust safety zone identified in the Antitrust Division of the United States Department of Justice's Healthcare Antitrust Guidelines. The exchange of this information itself has suppressed competition among Chicago area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.     Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Chicago area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Chicago area, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Chicago area has remained low and surprisingly stagnant. The few compensation increases in the past

several years have been far too small to substantially decrease the area's nursing shortage.

4.    Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover the compensation properly earned by RNs employed at Chicago area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein.  Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.    Plaintiff Lisa Reed is an RN employed at Advocate South Suburban Hospital, where she has worked for over ten years. She currently resides in Country Club Hills, Illinois.

8.    Plaintiff Cindy Digiannantonio is an RN who was employed by Evanston Northwestern Healthcare as an RN from 1991 through September 2005.  She currently resides in Highland Park, Illinois.

9.    Defendant Advocate Health Care ("Advocate") has its headquarters at 2025 Windsor Drive in Oak Brook, Illinois 60523. According to its website, Advocate "is the largest fully integrated not-for-profit health care delivery system in metropolitan Chicago." <http://www.advocatehealth.com/system/about/overview.html>.    It    was

created in 1995 through the merger of Evangelical Health Systems Corporation and Lutheran General HealthSystem. According to its 2004 Annual Report, Advocate had $3.57 billion in total assets in 2004. Among the hospitals Advocate operates in the Chicago area are: (a) Advocate Illinois Masonic Medical Center, a 527 bed teaching hospital located in the Lake View community that serves Chicago's north and northwest sides; (b) Advocate Trinity Hospital, a 263 bed facility located on Chicago's southeast side; (c) Advocate Lutheran General Hospital, a 513 bed facility located in Park Ridge, Illinois; (d) Advocate Good Shepard Hospital, a 156 bed facility located in Barrington, Illinois; (e) Advocate Christ Medical Center, a 598 bed facility located in Oak Lawn, Illinois; (f) Advocate South Suburban Hospital, a 291 bed facility located in Hazel Crest, Illinois; (g) Advocate Good Samaritan Hospital, a 302 bed facility located in Barrington, Illinois; and (h) Advocate Bethany Hospital, located in Chicago. *See* <http://www.advocatehealth.com/system/about/news/factsheets.html> . These and other Advocate hospitals are members of the Metropolitan Chicago Healthcare Council ("MCHC").

10.    Defendant Children's Memorial Hospital ("CMH") is a 270 bed pediatric hospital located at 2300 Children's Place, Chicago, Illinois 60614-3394. CMH is a member of the MCHC.

11.    Defendant Evanston Northwestern Healthcare ("ENH") has its headquarters at 2650 Ridge Avenue, Evanston, Illinois 60201. ENH is an academic health system affiliated with Northwestern University and, according to its 2005 annual report, has $2.47 billion in assets. ENH operates three hospitals in the Chicago area: (a) the 645 bed Evanston Hospital, its flagship operation; (b) Glenbrook Hospital, a 143 bed

facility; and (c) Highland Park Hospital, a 239 bed facility. *See* <http://www.enh.org/aboutus/organization/ >. All three of these hospitals are members of the MCHC.

12. Defendant Michael Reese Medical Center Corporation ("MRMCC") is located at 6730 N. Scottsdale Road, Suite 290, Scottsdale, Arizona 85253. MRMCC operates the Michael Reese Hospital ("MRH"), a 450 bed facility located at 2929 Ellis Avenue, Chicago, Illinois.

13. Doctors Community Healthcare Corporation ("DCHC") is located at 6720 North Scottsdale Road, Suite 275, Scottsdale, Arizona 85253. DCHC operates a number of hospitals across the country, and, on information and belief, is affiliated with MRMCC and the operation of MRH.

14. Defendant Resurrection Health Care ("Resurrection") is a not-for-profit corporation sponsored by the Sisters of the Holy Family of Nazareth and the Sisters of the Resurrection. It is the parent corporation of entities that operate nine hospitals in the Chicago area, including Our Lady of the Resurrection Medical Center (a 291 bed facility in northwestern Chicago), Resurrection Medical Center (a 434 bed facility near O'Hare Airport), St. Joseph Hospital (serving Chicago's north side), Saint Elizabeth Hospital (a 276 bed facility in Chicago), and Saint Mary of Nazareth Hospital Center. *See* <http://www.reshealth.org/locations/default.cfm >. All these hospitals are members of the MCHC.

15. The University of Chicago Hospitals ("UCH") is an academic medical center based in Hyde Park on the campus of the University of Chicago. Its headquarters are located at 5841 S. Maryland Avenue, Chicago, Illinois 60637. UCH is a not-for-profit

corporation that operates Bernard A. Mitchell Hospital (a primary adult patient care facility), the University of Chicago Comer Children's Hospital, and the Chicago Lying-in Hospital (a maternity facility). UCH is, according to its website (<http://www.uchospitals.edu/about/fact/hospitals-sheet.html>), the largest employer on Chicago's south side and earned $869 million in revenues during the 2005 fiscal year. UCH is a member of the MCHC.

## CO-CONSPIRATORS

16.     Various other hospitals and individuals not presently named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein. Plaintiffs are not including any federal, state, county or municipal entities among these co-conspirators.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a
> hospital in the Chicago area as an RN at any time from June 20, 2002 until
> the present.

18.     Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants.  Plaintiffs believe that at least thousands of RNs have been or are employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

19.    Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.   Whether Chicago area hospitals, including those operated by defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.   Whether the alleged conspiracy has been effective in depressing RN compensation;

c.   Whether Chicago area hospitals, including those operated by defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.   Whether defendants and the other Chicago area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.   Whether the exchange of such information suppressed competition among Chicago area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f.   The formula and data for estimating the amount by which Class members' compensation was depressed.

20.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who have been employed by one or more of the Chicago hospitals during the Class period and have been damaged by the

unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

21.    Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

22.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

### INTERSTATE TRADE AND COMMERCE

23.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Illinois.

24.    Each defendant named herein compensates the RNs it employs within the Chicago area in part with funds provided by insurance carriers and other health care providers that are located in states other than Illinois. These carriers and providers render payments to each named defendant by mailing funds across state lines.

25.    Each defendant named herein also compensates the RNs it employs within the Chicago area in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

26.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Chicago Area Hospital RN Market

27.     The Chicago area, as noted above, is comprised of the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area as defined by the United States Office of Management and Budget as of December 2005.

28.     Hospitals located in the Chicago area currently employ tens of thousands of full-time equivalent RNs.

### Conspiracy to Suppress RN Compensation

29.     Beginning before June of 2002 and continuing to the present, defendants have conspired with each other and with other Chicago area hospitals to depress the compensation paid to RNs employed at hospitals within the Chicago area.

30.     In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

   a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

   b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

   c.  Tacitly agreeing not to hire directly RNs employed at other hospitals by offering a higher wage;

   d.  Paying RN employees at the same or nearly the same rate as each other; and

78187.1                                    9 .

e. Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract
new RNs to their respective hospitals.

31.     In particular, during and before the Class period, the actions of defendants
and their co-conspirators taken in furtherance of the conspiracy have included the
following.

32.     Human resources employees working at defendant and co-conspirator
hospitals have regularly telephoned each other to determine the compensation for RNs at
competing hospitals, including any scheduled increases in RN compensation contained in
operating plans or projected budgets. These information exchanges have increased in
frequency and detail at the end of each fiscal year when hospitals draft budgets and
decide on RN compensation levels for the following year. Hospital administrators in the
Chicago area have used this information to set RN compensation. Human resources
employees have been evaluated by their superiors on their ability to accomplish this RN
compensation coordination.

33.     Several of the defendants and their co-conspirators conducted informal
surveys of other hospitals in order to determine what wages those entities were providing
to RNs.

34.     Hospital recruiters and other hospital human resource personnel of the
defendants and their co-conspirators met at job fairs and at annual events sponsored by
*Nursing Spectrum* magazine and exchanged wage information for RNs in the Chicago
area.

35.     Similar types of information were exchanged by representatives of the
defendants and their co-conspirators at meetings of various third-party organizations,

including, but not limited to, the Chicago Health Executives Forum, the Human Resources Management Association of Chicago, and the Chicago chapter of the American Society for Healthcare Human Resources Administration.

36.    The great majority of hospitals in the Chicago area are members of MCHC. MCHC on its website touts its "human resource services" that include "HRS Surveys [that] provide members with valuable benchmarking data to assist them in developing best practices in the areas of recruiting, retention, compensation and benefits." Among the compensation surveyed is that earned by Chicago area RNs. The resulting data, though ostensibly blinded, readily can be disaggregated on a hospital-by-hospital basis due to other identifying and descriptive information that MCHC provides, such as data on licensed beds and institutional revenue.

37.    MCHC conducted meetings for Chicago area hospital recruiters of RNs where compensation was both an agenda item for discussion and the subject of informal discussion.

38.    Hospitals in the Chicago area have paid RN compensation within a narrow band of wages.

39.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

   a.  Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Chicago area has been restrained;

   b.  Compensation for hospital RN employees in the Chicago area has remained at artificially low levels; and

c.  Chicago area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

40.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue.  The Antitrust Division of the United States Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel."  Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates.  Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it -- they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

41.    During the Class Period (and before), plaintiffs suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF
### SECTION 1 OF SHERMAN ANTITRUST ACT

42.    Plaintiffs re-allege the allegations in paragraphs 1-40 as if set forth fully herein.

43.     Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Chicago area, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

44.     Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Chicago area at artificially low levels.

45.     As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

<u>COUNT II</u>

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

46.     Plaintiffs re-allege the allegations in paragraphs 1-44 as if set forth fully herein.

47.     Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

48.     This information-exchange agreement has reduced competition among Chicago area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

49.    The relevant geographic market for the claim alleged in this Count is the Chicago area, and the relevant service market consists of the services provided to hospitals by RN employees.

50.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Chicago area without causing too many RNs to move to any non-conspiring hospitals in the Chicago area, to non-hospital employers within the Chicago area or to employers outside the Chicago area.

51.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

52.    Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

53.    Chicago area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Chicago area, but not about compensation paid to non-hospital RNs or RNs working outside the Chicago area. Chicago area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Chicago area.

78187.1                                14

54. Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, generally cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

55. The information-exchange agreement has had the effect of suppressing competition among Chicago area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a. The information regularly exchanged by Chicago area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that

superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.  Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.  The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d.  The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

56.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

57.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiffs and the other members of the Class have been

injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

    A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    C.    Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

    D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

    E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

    F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable in this case.

Respectfully Submitted,

February 28, 2007                    By_____/s/ Marvin A. Miller_____

MARVIN A. MILLER
MATTHEW E. VAN TINE
MILLER LAW LLC
101 North Wacker Drive, Suite 2010
Chicago, IL 60602
Tel: (312) 782-4880
Fax: (312) 782-4485

JOSEPH M. VANEK
SCOTT A. RUKSAKIATI
DAVID P. GERMAINE
VANEK, VICKERS & MASINI, P.C.
225 W. Washington, 18th Floor
Chicago, IL 60606
T: (312) 224-1500
F: (312) 224-1510

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES E. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

78187.1                              18

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

LAWRENCE WALNER
AARON WALNER
LAWRENCE WALNER &
ASSOCIATES
150 N. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: (312) 201-1616
FAX: (312) 201-1538

Attorneys for Plaintiffs

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WENDY FLEISCHMAN and CINDY CULLEN, on
behalf of themselves and all others similarly situated,

                          Plaintiffs,

            v.

ALBANY MEDICAL CENTER, ASCENSION
HEALTH, INC., CATHOLIC HEALTH EAST,
ELLIS HOSPITAL, NORTHEAST HEALTH,
SETON HEALTH SYSTEM, and ST. PETER'S
HEALTH CARE SERVICE,

                          Defendants.

**SUBPOENA IN A CIVIL CASE**

Civil Action No. 06-CV-0765 (TJM) (DRH) (N.D.N.Y.)

TO:    James Mintz Group, Inc.
       1150 18th Street, NW
       Suite 500
       Washington, DC 20036

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in
the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the
above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| McDermott Will & Emery LLP<br>600 13th Street, N.W.<br>Washington, D.C. 20005<br>(See Schedule A) | October 30, 2007 at 9:00 a.m. |

☐    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place,
date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or
managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which
the person will testify. Federal Rules of Civil Procedure 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Carla Hine* | 11 October 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Carla A. Hine
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
(202) 756-8000
Counsel for Defendant Albany Medical Center

AO 88 (Rev. 1/94) Subpoena in a Civil Case          (See Rule 45, Federal Rules of civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                        DATE                              SIGNATURE OF SERVER

                                                          _____
                                                          ADDRESS OF SERVER

## Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

    (1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

    (2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

        (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

    (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

        (i) fails to allow reasonable time for compliance;

        (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

        (iv) subjects a person to undue burden.

        (B) If a subpoena

        (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

        (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

    (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A TO SUBPOENA -- DEPOSITION TOPICS

Pursuant to Rules 45 and 30(b)(6) of the Federal Rules of Civil Procedure, Defendants will take the testimony upon oral examination of The James Mintz Group ("The Mintz Group"). The deposition will be taken by stenographic and/or videographic means before a notary public or other officer authorized by law to administer oaths, at the offices of McDermott Will & Emery LLP, located at 600 13th Street, N.W., Washington, D.C. 20005, commencing at 9:00 a.m. on October 30, 2007, and will continue from day to day, as necessary, until completed.

## TOPICS

Testimony will cover the following subjects:

1. The organizational structure and personnel hierarchy of The Mintz Group.

2. The business, contractual, or other relationship between The Mintz Group and the SEIU relating to the Albany Lawsuit.

3. The business, contractual, or other relationship between The Mintz Group and James & Hoffman, P.C. ("J&H") relating to the Albany Lawsuit.

4. The business, contractual, or other relationship between The Mintz Group and Plaintiffs' Counsel relating to the Albany Lawsuit.

5. The business, contractual, or other relationship between The Mintz Group and any Named Plaintiff relating to the Albany Lawsuit.

6. The business, contractual, or other relationship between The Mintz Group and any consultant retained by the Named Plaintiffs, the SEIU or their counsel, including J&H, to analyze, discuss or investigate nurse compensation, the nurse shortage, or any of the allegations in the Complaint, including, but not limited to, the Institute for Women's Policy Research, the Feldman Group, Barbara Bergmann, and the Global Strategy Group.

7.    Any surveys, polls, questionnaires, or statements of opinion or fact solicited from
or provided by the Named Plaintiffs or any member of the putative class in the Albany Lawsuit
to The Mintz Group, SEIU, J&H or Plaintiffs' Counsel including, without limitation, the
following:

    a.    The National Nurses Wage Survey commissioned by the SEIU and conducted
    by the Feldman Group in August-September 2005;

    b.    The survey of registered nurses commissioned by the SEIU Nurse Alliance in
    connection with the report entitled "The Shortage of Care," including, without
    limitation, telephone interviews of nurses conducted by The Feldman Group in
    December 2000 and January 2001;

    c.    The field research regarding nurse wages and the nursing shortage conducted
    by the SEIU in August – September 2005; and

    d.    The work performed or interviews conducted as follow-up to the information
    obtained or collected through the work described in (a), (b) or (c).

8.    Any studies, reports, surveys, or other information collected, compiled,
commissioned or created by The Mintz Group relating to the registered nurses in the Albany-
Schenectady-Troy MSA including, but not limited to, union density, registered nurse wages,
registered nurse benefits, mobility of registered nurses, or employment options available to
registered nurses.

9.    Any efforts to investigate the allegations or issues in the Albany Lawsuit prior to
the filing of the Complaint, including, but not limited to, all notes or memoranda relating to any
interview of or meeting with any registered nurse, human resources employee or health care
official in the Albany-Schenectady-Troy MSA.

10.    Any efforts to identify individuals to serve as Named Plaintiffs for the Albany
Lawsuit.

11.    Any assistance or information that The Mintz Group offered or provided to the
Named Plaintiffs, J&H or Plaintiffs' Counsel that relates to (i) the Named Plaintiffs, (ii) the

Hospital Defendants, (iii) the Albany Lawsuit, (iv) compensation for registered nurses employed in or living in the Albany-Schenectady-Troy MSA, (v) the nursing shortage; or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Albany-Schenectady-Troy MSA.

12.    Any Communications between The Mintz Group and the SEIU, The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Albany Lawsuit, J&H or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Albany Lawsuit, (iv) compensation for registered nurses employed in or living in the Albany-Schenectady-Troy MSA, (v) the nursing shortage; or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Albany-Schenectady-Troy MSA.

13.    Any Communications between the SEIU and The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Albany Lawsuit, or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Albany Lawsuit, (iv) compensation for registered nurses employed in or living in the Albany-Schenectady-Troy MSA, (v) the nursing shortage; or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Albany-Schenectady-Troy MSA.

14.    Any facts supporting or undermining the allegations in the Complaint including, but not limited to, the alleged collusion by or among Hospital Defendants.

15.    Any plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the Albany-Schenectady-Troy MSA and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital within the Albany-Schenectady-Troy MSA.

16.    The actual, potential or anticipated impact of or benefit from the filing of the Albany Lawsuit on the SEIU, including, but not limited to, the Albany Lawsuit's impact or benefit on the SEIU's membership, organizing campaigns, publicity campaigns, visibility or status among registered nurses in the Albany-Schenectady-Troy MSA or elsewhere.

17.    The Mintz Group's collection, preservation, and production of documents in response to the subpoena *duces tecum* issued by Defendant Albany Medical Center on December 1, 2006, including, without limitation:

    a.  The scope of the search performed; and

    b.  The identification of the individual employees, files, computers, location, and divisions within The Mintz Group that were searched for responsive documents; and

    c.  Identification, by specific Bates ranges, of the individual custodians or sources for the documents that have been produced by The Mintz Group.

## INSTRUCTIONS AND DEFINITIONS

The following definitions and instructions apply to the topics listed above:

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Complaint" means the Second Amended Complaint (attached as Exhibit A) filed by the Named Plaintiffs on or about March 2, 2007.

3.    "Plaintiffs' Counsel" means any attorney or firm representing a Named Plaintiff including, but not limited to, any partner, of counsel, associate, member, shareholder, affiliate, employee, agent, or representative of that attorney or firm.

4.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure.

5.    "Hospital Defendant" means any defendant named in the Albany Lawsuit, including Albany Medical Center, Ellis Hospital, Northeast Health, Seton Health System, and St. Peter's Health Care Service.

6.    "Albany Lawsuit" means the action entitled Fleischman, et al. v. Albany Medical Center, et al., Civil Action No. 06-cv-0765-TJM-DRH, pending in the United States District Court for the Northern District of New York, and includes any of the allegations made in the Second Amended Complaint and in previous complaints filed by the Named Plaintiffs.

7.    "Named Plaintiffs" means current or former named plaintiffs in the Albany Lawsuit (Marjory Unger, Wendy Fleischman, and Cindy Cullen) and any additional plaintiffs subsequently named in any amended complaints.

8.    "Relating To" means consisting of, referring to, reflecting, describing, concerning, or evidencing.

9.    "Albany-Schenectady-Troy MSA" means the Albany-Schenectady-Troy Metropolitan Statistical Area as that term is defined in paragraphs 1 and 25 of the Complaint.

10.    "The Mintz Group" means The James Mintz Group, Inc. and any of its officers, employees, attorneys, agents, or other representatives and includes any of its offices.

11.    "SEIU" means the Service Employees International Union and its officers, agents, employees, representatives, members, affiliates, attorneys (in-house and outside counsel) and representatives, including, but not limited to, the SEIU Nurse Alliance.

12.    The definitions of "Named Plaintiffs," "Hospital Defendants," "SEIU," and "The Mintz Group" further include their past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors, and successors.

13.    AMC requests that you, at least by October 23, 2007, designate by service upon counsel for AMC, the person or persons who will testify on The Mintz Group's behalf regarding the topics set forth above, and identify for each person so designated those topics or parts thereof to which (s)he will testify.

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Wendy Fleischman and Cindy Cullen, | ) |
| | ) |
| on behalf of themselves and all others | ) |
| similarly situated, | ) |
| Plaintiffs, | ) |
| | ) **Civil Action No. 06-CV-0765/ TJM/DRH** |
| v. | ) **CLASS ACTION COMPLAINT** |
| | ) **JURY TRIAL REQUESTED** |
| Albany Medical Center; Ellis Hospital; | ) |
| Northeast Health; Seton Health System; | ) |
| St. Peter's Health Care Service, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### SECOND AMENDED COMPLAINT

Plaintiffs Wendy Fleischman and Cindy Cullen, by and through counsel, on

behalf of themselves and all others similarly situated, bring this action against defendants

for damages, and demand a trial by jury, complaining and alleging as follows:

### NATURE OF THE ACTION

1.     Defendants, which own and operate hospitals in the Albany-Schenectady-

Troy Metropolitan Statistical Area ("Albany MSA" or "Albany area"), have for years

conspired among themselves and with other hospitals in the Albany MSA to depress the

compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     In furtherance of their conspiracy, defendants and their co-conspirators

also agreed to regularly exchange detailed and non-public information about the

compensation each is paying or will pay to its RN employees.  The agreement to

exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Albany-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.     Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Albany-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Albany MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Albany MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.     Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Albany-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.    Plaintiff Wendy Fleischman is an RN who has worked at St. Peter's Health Care Services since 1995. Ms. Fleischman currently resides in Albany, New York.

8.    Plaintiff Cindy Cullen is an RN who has worked at Albany Medical Center as an RN since 1991. Ms. Cullen currently resides in Schenectady, New York.

9.    Defendant Albany Medical Center ("Albany Medical") is a New York corporation with its principal place of business located at 43 New Scotland Avenue, Albany, New York 12208. Albany Medical is a hospital located within the Albany MSA. It has a 584 bed capacity and employs approximately 859 RNs.

10.    Defendant Seton Health System ("Seton Health") is a New York Corporation with its principal place of business located at 1300 Massachusetts Avenue, Troy, New York 12180. Seton Health is a healthcare system that owns and operates hospitals within the Albany MSA, including St. Mary's Hospital ("St. Mary's"), which is located at 427 Guy Park Avenue, Amsterdam, New York 12010. St. Mary's has a 179 bed capacity, and employs approximately 256 RNs.

11.    Defendant St. Peter's Health Care Services is a New York corporation with its principal place of business located at 315 South Manning Boulevard, Albany,

3

New York 12208. St. Peters is a hospital that has a 442 bed capacity and employs approximately 695 RNs.

12.    Defendant Ellis Hospital ("Ellis) is a New York corporation with its principal place of business located at 1101 Nott Street, Schenectady, New York 12308. Ellis is located within the Albany MSA and has a 351 bed capacity and employs approximately 379 RNs.

13.    Defendant Northeast Health, Inc. ("Northeast") is a New York corporation with its principal place of business located at 2212 Burdett Avenue, Troy, New York 12180. Northeast is a health care network that owns and operates hospitals and health care facilities within the Albany MSA, including two hospitals: Samaritan Hospital ("Samaritan"), located at 2215 Burdett Avenue, Troy, New York 12180, has a 238 bed capacity and employs approximately 259 RNs; and Albany Memorial Hospital ("Albany Memorial"), located at 600 Northern Medical Boulevard, Albany, New York, has a 165 bed capacity and employs approximately 156 RNs.

## CO-CONSPIRATORS

14.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

## CLASS ACTION ALLEGATIONS

15.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Albany MSA as an RN at any time from June 20, 2002 until the present.

4

16.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005 there were more than 2,300 full-time-equivalent RNs employed by Albany-area hospitals. Thus, the Class is so numerous that joinder of all Class members is impracticable.

17.    Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.    Whether Albany-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.    Whether the alleged conspiracy has been effective in depressing RN compensation;

c.    Whether Albany-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.    Whether defendants and the other Albany-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.    Whether the exchange of such information suppressed competition among Albany-area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f.    The formula and data for estimating the amount by which Class members' compensation was depressed.

18.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who has been employed by one or more of the Albany-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

19.    Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

20.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

21.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than New York.

22.    Each defendant named herein compensates the RNs it employs within the Albany MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than New York. These carriers and providers render payments to each named defendant by mailing funds across state lines.

23.    Each defendant named herein also compensates the RNs it employs within the Albany MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

24.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Albany MSA Hospital RN Market

25.    The Albany MSA is comprised of Albany, New York, Schenectady, New York and Troy, New York and their immediately surrounding towns and cities.

26.    Hospitals in the Albany MSA currently employ more than 2,300 full-time-equivalent RNs.

27.    This market is heavily concentrated.  The five named defendants employ approximately 73% of the hospital RNs in the Albany MSA.

### Conspiracy to Suppress RN Compensation

28.    Beginning before June 2002 and continuing to the present, defendants have conspired with each other and with other Albany-area hospitals to depress the compensation paid to RNs employed at hospitals within the Albany MSA.

29.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

7

b.  Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

c.  Paying RN employees at the same or nearly the same rate as each other; and

d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

30.     In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

31.     Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Albany MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

32.     The great majority of hospitals in the Albany MSA, including defendants, are members of the Iroquois Healthcare Association ("Iroquois"). Iroquois conducts and publishes an annual survey of the benefits and salaries of approximately 100 upstate hospitals. The published survey includes hospital-by-hospital data from as little as a month before. Although the published survey does not identify hospitals by name, human resources employees can readily identify each surveyed hospital from identifying information such as the numbers of different types of employees and the size of the

8

operating budget. On request from individual members, Iroquois publishes survey reports providing selected information on selected hospitals (e.g., a hospital's top five competitors), making identification of the included hospitals even easier.

33.    Hospitals in the Albany MSA have paid very similar RN compensation. For example, during the class period, all or nearly all Albany-area hospitals have compensated entry-level RN employees at an hourly rate that has differed from one another by no more than $1.

34.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

    a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Albany area has been restrained;

    b.    Compensation for hospital RN employees in the Albany MSA has been at artificially low levels; and

    c.    Albany-area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

35.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators,

like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it -- they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

36.    During the Class Period (and before), plaintiffs have suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

37.    Plaintiffs re-allege the allegations in paragraphs 1-37 as if set forth fully herein.

38.    Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Albany MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

39.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Albany MSA at artificially low levels.

40.    As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

41.     Plaintiff re-alleges the allegations in paragraphs 1-41 as if set forth fully herein.

42.     Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

43.     This information-exchange agreement has reduced competition among Albany-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

44.     The relevant geographic market for the claim alleged in this Count is the Albany MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

45.     A slight decrease in RN compensation from a competitive level could be imposed collectively by the conspiring hospitals in the Albany MSA without causing too many RNs to move to any non-conspiring hospitals within the Albany MSA, to non-hospital employers within the Albany MSA or to employers outside the Albany MSA.

46.     RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

47.     Hospital RNs possess unique skill sets and gain industry-specific experience as they work, which renders them more valuable to hospitals than to non-

11

hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

48.    Albany-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Albany MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Albany MSA. Albany-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Albany area.

49.    Defendants and their co-conspirators comprise 100% or nearly 100% of the hospitals within the Albany MSA. Collectively, they have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

50.    The information-exchange agreement has had the effect of suppressing competition among Albany-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

12

a.  The information regularly exchanged by Albany-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation.  An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation.  The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals.  But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place.  Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels.  The result is higher labor costs with no competitive advantage.  An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors.  Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.  Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.  The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages.  With such information, hospitals know what others are paying their RN employees, while RN employee applicants,

13

who lack access to most or all of such (non-public) information, know much
less about the competitive landscape.

    d.  The regularity and detail of the information exchanged, the relationships of trust
developed among the individuals exchanging the information, and the
assurances given that the information would not be used for competitive
advantage, encouraged defendants and their co-conspirators to use the
information to match and not exceed each other's RN employee compensation
levels.

    51.    For these reasons, the effect of the information-exchange agreement,
before and during the Class period, has been to reduce competition among hospitals in
the compensation of RN employees and to depress such compensation.

    52.    As a result of the unlawful agreement alleged herein to exchange RN
compensation information, plaintiff and the other members of the Class have been injured
in their business or property by receiving artificially depressed compensation during and
before the Class period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

    A.    The Court declare, adjudge, and decree this action to be a proper class
action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class
defined herein;

    B.    Defendants' actions alleged herein be adjudged and decreed to be in
violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

14

    C.     Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

    D.     Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded interest at the highest legal rate from and after the date of service of this Complaint;

    E.     Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

    F.     Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: January 31, 2007

By  /s/ James T. Towne, Jr.

JAMES T. TOWNE, JR.
MICHAEL RHODES-DEVEY
TOWNE LAW FIRM
421 New Karner Road
Albany, New York 12212-5072
Tel: (518) 452-1800
Fax: (518) 452-6435

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES E. TOMPKINS
ALLYSON B. BAKER
KALPANA KOTAGAL
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005

15

Tel: (202) 408-4600
Fax: (202) 408-4699

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

ARNOLD LEVIN
CHARLES E. SCHAFFER
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Attorneys for Plaintiffs

16

17

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAT CASON-MERENDA and JEFFREY A. SUHRE, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

DETROIT MEDICAL CENTER, HENRY FORD HEALTH SYSTEM, MOUNT CLEMENS GENERAL HOSPITAL, INC., ST. JOHN HEALTH, OAKWOOD HEALTHCARE, INC., BON SECOURS COTTAGE HEALTH SERVICES, WILLIAM BEAUMONT HOSPITAL d.b.a. BEAUMONT HOSPITALS, and TRINITY HEALTH CORP.,

Defendants.

**SUBPOENA IN A CIVIL CASE**

Civil Action No. 06-15601 (GER) (MKM) (E.D. Mich.)

TO:    James Mintz Group, Inc.
       1150 18th Street, NW
       Suite 500
       Washington, DC 20036

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| McDermott Will & Emery LLP<br>600 13th Street, N.W.<br>Washington, D.C. 20005<br>(See Schedule A) | October 30, 2007 at 9:00 a.m. |

☐    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE(INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Carla Hine* | 11 October 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Carla A. Hine
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
(202) 756-8000
Counsel for Defendant Henry Ford Health System

AO 88 (Rev. 1/94) Subpoena in a Civil Case    (See Rule 45, Federal Rules of civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

| DATE | SIGNATURE OF SERVER |
|---|---|
| | ADDRESS OF SERVER |

## Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d)  DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A TO SUBPOENA -- DEPOSITION TOPICS

Pursuant to Rules 45 and 30(b)(6) of the Federal Rules of Civil Procedure, Defendants will take the testimony upon oral examination of The James Mintz Group ("The Mintz Group"). The deposition will be taken by stenographic and/or videographic means before a notary public or other officer authorized by law to administer oaths, at the offices of McDermott Will & Emery LLP, located at 600 13th Street, N.W., Washington, D.C. 20005, commencing at 9:00 a.m. on October 30, 2007, and will continue from day to day, as necessary, until completed.

## TOPICS

Testimony will cover the following subjects:

1.    The organizational structure and personnel hierarchy of The Mintz Group.

2.    The business, contractual, or other relationship between The Mintz Group and the SEIU relating to the Detroit Lawsuit.

3.    The business, contractual, or other relationship between The Mintz Group and James & Hoffman, P.C. ("J&H") relating to the Detroit Lawsuit.

4.    The business, contractual, or other relationship between The Mintz Group and Plaintiffs' Counsel relating to the Detroit Lawsuit.

5.    The business, contractual, or other relationship between The Mintz Group and any Named Plaintiff relating to the Detroit Lawsuit.

6.    The business, contractual or other relationship between The Mintz Group and any consultant retained by the Named Plaintiffs, the SEIU or their counsel, including J&H, to analyze, discuss or investigate nurse compensation, the nurse shortage, or any of the allegations in the Complaint, including, but not limited to, the Institute for Women's Policy Research, the Feldman Group, Barbara Bergmann, and the Global Strategy Group.

7.   Any surveys, polls, questionnaires, or statements of opinion or fact solicited from or provided by the Named Plaintiffs or any member of the putative class in the Detroit Lawsuit to The Mintz Group, SEIU, J&H or Plaintiffs' Counsel including, without limitation, the following:

    a. The National Nurses Wage Survey commissioned by the SEIU and conducted by the Feldman Group from approximately August to September 2005;

    b. The survey of registered nurses commissioned by the SEIU Nurse Alliance in connection with the report entitled "The Shortage of Care," including, without limitation, telephone interviews of nurses conducted by The Feldman Group in December 2000 and January 2001;

    c. The field research regarding nurse wages and the nursing shortage conducted by the SEIU in approximately August or September 2005; and

    d. The work performed or interviews conducted as follow-up to the information obtained or collected through the work described in (a), (b) or (c).

8.   Any studies, reports, surveys, or other information collected, compiled, commissioned or created by The Mintz Group relating to the registered nurses in the Detroit MSA including, but not limited to, union density, registered nurse wages, registered nurse benefits, mobility of registered nurses, or employment options available to registered nurses.

9.   Any efforts to investigate the allegations or issues in the Detroit Lawsuit prior to the filing of the Complaint, including, but not limited to, all notes or memoranda relating to any interview of or meeting with any registered nurse, human resource employee or health care official in the Detroit MSA.

10.   Any efforts to identify individuals to serve as Named Plaintiffs for the Detroit Lawsuit.

11.   Any assistance or information that The Mintz Group offered or provided to the Named Plaintiffs, J&H or Plaintiffs' Counsel that relates to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Detroit Lawsuit, (iv) compensation for registered nurses employed

in or living in the Detroit MSA, (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Detroit MSA.

12.    Any Communications between The Mintz Group and the SEIU, The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Detroit Lawsuit, J&H or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Detroit Lawsuit, (iv) compensation for registered nurses employed in or living in the Detroit MSA, (v) the nursing shortage, or (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Detroit MSA.

13.    Any Communications between the SEIU and The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the Detroit Lawsuit, or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Detroit Lawsuit, (iv) compensation for registered nurses employed in or living in the Detroit MSA, or (v) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the Detroit MSA.

14.    Any facts supporting or undermining the allegations in the Complaint, including, but not limited to, the alleged collusion by or among Hospital Defendants.

15.    Any plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the Detroit MSA and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital within the Detroit MSA.

16.    The actual, potential or anticipated impact of or benefit from the filing of the Detroit Lawsuit on the SEIU, including the Detroit Lawsuit's impact or benefit on the SEIU's membership, organizing campaigns, publicity campaigns, visibility or status among registered nurses in the Detroit MSA or elsewhere.

17.    The Mintz Group's collection, preservation, and production of documents in response to the subpoena *duces tecum* issued by Defendant Henry Ford Health System on July 17, 2007, including, without limitation:

a. The scope of the search performed; and

b. The identification of the individual employees, files, computers, location, and divisions within The Mintz Group that were searched for responsive documents; and

c. Identification, by specific Bates ranges, of the individual custodians or sources for the documents that have been produced by The Mintz Group.

## INSTRUCTIONS AND DEFINITIONS

The following definitions and instructions apply to the topics listed above:

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Complaint" means the Third Corrected Class Action Complaint (attached as Exhibit A) filed by the Named Plaintiffs on or about June 15, 2007.

3.    "Plaintiffs' Counsel" means any attorney or firm representing a Named Plaintiff including, but not limited to, any partner, of counsel, associate, member, shareholder, affiliate, employee, agent, or representative of that attorney or firm.

4.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure.

5.     "Hospital Defendant" means any defendant named in the Detroit Lawsuit, including Detroit Medical Center, Henry Ford Health System, Mount Clemens General Hospital, Inc., St. John Health, Oakwood Healthcare Inc., Bon Secours Cottage Health Services, Wiliam Beaumont Hospital d/b/a Beaumont Hospitals, and Trinity Health Corp.

6.     "Detroit Lawsuit" means the action entitled Cason-Merenda, et al. v. Detroit Medical Center, et al., Civil Action No. 06-15601, pending in the United States District Court for the Eastern District of Michigan – Southern Division, and includes any of the allegations made in the Third Corrected Class Action Complaint and in previous complaints filed by the Named Plaintiffs.

7.     "Named Plaintiffs" means current named plaintiffs in the Detroit Lawsuit (Pat Cason-Merenda and Jeffrey Suhre) and any additional plaintiffs subsequently named in any amended complaints.

8.     "Relating To" means consisting of, referring to, reflecting, describing, concerning, or evidencing.

9.     "Detroit MSA" means the Detroit-Warren-Livonia Metropolitan Statistical Area as that term is defined in paragraphs 1 and 31 of the Complaint.

10.    "The Mintz Group" means The James Mintz Group, Inc. and any of its officers, employees, attorneys, agents, or other representatives and includes any of its offices.

11.    "SEIU" means the Service Employees International Union and its officers, agents, employees, representatives, members, affiliates, attorneys (in-house and outside counsel) and representatives, including, but not limited to, the SEIU Nurse Alliance.

12.    The definitions of "Named Plaintiffs," "Hospital Defendants," "SEIU," and "The Mintz Group" further include their past and present officers, directors, agents, employees,

attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries,

affiliates, predecessors, and successors.

13. Henry Ford Health System requests that you, at least by October 23, 2007,

designate by service upon counsel for Henry Ford Health System, the person or persons who will

testify on The Mintz Group's behalf regarding the topics set forth above, and identify for each

person so designated those topics or parts thereof to which (s)he will testify.

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAT CASON-MERENDA and JEFFREY A.　)
SUHRE on behalf of themselves and others　)
similarly situated,　)
　)　Case No. 06-15601
　)
Plaintiffs,　)
　)　Hon. Gerald E. Rosen
　)
v.　)　Magistrate: Mona K. Majzoub
　)
　)
DETROIT MEDICAL CENTER, HENRY　)
FORD HEALTH SYSTEM, MOUNT　)
CLEMENS GENERAL HOSPITAL, INC.,　)
ST. JOHN HEALTH, OAKWOOD　)
HEALTHCARE INC., BON SECOURS　)
COTTAGE HEALTH SERVICES, WILLIAM　)
BEAUMONT HOSPITAL d.b.a BEAUMONT　)
HOSPITALS, and TRINITY HEALTH CORP.,　)
　)
Defendants.　)

THIRD CORRECTED
CLASS ACTION COMPLAINT
JURY TRIAL REQUESTED

Plaintiffs Pat Cason-Merenda and Jeffrey A. Suhre ("Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, files this complaint.

### Nature of the Action

1.　Defendants, which own and operate hospitals in the Detroit-Warren-Livonia Metropolitan Statistical Area ("Detroit MSA" or "Detroit area"), have for years conspired among themselves and with other hospitals in the Detroit MSA to depress the compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.　　In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees.　The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy.　Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Detroit-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.　　Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage.　Absent their conspiracy, Detroit-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals.　The history of hospital RN compensation and vacancy rates in the Detroit MSA, however, reveals that hospital RNs are not being compensated at competitive levels.　Despite years of high vacancy rates, compensation for hospital RNs in the Detroit MSA has remained low and surprisingly stagnant.　The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.　　Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein.　Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

### JURISDICTION AND VENUE

5.　　This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.　　Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.    Plaintiff Pat Cason-Merenda is an RN who has been employed by Detroit Medical Center since November 2002 and currently resides within the Detroit MSA.

8.    Plaintiff Jeffrey A. Suhre is an RN who has been employed by Providence Hospital since November of 2002 and currently resides within the Detroit MSA.

9.    St. John Health is a member of Ascension Health and is comprised of numerous hospitals and medical facilities in southeast Michigan.  St. John Health's principal place of business is located at 28000 Dequindre, Warren, Michigan 48092.

10.    Ascension Health is a Missouri corporation with its principal place of business located at 4600 Edmundson Road, St. Louis, Missouri 63134.  Ascension Health is a parent corporation for health care systems and hospitals throughout the United States.  It has affiliate hospitals and hospital systems throughout the United States and within the Detroit MSA, including St. John Health.

11.    St. John Health is a Michigan Corporation which owns and operates a number of hospitals located in the Detroit MSA including, but not limited to:  St. John Detroit Riverview Hospital, a 285 bed hospital located at 7733 East Jefferson, Detroit, Michigan 48214; St. John Hospital and Medical Center, a 607 bed facility located at 22101 Moross Road, Detroit, Michigan 48236; St. John River District Hospital, a 68 bed facility located at 4100 South River Road, East China, Michigan 48054; St. John North Shores Hospital, a 96 bed facility located at 26755 Ballard Street, Harrison Township, Michigan 48045; St. John Oakland Hospital, a 210 bed hospital located at 27351 Dequindre Road, Madison Heights, Michigan 48071; Providence Hospital, a 384 bed hospital located at 16001 West Nine Mile Road, Southfield, Michigan 48075; Brighton Hospital, a 92 bed hospital located at 12851 East Grand River Avenue, Brighton, Michigan 48116; and St. John Macomb Hospital, a 376 bed facility located at 11800 East Twelve Mile, Warren, Michigan 48093.  It is estimated that over 3,000 RNs are employed through St. John Health hospitals.

- 3 -

12.    Defendant Henry Ford Health System ("Henry Ford Health") is a Michigan corporation with its principal place of business located at 1 Ford Place, Detroit, MI 48202. Henry Ford Health earns $3.05 billion in revenues annually, and $112 million in net income in 2005.   *See* http://www.henryford.com/body.cfm?id=37460&oTopID=0.   Henry Ford Health owns and operates health care facilities within the Detroit MSA which include, but are not limited to:  Henry Ford Hospital, a 903 bed hospital located at 2799 W. Grand Blvd., Detroit, Michigan 48202; Henry Ford Wyandotte Hospital, a 344 bed hospital located at 2333 Biddle Avenue, Wyandotte, Michigan 48192; Henry Ford Bi-County Hospital, a 203 bed hospital located at 13355 East Ten Mile Road, Warren, Michigan 48089; Kingswood Hospital, a 100 bed hospital located at 10300 West Eight Mile Road, Ferndale, Michigan 48220.

13.    Henry Ford Health represents that it employs over 3,000 RNs in its various hospitals. http://www.henryford.com/body.cfm?id=38768.

14.    Bon Secours Cottage Health Services is a joint venture between Bon Secours Health System of Marrriottsville, MD, and the Henry Ford Health System.  Bon Secours Cottage Health System is headquartered at 468 Cadieux Road, Grosse Pointe, MI 48230. Bon Secours Cottage Health Services operates Cottage Hospital located at 159 Kercheval Avenue, Grosse Pointe Farms, Michigan 48236 and Bon Secours Hospital located at 468 Cadieux Road, Grosse Pointe, Michigan 48230.   These hospitals have a collective 175 bed capacity.

15.    Defendant Detroit Medical Center ("Detroit Medical") is a Michigan corporation with its principal place of business located at 3663 Woodward Avenue, Suite 200, Detroit, Michigan 48201 and Corporate Offices at DMC Corporate Offices, 3990 John R, Detroit, MI 48201. Detroit Medical represents itself as the largest health care provider in southeast Michigan and has more than 2,000 licensed beds. *See* http://www.dmc.org/org_profile/. Detroit Medical owns and operates numerous health care facilities within the Detroit MSA which include, but are not limited to:  Harper University Hospital located at 3990 John R, Detroit, Michigan 48201; Sinai-Grace Hospital located at 6071 W. Outer Drive, Detroit, Michigan 48235; Children's Hospital of Michigan located at 3901 Beaubien, Detroit, Michigan 48201; Rehabilitation

- 4 -

Institute of Michigan located at 261 Mack Avenue, Detroit, Michigan 48201; Detroit Receiving Hospital/University Health Center located at 4201 St. Antoine Blvd, Detroit, Michigan 48201; Huron Valley-Sinai Hospital located at 1 William Carls Drive, Commerce, Michigan 48382; and The Orthopaedic Specialty Hospital located at 30671 Stephenson Highway, Madison Heights, Michigan 48071. Approximately 2,300 RNs are employed through these hospitals.

16.    Defendant Oakwood Healthcare Inc. ("Oakwood") is a Michigan corporation with its principal place of business located at 23400 Michigan Avenue, Dearborn, Michigan 48124. Oakwood owns and operates hospitals within the Detroit MSA including Oakwood Annapolis Hospital, a 259 bed hospital located at 33155 Annapolis Street, Wayne, Michigan 48184; Oakwood Heritage Hospital, a 233 bed hospital located at 10000 Telegraph Road, Taylor, Michigan 48180; Oakwood Hospital & Medical Center, a 632 bed facility located at 18101 Oakwood Blvd, P.O. Box 2500, Dearborn, Michigan 48124; and Oakwood Southshore Medical Center, a 183 bed hospital located at 5450 Fort Street, Trenton, Michigan 48183. In 2005, Oakwood recorded $2.0 billion in gross revenues and $902 million in total operating revenues. *See* http://www.oakwood.org/About/about_detail.asp?ContentId=272.    Oakwood employs approximately 1,500 RNs through these hospitals.

17.    Defendant Mount Clemens General Hospital, Inc., ("Mount Clemens") is a Michigan Corporation. Mount Clemens is located at 1000 Harrington Street, Mount Clemens, Michigan 48043. In approximately July of 2006, McLaren Health Care Corp acquired Mount Clemens General Hospital, Inc. McLaren Health Care Corp operates hospitals throughout the state of Michigan and is a Michigan Corporation located at G-3255 Beecher Rd. Flint, MI 48532. Mount Clemens is a 288 bed facility and employs over 300 RNs.

18.    Defendant William Beaumont Hospital, d.b.a. Beaumont Hospitals, is a Michigan Corporation located at 3601 W. 13 Mile Rd., Royal Oak, MI 48073. William Beaumont Hospital owns and operates numerous health care facilities within the Detroit MSA which include, but are not limited to: William Beaumont Hospital, a 1061 bed facility located at 3601 W. 13 Mile Rd.,

Royal Oak, MI 48073, and William Beaumont Hospital, Troy, a 296 bed facility at 44201 Dequindre Road, Troy MI, 48085.

19.    Trinity Health Corporation is an Indiana Corporation located at 251 E. Ohio Street, Ste 1100, Indianapolis, IN 46204, whose registered office and headquarters is located at 27870 Cabot Dr., Novi, MI 88377-2920. Trinity Health earns revenues of $6.1 billion dollars annually.  http://www.trinity-health.org/who/pdf/2007%20Facts%20and%20Figures.5.10.07.pdf. Trinity Health owns and operates numerous health care facilities within the Detroit MSA which include but are not limited to: St. Joseph Mercy, Oakland, a 428 bed facility at 44405 Woodward Avenue, Pontiac, MI 49341, and St. Mary Mercy Hospital, a 304 bed facility at 36475 West Five Mile Road, Rochester, MI 48307.

### CO-CONSPIRATORS

20.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

### CLASS ACTION ALLEGATIONS

21.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Detroit MSA as an RN at any time from December 12, 2002 until the present.

22.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. As of 2005, there were at least thousands of full-time-equivalent RNs employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

23.    Questions of law and fact that are common to Plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

- 6 -

a.   Whether Detroit-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.   Whether the alleged conspiracy has been effective in depressing RN compensation;

c.   Whether Detroit-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.   Whether defendants and the other Detroit-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.   Whether the exchange of such information suppressed competition among Detroit-area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f.   The formula and data for estimating the amount by which Class members' compensation was depressed.

24.   Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, like all Class members, are RNs who have been employed by one or more of the Detroit-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein.  Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

25.   Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.  There are no material conflicts between Plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate.  Counsel for Plaintiffs are experienced in antitrust class actions, and will vigorously assert Plaintiffs' claims and those of the other Class members.

26.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

27.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Michigan.

28.    Each defendant named herein compensates the RNs it employs within the Detroit MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Michigan. These carriers and providers render payments to each named defendant by mailing funds across state lines.

29.    Each defendant named herein also compensates the RNs it employs within the Detroit MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

30.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

*The Detroit MSA Hospital RN Market*

31.    The Detroit MSA is comprised of Detroit, Warren, Livonia, Dearborn, Troy, Farmington Hills, Southfield, Pontiac, Taylor, Novi, and their immediately surrounding towns and cities.

32.    Hospitals in the Detroit MSA employ approximately ten thousand full-time-equivalent RNs.

33.    This market is heavily concentrated.    The named defendants employ approximately 80 % of the hospital RNs in the Detroit MSA.

*Conspiracy to Suppress RN Compensation*

34.    Beginning before November 2002 and continuing to the present, defendants have conspired with each other and with other Detroit-area hospitals to depress the compensation paid to RNs employed at hospitals within the Detroit MSA.

35.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

    a.    Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

    b.    Agreeing not to compete, and not competing, with each other in the setting or RN employee compensation;

    c.    Paying RN employees at the same or nearly the same rate as each other; and

    d.    Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

36.    In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

37.    Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned and/or surveyed each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year.    Hospital

- 9 -

administrators in the Detroit MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

38. Several of the defendants and their co-conspirators conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs.

39. Several of the defendants and their co-conspirators retained consultants such as Watson Wyatt Worldwide and Sullivan, Cotter and Associates, Inc. to conduct surveys of other hospitals in order to determine what wages those entities were providing to RNs.

40. Hospitals that cooperated in compiling these consultants' surveys would receive free copies of reports commissioned by their supposed rival hospitals.

41. The Michigan Health and Hospital Association ("MHA") releases periodic reports relating to benefits and salaries of Detroit areas hospitals, and the human resource departments of several of the defendants and their co-conspirators obtain and review these reports. Human resources employees can readily identify each surveyed hospital from identifying information contained therein including identification of the number of beds provided for each listed hospital. Hospital administrators in the Detroit MSA have used this information to set RN compensation.

42. Hospital recruiters and other hospital human resource personnel of the defendants and their co-conspirators met periodically in both formal and informal settings to discuss and exchange wage information for RNs in the Detroit area.

43. Hospital recruiters attended meetings of various organizations in the Detroit area at which current wage information is shared. One example is the Health Care Recruiters Associations of Metro Detroit ("HCRAMD"). According to the HCRAMD website, since "the early 80's a group of Nurse Recruiters from local hospitals in the metropolitan Detroit area began meeting on a regular basis to share information and offer support and direction to each other. . . . Today, HCRAMD functions with over 50 members from 32 facilities", and meetings are held monthly. http://hcramd.hodes.com/index.asp. Hospital recruiters and administrators in

- 10 -

the Detroit MSA exchanged wage information for RNs in the Detroit area, and used this information to set RN compensation.

44.    Through HCRAMD, defendant hospitals and other unnamed conspirators agreed that it would be in the interests of HCRAMD members to limit the use of recruitment incentives, such as sign-on bonuses, because such incentives financially hurt hospitals and led to "churning" of their nurses.

45.    Nurse wage data was also shared at meetings of the Michigan Organization of Nurse Executives ("MONE").

46.    During the class period, hospitals within the Detroit MSA have paid very similar RN compensation.

47.    Defendants' unlawful conspiracy has had the following effects, before and after the Class period:

a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Detroit area has been restrained;

b.    Compensation for hospital RN employees in the Detroit MSA has remained at artificially low levels; and

c.    Detroit area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

48.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and morality rates.

- 11 -

Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to achieve it – they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

49.    During the Class Period (and before), Plaintiffs have suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I:
### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF
### SECTION 1 OF SHERMAN ANTITRUST ACT

50.    Plaintiffs re-allege the allegations in paragraphs 1-47 as if set forth fully herein.

51.    Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Detroit MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

52.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Detroit MSA at artificially low levels.

53.    As a result of the unlawful conspiracy alleged in this Count, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### COUNT II
### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION
### IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

54.    Plaintiffs re-allege the allegations in paragraphs 1-51 as if set forth fully herein.

55.    Beginning before November 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed

and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

56.    This information-exchange agreement has reduced competition among Detroit-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

57.    The relevant geographic market for the claim alleged in this Count is the Detroit MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

58.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Detroit MSA without causing too many RNs to move to non-hospital employers within the Detroit MSA or to employers outside the Detroit MSA.

59.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

60.    Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

61.    Detroit-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Detroit MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Detroit MSA. Detroit-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Detroit area.

- 13 -

62.    Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

63.    The information-exchange agreement has had the effect of suppressing competition among Detroit-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

64.    The information regularly exchanged by Detroit-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

65.    Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

- 14 -

66.     The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

67.     The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

68.     For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

69.     As a result of the unlawful agreement alleged herein to exchange RN compensation information, Plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.     The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. § 15(a);

- 15 -

D.      Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

E.      Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.      Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

KELLER ROHRBACK L.L.P.


By:    s/ Mark A. Griffin
Mark A. Griffin
Raymond J. Farrow
Lorraine Lewis Phillips
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel: 206-623-1900
Fax: 206-623-3384
Email: mgriffin@kellerrohrback.com
Email: rfarrow@kellerrohrback.com
Email: lphillips@kellerrohrback.com


Stephen Wasinger (P25963)
STEPHEN F. WASINGER PLC
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, MI 48073
Tel: 248-554-6300
Fax: 248-479-0391
Email: sfw@sfwlaw.com


Charles P. Tompkins
Daniel Small
Kalpana Kotagal
COHEN MILSTEIN HAUSFELD & TOLL PLLC
1100 New York Avenue, NW,
Suite 500, West Tower
Washington D.C. 2005
Tel: 202-408-4600
Fax: 202-408-4699
Email: ctompkins@cmht.com
Email: dsmall@cmht.com
Email: kkotagal@cmht.com


Shelly L. Friedland
Sharon Robertson
COHEN MILSTEIN HAUSFELD & TOLL PLLC
150 East 52d Street, Thirtieth Floor
New York, NY 10022
Tel: 212-838-7797

- 17 -

Fax: 212-838-7745
Email: sfriedland@cmht.com


David P. Dean
Mary Joyce Carlson
JAMES & HOFFMAN
1101 17th Street, NW, Suite 510
Washington, DC 20036-4748
Tel: 202-496-0500
Fax: 202-495-0555
Email: dpdean@jamhoff.com
Email: carlsonmjj@aol.com

Daniel E. Gustafson
Brian L. Williams
Amanda M. Martin
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
Email: dgustafson@gustafsongluek.com
Email: bwilliams@gustafsongluek.com
Email: amartin@gustafsongluek.com

Michael P. Lehmann
Thomas P. Dove
Kimberly A. Kralowec
FURTH LEHMAN LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076
Email: mlehman@furth.com
Email: tdove@furth.com
Email: kkralowec@furth.com

Arnold Levin
Charles Schaffer
LEVIN, FISHBEIN SEDRAN & BERMAN
510 Walnut St., Ste 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Email:  alevin@lfsblaw.com
Email:  cschaffer@lfsblaw.com

*Co-Counsel For Plaintiffs*

Dated: June 15, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Michael J. Bommarito | michaelb@mclaren.org |
| Charles N. Raimi | craimi@dmc.org |
| Stephen F. Wasinger | sfw@sfwlaw.com |
| Benjamin J. Hanauer | bhanauer@mwe.com |
| David L. Hanselman, Jr. | dhanselman@mwe.com |
| Fred K. Herrmann | fkh@krwlaw.com |
| Howard B. Iwrey | hiwrey@dykema.com |
| David Marx, Jr. | dmarx@mwe.com |
| Terrence J. Miglio | tjm@kellerthoma.com |
| Jonathon A. Rabin | jar@kellerthoma.com |
| Mark S. Wilkinson | msw@kellerthoma.com |
| Alethea A. Wilson | awilson4Wdmc.org |
| Stephen Y. Wu | swu@mwe.com |
| Patricia C. Schabath | pschabat@dmc.org |
| L. Pahl Zinn | pzinn@dickinsonwright.com |
| Kenneth J. McIntyre | kmcintyre@dickinsonwright.com |
| David A. Ettinger | dettinger@honigman.com |
| Peter E. Boivin | pboivin@honigman.com |
| David A. Hardesty | dhardest@clarkhill.com |
| Thomas M.J. Hathaway | thathaway@clarkhill.com |
| Louis P. Gabel | lpgabel@jonesday.com |

N:\CLIENTS\27249\1\PLEADINGS\3DAMENDEDCOMPLAINT.DOC - 20 -

Paul F. Novak                    pnovak@clarkhill.com
Shari Ross Lahlou                slahlou@crowell.com
Michelle R. Heikka               mheikka@dickinsonwright.com


KELLER ROHRBACK L.L.P.


s/ Mark A. Griffin
Mark A. Griffin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA  98101
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384
Email:  mgriffin@kellerrohrback.com
Email:  rfarrow@kellerrohrback.com

# EXHIBIT G

1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - -

4    MARJORY UNGER, et al.,

5                        Plaintiffs,

6        -versus-                        06-CV-765

7                                (IN-COURT CONFERENCE)

8    ALBANY MEDICAL CENTER, et al.,

9                        Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12

13

14           TRANSCRIPT OF PROCEEDINGS held in and for the

15   United States District Court, Northern District of New York,

16   at the James T. Foley United States Courthouse, 445 Broadway,

17   Albany, New York 12207, on WEDNESDAY, MAY 16, 2007, before

18   the HON. DAVID R. HOMER, United States District Court

19   Magistrate Judge.

20

21

22

23

24

25

2

```
 1
 2   APPEARANCES:
 3   FOR THE PLAINTIFFS:
 4   CHARLES E. TOMPKINS, IV, ESQ.
 5   DAVID P. DEAN, ESQ.
 6   KALPANA KOTAGAL, ESQ.
 7
 8   FOR THE DEFENDANT AMC:
 9   DAVID MARX, ESQ.
10
11   FOR THE DEFENDANT NE HEALTH:
12   DANIEL J. HURTEAU, ESQ.
13
14   FOR THE DEFENDANT SETON HEALTH:
15   MICHAEL R. SHUMAKER, ESQ.
16   PHILIP ROSENBERG, ESQ.
17
18   FOR THE DEFENDANT ST. PETER'S:
19   BRIAN M. CULNAN, ESQ.
20   JOHN QUEENAN, ESQ.
21
22   FOR THE DEFENDANT ELLIS HOSPITAL:
23   WILLIAM REYNOLDS, ESQ.
24
25
```

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                           3

1                    (Court commenced at 2:00 PM.)

2                    MR. TOMPKINS:  Charles Tompkins and David

3       Dean for the plaintiffs.

4                    MR. MARX:  David Marx, your Honor, for Albany

5       Medical Center.

6                    MR. SHUMAKER:  Mike Shumaker on behalf of

7       Seton Health.

8                    MR. HURTEAU:  Your Honor, Dan Hurteau, with

9       Nixon, Peabody, representing Northeast Health.

10                   MR. ROSENBERG:  Philip Rosenberg, from

11      Wilson, Elser, Moskowitz, Edelman & Dicker, local counsel

12      for Seton.

13                   MR. REYNOLDS:  Your Honor, William Reynolds,

14      from Bond, Schoeneck & King, for Ellis Hospital.

15                   MR. CULNAN:  Brian Culnan, John Queenan, from

16      Iseman, Cunningham, Reister & Hyde, for St. Peter's Health

17      Care.

18                   (Additional speakers state their appearance;

19                    inaudible on CD.)

20                   THE COURT:  All right.  Thank you.  First of

21      all, I apologize for the cold weather in the courtroom.

22      Seems unusually cold to me, but it's apparently beyond our

23      control at the moment.

24                   The matter was scheduled on two issues raised

25      by the defendants.  The first is concerning the assertion of

Unger v. AMC, et al. - 06-CV-765                                    4

1    the work product doctrine as protection against disclosure

2    by the plaintiffs and certain nonparties reflected in

3    privilege logs served by the plaintiffs, and the second is

4    Seton's request for an order compelling nonparty Union 1199

5    to produce certain additional documents -- or at least

6    contents of documents which were redacted.  Am I correctly

7    advised that the second issue with respect to 1199 is

8    resolved?

9            MR. SHUMAKER:  Yes, your Honor.  This morning

10   they agreed to produce the materials in unredacted form.

11           THE COURT:  All right.  And are you

12   withdrawing your request for an order?

13           MR. SHUMAKER:  Yes, your Honor, I am.

14           THE COURT:  All right.  Now, with respect to

15   the other issue then that's raised by defendants, Mr. Dean,

16   I'll hear from you first.  I'm sorry, Mr. Marx.  It's raised

17   by Mr. Marx.

18           MR. MARX:  First, I apologize for the massive

19   paper that was dropped on you at the end of last week and

20   again yesterday.  We had hoped to work some of those issues

21   out, but, obviously, we were unable to do that.  As a

22   practical matter, we only received, as I suspect you did,

23   plaintiffs' response to our motion yesterday and, frankly, I

24   reviewed it, but haven't had a complete opportunity to

25   assimilate it.  We're prepared to argue about this today.

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                    5

1    If it would be your preference that we submit a reply and

2    argue later, we're prepared to do that.  But we're prepared

3    to go today if that's what you --

4              THE COURT:  All right.  Let's go forward with

5    the argument.  I'll hear you from first.

6              MR. MARX:  First, your Honor, I think it's

7    important to note that discovery in this case, and this case

8    was initiated, by the way, by a plaintiff who not only had

9    been terminated for cause by Albany Medical Center during

10   the alleged class period but has now been voluntarily

11   dismissed because she lost interest just before discovery of

12   her was about to begin.

13             The discovery in this case has all been

14   virtually all one-sided.  Defendants have incurred,

15   separately, several hundred thousand dollars' worth of

16   expenses to respond to plaintiffs' discovery request just in

17   relation to class certification so far.  Collectively, the

18   dollars spent by all of these not-for-profit hospitals is in

19   the several million dollar range, I believe.

20             In response to all of this, you know, the

21   plaintiffs have produced so far 482 pages worth of

22   documents.  Now, recently I understand that the plaintiffs

23   have begun supplementing a little bit that production, but

24   they've claimed privilege for more than three thousand pages

25   worth of materials.  Notwithstanding what Miss Carlson says

Unger v. AMC, et al. - 06-CV-765                                    6

1   in her affidavit and what the plaintiffs say in their

2   response, as best we can tell, Local 1199 has produced 102

3   pages of documents in response to the subpoenas that have

4   been issued, the SEIU has produced 339 pages and three

5   spread sheets, Barbara Bergmann produced 58 pages of

6   documents in response to the subpoenas issued in connection

7   with the Albany case and the San Antonio case, 773 pages in

8   Chicago.  And the Mintz Group has produced absolutely no

9   documents whatsoever in response to any of these.

10          Now, we have no objection to what the

11   plaintiffs have offered, which is your conducting an

12   in-camera review of the documents that have been withheld.

13          THE COURT:  Let's explore some other options

14   first.

15          MR. MARX:  We figured you would want to do

16   that, your Honor, but that wasn't part of what we were

17   proposing, to the extent that we weren't able to reach

18   agreement.  But it's important to note that the plaintiffs

19   don't argue in their response that the documents that

20   they've withheld are not responsive or relevant, even as to

21   class certification.

22          THE COURT:  Well, they do raise questions of

23   relevance, don't they?  Whatever the footnote was, 673,

24   whatever the last footnote is in their letter certainly

25   mentions relevance.

Unger v. AMC, et al. - 06-CV-765                                    7

1              MR. MARX:  Well, they've listed the documents

2      on their privilege logs, so presumably they are responsive

3      to our requests, and they say some of the materials that

4      have been withheld are irrelevant to the issue of class

5      certification.  We don't know because we haven't seen any of

6      the materials and the descriptions really don't tell us.

7      You know, class certification, as it relates to the

8      plaintiffs, is not just -- as we have to defend is not just

9      a function of how much they were paid, but there are issues

10     of the adequacy of the plaintiff as a representative,

11     typicality, those kinds of things.  So, for example, all of

12     those interview reports that the Mintz Group did for which

13     the plaintiffs are asserting work product privilege, that's

14     all factual information and that is all relevant to class

15     certification and there's no plausible basis for the

16     plaintiffs to claim work product privilege with respect to

17     the interview reports that were done by the Mintz Group that

18     was retained by a nonparty prior to the time that this

19     litigation was commenced or that a plaintiff was even in

20     sight.

21             THE COURT:  Well, if the Mintz Group --

22     assume for the sake of argument that the Mintz Group was

23     retained by a party enjoying the work product privilege.  Is

24     their information not then within the scope of the

25     doctrine -- not a privilege, the doctrine?

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                              8

1              MR. MARX:  Not necessarily.

2              THE COURT:  Why not?

3              MR. MARX:  Everything, the interview reports,

4    the factual information --

5              THE COURT:  Yes, why not?

6              MR. MARX:  Because it's factual information,

7    it doesn't contain attorney's thought process.  I'm not

8    asking -- there might be a plausible argument that the

9    interview outline that James & Hoffman or Cohen, Milstein,

10   or whoever wants to take credit for it, provided to the

11   Mintz Group to use for their interview --

12             THE COURT:  Is it your position that no

13   factual information is protected by the doctrine?

14             MR. MARX:  No factual information.  So all of

15   those interview reports that appear on the log that we got

16   last night from the plaintiffs, I can give you numbers, I

17   think, in a minute, interview potential witness, numbers 8,

18   9, 10, 11, 12, 15 through 18, some of which are undated, all

19   of which, again, predate there being a plaintiff in this

20   case, and the whole question of whether --

21             THE COURT:  Well, you allude to the two

22   central issues that you raise.  One is whether or not there

23   is a sufficient showing that this was by or for a party or a

24   party's representative and the second is whether or not this

25   was in anticipation of litigation.


                    THERESA J. CASAL, RPR, CRR
                 UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    9

1              MR. MARX:  Yes.  But I think the Pfohl

2    Brothers case addresses that.  Just because you're thinking

3    maybe sometime in the future, maybe 18 months away, which is

4    what the time line is here, and maybe if I could, I've

5    got -- we prepared a short time line that sort of summarizes

6    the relationships leading up to the filing of this case.

7              THE COURT:  Has this been shown to

8    plaintiffs' counsel?

9              MR. MARX:  I will show it to plaintiffs now.

10             THE COURT:  I do want some factual

11   information.  If it's agreed to, with respect to when the

12   plaintiffs in this case became clients --

13             MR. MARX:  I don't think there is going to be

14   a dispute about that.  May I offer --

15             THE COURT:  Yes, please.  Thank you.

16             MR. MARX:  The investigation and the

17   retention of Barbara Bergmann began in October 2004.  The

18   original named plaintiff in this case, Marjory Unger,

19   executed a retention letter on May 10, 2006.

20             THE COURT:  January 10, 2006?

21             MR. MARX:  May 10, 2006.

22             THE COURT:  May 10th.

23             MR. MARX:  The two current plaintiffs didn't

24   execute -- didn't retain counsel until November 14, 2006.

25   Now, for purposes of our discussion today, though it pains

Unger v. AMC, et al. - 06-CV-765                    10

1   me to do it, I'll concede that they have plaintiff on

2   May 10, 2006.  Didn't last for long, but they have it.  But

3   everything above this dotted line, all of those

4   communications above the dotted line, that occurred before

5   the dotted line for which the plaintiff or the Mintz Group

6   or Barbara Bergmann or the SEIU or 1199 are claiming

7   privilege, we don't think they're entitled to it, because

8   there wasn't -- they weren't doing the work on behalf of a

9   party or a representative of a party.  And even -- which is

10  the one -- and even with respect to -- even if you were to

11  accept the argument that if the James & Hoffman firm, which

12  is the functional equivalent of the SEIU, I think we're

13  realizing, was the one that did the retaining of the Mintz

14  Group, and here it was in rendering legal advice to the

15  SEIU, that's what their retention was, I think the factual

16  information that was generated by the Mintz Group in those

17  interviews is not protectable, as long as it's responsive to

18  our discovery request in this litigation.  And I haven't

19  heard the plaintiffs say that it isn't.  And frankly, the

20  fact that it's listed on the privilege log I would view as

21  an admission that it is responsive.  Otherwise, it wouldn't

22  have had to have been listed in the first place.

23          So, when you look at what they're saying, the

24  plaintiffs, they're saying these are documents that are

25  responsive to the discovery that we're not producing because

Unger v. AMC, et al. - 06-CV-765                                11

1   we think they represent work product, but -- and that's

2   really the sum and substance of their argument, but they

3   can't use this work product claim, your Honor, it seems to

4   us, as both a sword and a shield, and that's really what

5   they're doing.

6           THE COURT:  Well, thank you for being the

7   first one to invoke that metaphor.  I was afraid it was

8   gonna be me, but that's all right.

9           MR. MARX:  No.  No.  But they were generated

10  by a nonparty, whether it's Barbara Bergmann, the SEIU, the

11  Mintz Group, long before a plaintiff, any plaintiff, let

12  alone one of the remaining ones, was here.  They used those

13  materials as the basis for the lawsuit.

14          THE COURT:  Does your analysis of whether

15  it's in anticipation of litigation differ between, for

16  example, I believe it was SEIU that retrained Bergmann, but

17  it was the law firm J&H that retained the Mintz Group.  Does

18  that affect your analysis?

19          MR. MARX:  No, because they retained the

20  Mintz Group to provide advice to the SEIU, not to a

21  plaintiff.  And the SEIU has told us over and over and over

22  again that they are not a party and they're not representing

23  a party.  So, I don't think -- look, I'll use another one,

24  but it's a shell game.  You know, I feel like I'm watching a

25  game of four card -- five card Monty, actually.  We have got

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                     12

1    plaintiffs' counsel, we have got Bergmann, we've got the

2    SEIU, we've got 1199 and we've got the Mintz Group, and they

3    keep pointing the finger in a different direction and saying

4    you're not entitled to any of this stuff.  We're entitled to

5    everything, but you're not entitled to anything.

6               THE COURT:  Let's say that a law firm had an

7    intellectual curiosity about the possibilities of an

8    anti-trust lawsuit and conducted its own legal research and

9    analysis and maybe even hired an investigator to conduct

10   some factual investigation and analysis.  No plaintiff, no

11   party, no litigation pending.  They wanted to know -- maybe

12   they want to pay for it themselves.  Litigation ensues

13   following that, a year or two later.  Are you entitled to

14   what that law firm did?

15              MR. MARX:  I would not ask for the legal

16   analysis.  I would ask for the results of the factual

17   information to the extent that it did not disclose attorney

18   thought process.

19              THE COURT:  Okay.

20              MR. MARX:  And -- but let's be clear.

21   James & Hoffman and the SEIU in this case are functionally

22   the same, and I think it's inappropriate for the SEIU -- for

23   the plaintiffs and James & Hoffman to sort of hide behind

24   the work product privilege when all of this work was being

25   done on behalf of the SEIU, not a party.  We haven't done

Unger v. AMC, et al. - 06-CV-765                    13

1   anything yet with respect to any of the materials that were

2   prepared post acquisition of a plaintiff and we'll save that

3   for another day.  But that's where we come to.

4            THE COURT:  What is your position with

5   respect to the plaintiffs' argument that in the context, as

6   this is, of anti-trust litigation, or other similar types of

7   class actions, it is not, first of all, unusual for

8   investigation and legal analysis to precede the formal

9   retention of a client and that to hold otherwise, as you

10  would have me do, would undercut the purposes of that type

11  of litigation?

12           MR. MARX:  First, if what they're withholding

13  is the law firm's legal analysis, I'm less troubled.  But

14  much of what's on this list is not legal analysis, it's

15  analysis of data, it's the interview reports done of nurses

16  or others.  That information, if it formed the basis for the

17  complaint in this case, your Honor, frankly should have been

18  disclosed in the context of a Rule 26 disclosure.  And I

19  think in response to your question, in an anti-trust case or

20  in a discrimination, any class action case, if an

21  investigation, factual investigation is undertaken where

22  they've identified people with information relevant to the

23  complaint that forms the basis for the complaint, I think

24  that information is information that would be disclosed

25  under Rule 26 and would properly be the subject of

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                              14

1    discovery.  The legal analysis, I think, falls into a

2    different category.

3              But I don't think that's true with respect to

4    the factual analysis, and likely even with respect·to the

5    economic analysis that's done.  We're not·talking about,

6    we're not talking about information that was prepared by

7    experts who are going to testify in this case for which

8    we'll get discovery when the appropriate time comes, but

9    that other work wasn't being done on behalf of a plaintiff,

10   it was being done for the SEIU.  It loses its privilege in

11   that context.  It wasn't being done by the law firm for the

12   law firm, it was being done for the SEIU.

13             THE COURT:  What -- with respect to the --

14   your contention that the work being done for SEIU would not

15   suffice to establish the privilege here because they're not

16   a party, what's the best case that supports that

17   proposition?  Is it the Pfohl case?

18             MR. MARX:  I think Pfohl Brothers is probably

19   the best example.

20             THE COURT:  All right.  Anything else?

21             MR. MARX:  Not now, your Honor, thank you.

22             THE COURT:  Thank you.  Mr. Dean.

23             MR. DEAN:  Thank you.  What I'd like to do is

24   start with the facts and move to the law.  On the facts, I'd

25   like to explain -- I think there's four categories of

Unger v. AMC, et al. - 06-CV-765                                15

1    documents that are at issue.  I think none of them would

2    exist but for the anticipated litigations on behalf of

3    hospital nurses against hospital employers, including this

4    litigation and this purported class.  On the law, I am gonna

5    make just three points.  On the question of in anticipation

6    of the governing Second Circuit authority, which is not even

7    cited in the brief by the defendants, is US v. Adlman, that

8    sets out a "because of" standard.  On Rule 26(b)(3), clearly

9    plain language of the rule covers a party's representative

10   and James & Hoffman and Cohen, Milstein are party

11   representatives who --

12                THE COURT:  What party?

13                MR. DEAN:  The plaintiffs.

14                THE COURT:  They became -- at the earliest,

15   they became the representative of the parties in this action

16   May 10, 2006.  What about documentation --

17                MR. DEAN:  I am not gonna -- I won't argue

18   with the May 10th date, your Honor.

19                THE COURT:  What about documents that came

20   into existence before that time?

21                MR. DEAN:  The documents that were created

22   before that time were created under the direction of James &

23   Hoffman for the benefit of the purported class in this case

24   and Cohen, Milstein.  Again, when I go over the facts, I

25   hope that will be clear, and the facts that I will recite

Unger v. AMC, et al. - 06-CV-765                            16

1    are laid out in longer form in Mary Joyce Carlson's

2    declaration.  But, in any case, I think it's critical to

3    realize that Rule 26(b)(3) and its reference to a party's

4    representative is a partial codification of the work product

5    rule and Hickman v. Taylor remains --

6                    THE COURT:  Where in the Second Circuit does

7    it say it's a partial codification?  Even your case, even

8    your case, Adlman, says that Hickman was codified, not

9    codified in part, by Rule 26 (b).

10                   MR. DEAN:  I think that in the Second Circuit

11   the governing standard is appropriately laid out in the

12   Abdell case and the Haus case, both in the Southern District

13   of New York, June and October last year, and they lay out

14   the test.  I believe Abdell makes the point about partial

15   codification, and they set out a three-part test for the

16   applicability of Hickman.  That test is whether or not

17   ruling that certain documents should be disclosed will alter

18   attorney behavior, whether or not it will reward attorney

19   slough and whether or not it will interfere with ongoing

20   litigation.

21                   THE COURT:  Attorney slough?

22                   MR. DEAN:  Yes, that's the word they actually

23   used.

24                   THE COURT:  Okay.

25                   MR. DEAN:  And on that point --


                        THERESA J. CASAL, RPR, CRR
                    UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    17

1           THE COURT:  We are gonna get the other six

2   deadly sins in here at some point.

3           (Laughter.)

4           MR. DEAN:  The -- to take a momentary detour,

5   the facts are certainly not privileged, but all of the names

6   of all the witnesses who were interviewed by the Mintz folks

7   are in the possession of the defendants and they are free to

8   go interview every single one of those folks and discover

9   their own facts.

10          THE COURT:  Wait a minute.  You say the facts

11  are not privileged.  You agree with that?

12          MR. DEAN:  The underlying facts are not

13  privileged.  The underlying facts are available to the

14  defendants by talking to these witnesses.  To the extent

15  that these witnesses know something more about nurse

16  compensation than they themselves do, they are free to go

17  interview these witnesses and discover those facts.

18          THE COURT:  Well, I -- let me talk about

19  definitions for a minute.

20          MR. DEAN:  Okay.

21          THE COURT:  Let's say the Mintz Group

22  interviewed Nurse So and So who said I earned, you know, $18

23  an hour on such and such a date.

24          MR. DEAN:  Yes.

25          THE COURT:  Why -- isn't that a fact?

Unger v. AMC, et al. - 06-CV-765                          18

1              MR. DEAN:  Yes.

2              THE COURT:  Then why aren't they entitled to

3    what the nurse told the Mintz Group?

4              MR. DEAN:  Because the document that records

5    that was prepared in anticipation of litigation, they are --

6    they can -- they can get discovery into facts --

7              THE COURT:  No analysis.

8              MR. DEAN:  Well, as you -- no, there's

9    opinion work product and there's fact work product.  And the

10   fact work product under Rule 26(b)(3) requires a showing of

11   undue burden or hardship, substantial burden I think, or

12   something like that, for the defendants.  In other words,

13   since they're free to go find those --

14             THE COURT:  Well, they don't make that

15   argument here.  It's -- the first question, the threshold

16   question, is whether or not what you call fact -- what was

17   your phrase?  You differ between facts and fact gathering or

18   something.

19             MR. DEAN:  Well, okay, there's opinion work

20   product and fact work product.

21             THE COURT:  All right.  Fact work product.

22   You make the distinction between facts and fact work

23   product, is that it?

24             MR. DEAN:  Yes.

25             THE COURT:  All right.

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    19

1            MR. DEAN:  The facts that have been -- that

2    are reported on documents that were prepared by attorneys in

3    anticipation of litigation are work product.

4            THE COURT:  But with respect to need, which

5    you raise throughout your paper, the defendants don't argue

6    that, I believe, because the threshold question is whether

7    or not these documents are even covered by the work product

8    doctrine.  If they're not, then they don't have to show

9    need.

10            MR. DEAN:  That's correct.  So I understand

11    their position to be that these documents, even though they

12    were created in anticipation of this very litigation, under

13    the direction and control of the plaintiffs' representatives

14    because they were generated before plaintiffs retained the

15    work are not work product.  I understand that to be their

16    position also.

17            THE COURT:  Correct.

18            MR. DEAN:  Okay.  I just think they're wrong

19    about it.

20            THE COURT:  Well, you threw me for a loop

21    when you said facts are not and I need to understand what

22    you mean by "facts."

23            MR. DEAN:  Sure, I -- okay.  Well, let me go

24    to the facts about these documents so that we can understand

25    what we're talking about.  The -- there were two parts to

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    20

1    James & Hoffman and then James & Hoffman and Cohen,

2    Milstein's prefiling investigation in this case.  Both were

3    highly informed by legal analysis.  We're talking here

4    about, you know, the Sherman Act claim for price fixing

5    based on circumstantial evidence showing collusion which

6    requires a good bit of legal analysis and I assume that

7    we're gonna be in some disputes about what constitutes

8    collusion and what constitutes evidence of collusion.

9            But following that legal analysis, there were

10   two parts to this investigation:  There was the economic

11   analysis and research, and then there was the factual

12   research that was carried on by the Mintz Group.  The SEIU

13   commissioned James & Hoffman to perform that prefiling

14   investigation.  They -- James & Hoffman conducted that

15   investigation completely separately from SEIU's normal

16   ongoing institutional activities which continued on,

17   parallel, to James & Hoffman's investigation.  But James &

18   Hoffman did not allow SEIU or SEIU ultimately did not use

19   the results of either investigation and, in fact, did not

20   even see the Mintz work product that's at issue here until

21   after this litigation was filed.  So, it was no part of

22   their normal ongoing institutional activities.

23           They -- the SEIU International did begin a

24   public campaign on the nurse wage issue.  They commissioned

25   their own economic analysis from the Institute for Women's

Unger v. AMC, et al. - 06-CV-765                                    21

1    Policy Research, they did a national survey, I think they

2    engaged the Feldman Group, they used their own networks to

3    gather factual information and then they put out their

4    communications seeking to pursue their agenda of organizing

5    nurses.

6                THE COURT:  I understand your position on the

7    Mintz Group and James & Hoffman.

8                MR. DEAN:  Okay.

9                THE COURT:  What about your position on SEIU

10   itself and SEIU and Bergmann together?

11               MR. DEAN:  The SEIU materials that were part

12   of all those activities that I just talked about have all

13   been produced, as far as I know, we're certainly not

14   claiming work product on any of that material.  And I

15   listened to the numbers here, I haven't, you know, gone and

16   counted the pages in the SEIU's production, but my

17   impression in Chicago was that it was in the thousands of

18   pages that were produced because they carried on an entire

19   public campaign on this issue and they, you know, they have

20   a lot of documents, the Institute for Women's Policy

21   Research produced a document that they've used in this

22   campaign and you've got, with the Carlson declaration, the

23   retainer that SEIU entered with the Institute to generate

24   that study.  All of that material has been produced for --

25   plaintiffs have certainly not prevented any of it from being

Unger v. AMC, et al. - 06-CV-765                                    22

1   produced.

2               Bergmann was retained to advise on both and

3   what Bergmann -- what Bergmann did, because she was, in many

4   ways, the genesis of the theory, the overall overbranching

5   theory here, what she did is she was retained by the SEIU,

6   she certainly advised this them and consulted with them on

7   the public campaign side.  She also -- there was a clause

8   essentially in her retention that said that she could

9   consult with James & Hoffman on the litigation support.  Her

10  involvement in that was essentially two-fold:  On one hand,

11  she did a -- gave us a commentary, I guess, on the report

12  that was generated by the expert consultants that we engaged

13  for the prelitigation economic analysis, and that we've

14  claimed work product for, and then, secondarily, she was

15  involved and consulted with James & Hoffman and the Mintz

16  Group on the factual investigation.  And I don't think

17  there's a lot of documents that resulted from that, but

18  there are a couple where -- apparently e-mails where she was

19  giving input as to what she thought would be appropriate

20  avenues of inquiry for the Mintz Group and the kinds of

21  questions that they should be asking, et cetera.  We've

22  claimed work product for that.  It was done pursuant to her

23  agreement and pursuant to the arrangement, even outside the

24  agreement, of her consultation with James & Hoffman on the

25  litigation support.

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                          23

1                  THE COURT:  Why is SEIU entitled to work

2       product protection here?

3                  MR. DEAN:  SEIU has not asserted work product

4       protection here.  The plaintiffs have directed SEIU to

5       withhold documents based on work product and SEIU, as an

6       ally, with a very similar interest --

7                  THE COURT:  Where is there a case that says

8       an ally enjoys the privilege?

9                  MR. DEAN:  The -- it's -- the privilege that

10      they're asserting --

11                 THE COURT:  Lot of people walking down the

12      street who may be sympathetic with the union, but they don't

13      get the work product privilege, do they, simply because

14      they're sympathetic?

15                 MR. DEAN:  There's no waiver -- if, in fact,

16      they have -- if it does not increase the risk of the

17      material being disclosed to the defendants in the case, that

18      is if they're not just gonna turn around and give them the

19      document, or might turn around and give them the document,

20      consistent with the adversary process that the work product

21      doctrine derives from, there's no waiver of the work

22      product --

23                 THE COURT:  I'm not saying waiver.  I'm

24      saying why is it protected in the first instance, whether or

25      not it's been waived?

Unger v. AMC, et al. - 06-CV-765                    24

1            MR. DEAN:  It's protected in the first
2    instance because it is work product, it is the plaintiffs'
3    counsel in this hour -- if -- I mean, if we prevail --
4            THE COURT:  In anticipation of what
5    litigation did SEIU obtain this -- these factual -- the
6    factual information and do the legal analysis?
7            MR. DEAN:  Okay.  The -- focusing on the
8    Mintz documents --
9            THE COURT:  Mintz is with J&H.  I'm not
10   talkin' about Mintz, I'm talking about SEIU.
11           MR. DEAN:  Right.  But the only -- SEIU --
12   documents that -- factual analysis that was generated by the
13   SEIU as opposed to J&H and Mintz, we've not claimed work
14   product, it's all been subject to discovery.
15           THE COURT:  But you've directed SEIU not to
16   produce certain documents in their possession.
17           MR. DEAN:  Talkin' about J&H or Mintz --
18           THE COURT:  Okay.
19           MR. DEAN:  -- which, which SEIU only came
20   into possession of after this case was filed and the reason
21   they came into possession was because the defendants
22   subpoenaed the SEIU under the DC ethical rules, this is set
23   out in Mary Joyce Carlson's declaration in the final couple
24   of paragraphs, under the DC ethical rules, when a former
25   client asks for their file, it's extremely broad definition,

Unger v. AMC, et al. - 06-CV-765                                    25

1    and material that you have as an attorney that relates to

2    their case or matter you're required to turn over under the

3    ethical rules.  We did not want to obstruct discovery in the

4    case, we wanted to comply with our DC ethical rules, we made

5    the judgment, which I hope was not a mistake in judgment, or

6    an inadvertent disclosure, but we decided that because --

7    while they had never seen the Mintz documents, the Mintz

8    documents had absolutely informed James & Hoffman's advice

9    to the SEIU in its role as a third-party payer, which was

10   the legal advice that they got, that these were good cases

11   and that it would be fine for them to go ahead and pay for

12   it.  And because we had the material generated for the

13   benefit of these plaintiffs and to bring this case and just

14   like any class action plaintiff firm would have done their

15   investigation and figured out who a representative plaintiff

16   was and gone ahead, we had done that, but we had been

17   commissioned by the SEIU to do that and we had been advised

18   by the SEIU that we had a good case and since that material

19   informed it, we felt like it was appropriate to turn it over

20   because they assured us they would claim work product at our

21   direction for the material that was work product.

22              THE COURT:  Well, just so I understand, are

23   you saying that SEIU has not asserted the protection for any

24   of the documents that it generated itself?  It has only been

25   asserted for documents it received from J&H or the Mintz

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                    26

1    Group?

2                    MR. DEAN:  Yes.  And I believe the SEIU

3    privilege log indicates that.

4                    THE COURT:  Okay.

5                    MR. DEAN:  They've asserted an

6    attorney/client privilege undoubtedly for some material of

7    theirs, but no work product privilege that I know of.

8                    THE COURT:  Before we leave SEIU, at least

9    before I do for the moment, it might be -- is it not a

10   little bit more complicated with respect to Bergmann because

11   she had, in essence, a dual employer, SEIU and J&H?

12                   MR. DEAN:  Let me say that I'm a little

13   puzzled --

14                   THE COURT:  If she did work solely for SEIU,

15   which may later have been turned over to J&H, is that --

16   does that enjoy the protection of the privilege?

17                   MR. DEAN:  As far as I know, and I looked

18   through their papers to discover differently and did not,

19   Professor Bergmann has not asserted that she was instructed

20   by the plaintiffs to claim work product over any material.

21   She has produced material without any direction from the

22   plaintiffs to claim work product.  So I'm not even sure why

23   they're moving you for an order for us not to instruct her

24   in this case to assert work product, she hasn't done it.

25   Now, in Chicago --

Unger v. AMC, et al. - 06-CV-765                        27

1                    THE COURT:  In this case.

2                    MR. DEAN:  Right.

3                    THE COURT:  Chicago is somebody else's

4    problem.  In this --

5                    MR. DEAN:  Well, there is no document at

6    issue.

7                    THE COURT:  There's no work product claim for

8    anything from Bergmann, is that correct?

9                    MR. DEAN:  Bergmann has not asserted work

10   product.

11                   THE COURT:  Have you directed her --

12                   MR. DEAN:  No.

13                   THE COURT:  -- to assert work product in this

14   case?

15                   MR. DEAN:  No.  There are documents that are

16   in the plaintiffs' possession -- again, I think there's

17   maybe two, they're e-mails -- that -- where she commented on

18   the economic analysis on one hand, that's one, and she

19   commented on the Mintz investigation, two.

20                   THE COURT:  Commented to whom?

21                   MR. DEAN:  To J&H.  She --

22                   THE COURT:  Only?  They're e-mails.  Who are

23   the recipients?

24                   MR. DEAN:  I would look, but I think J&H and

25   the Mintz Group in one case, I'm not certain in the other

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    28

```
 1    case.
 2                 THE COURT:  Is SEIU a recipient of either
 3    e-mail?
 4                 MR. DEAN:  I didn't think so, but I'm not
 5    certain.
 6                 THE COURT:  If they were --
 7                 MR. DEAN:  Yes.
 8                 THE COURT:  -- would the documents still be
 9    protected?
10                 MR. DEAN:  I would say yes, for this reason:
11    Pursuant to her retention agreement, it was understood that
12    there was certain work that she would do under the direction
13    and control of J&H.  I requested her comments on the
14    economic analysis.  Now if she -- so, she performed that
15    work under our direction and control, she was informed by
16    our control, it was informed by our explanation to her of
17    the legal theories, et cetera.  If, when she gave it, she
18    CCd it to somebody at the SEIU, which I don't think she did,
19    but if she did, again, I don't think that would constitute a
20    waiver, in any way, of the fact that this was work product
21    because it was a document created for James & Hoffman, now
22    plaintiffs' counsel, in anticipation of this litigation.
23                 THE COURT:  Not a waiver, just that the
24    document pursuant to her retention agreement with SEIU was
25    shared with SEIU which, as you have said, does not enjoy the
```

Unger v. AMC, et al. - 06-CV-765                          29

1    protection for its documents.

2                MR. DEAN:  I don't know whether SEIU has that

3    document now.  A lot of these e-mails obviously were -- you

4    know, disappeared, so I don't know whether SEIU has that

5    document.  We have asserted work product for that document

6    because it was generated for James & Hoffman, under our

7    direction and control, and because it comments on an

8    economic analysis that was for the same purposes, for this

9    litigation.  She did write one e-mail to -- directly to the

10   minutes group, again she was working with us in helping to

11   consult on where we ought to look, in essence, and I know

12   that there was one e-mail that I would -- my understanding

13   was that she only wrote to me essentially, but I believe

14   there was one e-mail that went straight to the Mintz Group

15   and didn't go through me.  Those are the only communications

16   I'm aware of.

17                THE COURT:  Okay.

18                MR. DEAN:  The -- to hit -- to quickly talk

19   about the other pieces, the other categories of documents,

20   this economic analysis that we engaged an expert firm to do,

21   initially we were going to have the Institute for Women's

22   Policy Research take a shot at doing it.  We entered into

23   negotiation with them to do it that failed.  We had a letter

24   with them that said we are gonna be talking to you about our

25   legal analysis, this is all, you know, work product.  But it

Unger v. AMC, et al. - 06-CV-765                                30

 1    didn't work out.  But the early e-mails on the list are

 2    essentially the back and forth, where we are telling them

 3    what our legal theories are and here's the way we see the

 4    research task and can you do this.  The answer ultimately

 5    was no.  But those are the first sets of e-mails, the

 6    early -- late January, February '05 e-mails.

 7              Then we turn around and we engage this other

 8    firm of expert consultants which are currently engaged by

 9    the plaintiffs to be expert witnesses in this case and we

10    ask for IWPR to comment on that and Bergmann to comment on

11    that and there are a couple of documents in that category

12    that we've just been talking about.

13              Then there was, after the economic analysis,

14    in essence, a resulting factual investigation which was the

15    Mintz investigation, that's a third category of documents.

16              The fourth category of documents that we

17    haven't mentioned, when we got to the stage of essentially

18    drafting a complaint, we were -- we picked up the phone or

19    wrote an e-mail to the SEIU research department and we said,

20    can you explain to us exactly how these databases work?

21    What is -- you know, we are trying to frame a complaint, we

22    are trying to figure out exactly what's implicated by these

23    things, can you just explain to us this and that?  And there

24    are several of those e-mails that are on the privilege log.

25    Those that -- only those that are James & Hoffman's

Unger v. AMC, et al. - 06-CV-765                               31

1   questions to them and those answers that just sort of say,

2   well, answer one, answer two, answer three, and, therefore,

3   reveal the attorney mental process and impression and legal

4   theory in trying to put this together.

5               And I have to say, though, I totally disagree

6   with Mr. Marx's idea that somehow the economic analysis in

7   this case is not work product.  I mean, we -- there's been

8   an enormous amount of legal effort in figuring out how to

9   frame an economic analysis that'll fit the requirements of

10  the Sherman Act.

11              The law.  The --

12              THE COURT:  Before you get to the law,

13  what -- what was the nature of the factual investigation

14  conducted by the Mintz Group?  Interviews only?

15              MR. DEAN:  Well, it began with a process of

16  working out with them an understanding of what we were

17  looking for and then --

18              THE COURT:  I don't mean between you and the

19  Mintz Group.  Once they were retained, what did they do?

20              MR. DEAN:  They went out and talked to

21  employees and former employees.

22              THE COURT:  All right.  And then they

23  committed those interviews to writing somehow?

24              ATTORNEY2:  The -- there were no verbatim

25  transcripts of these interviews.  There are -- if there's a

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                          32

1    quote or two in these memos I think that would probably be

2    it.  What they did do was try to summarize based on what

3    they understood to be our interest the results of those

4    interviews.  They wrote up individual interview memoranda

5    for the people that they were eventually able to talk to you

6    and actually interview.

7                    THE COURT:  How many?

8                    MR. DEAN:  In this case, I would have to -- I

9    would be somewhat guessing.  It's on the order of --

10                   THE COURT:  I won't hold to it, but I don't

11   know if you're talking about 5 or 500 or what the number is.

12                   MR. DEAN:  Actually, I have the memorandum

13   right here.  It's 7, 10, 15; 7, 10, 15, somewhere in that

14   area.  Now they also took notes.  I mean, in the Mintz files

15   were notes that they took.

16                   THE COURT:  During the interviews?

17                   MR. DEAN:  During -- I'm not certain.  They

18   certainly seem to be more or less contemporaneous, whether

19   different investigators may have different styles, I'm not

20   sure.  But there are documents that reflect that, they side

21   this, they said that.  Then there are these formal memoranda

22   that turned around and came to James & Hoffman from the

23   Mintz Group summarizing what the witness had to say,

24   assessing the witness as a witness, et cetera.

25                   THE COURT:  You were -- you said you wanted

Unger v. AMC, et al. - 06-CV-765                    33

1   to get to the law.

2           MR. DEAN:  Get to the law.  I want to make

3   sure there are no other facts about the --

4           THE COURT:  No, that's fine.  Thank you.

5           MR. DEAN:  On the law, as I said at the

6   outset, US v. Adlman sets out the anticipation of standard.

7   We believe it's clear that none of these documents would

8   exist but for the -- these litigations of which Albany has

9   always been included.  And again, they didn't have any other

10  use.  The SEIU did not use this material.

11          THE COURT:  But you agree that even in

12  Adlman, what was at issue there was legal and factual

13  analysis, not fact finding, and that the case does draw a

14  distinction between the protection afforded legal and

15  factual analysis and that afforded to facts.

16          MR. DEAN:  I believe there's certainly a

17  distinction between opinion work product and factual work

18  product that's recorded on documents that doesn't reveal

19  attorney impressions.  The former rarely, if ever,

20  discoverable, only from the highest need.  The factual

21  material that's recorded in documents is -- you have to

22  demonstrate a need.  I don't think the defendants can meet

23  that.  They haven't even attempted to meet it, I don't

24  think, for the simple reason that all these people are

25  available for them to go talk to.  First, they know the

                    THERESA J. CASAL, RPR, CRR
              UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                        34

1   facts because they pay these folks and then second of all,

2   if they want to go find out that Nurse X earns, you know, X

3   amount of money, all they need to do is call her up or at

4   least they have equal -- as far as I know, they have equal

5   access that we did to any of these employees and former

6   employees.  And I think again that's a critical element of

7   the analysis under Hickman that goes to attorney slough.

8   You're not supposed to be able to piggy-back on the

9   investigation that your opponent does to get the facts.

10          So, anyway, the -- in -- I think the question

11  of whether these documents exist because of the litigation

12  is driven by the facts, I've explained the facts.  We

13  believe it's clear that they only exist because of the

14  litigations.

15          The question of nonparty or whether or not

16  you have to be a party's representative at the time that you

17  develop this as an attorney, we think that Rule 26(b)(3)

18  properly construed would apply such that because James &

19  Hoffman is now the party to the case, because we developed

20  this legal analysis, economic analysis and factual research

21  for this case, that it is as you set out earlier, equivalent

22  to what class action anti-trust counsel do all over the

23  country every day.  They go out, they do an investigation,

24  they find out, particularly in a situation like this where

25  you've got a conspiracy that the harmed parties don't each

Unger v. AMC, et al. - 06-CV-765                          35

1    know about, until you can figure out both whether that's

2    true and whether you can prove it, you're not in a position

3    to, you know, bring a case, discover who's a representative

4    plaintiff and then see if those people are interested in

5    bringing a suit.  And that it would radically alter the way

6    law is practiced.

7              THE COURT:  I take it from your papers that

8    you -- that the -- you agree that the Pfohl Brothers case

9    stands against your position?

10             MR. DEAN:  No.  Pfohl Brothers, there's --

11   there is -- Pfohl Brothers appears to turn on its own

12   analysis on whether or not a claim existed at the time that

13   the investigation was done.  And the Judge seemed taken with

14   the fact that there was no claim until the federally

15   required commencement date occurred, so that you had no

16   claim and because you had no claim, the Judge seemed to say

17   you couldn't be in anticipation of litigation and you

18   couldn't even have a client, he suggests.

19             On its own terms, which we don't entirely

20   agree with, there's a section where he says -- I say he, I

21   actually don't know if it's a he or a she, but --

22             THE COURT:  It's a he.

23             MR. DEAN:  Okay, thank you.  There's a

24   section where he says if I'm wrong and if there are some of

25   these plaintiffs who -- for whom the FRDC was earlier than

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

1  the date I'm looking at, then, he seems to say, okay, it

2  would be work product, but I find that it's implicitly

3  waived because of the fact that the sole issue in discovery

4  which he says plaintiffs have put into issue is what they

5  knew and when they knew it.  And if what they knew and when

6  they knew it is put in issue, then they can't turn around

7  and say I'm not gonna tell you what and when I was told.

8              If, in this case, if the issue was when did,

9  you know, James & Hoffman, you know, find something out and

10  what did they find out, it would look a little bit like

11  Pfohl Brothers.  But that is not the issue in this case.

12  The issue in this case is what the defendants did and

13  whether or not they're conspiring to suppress nurse wages.

14  So -- and that claim has existed ongoing, it certainly

15  existed for the last four years, it has not -- there was no

16  Statute of Limitations that had expired that could only be

17  resurrected by something like the FRDC, and so -- or FRCD,

18  therefore, we think that the Judge's analysis in that case

19  would actually bring us into work product.

20              THE COURT:  What are the best -- what's the

21  best case that supports your position that even without a

22  client, this was by or for a party, party's representative?

23              MR. DEAN:  I would -- well, Hickman v.

24  Taylor.  What I would say is, if you look at Abdell and

25  Haus, who actually -- the analysis is actually a little

Unger v. AMC, et al. - 06-CV-765                                    37

1    different, because what they're doing -- they set out the

2    test, first of all, for whether work product should apply.

3    They -- in those cases what was at issue was -- were civil

4    suits by demonstrators who had been arrested and then turned

5    around and sued after their criminal proceedings were over

6    or never brought, they turned around and sued and what was

7    at issue were the -- they call 'em the DA data statements,

8    something like that, but it was the forms that the DAs, I

9    guess, filled out in the criminal proceeding.  And -- which

10   had then been subpoenaed by the plaintiffs in the civil

11   litigation.  And the question was whether or not those were

12   work products or not, even though, obviously, the -- you

13   know, they were nonparty statements or attorneys for

14   nonparties who had filled them out.  The tests that they

15   apply, I laid out before, they found that they were not work

16   product but only because it would not alter attorney

17   behavior since the DAs were required to fill out those forms

18   and they were for criminal cases, et cetera, so -- and they

19   were usually turned over in the criminal case, so the

20   attorneys already did it with an eye to the litigation, so

21   it wasn't gonna change anything to make 'em available here.

22   They said that, you know, that the only way that they were

23   gonna get these sort of contemporaneous statements, that

24   there wasn't another way that the plaintiffs could get them,

25   and they said that since the criminal cases are over,

Unger v. AMC, et al. - 06-CV-765                                    38

1    there's no ongoing litigation that this is gonna interfere

2    with.  But they articulated that test for work product as

3    the Hickman test, Hickman v. Taylor test it.  It's a test

4    that, applied here, we think, you know, incontrovertibly

5    results in the holding that these materials are work

6    product.

7                On the question of altering attorney

8    behavior, it is the question that your Honor posed about

9    whether or not class action firms that are involved in

10   bringing anti-trust cases up for secret price fixing

11   conspiracies are gonna be able to do investigations.  Or

12   whether they have to turn over their investigation at the

13   beginning of the suit to the defendants.  If they did --

14                THE COURT:  You have to admit, though, this

15   is not the conventional situation where a client comes

16   forward and generates attorney investigation.  Here, we have

17   attorney investigation and then you find a client.

18                MR. DEAN:  My understanding, and I could let

19   Mr. Tompkins speak to this 'cause his firm is one of the

20   premiere class action anti-trust firms in the country, I can

21   let him speak to what the normal practice is.  My

22   understanding is the normal practice for this kind of class

23   action case, because it requires an enormous amount of

24   resources, it's -- the firms do the investigation to figure

25   out whether or not there's a claim and then -- and determine

Unger v. AMC, et al. - 06-CV-765                    39

1   who the appropriate kind of plaintiff would be and then

2   they, in ethical manners, you know, end up with plaintiffs.

3                THE COURT:  But it does not appear that there

4   is any at least reported case addressing the work product

5   protection in that circumstance.

6                MR. DEAN:  The best I can -- there's

7   certainly none addressing it in that circumstance that finds

8   that it doesn't.  I mean, the defendants have certainly not

9   cited a case.  My guess is that it is not challenged because

10  it is so accepted that it's work product, but, again, I

11  could let Mr. Tompkins speak to it, it's his area of

12  practice.

13                MR. TOMPKINS:  (Inaudible.)  I think one

14  critical distinction that has to be understood in the

15  context of a price fixing case is that the normal model

16  where you would have a victim who had been harmed by

17  something, say in a car accident, you know you've been

18  harmed, you go hire a lawyer.

19                The problem in an anti-trust price fixing

20  case, and this is just one of many that we handle, the

21  victims don't know they're harmed in many cases.  There's no

22  way for a victim to retain counsel, no effective way for a

23  victim to retain counsel prior to the onset of the

24  investigation.  We investigate cases all the time that are

25  brought to us either by virtue of some insider who thinks

Unger v. AMC, et al. - 06-CV-765                    40

1    they know something or someone who thinks they have seen a

2    wrong or what have you.  Those aren't gonna be potential

3    clients because they aren't gonna fit within the class, they

4    haven't been harmed.  Nevertheless, we investigate the

5    merits of those claims, as we are required under Rule 11.

6    We oftentimes commission economic analysis that's quite

7    expensive, we occasionally use investigators.  All of that

8    work is our work product and it's not just our fact work

9    product, it's our opinion work product.  We tell the

10    investigators what to ask and how to ask it and what

11    information to record and what not to record, and we tell

12    the economists what to look for and the economists tell us

13    what they're looking for, and all of that material is the

14    core work product that then identifies -- it's all done on

15    behalf of a class, we know who the class is gonna be right

16    from the outset, we may not know the precise contours of it,

17    for example we might not know if it's gonna be hospital

18    nurses, or nurses -- you know, bedside nurses, hospital

19    nurses in certain hospitals, what have you.  We know the

20    class, even though the identity of a proper class

21    representative may not be clear at the time the research

22    begins.  That doesn't make it any less our work product,

23    certainly under the rationale of Hickman.

24              THE COURT:  Okay.  Thank you.  Anything else,

25    Mr. Dean?

Unger v. AMC, et al. - 06-CV-765                               41

1              MR. DEAN:  I was just checking the privilege

2       list to see if I can answer your question and I'm sorry, I

3       was unable to find the -- immediately the Bergmann e-mail.

4       I did find the IWPR e-mail that commented on the expert

5       report or a draft expert report.  She is an economist with

6       the Institute for Women's Policy Research and her e-mail in

7       her case did go to me, Barbara Bergmann, Mary Joyce Carlson

8       and some SEIU personnel who were the SEIU researchers.

9              The -- now, again, that expert report itself

10      is subject to the expert stipulation in this case, it's not

11      listed on these privilege logs, it's by, you know, economic

12      experts who will be testifying that her critique of it, I

13      would argue, would be inappropriate to produce in the

14      context of probably with the expert stipulation also, we

15      could have tried to do that.  We didn't.  We choose to --

16      conservatively to interpret the expert stipulation.  But

17      obviously it tends to reveal some aspects of that report.  I

18      think that she wrote to us because in fact IWPR, 99 percent

19      of their efforts were on the SEIU public side, she -- when

20      she wrote the -- responded to my inquiry, she CCd the normal

21      line of people on it, I guess.

22             THE COURT:  Thank you.  Anything further,

23      Mr. Marx?

24             MR. MARX:  A few points, your Honor, and I'll

25      try and keep this brief and sort of shotgun them, if you

Unger v. AMC, et al. - 06-CV-765                                    42

1    will.  First, the notion that the information that the Mintz

2    group gathered is equally available to us as it was to the

3    investigators would be true potentially if we had any idea

4    who it was that the Mintz Group talked to, but we have no

5    idea.  The names have not been disclosed to us --

6                    THE COURT:  Hold on.

7                    MR. MARX:  -- and we don't know who they

8    talked to.  First.

9                    Second, the notion that because the SEIU's

10   materials are in James & Hoffman's files means that the SEIU

11   doesn't have them or that somehow they should be, quote, the

12   privilege, is I think a little bit misguided.  Just because

13   the SEIU puts materials into its lawyers' files, that

14   doesn't mean they have custody and control over them, of

15   course they do, they can just tell 'em to produce 'em.  It's

16   not -- so the fact that the SEIU may not have them or that

17   they're in James & Hoffman's files doesn't -- doesn't

18   arrogate them to anymore protection than they would have if

19   they were in the SEIU's files.

20                    As a point of clarification, Barbara Bergmann

21   may not have withheld any documents herself in this case

22   based on work product privilege claim.  She did in Chicago.

23   And plaintiffs are withholding documents that Barbara

24   Bergmann prepared that they have, they're in the possession,

25   custody and control of the plaintiffs.


                    THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                    43

1          THE COURT:  That's in Chicago, though.

2          MR. MARX:  Well -- no, Chicago she actually

3    did.  I have a privilege log for her in Chicago and I think

4    it's attached in one of our exhibits.  There was no

5    privilege log in response to the subpoena here, so she

6    didn't specifically withhold them, but -- while she may not

7    have claimed work product privilege in this case, plaintiffs

8    are claiming work product privilege for documents that she

9    created that are in the plaintiffs' lawyers' files, so it's

10   on their privilege log instead of hers I guess is the point

11   there.

12          I don't think that any of the cases that

13   address this work product privilege involve a relationship

14   between nonparty and plaintiffs' subsequently found counsel

15   that we have here.  You know, bear in mind, I know we keep

16   repeating this, but it shouldn't be lost in this whole

17   notion of when privilege can be asserted for what the SEIU

18   or the Mintz Group, having been retained by the SEIU did.

19   The Mintz Group's General Counsel -- or SEIU's General

20   Counsel comes from James & Hoffman.  Mary Joyce Carlson is

21   there, she's got an office there, she's their national

22   something or other.

23          THE COURT:  But don't I have to look to the

24   retainer agreement with the Mintz Group?

25          MR. MARX:  But the question becomes --


                    THERESA J. CASAL, RPR, CRR
                 UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. ~ 06-CV-765                          44

1   James & Hoffman, because it's a law firm and, frankly, it's

2   almost in-house counsel for the SEIU, in some respects, is

3   now asserting work product privilege on behalf of these

4   plaintiffs.  And so that's what distinguishes in many

5   respects and complicates and makes this more like a shell

6   game.

7                   THE COURT:  Well, they are counsel of record

8   here, are they not?

9                   MR. MARX:  I'm not suggesting that they're

10  not.  I am just saying that to the extent -- yes, they are.

11  But to the extent that it complicates the assertion of the

12  work product privilege --

13                  THE COURT:  Well, it certainly does that.

14                  MR. MARX:  -- I don't think the other cases

15  on which they're relying had a situation quite like that,

16  where the SEIU went out, retained somebody to do the

17  investigation, to find the plaintiffs, and then referred the

18  plaintiffs to the SEIU's in-house and outside counsel who

19  then became of record.

20                  THE COURT:  Well, let me get to one of the

21  arguments that they make and your time line here.

22                  Unger retained counsel May 10, 2006.  The

23  putative class hypothetically existed at the top of your

24  time line, or bottom, whichever way it flows, and were in

25  existence from the moment the law firms began their

Unger v. AMC, et al. - 06-CV-765                                45

1   investigation here.  What is your response to their

2   contention that the putative class satisfied Rule 26(b)(3)

3   requirements that it be by or for a party?

4            MR. MARX:  That's speculative.  There is

5   still no claim -- there's still no representative, there's

6   still no party.  The work wasn't being done on behalf of a

7   party.  It was being done in the hopes that they would be

8   able maybe to find a party later who would fall in that

9   class if they were able to put it together.  It's

10  speculative.  That's what Pfohl Brothers said.

11           THE COURT:  Okay.

12           MR. MARX:  The litigation in this case would

13  not exist but for the results of that factual investigation.

14  And what we want are the results of the factual

15  investigation to the extent that they're out there.  Let me

16  be clear because we're not interested in the legal or mental

17  impressions of Cohen, Milstein, frankly, even James &

18  Hoffman.  But if you look at the Mintz Group --

19           THE COURT:  Well, that's payback for slough.

20           (Laughter.)

21           MR. MARX:  But if you look at the Mintz

22  Group, if you look at the Mintz Group privilege log,

23  Exhibit 11 to our papers, there's an awful lot of stuff on

24  here, interview notes, interview notes, interview notes,

25  interview memoranda, interviewee information, interview

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                           46

1   notes, investigative notes, hospital information list, what

2   could possibly be privileged about hospital -- work product

3   privilege about hospital information lists?  Hospital lists

4   and interviewee personal information.  Again, I don't see

5   where there are -- where there's work product that can

6   attach to that kind of factual information, particularly one

7   when, as I say, it was done for the SEIU not for any of

8   these plaintiffs, to the extent it predates Margory Unger's

9   involvement.

10                  I think that's all I have, your Honor.

11                  THE COURT:  All right.  Thank you.

12                  MR. TOMPKINS:  Your Honor, I just want to

13  correct the record on one very brief thing.  The identities

14  of all the Mintz interviewees were provided in response to

15  interrogatory (inaudible.)  Those interrogatories, persons

16  with knowledge, we identified everyone with knowledge, that

17  includes, but is not limited to Mintz interviewees.  Their

18  identities are clear.

19                  MR. MARX:  Well, let's wait a second.

20                  MR. TOMPKINS:  I just want to make it clear.

21  It is out there.  We just provided it yesterday.

22                  MR. MARX:  I was in Cleveland yesterday,

23  so...

24                  MR. TOMPKINS:  Well, we had until the 25th to

25  provide it under our agreement.

                    THERESA J. CASAL, RPR, CRR
                 UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                        47

1              MR. MARX:  I understand.

2              MR. TOMPKINS:  I provided it yesterday so it

3    wouldn't be an issue here, so...

4              MR. MARX:  One last -- I guess -- and I

5    neglected to mention it because it is like pulling teeth.

6    None of the information that was contained either in Mary

7    Joyce Carlson's affidavit or the factual information as it

8    was recited in plaintiff's letter has been disclosed to us

9    until yesterday.  And frankly, you know, I thought that's

10   what the meet and confer process was, in part, about.  But

11   it didn't happen.  So, I just add that as a footnote and

12   which I think goes to the question of why it was we had to

13   dump so many materials on you at such a late point.

14             MR. TOMPKINS:  Well, I was nine days early.

15             MR. CULNAN:  What's happened here, going back

16   six weeks ago, I had sent a letter to Mr. Tompkins, asking

17   them to supplement their Rule 26 disclosure because in our

18   initial disclosures in this case, all that were identified

19   were the two named plaintiffs, the defendants and the first

20   and third parties of (inaudible) subpoenas for information.

21   And Mr. Tompkins and I discussed last week that apparently

22   it's the plaintiffs' position under Rule 26 they are not

23   obliged to provide the names of these potential fact

24   witnesses, if you will, because plaintiffs in this case do

25   not intend to rely upon any nurses, individual nurses, to

Unger v. AMC, et al. - 06-CV-765                               48

1   prove their claims for -- to prove their class certification

2   part of the case.

3              We did have a discussion regarding -- there

4   was an interrogatory served by Seton that asked them to

5   identify any individuals who had relevant information

6   pertaining to some (inaudible) take it for face value.

7              The other part of the -- you know, this

8   investigation that we are talking about, in terms of things

9   that were dropped upon us, you know, at the last minute

10  here, in response to the -- Mr. Shumaker said regarding the

11  subpoena to Local 1199, and I'm not exactly clear, in terms

12  of what their role in this whole thing is; but we have pages

13  and pages of interview notes and in quotes here of

14  interviews, quite frankly, of hospital representatives that

15  under any stretch of the Nicely versus Key One (phonetic)

16  case would be improper.  We're looking at notes of

17  interviews with the Vice President of Human Resources at

18  Seton Health, the Director of Recruitment at Northeast

19  Health, we have the Staff Development Director at

20  St. Peter's Hospital, the Director of Ellis School of

21  Nursing.  This is apparently from interviews that were done

22  in the fall of 2005, September 2005, so this is all part of,

23  you know, the investigation.  This on its face would seem to

24  be improper.

25                    THE COURT:  Why?

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                    49

1            MR. CULNAN:  I don't think that -- I think

2    that the people that they're talking about under the Nicely

3    cases, particularly interviews of current employees, many of

4    whom are (inaudible) involve the corporation, I don't think

5    they're entitled to speak to folks.

6            THE COURT:  Well, we're not gonna address

7    that today.  I mean, if you want to make a motion, you

8    know -- I know you know how to do that.

9            MR. CULNAN:  (Inaudible) people that

10   conducted these interviews, we don't know about who they

11   are.  I think that's the point.

12           THE COURT:  The people who conducted the

13   interviews?

14           MR. CULNAN:  Conducted it or who they spoke

15   to.

16           THE COURT:  Well, for purposes of Rule 26,

17   what difference does it make?

18           THE INTERPRETER:  Well, they haven't -- but

19   we were going on at this particular point in time, I think,

20   as Mr. Marx had said before, they're askin' us to try to

21   find the proverbial needle in a haystack.

22           THE COURT:  Well, they told you apparently

23   yesterday who they interviewed.  That was the complaint.

24           MR. CULNAN:  I understand that.  I haven't

25   seen the list to see who they were.  At least (inaudible).

Unger v. AMC, et al. - 06-CV-765                    50

1          THE COURT:  But now you seem to be contending

2     that you're also entitled to know who conducted the

3     interviews.

4          MR. CULNAN:  Well, we may find out --

5          THE COURT:  Why?

6          MR. CULNAN:  I think this goes to what

7     Mr. Marx's point is talking about, in terms of (inaudible).

8     We have to know --

9          THE COURT:  Not under Rule 26, you're not.

10         MR. CULNAN:  Well, under the other

11    department's formal discovery process I think is what we are

12    talking about here.

13         THE COURT:  Maybe.

14         MR. CULNAN:  Mr. Shumaker said I think the

15    supplementation -- I have not seen it, but really did not

16    have much discussion --

17         MR. MARX:  And my understanding is that the

18    supplementation is simply is list of individuals that they

19    identified as having relevant and responsive information.

20    They did not identify those people as people that the Mintz

21    Group spoke with.

22         MR. TOMPKINS:  That's right.  We have an

23    interrogatory directed to us that said identify with

24    information.  Mr. Shumaker and I have had, you have to

25    admit, exhaustive negotiations about the scope of our

Unger v. AMC, et al. - 06-CV-765                    51

1    answers.  We agreed, I think in response to Mr. Culnan, to

2    identify individuals with knowledge, even though we don't

3    intend to rely on those individuals at the certification

4    stage.  We nonetheless agreed to provide a list of them

5    now at this stage to avoid another dispute.  We had until

6    May 25th to provide them and I provided them yesterday so

7    this wouldn't be an issue today.

8                    THE COURT:  Have the parties agreed that the

9    Rule 26 disclosures are limited to the certification

10   proceedings?  Or for the merits as well?

11                   MR. TOMPKINS:  I don't know if we've actually

12   technically discussed it although we are not claiming that

13   these people would be relied on by us at the certification

14   stage, we frankly gave up their names so that we wouldn't

15   have another argument about it.  I mean, we're not --

16                   THE COURT:  Has there been any argument to

17   limit the Rule 26 obligation?

18                   MR. TOMPKINS:  Not that I'm aware of.

19                   MR. CULNAN:  Not that I'm aware of.

20                   MR. MARX:  I think the defendants have

21   limited their Rule 26 disclosures to class certification

22   issues at this time.

23                   THE COURT:  Okay.

24                   MR. MARX:  I think in the context of

25   identifying for purposes of discovering people with relevant

Unger v. AMC, et al. - 06-CV-765                          52

1    information, most of us would probably disclose everybody

2    who would have relevant information, whether it's class

3    (inaudible.)  But in terms of the full scope of the

4    disclosure, we focused on class certification.

5              THE COURT:  Okay.  Anything else from --

6    Mr. Marx?

7              MR. MARX:  No, your Honor.

8              THE COURT:  Mr. Dean, anything else?

9              MR. DEAN:  Two quick points of clarification.

10   I don't want to confuse whatever material 1199 SEIU turned

11   over pursuant to whatever investigation or --

12             THE COURT:  It's not an issue that's before

13   me today.

14             MR. DEAN:  Yeah, and it's totally separate

15   from the attorney investigation that happened.  And just on

16   the general subject of aspersions, I want to say that

17   Professor Barbara Bergmann has been published, her insights

18   on this issue in the New England Journal of Medicine and she

19   should not be collateral damage in terms of reputations

20   here.

21             THE COURT:  All right.  Anything else from

22   anybody?  All right.  Thank you.  Decision's reserved.

23             MR. TOMPKINS:  Your Honor, we do have

24   another -- we do have another issue that although it has not

25   been raised in a letter brief, I think it became clear as of

Unger v. AMC, et al. - 06-CV-765                        53

1    Friday afternoon that there is a dispute regarding it, we

2    are happy -- if you'd rather get letters in advance and

3    schedule another hearing, either telephonic or in person

4    shortly, it's a discovery dispute about production data or I

5    can --

6                    THE COURT:  What's the dispute?  Let me hear

7    what it is.

8                    MR. TOMPKINS:  The dispute is the plaintiffs

9    have requested certain data that apparently is maintained

10   electronically.  It is the race, gender, marital status of

11   potential class members.  Let me tell you why we've

12   requested it.  The claim by the defendants at the class

13   certification stage will undoubtedly be that nurse wages

14   vary by two great and two unpredictable factors to allow for

15   a certifiable class to go forward.  The compensation varies.

16   As to why it varies (inaudible), we think their argument

17   will be because we've seen it in other jurisdictions.  Here,

18   it is just a matter of labor economics that the wages or the

19   compensation of nurses or any company will vary to some

20   extent by race, gender and marital status.  That, by the

21   way, does not imply any discrimination.  It just is a fact

22   of labor economics.

23                    And so, in order to explain the variance in

24   the data, there will be some variance based on those

25   factors, we need that information to explain that variance,

1   so the defendants cannot use that variance to argue that a

2   class is not certifiable here.  We've obviously signed

3   confidentiality agreements and as I've explained during

4   negotiations, you know, we're not intending to even perform

5   an analysis (inaudible) you know, to pursue some sort of

6   discrimination lawsuit or something like that.  So, you

7   know, we have confidentiality agreements that would prevent

8   that.  We won't do it, I'll represent we won't do it.  But

9   the information is relevant to the issue of the degree and

10  predictability of the variability in nurse wages, which I

11  predict will be an issue at the certification stage.  That's

12  the broad outlines of dispute.  If you'd rather have -- you

13  know, we can submit some letter briefs on it.  It just

14  really became clear there was a dispute, actually I think it

15  was Friday afternoon.

16          THE COURT:  Are you looking for the

17  statistical data?

18          MR. TOMPKINS:  Yeah, what it is is the

19  information -- it wouldn't be by name or even by social

20  security number.  It would be the race, gender, marital

21  status of whatever the unique -- of each nurse that is

22  assigned a unique identifier number in the data.

23          THE COURT:  Have you been provided other

24  information with respect to each such nurse?

25          MR. TOMPKINS:  Yes, compensation information,

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                          55

1   sure, we've been provided, you know, what -- how much they

2   make in shift differentials and things like that.

3              THE COURT:  What's the defendants' position?

4              MR. MARX:  Your Honor, I think I can answer

5   that in a couple ways.  First, they're anticipating an

6   argument that, frankly, we don't expect to make, and if

7   we're not gonna argue that race, sex or marital status is a

8   factor in terms of why it is the class should be certified,

9   it seems to me there's no need for them to have that data.

10  Our economists do not have that information and are not

11  relying on the information, number one.  And number two, to

12  the extent that it could be generated from databases that we

13  have now, I am advised, at least with respect to my client

14  and I believe this'll be true with respect to everybody

15  else, the marital status information may not be relied upon,

16  for a whole host of reasons.

17             THE COURT:  It exists but may not be

18  reliable?

19             MR. TOMPKINS:  Can I just --

20             THE COURT:  Hold on.  If the defendants don't

21  introduce the issue into the case, the data is irrelevant,

22  correct?

23             MR. TOMPKINS:  No, your Honor, and I'll tell

24  you why.  Because the issue is whether any variation that

25  you see in nurse wages falls along predictable scales.  So

Unger v. AMC, et al. - 06-CV-765                              56

1    their expert likely, I am predicting somewhat, but we saw

2    this argument in other jurisdictions, will say, you know,

3    nurse wages are very variable, you can't predict why they

4    vary and therefore you can't have a class in this case.  Now

5    if the issue is if I knew race, gender, marital status, I

6    would have three reasons why they vary.  That's why the

7    defendants' experts don't need it 'cause they're not trying

8    to explain the variation, they're gonna create variation, so

9    they don't want the data.  In fact, it would probably hurt

10   their variability argument.  We do need the data to explain

11   the variation because even in the absence of discrimination,

12   it's just a well known fact that wages vary along those

13   factors.  And I can -- if you would like letter briefing, I

14   can present citations on that.

15            THE COURT:  Thank you for your offer.

16   Mr. Marx, unless the defendants stipulate that they will not

17   argue that the data presented by the plaintiff varies by

18   race, marital status or -- was age the other one?

19            MR. TOMPKINS:  Race, marital status or

20   gender.

21            THE COURT:  Race, marital status or gender,

22   unless there is a stipulation to that effect, isn't it

23   irrelevant?

24            MR. MARX:  I don't --

25            THE COURT:  I mean, if the defendants are

Unger v. AMC, et al. - 06-CV-765                    57

1   gonna suggest that it varies, that there are other

2   explanations for variances in wages --

3                   MR. MARX:  There are lots of explanations for

4   the variances (inaudible).

5                   THE COURT:  That may be, but then it becomes

6   the burden of the plaintiff to exclude other possibilities,

7   as many as they can.

8                   MR. MARX:  I think -- well, I think it would

9   be relevant.  I think it would be relevant.  We do have a

10  problem, I know, with the accuracy of the marital status.

11                  THE COURT:  That goes to weight and not

12  discoverability, though, doesn't it?

13                  MR. TOMPKINS:  One other thing, your Honor --

14                  THE COURT:  Marital status tends to change,

15  gender doesn't.

16                  MR. MARX:  It's not so -- I will tell you

17  why -- let me tell you why it's a problem with the accuracy

18  and that is because the databases we are looking at are

19  compensation payroll databases and sometimes people will --

20  someone who's married may decide that they want their

21  withholding to be done as if they were single.

22                  THE COURT:  Right.

23                  MR. MARX:  And so for this particular nurse,

24  that whatever he or she has requested in terms of

25  (inaudible) for purpose of deduction is what they would get

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                     58

1   and it may not be accurate.  We don't know whether it's --

2   and right, marital status will sometimes change, and we may

3   be the last to know.

4            I also understand with respect to some of the

5   defendants, and Mr. Shumaker will talk about this, some of

6   this information may not be available electronically in

7   which case there's a burden with having to produce it and

8   that's an issue that I think ought to be addressed as well,

9   particularly given the one-sided nature of the (inaudible).

10           MR. SHUMAKER:  In particular, your Honor --

11           THE COURT:  You have to point to me where in

12  Rule 26 symmetry becomes a factor I'm supposed to consider.

13           MR. MARX:  I'm afraid I am gonna have to wait

14  on that, your Honor.

15           THE COURT:  I can sympathize with you, but

16  there's not a legal factor.

17           (Attorneys talking over the judge;

18            undecipherable.)

19           MR. SHUMAKER:  The point I was just gonna

20  make, your Honor, for some of the defendants, and I can't --

21  I can't recall which one of the counsels I've talked to

22  which raised the issue when we have these discussions, it's

23  not as easy as pushin' a button.  Some of this information

24  for some of the defendants would require a very detailed

25  review of the personnel file to provide the information.


THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                          59

1   It's not readily sitting anywhere.  Exactly who that is --
2              THE COURT:  I heard the demand to be for
3   electronically maintained data.
4              MR. SHUMAKER:  Okay.  Well, that would be a
5   different story.  But some of the defendants -- and I wonder
6   if it's just gonna be electronic what value that would be to
7   plaintiffs if they get part of the picture and not all of
8   the defendants' electronic data.
9              MR. TOMPKINS:  My -- personally, I don't know
10  exactly how everything is maintained.  I will say the
11  defendants were all required to submit the state of the
12  EEOC, their EEO-1 reports.  I can't imagine it's not
13  maintained electronically.  If a defendant has in only on
14  paper, we would obviously negotiate in good faith without
15  the burden.
16             THE COURT:  Anybody else want to be heard?
17             Seems to me the plaintiffs are entitled
18  to it at this stage unless there's a stipulation to their
19  satisfaction that these are not gonna be issues in the
20  case.  So, I would direct the defendants to produce the
21  electronically-maintained information on gender, race and
22  marital status.  How long do you need?
23             MR. MARX:  That will vary from defendant to
24  defendant, we will notify our clients, but it will probably
25  depend upon --


                    THERESA J. CASAL, RPR, CRR
                  UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                          60

1              MR. SHUMAKER:  I'm looking over at my

2    colleague who's looking at me going months.  But apparently

3    the difficulty is we need to match the information with the

4    identifiers.  When we produce the compensation data, we

5    don't say Mary Smith this is her information, it's nurse

6    one.  And we're going to need to pair nurse one and her

7    compensation information with marital status, gender and all

8    of that, so that may take some time.

9              MR. MARX:  It's a programming issue for us.

10   Same issue, but programming (inaudible).

11             MR. TOMPKINS:  I'll just note that we would

12   take the names.  They didn't want to give 'em to us.  We

13   would take the names that we could match, it would be easy.

14             MR. MARX:  No, your Honor.  We'll go through

15   the IT hoops to provide the information (inaudible) nurse

16   identification (inaudible).

17             THE COURT:  Give me an outside date.

18             MR. MARX:  It will vary.  We all know when

19   the discovery cutoff is, and we've produced our compensation

20   data, I believe, so if -- insert three more data points in

21   there.

22             THE COURT:  Sixty days?

23             MR. MARX:  At least.

24             MR. SHUMAKER:  Yeah, that'll be fine.

25             MR. MARX:  That'll be fine, your Honor.


                    THERESA J. CASAL, RPR, CRR
               UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                    61

1    We'll do a --

2                THE COURT:  Plaintiffs agreeable?

3                MR. TOMPKINS:  As an outside date?

4                THE COURT:  Outside date, 60 days.

5                MR. MARX:  Thank you.

6                MR. REYNOLDS:  Your Honor, if I could just

7    jump in on behalf of Ellis.  I can represent I believe that

8    Ellis Hospital does not have this data electronically, so

9    just to clarify the parameters of your order, you are only

10   requiring those defendants that have the data stored

11   electronically (inaudible).

12               THE COURT:  That's correct.  And if they

13   don't, an affidavit to that effect from a person with

14   knowledge.

15               MR. REYNOLDS:  Okay.  Thank you.

16               THE COURT:  All right.  Anything else?

17               MR. CULNAN:  Judge, I know this was

18   originally scheduled for a status conference today and one

19   thing -- not that it's gonna be on for discussion today, but

20   I think just to give you an idea of where we are in the

21   electronic discovery side of this, based upon the

22   conversations that we have had, most of the defendants are

23   significantly (inaudible) the initial review of the

24   electronic discovery in this case (inaudible) at least the

25   initial review of all of the e-mails that were produced as a

Unger v. AMC, et al. - 06-CV-765                                    62

1    result of (inaudible).  Over the course of the next week or

2    ten days, we started the discussion (inaudible) discovery

3    order regarding (inaudible) find out what form we had to

4    produce.  That was an issue going forward.  I do not pretend

5    to be an IT guy and know all the details of data form versus

6    (inaudible) versus all of the very things.  But it's an

7    issue that at least based upon what I've seen so far, it may

8    be an issue that we may be back before you in short order to

9    try and get resolved.

10              THE COURT:  Have the defendants -- do the

11   defendants have in common a form in which they would like to

12   produce these things?  Is there one form that all defendants

13   can agree on?

14              MR. CULNAN:  I don't think that's the case.

15   I think in large part at this point in time the difference

16   varies, as I understand it, depending upon whether it's in

17   native form, for example, certain redactions may or may not

18   be allowed to be done.  There are also issues in terms of

19   cost.  It is my understanding that each of the defendants

20   are working with their discovery members at this point in

21   time to try to ascertain what the costs are in terms of

22   doing it in native format as opposed to (inaudible) PDF.

23              So, once the defendants find out what the

24   costs are, I think there may be -- I don't know whether

25   there'll be unanimity between the defendants, but at least

at that point in time, I know that there has been (inaudible) very, very expensive from what I understand (inaudible) that are being looked for are quite extensive. There's a wish list and at this point (inaudible) that's something if we can't work out (inaudible) the August 1st deadline to respond, so you are aware that these issues are out there we may have to be back sooner rather than later to get this worked out.

THE COURT: How close are you to production of any kind?

MR. CULNAN: We can produce, I think, if John Queenan, my associate (inaudible) speak to it much more than I could, but as I understand it, once we have agreed upon the form of production, our E discovery vendor would take approximately five business days in order to begin the first bit of production, and as I said, as I understand it with respect to our client, a review of all of the e-mails has been complete (inaudible).

THE COURT: Is the form of production a hold up now?

MR. CULNAN: Yes. We are not in agreement between the parties on that issue.

THE COURT: What's the plaintiff's position on form of production?

MR. TOMPKINS: Let me (inaudible) with

Unger v. AMC, et al. - 06-CV-765                          64

1    limited knowledge and I may have to refer you to Kulpana for

2    details.  My understanding is that AMC -- Seton, excuse me,

3    has proposed the production of the materials in native

4    format with Medi-data.

5                    THE COURT:  What is native format?

6                    MR. TOMPKINS:  Kulpana?

7                    MS. KOTAGAL:  Your Honor, that would be a

8    situation where you would receive the file itself, you would

9    receive an Excel file as opposed to receiving a tip

10   (phonetic) or PDF, which would be a picture, so --

11                   THE COURT:  And this is all, I take it, gonna

12   be on CD ROM of some kind?

13                   MS. KOTAGAL:  Yes.  It would be (inaudible).

14                   THE COURT:  Okay.  So native format is just

15   the file itself rather than PDF?

16                   MS. KOTAGAL:  Correct, your Honor.

17                   MR. TOMPKINS:  There are, I will say, some

18   advantages to getting it in native format and Excel spread

19   sheet is the perfect one where when you get an Excel, you

20   can see it all on a screen.

21                   THE COURT:  Let me ask the plaintiffs this.

22   Why should not the defendants be able to produce it to you

23   in whatever format they choose?

24                   MS. KOTAGAL:  Your Honor, let me speak to the

25   electronic discovery order from last year.  That provides

Unger v. AMC, et al. - 06-CV-765                            65

1    for production of documents in either a tip or PDF format

2    with accompanying Medi-data and text files.  That was, in

3    fact, what I believed we would be getting.  On a call -- on

4    a phone call late last week with Seton Health's counsel,

5    they proposed producing the data in native format.  So, that

6    was the first time that I had heard that.  We are open to, I

7    think, working with defense counsel to figure out the right

8    way to get the data -- to get the ESI produced.  I don't

9    think we're locked in to either receiving it in native or in

10   tip or PDF format.  We just want to be sure that if we get

11   the ESI in tip or PDF format, we get it in a way that we

12   understand the full parameters of that document and that's

13   the Medi-data.  And I think, as I read your order of late

14   last year, it provides (inaudible).

15            MR. CULNAN:  (Inaudible) this was agreed upon

16   by the parties.  I think that was the plan.  Mike can speak

17   to this, I think he has been involved in the discussion.  I

18   think once we got to the point where we were ready to

19   produce and I think that we felt that given where we were in

20   this case and your expectations about rolling production, we

21   wanted to be in a position where we (inaudible).  We started

22   the production process and we're making strides towards

23   where we want to be.  We looked at the order and said this

24   is an open question (inaudible).

25            THE COURT:  What form do you want to produce

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                   66

1    it in?

2                    MR. TOMPKINS:  I mean --

3                    MR. CULNAN:  I think part of the problem at

4    this point in time is we don't know what the cost associated

5    with the two options are.  There are pros and cons

6    associated with -- one may be cheaper, one we may not be

7    able to redact information and that's the problem we are

8    trying to weigh at this point.

9                    MS. KOTAGAL:  Your Honor, I'm not sure that

10   this is necessarily ripe yet.

11                   MR. TOMPKINS:  Yeah.

12                   (Attorneys talking over each other;

13                    indecipherable.)

14                   MR. CULNAN:  No, I said -- I think I prefaced

15   my comments before.  It's not that it's ripe at this point

16   in time, I'm just saying to you that we started the

17   conversation we may be back to you sooner if we can't get it

18   worked out.

19                   THE COURT:  When you said it was holding up

20   production, I thought if we could resolve it today, it might

21   expedite things.

22                   MR. CULNAN:  No, I don't think we can.

23                   THE COURT:  Okay.

24                   MR. CULNAN:  We would be ready to produce

25   once we get the agreement in place.

Unger v. AMC, et al. - 06-CV-765                          67

1                    THE COURT:  All right.  I'll butt out.  And

2      if there's an issue, let me know and we'll try and resolve

3      it.  Anything else?  How are we on the schedule?  You have

4      two-and-a-half months left of the discovery deadline.

5                    MR. DEAN:  If we will bring this issue to

6      closure sooner than later, your Honor, we'll be fine.

7                    THE COURT:  Should we set another status

8      conference?

9                    MR. TOMPKINS:  I think that's a good idea.

10                    MR. DEAN:  Not a bad idea.

11                    MR. TOMPKINS:  Just to focus the mind on the

12     discovery issues.

13                    THE COURT:  It may motivate me to get a

14     decision out before that, but you never know, so... 30 days,

15     45 days?  60?

16                    MR. TOMPKINS:  I think 30 days is fine.  I

17     think 30 days may make more sense, or sooner.  30 days,

18     certainly not longer.

19                    MR. MARX:  June 11th?

20                    THE COURT:  You don't have the schedule

21     there, do you, Linda?

22                    THE CLERK:  No.

23                    THE COURT:  Can you hold on for a second?

24                    (Pause in proceedings.)

25                    THE COURT:  June 11th is fine.


                    THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

Unger v. AMC, et al. - 06-CV-765                                    68

1                    MR. MARX:  Or the week of. June 11th?  What

2    time?

3                    MR. TOMPKINS:  Afternoon, is that possible,

4    your Honor?

5                    THE COURT:  Afternoon's fine, if you would

6    rather do afternoon.

7                    MR. TOMPKINS:  2:00 PM, your Honor?

8                    THE COURT:  2:30 or 3 o'clock.  I'd say

9    3 o'clock.

10                   MR. TOMPKINS:  3 o'clock.

11                   MR. CULNAN:  3 o'clock.

12                   THE COURT:  Okay.  All right.  Anything else?

13   Thank you very much.

14                   (This matter adjourned at 3:27 PM.)

15                        - - - - -

16

17

18

19

20

21

22

23

24

25

69

```
 1                          CERTIFICATION:

 2

 3

 4              I, THERESA J. CASAL, RPR, CRR, Official Court

 5   Reporter in and for the United States District Court, Northern

 6   District of New York, do hereby certify that I transcribed

 7   the digitally-recorded hearing held in the heading hereof;

 8   and that the foregoing is a true and correct transcript of

 9   the same and the whole thereof, to the best of my ability.

10

11

12

13                                 _____

14                                 THERESA J. CASAL, RPR, CRR

15                                 Official Court Reporter

16

17

18

19   DATE:

20

21

22

23

24

25
```

# EXHIBIT H

Reed  Lisa - redacted

ACR REPORTING, LLP (312) 422-0515

HIGHLY CONFIDENTIAL NOT TO DISCLOSE TO UNION      175

| | | |
|---|---|---|
| 02:48:37 PM | 24 | offended by the wage collusion issue because like I |
| 02:48:43 PM | 1 | said, I had previously felt that something was |
| 02:48:46 PM | 2 | happening.  I had no concept of wage collusion |
| 02:48:50 PM | 3 | going on, but I knew that for some reason our wages |
| 02:48:55 PM | 4 | had been stagnated over the last several years. |
| 02:48:58 PM | 5 | And I felt that it was wrong.  And I wanted to try |
| 02:49:01 PM | 6 | to correct that. |
| 02:49:13 PM | 7 | Q      Have you also testified before the |
| 02:49:14 PM | 8 | Chicago City Council at SEIU's request? |
| 02:49:18 PM | 9 | A      Yes. |
| 02:49:20 PM | 10 | Q      Was that a committee headed by Alderman |
| 02:49:24 PM | 11 | Ed Smith? |
| 02:49:26 PM | 12 | A      I'm not sure who headed it up at the |
| 02:49:29 PM | 13 | time.  I'm not positive.  But I did go to |
| 02:49:32 PM | 14 | Springfield for a committee meeting. |
| 02:49:42 PM | 15 | Q      So is there testimony in Springfield for |
| 02:49:45 PM | 16 | the Illinois State Legislature, as well as |
| 02:49:47 PM | 17 | testimony at a Chicago City Council meeting? |
| 02:49:54 PM | 18 | A      Yes. |
| 02:49:54 PM | 19 | Q      Two different events? |
| 02:49:56 PM | 20 | A      Yes. |
| 02:49:56 PM | 21 | Q      Was the event in Springfield a committee |
| 02:49:59 PM | 22 | headed by Representative Flowers? |
| 02:50:01 PM | 23 | A      Yes, I believe she -- yes, she was |
| 02:50:03 PM | 24 | there.  And I believe it was her.  She is the head |

Page 150

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Lisa Reed and Mary McDowell, | ) |
| On behalf of themselves and all others | ) |
| similarly situated, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Advocate Health Care; Children's Memorial | ) |
| Hospital; Evanston Northwestern Healthcare; | ) |
| Resurrection Health Care; University | ) |
| of Chicago Hospitals, | ) |
| Defendants. | ) |
| | ) |

## <u>PROPOSED ORDER</u>

Upon consideration of Plaintiffs' Motion to Quash Subpoena Directed at the Mintz Group

and the entire record herein, IT IS, this __ day of November, 2007, by the United States District

Court for the District of Columbia, ORDERED:

That Plaintiffs' Motion to Quash Subpoena Directed at the Mintz Group is GRANTED.

Dated:

_____
United States District Judge