PUBLIC VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>ADVOCATE HEALTH CARE, et al.<br>Defendants. | ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-0450-RMU |
| WENDY FLEISCHMAN and CINDY CULLEN, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>ALBANY MEDICAL CENTER, et al.<br>Defendants. | ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-0451-RMU |
| PAT CASON-MERENDA and JEFFREY A. SUHRE, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>DETROIT MEDICAL CENTER, et al.<br>Defendants. | ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-0452-RMU |
| SUZANNE C. CLARKE and CONISE P. DILLARD, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>BAPTIST MEMORIAL HEALTHCARE CORP, et al.<br>Defendants. | ) ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-0463-RMU |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS TO QUASH
SUBPOENA DIRECTED AT THE MINTZ GROUP[1]**

---

[1] Defendants submit this omnibus brief in response to the Motions to Quash Subpoena Directed at the Mintz Group filed in this Court in *Reed, et al. v. Advocate Health Care, et al.*, No. 07-mc-0450, *Fleischman, et al. v. Albany Medical Center, et al.*, No. 07-mc-0451, and *Cason-Merenda, et al. v. Detroit Medical Center, et al.*, 07-mc-0452 on November 2, 2007 and in *Clarke, et al. v. Baptist Memorial Healthcare Corp., et al.*, 07-mc-0463 on November 8, 2007.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ....................................................................................................................... 1

SUMMARY OF FACTS ............................................................................................................. 1

DISCOVERY REGARDING THE MINTZ GROUP ................................................................. 5

ARGUMENT ............................................................................................................................... 7

I.  NEITHER THE MINTZ GROUP NOR J&H WAS "PLAINTIFFS' COUNSEL"
    AT THE TIME OF THE MINTZ GROUP'S INVESTIGATION. ................................... 9

    A.  J&H represented the SEIU, and not Plaintiffs, when the Mintz Group
        conducted its investigation for the SEIU. ............................................................. 9

    B.  Plaintiffs' reference to the Mintz Group as either Plaintiffs' counsel or the
        agents of Plaintiffs' counsel is contrary to the facts disclosed during
        discovery. ............................................................................................................. 10

    C.  Plaintiffs argument that Defendants are trying to depose opposing counsel
        is a red herring. ................................................................................................... 13

II.  THE WORK PRODUCT DOCTRINE DOES NOT PROTECT THE
     INFORMATION DEFENDANTS SEEK FROM THE MINTZ GROUP. ...................... 14

    A.  The SEIU did not retain the Mintz Group in anticipation of litigation on its
        own behalf. ........................................................................................................... 15

    B.  The work product doctrine does not extend to depositions of third party
        investigators that do not require the disclosure of attorney opinions. ................. 17

    C.  Even if Rule 26 applied, the Mintz Group's investigation was not on
        behalf of a party to this litigation. ...................................................................... 20

III.  THE INFORMATION DEFENDANTS SEEK FROM THE MINTZ GROUP IS
      RELEVANT TO THE CLAIMS AND DEFENSES ASSERTED IN THESE
      LAWSUITS. ................................................................................................................. 21

CONCLUSION .......................................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. FBI*,
  192 F.R.D. 12 (D.D.C. 2000)................................................................................. 6, 14, 17, 18, 21

*Amicus Communications,, L.P. v. Hewlett-Packard Co.*,
  Case No. 99-02841999, U.S. Dist. LEXIS 20901 (D.D.C. Dec. 3, 1999)................................ 15

*Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*,
  709 F.2d 1109 (7th Cir. 1993) ............................................................................................. 16, 17

*Chicago Meat Processors, Inc. v. Mid-Century Ins. Co.*,
  No. 95 C 4277, 1996 U.S. Dist. LEXIS 4495 (N.D. Ill. Apr. 10, 1996)................................... 17

*Coastal States Gas Corp. v. Dep't. of Energy*,
  617 F.2d 854 (D.C. Cir. 1980)................................................................................................... 17

*Harper v. Auto-Owners Ins. Co.*,
  138 F.R.D. 655 (S.D. Ind. 1991)............................................................................................... 17

*Hickman v. Taylor,* 329 U.S. 495 (1947) ............................................................................... 18, 21

*Howell v. City of New York*,
  CV-06-6347, 2007 U.S. Dist. LEXIS 70163 (E.D.N.Y. Sept. 25, 2007) ................................ 21

*Hughley v. Art Institute of Chicago*,
  981 F. Supp. 1123 (N.D. Ill. 1997) ........................................................................................... 19

*In re Grand Jury Subpoenas*,
  318 F.3d 379 (2d Cir. 2002) ..................................................................................................... 19

*In re Pfohl Bros. Landfill Litig.*,
  175 F.R.D. 13 (W.D.N.Y. 1997)................................................................................................ 16

*In re Student Finance Corp.*,
  No. 02-11620-JBR, 2006 U.S. Dist. LEXIS 86603 (E.D. Pa. Nov. 29, 2006) ......................... 19

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
  5 F.3d 1508 (D.C. Cir. 1993)..................................................................................................... 15

*McCoo v. Denny's Inc.*,
  192 F.R.D. 675 (D. Kan. 2000) ................................................................................................. 16

*Nakash v. United States Dep't of Justice*,
    128 F.R.D. 32 (S.D.N.Y. March 17, 1989)................................................................ 14

*Ramsey v. NYP Holdings, Inc.*,
    00 Civ. 3478, 2002 U.S. Dist. LEXIS 11728 (S.D.N.Y. June 27, 2002)............................ 12, 18

*Sporck v. Peil*,
    759 F.2d 312 (3d Cir. 1985) ................................................................................ 18-19

**Rules and Regulations**

8 Charles Alan Wright, Arthur R. Miller & Richard R. Marcus,
    Federal Practice & Procedure § 2024 (2d ed. 1994)........................................ 20

Fed. R. Civ. P. 26(b)(3)........................................................................................ 14, 20

Fed. R. Civ. Pro. 30(b)(6) .................................................................................... 6

## INTRODUCTION

Plaintiffs have moved to quash four Rule 30(b)(6) deposition subpoenas that Defendants issued in four separate, but related, class action lawsuits pending in Albany, Chicago, Detroit, and Memphis.[2]  In each of those cases, individual registered nurses ("RNs"), purporting to represent a class of all RNs employed by the defendant hospitals, allege that the defendants conspired to fix or depress the compensation they paid to their employed RNs.

Plaintiffs assert that the subpoenas should be quashed in their entirety because the Mintz Group served as their agent during the pre-litigation investigation, and thus any discovery from the Mintz Group would improperly invade Plaintiffs' counsel's work product.  Plaintiffs' claim fails, however, because much, if not all, of the work that the Mintz Group performed was done for the Service Employees International Union ("SEIU"), a non-party to this litigation, or SEIU's counsel, for non-litigation purposes, prior to the identification of any named plaintiff. Information relating to the Mintz Group's "pre-plaintiff" investigation is properly discoverable. Moreover, Defendants have no intention of eliciting information from the Mintz Group regarding the opinions or litigation strategy of Plaintiffs' counsel.  Given these facts, the Court should deny Plaintiffs' Motions to Quash.

## SUMMARY OF FACTS

Plaintiffs filed their complaints in the Albany, Chicago, and Memphis cases on June 20, 2006, and in Detroit on December 12, 2006.[3]  Although it is the named Plaintiffs that claim the

---

[2] Reference to "Plaintiffs" throughout this brief refers to the individual plaintiffs who filed claims in the following lawsuits: *Fleischman, et al. v. Albany Medical Center, et al.*, Case No. 06-CV-0765 (N.D.N.Y.) ("Albany"); *Reed, et al. v. Advocate Health Care, et al.*, Case No. 06 C 3337 (N.D. Ill.) ("Chicago"); *Cason-Merenda, et al. v. Detroit Medical* Center, Case No. 06-CV-15601 (E.D. Mich.) ("Detroit"); and *Clarke v. Baptist Memorial Healthcare Corp.*, Case No. 2:06-cv-02377 (W.D. Tenn.) ("Memphis").
[3] A fifth related case, *Maderazo v. VHS San Antonio Partners, L.P. d/b/a/ Baptist Health Systems, et al.*, No. 6:05-cv-00535 (W.D. Tex.), alleging the same claims, is pending in San Antonio, Texas.  Because discovery (on class

(continued…)

Defendants conspired with each other and alleged unnamed co-conspirators to restrain competition in local markets for hospital RNs, it was the SEIU, a non-party, that conducted and directed the factual investigation that now forms the basis for Plaintiffs' claims -- an investigation that took place long before any of the named Plaintiffs were ever aware of any anticipated or pending litigation, and which had a well-defined non-litigation purpose.

That investigation, and the related lawsuits, had their genesis in an economics professor's theory that collusive behavior by hospital employers was contributing to a reported shortage of RNs. This professor, Barbara Bergmann, admittedly had little, if any, factual support for her belief, but she nonetheless tried to find a receptive audience for her view. In 2004, when Professor Bergmann conveyed her idea to the SEIU, a labor union whose goal is to unionize as many service employees as possible, her theory found traction. [4]

The SEIU was interested because it saw the collusion theory as an opportunity to advance its organizational interests.

<div style="border:1px solid black; padding:20px; text-align:center;">

**REDACTED FOR PUBLIC FILING**
**(COMPLETE BRIEF TO BE FILED UNDER SEAL)**

</div>

---

certification issues has closed in that case, Defendants did not issue a Rule 30(b)(6) deposition to the Mintz Group in connection with that case.

[4] *See* Bergmann-CH 0416-0418, attached as Exhibit 1 (e-mail from Professor Bergmann indicating that she interested the SEIU in the nurse wage issue, the SEIU then provided the funds to investigate her theory, and the nurse wage cases ensued); Bergmann-CH 0444, attached as Exhibit 2 (e-mail indicating that Professor Bergmann had difficulty interesting anyone in her "hypothesis" of wage-fixing with regards to nurses); Bergmann-CH 0413-0414, attached as Exhibit 3 ("The suits are a result of a little paper I wrote, . . . which got into the hands of the [SEIU], which then spent a fortune gathering evidence.").

REDACTED FOR PUBLIC FILING
(COMPLETE BRIEF TO BE FILED UNDER SEAL)

In furtherance of this goal, the SEIU and its counsel, James & Hoffman ("J&H"), retained a number of outside consultants, including the James Mintz Group ("Mintz Group"), to investigate Professor Bergmann's collusion theory. The Mintz Group retention commenced in October 2005 (at least eight months prior to any Plaintiff's engagement of counsel in these lawsuits), and it was tasked with "provid[ing] investigative services… to assist [J&H] in rendering legal advice to the [SEIU]" on possible collusion by hospital employers in violation of the antitrust laws." *See* SEIU-A 0046-0048, attached as Exhibit 5. J&H confirmed both its retention of the Mintz Group on behalf of the SEIU and the engagement's purpose in a subsequent letter dated February 9, 2006. *See Mintz Retainer Agreement*, attached to Plaintiffs' Motion to Quash at Exhibit E to Dean Decl. Notably, neither letter indicated that the Mintz Group or J&H were acting on behalf of Plaintiffs. Nor do they indicate that the Mintz Group acted at the discretion of any other counsel who would subsequently become Plaintiffs' counsel in these lawsuits, including Cohen, Milstein, Hausfeld, & Toll, P.L.L.C. ("CMHT").

As part of its investigation, the Mintz Group gathered publicly available material and conducted telephone "interviews" of current and former hospital employees.[5] *See* Privilege Log of Plaintiffs in *Reed, et al. v. Advocate Health Care, et al.* ("Plaintiffs' Privilege Log"), attached as Exhibit 7.[6] Presumably, these interviews contain information about nurse compensation, a subject at the heart of discovery in these lawsuits.

---

[5] Several witnesses have told defense counsel in the Chicago action that someone from the Mintz Group called and told them that the Mintz Group was conducting research on nurse compensation for a "Nursing Against the Odds" survey, an apparent reference to a 2005 book entitled *Nursing Against the Odds* by Cornell University professor Susanne Gordon. *See* Exhibit 6, Declarations of David L. Hanselman and Stephanie L. Poulos.

[6] Plaintiffs in Albany and Detroit also submitted privilege logs that contain substantially similar entries for the Mintz Group materials. Plaintiffs in Memphis have not yet submitted a privilege log in response to discovery.

In addition to conducting an investigation of the collusion theory, the SEIU actively recruited registered nurses to serve as named plaintiffs. *See* Declaration of Mary Joyce Carlson ("Carlson Decl.") ¶ 14, attached to Motion to Quash as Exhibit A to Dean Decl. The SEIU's counsel, J&H, even provided instructions to SEIU organizers about how to refer potential plaintiffs to J&H, including sign-up sheets for potential class members to express interest in talking to J&H about the possibility of becoming a named plaintiff. *See* Exhibit 8, SEIU-A 0011-0013. Additionally, the SEIU is financially supporting this litigation by paying J&H "a reduced fee for its work on the suits and for certain expenses." Carlson Decl. ¶ 15; *see also* Exhibit 9, SEIU-A 0001-0002.

Notwithstanding these efforts, the SEIU has repeatedly represented that it is not a party to any of these lawsuits, nor did it anticipate being a party to any of them.[7] *See also* Exhibit 10, Deposition of Jamie Cohen ("Cohen Dep.") at 193:6-11, 272:17-275:2 (the SEIU never intended to file suit on its own behalf). The SEIU has similarly asserted that it has no control over this lawsuit. *See* Exhibit 8, SEIU-A 0012 ("It is important SEIU not be mis-perceived as controlling the antitrust litigations. It doesn't."); Exhibit 11, SEIU-CH 0648-49 at SEIU-CH 0648 ("...*as a nonparty, SEIU* would not make any demands on your firm concerning the litigations or

---

[7] For example, the guidelines that J&H sent to the SEIU regarding the referral of nurses to J&H note, in pertinent part:

> 1. **It is important SEIU not be mis-perceived as controlling the antitrust litigations. It doesn't.** The litigations will be brought on behalf of nurses in an [sic] metropolitan area and the lawyers will act solely in those nurses' interests. SEIU will not control the timing of the suits, the prosecution of the suits, or their resolution. 2. **It is important SEIU not be mis-perceived as acting <u>as an agent</u> for some particular attorneys in referring nurses, soliciting legal business, and/or stirring up litigation.** SEIU is referring nurses to lawyers to help the nurses assert their rights because that is part of SEIU's own mission, not on behalf of any lawyers or group of lawyers.

*See* Exhibit 8, SEIU-A 0012 (emphasis in original). These guidelines make clear that the SEIU never intended to be a party to this litigation.

otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests.") (emphasis added).

Based upon information discovered to date, the first time that any named plaintiff in any of the cases became involved was May 2006, when Marjory Unger in Albany, Lisa Reed in Chicago and Suzanne Clarke in Memphis retained J&H and CMHT, well after (at least eight months) the Mintz Group began its investigation on behalf of the SEIU.[8]  Accordingly, much of the information that Defendants seek from the Mintz Group, and which Plaintiffs claim is work product, significantly pre-dates any Plaintiff retaining either J&H or CMHT in the lawsuits filed.

It was not until June 2006 that the individual RNs located by the SEIU in Albany, Chicago, Memphis, and San Antonio simultaneously filed their complaints. On the same day that Plaintiffs' attorneys filed these cases, the SEIU and Plaintiffs' counsel, CMHT and J&H, jointly held a press conference announcing the filings.  *See* SEIU-CH 0587-0590, SEIU-CH 0592-0634, SEIU-CH 0639-0642, attached as Exhibits 12, 13, and 14, respectively.

## DISCOVERY REGARDING THE MINTZ GROUP

Defendants in each of these cases served subpoenas on the SEIU and its third-party consultants, including the Mintz Group, seeking documents relevant to the allegations in the complaints.  In response, counsel for Plaintiffs in each lawsuit, instructed the SEIU and its third-party consultants, including the Mintz Group, to redact or withhold, on work product grounds,

---

[8] Marjory Unger retained J&H and CMHT on May 9, 2006 in connection with *Fleischman, et al. v. Albany Medical Center, et al.* (N.D.N.Y. Case No. 06-CV-0765).  Ms. Unger has since withdrawn from the suit due to lack of interest and was replaced by two other RNs.  Similarly, two named plaintiffs, Mary McDowell and Janet Schultz, withdrew from *Reed, et al. v. Advocate Health Care, et al.* (N.D. Ill. Case No. 06 C 3337), without explanation. Finally, Suzanne Clarke retained J&H and CMHT in connection with *Clarke v. Baptist Memorial Healthcare Corp.* (W.D. Tenn. Case No. 2:06-cv-02377) on May 7, 2006.  In Detroit, J&H and CMHT did not become "Plaintiffs' counsel" until October 10, 2006, the date on which Patricia Cason-Merenda retained them.

certain documents containing relevant factual information, including information that the Mintz

Group generated prior to Plaintiffs' involvement in these cases.[9]

Defendants have pursued written discovery and taken several depositions in these

lawsuits, including the depositions of most of the named Plaintiffs, Professor Barbara Bergmann,

and various representatives of the SEIU.[10]  Defendants in Albany, Chicago, Detroit and Memphis

also served the Mintz Group with a subpoena for the deposition of its corporate representative

pursuant to Fed. R. Civ. Pro. 30(b)(6) in October 2007.  That Rule 30(b)(6) deposition is the

subject of Plaintiffs' Motions to Quash.  As reflected by the deposition topics listed in those

subpoenas, the purpose of the Mintz Group deposition is to discover factual information

regarding the Mintz Group's involvement in the RN wage litigations.  *See* Schedule A to the

Subpoena attached to Motion to Quash as Exhibit F to Dean Decl.  This includes factual

information regarding: the SEIU's retention of the Mintz Group as a third-party consultant; the

relationship between the Mintz Group, the SEIU, J&H, and CMHT; the relationship between the

---

[9] Because the SEIU, the Mintz Group, and various other third-party consultants retained by the SEIU followed
Plaintiffs' instructions, Defendants in Albany and Chicago filed motions to compel production of the withheld
materials.  The parties have fully briefed and argued those motions in both jurisdictions.  While the parties are
awaiting a decision in Albany, the court in Chicago denied Defendants' motion on November 14, 2007.  Although
Plaintiffs may argue that the court in Chicago already determined that the material sought from the Mintz Group is
privileged, the court only decided that the _documents_ created by the Mintz Group were privileged work product.
That ruling did not address the question whether  "intangible items," such as deposition testimony, constitutes
attorney work product.  Moreover, Judge Grady's ruling conflicts with the decision in *Alexander v. FBI*, 192 F.R.D.
12 (D.D.C. 2000), which controls the issue in this District and held that the work product doctrine does not protect
depositions of third-party investigators that do not seek the disclosure of litigation strategy or attorney opinions.

Defendants in San Antonio also filed a motion to compel these third-party documents.  Because the Court in San
Antonio bifurcated discovery, the Court did not decide the motion to compel on the merits, but denied the motion
without prejudice to refiling during merits discovery.  *See Maderazo v. Vanguard Health Systems, et al.*, No. 5:06-
cv-00535 (W.D. Tex.) (Docket Nos. 164, 176, 177 and 182).

[10] Defendants deposed Professor Barbara Bergmann on August 30 and 31, 2007.  Defendants also took the 30(b)(6)
deposition of the SEIU on September 24, 25, and 26, 2007.  The SEIU was represented by Jamie Cohen ("Cohen"),
director of the Nurse Alliance for SEIU, Mark Rickling ("Rickling"), a senior research analysis for the SEIU, and
Deirdre Fitzpatrick ("Fitzpatrick"), an associate general counsel of SEIU.

Mintz Group and Plaintiffs and Plaintiffs' counsel; and the relationship between the Mintz Group and any other third-party consultants retained by the SEIU in connection with these cases.

Defendants do not intend to ask the Mintz Group's representative questions that will require the disclosure or production of work product or the mental impressions of Plaintiffs' counsel. Rather, Defendants intend to inquire, for example, about the nature of the work performed by the Mintz Group for the SEIU (its client), the factual information generated by the Mintz Group's work prior to J&H's retention by any Plaintiff in this case, and the disclosure of that information by the Mintz Group to any third-party (*e.g.*, the SEIU, Barbara Bergmann, or the Institute for Women's Policy Research, all third-party consultants retained by the SEIU).

## ARGUMENT

Despite Plaintiffs' claims to the contrary, the limited discovery taken to date reveals the improper basis for their work product claim. That discovery indicates that: (1) much, if not all, of the work performed by the Mintz Group was done for the SEIU, a non-party to the litigation; (2) the work performed for the SEIU related to a non-litigation interest of the SEIU, *i.e.*, the organization of nurses through the SEIU's "national issue advocacy campaign"; and (3) in retaining the Mintz Group, the SEIU never anticipated filing litigation on its own behalf. The results of this discovery further establish that the *factual* information regarding the SEIU's retention of the Mintz Group prior to any plaintiff retaining counsel in these lawsuits is not subject to the attorney work product privilege and is properly discoverable.

Plaintiffs claim that J&H was "Plaintiffs' counsel" when the Mintz Group began and conducted its investigation for the SEIU, and therefore, that the work the Mintz Group did was as

an "agent" of Plaintiffs' counsel. *See e.g.*, Br. at 2-4, 12-13, 16, 21-24.[11]  That characterization is misleading.  J&H engaged the Mintz Group **on behalf of the SEIU** in October 2005.  At that time, J&H only represented the SEIU.  Neither J&H nor CMHT became "Plaintiffs' counsel" until May 2006, when three nurses retained them in connection with the lawsuits filed in Albany, Chicago and Memphis.  Accordingly, Plaintiffs' repeated reference to J&H (or CMHT) as Plaintiffs' counsel when the SEIU retained the Mintz Group and its other third-party consultants misstates the facts.

Similarly, Plaintiffs are wrong when they argue that the information that Defendants seek to discover from the Mintz Group constitutes attorney work product.  Defendants seek to depose the Mintz Group about its involvement in the RN wage litigations, including the facts and information it learned during its investigation **for the SEIU**.  Defendants do not seek the disclosure of any attorney work product, such as the legal or mental impressions of J&H, who engaged the Mintz Group on behalf of the SEIU.

Moreover, the information Defendants seek is not generally protected by the work product doctrine.  The SEIU did not retain the Mintz Group as a third-party consultant in anticipation of litigation on its own behalf.  The Mintz Group worked for the SEIU, which is not, has never been, and never planned on being a party to any litigation involving nurse wages.  Accordingly, there is no legitimate connection between the SEIU and the Plaintiffs in any of the lawsuits to substantiate Plaintiffs' claim that the work performed by the Mintz Group for the SEIU should be afforded work product privilege protection.  Therefore, this Court should deny Plaintiffs' Motions to Quash Subpoenas Directed to the Mintz Group.

---

[11] Reference to Plaintiffs' Motions to Quash Subpoenas Directed at the Mintz Group is denoted as Br. at__, followed by the appropriate page references on which the cite is found.

I.    **NEITHER THE MINTZ GROUP NOR J&H WAS "PLAINTIFFS' COUNSEL" AT THE TIME OF THE MINTZ GROUP'S INVESTIGATION.**

The entire and mistaken premise of Plaintiffs' Motions to Quash is the characterization of J&H as "Plaintiffs' counsel." *See* Br. at 2-4, 12-13, 16, 21-24. Even knowing that it was actually the SEIU that retained the Mintz Group, Plaintiffs further claim that the Mintz Group should be considered "Plaintiffs' counsel" or an agent of Plaintiffs' counsel for work product purposes. *See* Br. at 3-4, 12-13, 16, 21-24. These claims are contrary to the information disclosed during discovery about the relationship between the Mintz Group and the SEIU. Accordingly, any reference to either the Mintz Group or J&H as Plaintiffs' counsel prior to May 2006 should be disregarded.

A.    **J&H represented the SEIU, and not Plaintiffs, when the Mintz Group conducted its investigation for the SEIU.**

When J&H engaged the Mintz Group on behalf of the SEIU in October 2005, J&H only represented the SEIU; J&H did not yet represent any of the Plaintiffs in any of the nurse wage lawsuits. SEIU representatives repeatedly maintained that when they met with counsel from J&H, they believed they were consulting with them as counsel for the SEIU. For example, Jamie Cohen, director of the Nurse Alliance of SEIU, testified that she always interacted with J&H in its role as counsel to the SEIU, and that J&H never indicated to her that it was representing Plaintiffs. *See* Exhibit 10 at 21:7-14, 63:20-22, 234:16-236:10. Another 30(b)(6) representative of the SEIU testified that when the SEIU shared information with J&H, they believed they were sharing it with J&H as counsel for the SEIU, not counsel for Plaintiffs. *See* Exhibit 15, Deposition of Mark Rickling ("Rickling Dep.") at 78:7-80:16, 121:7-11.[12]

---

[12] On November 13, 2007, one day before oral argument regarding Defendants' Motion to Compel Production of Documents Improperly Withheld as Work Product in *Reed*, Plaintiffs submitted an errata sheet for Mr. Rickling indicating that Mr. Rickling's understanding that the SEIU did not perform any work for Plaintiffs' counsel did not

(continued…)

J&H and CMHT did not become "Plaintiffs' counsel" until May 2006, when Marjory

Unger, Lisa Reed, and Suzanne Clarke retained them in Albany, Chicago and Memphis,

respectively.  This was eight months after the Mintz Group began its investigation for the SEIU.

In Detroit, J&H and CMHT did not become "Plaintiffs' counsel" until October 11, 2006, at least

a year after the Mintz Group commenced its investigation.  J&H cannot retroactively apply its

retention by Plaintiffs back to October 2005. Accordingly, any reference to J&H as "Plaintiffs'

counsel" when the Mintz Group performed its investigation for the SEIU is an unsubstantiated

attempt to turn the clock back several months to avoid the disclosure of relevant, discoverable

information.  It should be rejected.

> **B.**    **Plaintiffs' reference to the Mintz Group as either Plaintiffs' counsel or the agents of Plaintiffs' counsel is contrary to the facts disclosed during discovery.**

Similarly, any reference to the Mintz Group as either Plaintiffs' counsel or the agents of

Plaintiffs' counsel conflicts with the relationship between the SEIU and the Mintz Group

disclosed during discovery.  The SEIU, not Plaintiffs or Plaintiffs' counsel, retained the Mintz

Group in October 2005.  That makes the Mintz Group the SEIU's agent, not Plaintiffs' or

Plaintiffs' counsel's agent.

The Mintz Group's engagement letter dated October 11, 2005 confirms that the

investigation was for the SEIU only.   *See* Exhibit 5, SEIU-A 0046-48.  This letter specifically

states that J&H retained the Mintz Group **on behalf of the SEIU** to "provide investigative

services in the Nurse Pay matter to assist [J&H] in rendering legal advice **to the [SEIU]**."  *Id.*, at

---

fully reflect the SEIU's knowledge.  *See* Exhibit 16, 11/13/07 Letter to Judge Grady.  This change in testimony is just another attempt by Plaintiffs' counsel to rewrite and revise history in an effort to substantiate their improper work product claims.  An errata sheet, however, is not the proper place to change substantive testimony almost two months after Mr. Rickling's deposition.

SEIU-A 0047 (emphasis added).  Four months later, on February 9, 2006, J&H sent the Mintz Group another engagement letter that once again confirmed that J&H was retaining the Mintz Group **on behalf of the SEIU** to "provide investigative services [in the Nurse Pay matter] to assist J&H in rendering legal advice **to the SEIU**…"  *See Mintz Retainer Agreement*, attached to Plaintiffs' Motion to Quash at Exhibit E to Dean Decl.  Neither document mentions CMHT, any potential plaintiffs or any of the named plaintiffs in these lawsuits.  That is consistent with J&H's relationship with the Mintz Group, as the SEIU's counsel, not Plaintiffs' counsel.

Contrary to Plaintiffs' claim that, beginning in November 2005, CMHT also directed the Mintz Group's investigation, no contemporaneously prepared documents or discovery corroborate CMHT's involvement in the Mintz Group's investigation for the SEIU.  In fact, the materials produced thus far indicate that the first (and only) communication between the Mintz Group and anyone from CMHT occurred on March 15, 2006, at least six months after the Mintz Group initiated its investigation.  *See* Exhibit 7, Entry No. 220.[13]  Moreover, Plaintiffs' privilege log suggests that all communications or memoranda, both prior to and after March 15, 2006, occurred only between the Mintz Group and J&H.  *See e.g.* Exhibit 7, Entry Nos. 6, 21, 23, 31, 39, 47-48, 56, 69-71, 81, 89-90, 108-112, 124-25, 130, 144, 145, 156-58, 170-71, 179-81, 190-92, 197, 202-03, 208, 225, 233, 243.  This makes sense, of course, because it was J&H, not CMHT, who represented the SEIU and retained the Mintz Group to conduct its investigation on the SEIU's behalf.  Also, the SEIU, and not Plaintiffs, paid for the Mintz Group's investigation.  *See* Exhibit 10 at 77:14-78:1.

---

[13] This same correspondence appears on the privilege logs produced by the Plaintiffs in Albany and Detroit.  On both privilege logs, it is the first, and only, communication between the Mintz Group and CMHT.

Moreover, the retainer and funding relationship agreement between the SEIU and J&H, which established the SEIU as a third-party payor of J&H's legal fees for these lawsuits, confirms that the Mintz Group's investigation was for the SEIU, and not any of the Plaintiffs:

> SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions.

*See* Exhibit 11 at SEIU-CH 0648. Furthermore, it wasn't until the SEIU and J&H entered into this funding agreement, over a year after the Mintz Group began its investigation, that the SEIU authorized J&H to "share the results of those investigations ***conducted on SEIU's behalf*** with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion." *Id.* (emphasis added).

Finally, the SEIU's role as a third-party payor in these lawsuits does not make it the Plaintiffs' agent or representative for work product purposes. Indeed, the SEIU admits it is not Plaintiffs' agent. *See* Exhibit 8 at SEIU-A 0012 ("**It is important SEIU not be mis-perceived as acting <u>as an agent</u> for some particular attorneys in referring nurses, soliciting legal business, and/or stirring up litigation.** SEIU is referring nurses to lawyers to help the nurses assert their rights because that is part of SEIU's own mission, not on behalf of any lawyers or group of lawyers."). *Ramsey v. NYP Holdings, Inc.*, 00 Civ. 3478 (VM)(MHD), 2002 U.S. Dist. LEXIS 11728 (S.D.N.Y. June 27, 2002), is particularly instructive on this point. In *Ramsey*, John and Patsy Ramsey brought suit against a newspaper company on behalf of their minor child. *Id.* at *2. The parents sought to withhold, as work product, documents created for them because, among other reasons, they were representatives of their son, the plaintiff in the lawsuit. *Id.* at *25. The Court disagreed, holding that even when parents bring a lawsuit on behalf of their son, they are not representatives for work product purposes. *Id.* at *25-29. If the Ramseys

were not representatives of their child for work product purposes, the SEIU as a third-party payor certainly is not.

The facts are clear: it was the SEIU, not Plaintiffs or Plaintiffs' counsel, that retained the Mintz Group, whose investigation Plaintiffs' counsel now claim should be treated as privileged attorney work product. That J&H later became Plaintiffs' counsel in this litigation does not mean that they wore that hat at the time the Mintz Group performed its investigation for the SEIU.

**C.  Plaintiffs' argument that Defendants are trying to depose opposing counsel is a red herring.**

Ignoring the fact that the SEIU, and not Plaintiffs or Plaintiffs' counsel, retained the Mintz Group to conduct its investigation, Plaintiffs claim that the Mintz Group subpoena is an attempt to depose Plaintiffs' attorneys. Br. at 12-13. That is false.

Defendants seek the deposition of a third-party who obtained facts that are relevant to Plaintiffs' antitrust claims. Defendants seek discovery about the Mintz Group's relationship with the SEIU, Plaintiffs, Plaintiffs' counsel, and other third-party consultants retained by the SEIU. Defendants do not seek information created by Plaintiffs' attorneys or their agents, and the cases that Plaintiffs cite for this argument are inapposite. They all involve a situation where the deposition was directed to the attorney who was opposing counsel in a lawsuit. Plaintiffs cite no case that supports their position that factual discovery of a third-party consultant hired by a non-party whose counsel subsequently represented a party in a lawsuit is an attempt to take discovery from opposing counsel.

Because the subpoena to the Mintz Group is not directed to opposing counsel, but rather to a third-party consultant hired by a non-party in this litigation, the *Shelton v. American Motors Corp.* analysis suggested in Plaintiffs' Motions to Quash (Br. at 13) is unnecessary. *See Nakash*

*v. United States Dep't of Justice*, 128 F.R.D. 32, 35 (S.D.N.Y. 1989) (attorneys whose actions were not privileged cannot claim that they are opposing counsel for purposes of quashing a subpoena pursuant to *Shelton v. American Motors Corp.*).

Even if the Court did apply the *Shelton* test, which it should not, the information Defendants seek from the Mintz Group is properly discoverable. The Mintz Group's fact gathering was not performed by a party or for a party's representative; it was done for the SEIU, which did not anticipate filing litigation on its own behalf. *See supra* at 5. Additionally, Defendants do not intend to ask the Mintz Group questions seeking the disclosure of the legal or mental impressions of J&H. Finally, the Mintz Group gathered, on behalf of the SEIU, facts from witnesses who purport to have knowledge of the conspiracies alleged in these lawsuits. These facts are relevant to the claims and defenses of these lawsuits. *See supra* at 4-5.

## II.  THE WORK PRODUCT DOCTRINE DOES NOT PROTECT THE INFORMATION DEFENDANTS SEEK FROM THE MINTZ GROUP.

The information Defendants seek in the Mintz Group deposition is not protected by the work product doctrine. Rule 26(b)(3) applies to "documents and tangible things," but not to "intangible items," such as information learned during an investigation. Fed. R. Civ. P. 26(b)(3); *Alexander v. FBI*, 192 F.R.D. 12, 17 (D.D.C. 2000). In the context of a deposition – as contrasted with a document request – the court must determine "whether, in light of the nature of the [intangible work product] and the factual situation in the particular case, the [information] can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* If the information sought does not require the disclosure of litigation strategy or attorney opinions, as is the case here, it is properly discoverable. *Id.*, at 18.

**A.      The SEIU did not retain the Mintz Group in anticipation of litigation on its own behalf.**

In this case, Plaintiffs cannot show that the information Defendants seek from the Mintz Group was created "'with a specific claim supported by concrete facts which would likely lead to litigation in mind', not merely assembled in the ordinary course of business or for other non-litigation purposes." *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,* 5 F.3d 1508, 1515 (D.C. Cir. 1993)(quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980). That is Plaintiffs' burden in this Circuit. *See Amicus Communications., L.P. v. Hewlett-Packard Co.*, Case No. 99-0284, 1999 U.S. Dist. LEXIS 20901 at *8 (D.D.C. Dec. 3, 1999)(quoting *Linde Thomson Langworthy Kohn & Van Dyke P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1515 (D.C. Cir. 1993).

It is undisputed that the SEIU did not retain third-party consultants like the Mintz Group in anticipation of litigation on its own behalf. The SEIU testified that it never was, nor planned to be, a plaintiff in this litigation and never intended to file a lawsuit on its own behalf. *See* Exhibit 10 at 193:6-11, 272:17-275:2. Moreover, the initial engagement letter between the Mintz Group and J&H in October 2005 states that the Mintz Group's work was only to "provide investigative services in the Nurse Pay matter to assist [J&H] in rendering legal advice to the [SEIU]." *See* Exhibit 5, SEIU-A 0047. Indeed, the first, and only suggestion that the Mintz Group's work for the SEIU would be in anticipation of litigation was in the February 2006 retention agreement, created five months after the Mintz Group began its investigation. Curiously, however, the Funding Agreement between the SEIU and J&H, drafted eight months later in October 2006, states only that the "SEIU retained [J&H] to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages." *See* Exhibit 11 at SEIU-CH 0648. It says nothing about litigation.

The SEIU hired third-party consultants like the Mintz Group to provide investigative support for its attempt to prove Professor Bergmann's economic theories. They did so to promote the SEIU's business interest in branding itself as an advocate for nurses nationwide in an attempt to organize nurses in its target markets. *See, e.g.*, Exhibit 10 at 87:4-14 (wage collusion issue was "an important part of the work we were doing to brand ourselves as a national organization that was addressing issues that were of concern to nurses"); *id.* at 131:5-133:7 (Nurse Alliance brand campaign seeks to inform nurses that there is a national nurse organization addressing issues of concern to them);

> **REDACTED FOR PUBLIC FILING**
> **(COMPLETE BRIEF TO BE FILED UNDER SEAL)**

Accordingly, and in light of the SEIU's position that it did not retain consultants like the Mintz Group for litigation purposes on its own behalf, Plaintiffs should not be permitted to claim work product protection for the Mintz Group's investigation.

But even if there was no separate and independent business purpose, the work product doctrine still would not apply given the "remote prospect of future litigation." *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983) (quotation omitted); *see also, McCoo v. Denny's Inc.*, 192 F.R.D. 675, 683 (D. Kan. 2000)(quoting *Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.*, No. 94-22395-GTV, 1995 U.S. Dist. LEXIS 15416, at *9 (D. Kan. Oct. 5, 1995) ("'The inchoate possibility, or even the likely chance of litigation, does not give rise to the [work product] privilege.'"). The rule is clear – work product protection is unavailable when anticipated litigation was merely speculative in nature and the materials were created in the hope of attracting plaintiffs. *See In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 27-28 (W.D.N.Y. 1997). "To hold otherwise would be to allow the work-product privilege to attach to any material prepared in the hope that at some future time it may be used [to] demonstrate to a potential plaintiff that an actionable injury had been sustained and to persuade

such potential plaintiff to litigate the claim." *Id*. at 28; *see also Harper v. Auto-Owners Ins. Co*., 138 F.R.D. 655, 660-61 (S.D. Ind. 1991). "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege." *Binks*, 709 F.2d at 1118; *accord, e.g.*, *Chicago Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 U.S. Dist. LEXIS 4495, at *10 (N.D. Ill. Apr. 10, 1996) (citing *Binks*).

When the Mintz Group commenced its investigation, there was no "'articulable claim, likely to lead to litigation.'" *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 865 (D.C. Cir. 1980). There were not even any Plaintiffs. At most, the prospect of litigation was remote, which is insufficient under D.C. Circuit law to protect the information from discovery. *See id*. Accordingly, there is no work product protection for the deposition of the Mintz Group, an investigator retained by an organization with no articulable claims against Defendants and with no desire to become a party to litigation.

**B.      The work product doctrine does not extend to depositions of third party investigators that do not require the disclosure of attorney opinions.**

Even if the Court applies the analysis of *Hickman*, the work product doctrine does not protect depositions of third-party investigators that do not seek the disclosure of litigation strategy or attorney opinions. *See Alexander v. FBI*, 192 F.R.D. 12, 18 (D.D.C. 2000). The plaintiffs in *Alexander*, who claimed a violation of privacy interests when the FBI handed over FBI files to the White House, sought to depose Larry Potts, a third-party investigator hired by President and First Lady Clinton (a non-party to the suit) in connection with the Jones v. Clinton matter. *Id*. at 14. President Clinton intervened, claiming that Potts's investigation was protected by the attorney-client and work product privileges. *Id.* The plaintiffs moved to compel. *Id.* The court found that because the information was sought through a deposition, and not

documents, *Hickman,* rather than Rule 26(b)(3), governed the court's work product analysis. *Id.* at 17. The court found, however, that *Hickman* was distinguishable for two reasons: (1) unlike in *Hickman*, the deposition in *Alexander* was directed to a third-party investigator, and not the attorneys themselves; and (2) the *Alexander* deposition regarding the third-party investigation did not require the disclosure of litigation strategy or attorney opinions. *Id.* at 18. Accordingly, the court granted plaintiffs' motion to compel and allowed the deposition of the third-party investigator. *Id.* at 20.

The same analysis applies here. Defendants want to depose a non-attorney third-party investigator, the Mintz Group, about their investigation on behalf of a non-party, the SEIU. Specifically, Defendants intend to question the Mintz Group about the SEIU's retention of the Mintz Group as a third-party consultant, the relationship between the Mintz Group, the SEIU, J&H, and CMHT, and the relationship between the Mintz Group and the Plaintiffs and third-parties in this litigation, Defendants do not intend to ask the Mintz Group questions that would reveal any litigation strategy or attorney opinions.

The cases that Plaintiffs cite do not, as they assert, support the blanket application of work product protection over factual information learned by a third-party (the Mintz Group).[14] *Sporck v. Peil*, for example, addresses whether the selection process employed by defense counsel in grouping certain documents together for purposes of deposition preparation is work product, not the applicability of the work product doctrine to third-parties. *Sporck v. Peil*, 759

---

[14] Indeed, the principles in *Hickman* actually counsel in favor of compelling the disclosure of this information. *Hickman* states, "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Here, Defendants are only asking for the disclosure of _facts_ about the relationship of the Mintz Group to others involved in these cases, not the mental impressions of Plaintiffs' counsel. Both parties should have equal access to facts discovered during that investigation. *See Ramsey*, 2002 U.S. Dist. LEXIS 11728, at *23 (noting that disclosure from a non-party "does not distort the competitive balance between a plaintiff and a defendant, since neither is reaping the benefits of the other's labors").

F.2d 312, 315-17 (3d Cir. 1985). The other two cases Plaintiffs cite for this proposition actually support *Defendants'* position. *In re Grand Jury Subpoenas* affirmed an order compelling the production of materials prepared by a third-party, holding that the party invoking a privilege bears a "heavy" burden of establishing its applicability because "privileges are neither 'lightly created nor expansively construed.'" 318 F.3d 379, 384 (2d Cir. 2002) (citing *Nixon*, 418 U.S. at 710). *Hughley v. Art Institute of Chicago* required a third-party to turn over investigatory materials because they were not created for litigation. 981 F. Supp. 1123, 1128-29 (N.D. Ill. 1997).

The only case that Plaintiffs cite that arguably protects information as attorney work product is *In re Student Finance Corp.*, 2006 U.S. Dist. LEXIS 86603 (E.D. Pa. Nov. 29, 2006). But that case is plainly distinguishable because the third-party in *Student Finance* was working on behalf of a similarly-situated party in a related litigation. In that case, the largest creditor in a bankruptcy proceeding (Royal) hired the Mintz Group to investigate a bankrupt company (Student Finance) that had allegedly engaged in widespread fraud. *Id*. at *1-5. The defendant in a related adversary action (Career Path) sought documents relating to the Mintz Group's investigation. *Id*. at *8. Royal was not a party to the adversary action involving Career Path, but as Student Finance's largest creditor, Royal was a party to the underlying bankruptcy case, and a party in related litigation. *Id*. at *2-5.

Thus, Royal was a party to several related lawsuits, just not the particular lawsuit out of which the subpoena was served. The *Student Finance* court also found it significant that Royal "received a measure of control over the litigation." *Id*. at *35-36. In contrast, the non-party here – the SEIU – asserts that it has no control over these cases. *Compare id*. at *35-36 *with* Exhibit 8 at SEIU-A 0012 ("It is important SEIU not be mis-perceived as controlling the antitrust

- 19 -

litigations.  It doesn't….SEIU will not control the timing of the suits, the prosecution of the suits, or their resolution."); *see* Exhibit 11 at SEIU-CH 0648 ("...as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests.").  And it cannot be disputed that the SEIU is not an actual or anticipated party to any related lawsuits.  Unlike Royal, there simply was no relationship between the named Plaintiffs and counsel at the time the Mintz Group did its investigation.

In sum, the work product doctrine does not protect the deposition of a third-party investigator (the Mintz Group), hired by a non-party (the SEIU) who never planned on participating in any of the lawsuits filed in Albany, Chicago, Detroit or Memphis.[15]

### C.    Even if Rule 26 applied, the Mintz Group's investigation was not on behalf of a party to this litigation.

Rule 26(b)(3) only protects materials prepared by or for a party or a party's representative, and not materials prepared by or for a non-party or that non-party's representative. Fed. R. Civ. P. 26(b)(3); *see also* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD R. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024 (2d ed. 1994).  And courts having ruled on this issue have deferred to the plain language of Rule 26(b)(3) to hold that only "parties" may invoke the work product rule.

Plaintiffs have not, and cannot, dispute that no party or Plaintiff in this litigation retained the Mintz Group.  It was the SEIU who retained and paid for the Mintz Group, not Plaintiffs or Plaintiffs' counsel.  The SEIU is not a party or a representative of a party in any of these lawsuits.  Nor did the SEIU ever plan on being a party in this litigation.  *See* Exhibit 10 at 193:6-

---

[15] Further, the SEIU's disclosure to the Plaintiffs of the withheld information learned by the Mintz Group arguably constitutes a waiver of the privilege.

11, 272:17-275:2.  There is no legitimate connection between the SEIU, its third-party

consultants and the Plaintiffs in this litigation that can serve as a basis to quash, on work product

grounds, the subpoena for deposition directed to the Mintz Group.  *See Howell v. City of New*

*York*, 2007 U.S. Dist. LEXIS 71063 (E.D.N.Y. Sept. 25, 2007) (finding that the defendant could

not claim work product privilege over materials created by a non-party who was represented by

the attorney who subsequently became defense counsel in the pending case.).

### III.    THE INFORMATION DEFENDANTS SEEK FROM THE MINTZ GROUP IS RELEVANT TO THE CLAIMS AND DEFENSES ASSERTED IN THESE LAWSUITS.

The Mintz Group investigated and gathered facts on behalf of the SEIU by interviewing

former and current employees of many of the Defendants regarding, among other things, how the

Defendant-hospitals compensated and recruited RNs.  In particular, the Mintz Group obtained

factual information from witnesses who purport to have knowledge of the conspiracy alleged in

these cases.  Indeed, the information learned by the Mintz Group in its investigation could lead to

the discovery of admissible evidence, and, as Plaintiffs readily admit, is relevant.  *See Alexander*,

192 F.R.D. at 15; Br. at 10, n. 12.[16]

Plaintiffs also claim that the subpoena lists categories of information for which the Mintz

Group may not have information.  *See* Br. at 21-22.  In particular, *Plaintiffs*, and not the Mintz

---

[16] This is particularly true where the factual information relates to witnesses that the courts in Chicago and Detroit ordered Plaintiffs to disclose.  *See Reed, et al. v. Advocate Health Care, et al.*, Case No. 06-cv-3337 (Docket No. 360), *Cason-Merenda v. Detroit Medical Center, et al.*, Case No. 06-cv15601 (Docket No. 141).  Plaintiffs argue that Defendants can discover this information themselves because "Plaintiffs in all of the underlying actions have identified…all of the witnesses with knowledge of the allegations of the complaints, including all of the witnesses interviewed by Mintz."  *See* Br. at 22.  As an example, Plaintiffs' Initial Disclosures in Chicago list 172 witnesses, excluding the named Plaintiffs.  In response to this Court's ruling on September 5, 2007, Plaintiffs provided Defendants with the specific names of 23 witnesses who Plaintiffs' counsel thought had particularly valuable information.  This information, however, is undoubtedly information that Plaintiffs consider to be helpful to their case.  Defendants are entitled to facts relating to the other 149 witnesses interviewed by the Mintz Group in Chicago, which might contain exculpatory evidence.  Moreover, information on all of these witnesses "might be useful for purposes of impeachment or corroboration."  *Hickman*, 329 U.S. at 511.

Group, claim that the Mintz Group does not possess information regarding Topics 11-13, 15, and

16, and therefore, the Mintz Group is not competent to testify about these issues.  *See* Br. at 9-10,

21-22.  Plaintiffs' beliefs regarding whether the Mintz Group has any information about these

deposition topics are irrelevant and do not relieve the Mintz Group of its burden to disclose

relevant information it may have regarding this lawsuit or preclude Defendants from asking the

Mintz Group about them.

Moreover, Plaintiffs' claim that Topics 13, 15 and 16 are not relevant are also wrong.

Deposition Topic 13 seeks information regarding communications between the Mintz Group and

the SEIU, as well as the other third-party consultants retained by the SEIU.[17]  This information is

relevant to the investigation that the SEIU conducted, which Plaintiffs are now using to

substantiate their claims in these lawsuits, and any follow-up that the Mintz Group did on the

work done by other third-party consultants retained by the SEIU.  Topics 15 and 16 also relate to

the reasons why the SEIU became involved in these lawsuits.[18]  The Mintz Group's investigation

was part of the SEIU's national branding campaign, which in turn was designed to help the SEIU

organize nurses in the future.  According to Plaintiffs, the impetus of the Mintz Group's

investigation was the SEIU's research.  Based upon that research, the SEIU became a third-party

payor in these lawsuits.  The Mintz Group's work on behalf of the SEIU, including how it

---

[17] Specifically, Topic 13 seeks information regarding "[a]ny Communications between the SEIU and The Feldman Group, Global Strategy Group, the Institute for Women's Policy Research, Barbara Bergmann, the Named Plaintiffs or member of the putative class in the [lawsuits], or Plaintiffs' Counsel relating to (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the [lawsuits], (iv) compensation for registered nurses employed in or living in the [relevant areas], or (v) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the [relevant areas]."

[18] Topic 15 seeks information regarding "[a]ny plans, proposals, or actions to organize the employees of any of the Hospital Defendants or any other hospital within the [relevant areas] and/or obtain certification of the SEIU as the collective bargaining representative of any unit of the employees of any Hospital Defendant or other hospital within the relevant areas]."  Topic 16 seeks information regarding "[t]he actual, potential or anticipated impact of or benefit from the filing of the [lawsuits] on the SEIU, including the [lawsuits'] impact or benefit on the SEIU's membership, organizing campaigns, publicity campaigns, visibility or status among registered nurses in the [relevant areas]."

interfaced with the SEIU's organizing campaign, relates to how and why the SEIU became

involved in these lawsuits. Accordingly, it is relevant and discoverable.

Finally, Plaintiffs argue that Defendants can obtain the information sought from the

Mintz Group through means other than a deposition. *See* Br. at 22-23. Ironically, Plaintiffs have

obstructed any attempts by Defendants to discover relevant, non-privileged factual information

from the Mintz Group. Defendants served discovery requests on Plaintiffs and subpoenas on the

SEIU (both locally and nationally) and the Mintz Group requesting documents central to the

issues in this case. Although the SEIU produced about 8,500 pages of documents (many heavily

redacted), it withheld – as covered by the attorney work product privilege and at the insistence of

Plaintiffs' counsel – all documents relating to the Mintz Group's work for the SEIU.[19] *See* SEIU

Privilege Log, attached as Exhibit 17. Also at the insistence of Plaintiffs' counsel, the Mintz

Group responded to the subpoena for documents that it received with a blanket assertion of

attorney work product. For example in Albany, the Mintz Group provided only a 14-page

privilege log identifying 305 documents as protected by the work-product doctrine.[20] *See* Mintz

Group Privilege Logs, attached as Exhibit 18. The Mintz Group has not produced any materials

in response to these requests. Plaintiffs themselves are withholding these same documents. *See*

Plaintiffs' Privilege Log, attached as Exhibit 7.

---

[19] In meet and confer discussions, the SEIU's counsel stated that they were not asserting any work product objection of the SEIU, but rather Plaintiffs' counsel directed them to assert Plaintiffs' purported work product objection. The redacted and withheld documents include draft interview templates for use in the Mintz Group's interviews of potential witnesses, the Mintz Group's investigative interview memoranda and notes, and invoices for services rendered by the Mintz Group, among other materials. The sheer breadth of materials appearing on the SEIU's privilege log demonstrates that the Mintz Group's work was performed on behalf of the SEIU and not any anticipated party to litigation.

[20] The Mintz Group provided similar privilege logs in Chicago and Detroit. The Mintz Group has withheld, for example, publicly available articles, investigative interview notes and memoranda, sample interview questions, witness searches and results, interviewee contact information, employee listings, engagement letters between the Mintz Group and SEIU, and invoices to SEIU for services rendered, among other materials.

## **CONCLUSION**

The discovery taken to date reveals that when the SEIU retained the Mintz Group to do the work that generated the documents and information over which Plaintiffs now assert a work product claim, the SEIU did so on its own behalf as part of its non-litigation, "nurse wage campaign." No amount of revisionist history can change the basic fact that neither the SEIU nor J&H, on behalf of the SEIU, retained the Mintz Group for the Plaintiffs or Plaintiffs' (as contrasted with the SEIU's) counsel. They could not have – there were no plaintiffs when the SEIU retained the Mintz Group. At the time that SEIU retained the Mintz Group, J&H represented only the SEIU, and not any of the Plaintiffs in these actions.

The only connection that Plaintiffs have to the information over which they now assert a work product privilege is the fact that Plaintiffs retained the same attorney who also, and previously, represented the SEIU at the time the Mintz Group conducted its investigation. The mere fact that Plaintiffs hired the same attorney as the SEIU does not give the Plaintiffs the right to assert a work product privilege over the work done by the SEIU's consultant long before Plaintiffs retained their counsel. Moreover, J&H is not now entitled to put on its Plaintiffs' counsel hat to assert an attorney work product privilege over work that was performed for a different client that is not a party to this litigation.

Defendants are entitled to explore, by deposition, the relationship of the Mintz Group to the SEIU, other third-party consultants retained by the SEIU, Plaintiffs and Plaintiffs' counsel. The Court should, therefore, deny Plaintiffs' Motions to Quash Subpoenas Directed at the Mintz Group.

Date: November 19, 2007                    Respectfully submitted,

                                           By:    /s/ Michael R. Shumaker

                                           Phillip A. Proger (D.C. Bar No. 929596)
                                           Toby G. Singer (D.C. Bar No.942524)
                                           Michael R. Shumaker (D.C. Bar No. 434578)
                                           JONES DAY
                                           51 Louisiana Ave., NW
                                           Washington, D.C. 20001-2113
                                           Tel:  (202) 879-3939
                                           Fax:  (202) 626-1700

                                           **Counsel for Defendants Seton Health System, St.
                                           John Health and Baptist Memorial Healthcare
                                           Corp.**

David Marx, Jr.                            Margo L. Weinstein
David L. Hanselman, Jr.                    Richard L. Marcus
Stephen Y. Wu                              Robert T. Joseph
Jennifer A. Smulin                         Natalie J. Spears
Benjamin Hanauer                           Christopher Q. King
Amy J. Carletti                            Anthony T. Eliseuson
Stephanie L. Poulos                        Lisa Z. Fain
McDERMOTT WILL & EMERY LLP                 SONNENSCHEIN NATH &
227 West Monroe Street                     ROSENTHAL LLP
Chicago, Illinois 60606-5096               7800 Sears Tower
(312) 372-2000                             233 S. Wacker Drive
(312) 984-7700 (fax)                       Chicago, Illinois  60606-6404
                                           (312) 876-8000
                                           (312) 876-7934 (fax)
**Counsel for Defendants Resurrection
Health Care, Albany Medical Center and     **Counsel for Defendants University of
Henry Ford Health System**                 Chicago Hospitals and Trinity Health
                                           Corp.**

Timothy F. Haley
Scott A. Schaefers
Scott A. Carlson
Molly M. Joyce
Richard L. Reinish
P. Brian See
Annette Tyman
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603-4205
(312) 346-8000
(312) 269-8869 (fax)

Robert E. Bloch
MAYER BROWN LLP
1909 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 263-3203

Andrew S. Marovitz
Jonathan L. Lewis
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, Illinois 60606
Phone: (312) 782-0600

**Counsel for Defendant Evanston
Northwestern Healthcare**

Michael L. Shakman
Edward W. Feldman
Diane F. Klotnia
Thomas M. Staunton
MILLER SHAKMAN & BEEM LLP
180 North LaSalle Street, Suite 3600
Chicago, Illinois 60601
(312) 263-3700
(312) 263-3270 (fax)

**Counsel for Defendant Advocate Health
Care**

Martin T. Tully
David H. Kistenbroker
Laura Keidan Martin
David S. Slovick
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
(312) 902-5200
(312) 902-1061 (fax)

James J. Calder
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
(212) 940-8800
(212) 940-8776 (fax)

**Counsel for Defendant Children's
Memorial Hospital**

Howard B. Iwrey
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304

**Counsel for Defendant Oakwood
Healthcare, Inc.**

Kenneth J. McIntyre
L. Pahl Zinn
Michelle R. Heikka
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226

**Counsel for Defendant Detroit Medical
Center**

Shari Ross Lahlou
Bethany M. Wimsatt
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

**Counsel for Defendant Bon Secours
Cottage Health Services**

David A. Ettinger
Peter E. Boivin
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226

**Counsel for Defendant McClaren Health Care Corp.**

Nicholas J. D'Ambrosio
Sanjeeve DeSoyza
William Reynolds
BOND SCHOENECK & KING PLLC
111 Washington Avenue
Albany, NY 12210-2211

**Counsel for Defendant Ellis Hospital**

Robert H. Iseman
Brian M. Culnan
ISEMAN CUNNINGHAM REISTER &
HYDE LLP
9 Thurlow Terrace
Albany, NY 12203

**Counsel for Defendant St. Peter's Health Care Service**

William D. Slowey
Mark T. Nelson
Sheldon H. Klein
Bruce L. Sendek
Michael R. Turco
BUTZEL LONG
150 West Jefferson Street, Suite 100
Detroit, MI 48226

**Counsel for Defendant William Beaumont Hospital d/b/a Beaumont Hospitals**

Gordon L. Lang
NIXON PEABODY LLP
401 9th Street, N.W.
Washington, D.C. 20004-2128

Daniel J. Hurteau
NIXON PEABODY LLP
Omni Plaza, Suite 900
30 South Pearl Street
Albany, NY 12207

**Counsel for Defendant Northeast Health**

Corey W. Roush
HOGAN & HARTSON
555 Thirteenth Street NW
Washington D.C. 20004

**Counsel for Defendant Methodist Le Bonheur Healthcare**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br>　　v.<br>ADVOCATE HEALTH CARE, et al.<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 07-mc-0450-RMU |
| WENDY FLEISCHMAN and CINDY CULLEN, on behalf of themselves and all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br>　　v.<br>ALBANY MEDICAL CENTER, et al.<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 07-mc-0451-RMU |
| PAT CASON-MERENDA and JEFFREY A. SUHRE, on behalf of themselves and all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br>　　v.<br>DETROIT MEDICAL CENTER, et al.<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 07-mc-0452-RMU |
| SUZANNE C. CLARKE and CONISE P. DILLARD, on behalf of themselves and all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br>　　v.<br>BAPTIST MEMORIAL HEALTHCARE CORP, et al.<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 07-mc-0463-RMU |

## **PROPOSED ORDER**

Upon consideration of Plaintiffs' Motions to Quash Subpoena Directed at the Mintz

Group and the entire record herein, IT IS, this ___ day of _____, 2007, by the United

States District Court for the District of Columbia, ORDERED:

That Plaintiffs' Motions to Quash Subpoena Directed at the Mintz Group is DENIED.

Dated:

_____
United States District Judge

Exhibit 1

# Barbara R. Bergmann

| | |
|---|---|
| **From:** | Barbara R. Bergmann |
| **Sent:** | 8/5/2006 16:22:40 |
| **To:** | 'Gerald A. Pollack' gapollack@hotmail.com; |
| **Cc:** | |
| **Bcc:** | |
| **Subject:** | RE: question |
| **Attachments:** | image003.gif;image004.gif; |

Dear Jerry:



Redacted

Something I've been working on since the seventies has just come to fruition. I found out then, through a student project, that in each metropolitan area the hospitals were conspiring with eachother to keep nurse salaries down, and that that is the cause of the nurse shortage. I intermittently tried to interest nurse organizations, with no success. A year ago or so, I finally got SEIU interested, and they put up funds to gather evidence. The result was reported in the Times last month 4 anti-trust suits with more to come. (see link to story below)
Regards to Pat. Hope to see you both.
Love, Barbara



Bergmann-CH 0416



**Link to the NY Times:**

NATIONAL | June 21, 2006
**Suit Claims Hospitals Fixed Nurses' Pay**

---

Link to the NY Times:

NATIONAL   | June 21, 2006
Suit Claims Hospitals Fixed Nurses' Pay

---

Barbara R. Bergmann
Professor Emerita of Economics, University of Maryland and American University
mailing address: 5430 41 Place NW, DC 20015
brberg@verizon.net   202-537-3036

Redacted



Redacted

Bergmann-CH 0418

Exhibit 2

# Barbara R. Bergmann

**From:**     Barbara R. Bergmann
**Sent:**     8/16/2006 21:49:35
**To:**     'beverly' beverlyc@pipeline.com;
**Cc:**
**Bcc:**
**Subject:**     RE: nurse anti-trust suits

Redacted

As to the nurses, I tried for donkey's years to interest the Am Nurses Assn, which has union chapters, but they couldn't be bothered. It turns out that the org is dominated by nurse-administrators, who are the very ones doing the dirty work. I also tried interesting the California Nurses Assn, which is the militant bunch that pushed the nurse-patient ratio legislation through the Assembly. But they weren't interested either. Maybe the hypothesis seemed too far out. What did the trick was writing up the paper I sent you, which I did for a meeting of the Am Anti-Trust Inst, an org patronized by the plaintiffs bar. The SEIU became wildly interested when they saw my writeup, and spent what must have been hundreds of thousands for a premier detective agency to assemble evidence for these cases. What is curious, though, is that in their publicity even they do not emphasize pay, but better patient care. No doubt based on focus groups. It must be un-nurse-like to admit wanting more money.

Redacted

Love, Barbara

Barbara R. Bergmann
Professor Emerita of Economics, University of Maryland and American University
mailing address: 5430 41 Place NW, DC 20015
brberg@verizon.net   202-537-3036

-----Original Message-----
From: beverly [mailto:beverlyc@pipeline.com]
Sent: Wednesday, August 16, 2006 8:33 PM
To: Barbara R. Bergmann
Subject: Re: nurse anti-trust suits

Redacted

Redacted           As for the nurses, I read the story you
mentioned. It's ghastly if the hospitals have been doing that. It's
too bad there isn't more of a union presence in the market today.
That's why it took so long for the nurses to take action.  Do you
detect anything yet that gives you a lift about the progress of world
affairs?   The Republicans are hoping Lieberman wins.   Time is flying
so quickly that it's almost October 25 already and we'll be at the
opera.     Love,   Bev

>
>
>
>Barbara R. Bergmann
>Professor Emerita of Economics, University of Maryland and American
>University
>mailing address: 5430 41 Place NW, DC 20015
>brberg@verizon.net   202-537-3036
>
>
>

Exhibit 3

# Barbara R. Bergmann

**From:**    Barbara R. Bergmann
**Sent:**    8/1/2006 10:08:23
**To:**    'Buchan, Jim' JBuchan@QMUC.ac.uk;
**Cc:**
**Bcc:**
**Subject:**    RE: nurse anti-trust suits

Dear Jim:

The suits are a result of the little paper I wrote, which I believe I sent you a few years ago, which got into the hands of the Service Employees Intl Union, which then spent a fortune gathering evidence. Of course, the paper cites Yett's little survey.

I had also sent a copy to the U Penn nurse ed people, but they were not in the least interested.

————————————————————————

Barbara R. Bergmann

Professor Emerita of Economics, University of Maryland and American University

mailing address: 5430 41 Place NW, DC 20015

brberg@verizon.net  202-537-3036

————————————————————————
**From:** Buchan, Jim [mailto:JBuchan@QMUC.ac.uk]
**Sent:** Tuesday, August 01, 2006 5:22 AM
**To:** 'Barbara R. Bergmann'
**Subject:** RE: nurse anti-trust suits

Thanks Barbara,

this seems to echo some of the findings of Yett back in the 1970's?

Professor James Buchan

Queen Margaret University College

Clerwood Terrace

Edinburgh EH12 8TS

UK


Tel.  (+ 44) (0)131 317 3600

Fax. (+44) (0) 131 317 3605

Mobile (+44) (0)7957 571165


-----Original Message-----

**From:**  Barbara R. Bergmann [mailto:brbergmann@verizon.net]

Bergmann-CH 0413

**Sent:**  28 July 2006 03:59

**To:**  julieas@nursing.upenn.edu

**Cc:**  comanor@ucla.edu; rsavelson@cwsny.com; dyett@almaak.usc.edu; charlieb@umich.edu; ken.heier@usdoj.gov; Buchan, Jim; laiken@nursing.upenn.edu; lmellch@rwjf.org; lsupport@comcast.net; brberg@verizon.net; rashi_fein@hms.harvard.edu; dyett@usc.edu

**Subject:**  nurse anti-trust suits

<< OLE Object: Picture (Metafile) >>

<< OLE Object: Picture (Metafile) >>   << OLE Object: Picture (Metafile) >> The idea that I previously corresponded with you about -- that the nurse shortage has been a result of hospitals' behavior in reducing competition for nurses, keeping their salaries below the level at which supply equals demand -- has resulted in a set of lawsuits, as reported in the NY Times.

<< OLE Object: Picture (Metafile) >>

**Link to the NY Times: NATIONAL | June 21, 2006  Suit Claims Hospitals Fixed Nurses' Pay**
**<http://www.nytimes.com/2006/06/21/us/21nurses.html?emc=eta1>**
_____

Barbara R. Bergmann

Professor Emerita of Economics, University of Maryland and American University

mailing address: 5430 41 Place NW, DC 20015

brberg@verizon.net   202-537-3036

# EXHIBIT 4

# FILED UNDER SEAL

Exhibit 5

*520-069*
*APC*

```
┌─────────────────┐
│  J A M E S      │
│                 │
│  M I N T Z      │
│                 │
│  G R O U P      │
└─────────────────┘
```

**FAX TRANSMISSION**

| To: | David P. Dean, Esq.<br>James & Hoffman, P.C.<br>1101 17th Street, NW, Suite 510<br>Washington, DC 20036 | From: | Andrew B. Melnick<br>James Mintz Group<br>32 Ave. of the Americas, 21st Fl.<br>New York, NY 10013 |
|---|---|---|---|
| Phone: | 202-496-0500 | Phone: | (212)-489-7100 |
| Fax: | 202-496-0555 | Fax: | (212) 489-7037 |
| Re: | Engagement Letter | Date: | October 11, 2005 |

This fax contains __3__ pages including cover sheet.

RE: Nurse Pay Matter

Enclosed please find our engagement agreement in the above-referenced matter. Please return an executed copy to me as soon as possible.

Sincerely,

*Andy Melnick/ lc*

Andrew B. Melnick
General Counsel

---

32 Avenue of the Americas, 21st Floor, New York, N.Y. 10013   Phone: 212-489-7100  Fax: 212-489-7037

1150 18th Street, NW, Suite 500, Washington, D.C. 20036  Phone: 202-887-9100  Fax: 202-887-9122
1 California Street, Suite 2800, San Francisco, CA, 94111  Phone: 415-765-9900  Fax: 415-765-9910 Lic. # 24029
44 W. Flagler St., Suite 1050, Miami, Florida 33130  Phone: 305-373-8838  Fax: 305-373-3224 Lic. #A9700128
205 North Michigan Avenue, Suite 912, Chicago, IL 60601  Phone: 312-861-9500  Fax 312-861-9558
James Mintz & Associate, Art Recovery 3 Field Court, Gray's Inn, London WC1R 5EN, England  Phone: 011-44-171-1242-1226

Confidentiality Notice: The documents accompanying this fax transmission contain confidential information belonging to the sender that is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this faxed information is strictly prohibited. If you have received this fax in error, please immediately notify us by telephone to arrange for return of the original documents to us.

SEIU-A  0046



**JAMES MINTZ GROUP**

<u>PRIVILEGED AND CONFIDENTIAL</u>
<u>ATTORNEY WORK PRODUCT</u>

October 11, 2005

VIA FACSIMILE

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, DC 20036

Re:  <u>Nurse Pay Matter</u>

Dear Mr. Dean:

This letter confirms your firm's engagement of the James Mintz Group, Inc. ("JMG") on behalf of the Service Employees International Union ("the client") to provide investigative services in the Nurse Pay matter to assist your firm in rendering legal advice to the client under the terms set forth in this letter.

We are not asking your client for a retainer in this matter.  You agree that our bills will be paid within 30 days of your firm receiving them.

Your signature below is your representation that you are authorized to enter into this agreement on behalf of your firm and the client and, further, indicates your firm's and the client's acceptance of the terms set forth in this letter.

JMG will send bills to you on a monthly basis or more frequently, and our bills will include a day-by-day breakdown of our work.

We will bill for our services on an hourly basis.  Our investigators' hourly rates range from $120 to $375 per hour.  My rate is $375 per hour.  We expect that most of the work in this matter will be performed by investigators at rates between $200 and $275 per hour.

SEIU-A  0047

JAMES MINTZ GROUP, INC.

32 AVENUE OF THE AMERICAS • 21ST FLOOR • NEW YORK, NY • 10013 • PHONE: 212-489-7100 • FAX: 212-489-7037
1150 18TH STREET, NW • SUITE 500 • WASHINGTON, D.C. • 20036 • PHONE: 202-887-9100 • FAX: 202-887-9122
621 SANSOME STREET • SAN FRANCISCO, CA • 94111 • PHONE: 415-765-9900 • FAX: 415-765-9910 • LIC. #24029
44 WEST FLAGLER STREET • SUITE 1050 • MIAMI, FL • 33130 • PHONE: 305-373-8838 • FAX: 305-373-3234 • LIC. #A9700128
205 NORTH MICHIGAN AVENUE • SUITE 912 • CHICAGO, IL • 60601 • PHONE: 312-861-9500 • FAX: 312-861-9558

We also bill for any charges and disbursements such as computer databases, copies, fax, telephone, and overnight mail.

We will check in with you when and if our fees and expenses reach approximately $50,000, net of required sales tax, if any. JMG will not significantly exceed this amount without your prior approval.

We offer a 5% fees discount for payment of our invoices within 20 days, and we reserve the right to charge interest, at the rate of 1.5% per month, on any invoices unpaid after 30 days.

JMG will undertake only such work as is authorized by your firm, and JMG will work under your firm's direction and control. JMG will report the information obtained in the course of its work directly to your firm.

All documents, regardless of their source, obtained or created by JMG in connection with this matter, shall be held by JMG solely for your convenience and subject to your right to instruct JMG with respect to possession and control. This information will be provided to your firm for its exclusive use, and JMG will not assume liability in the event of your firm's use of the information.

To the extent JMG is permitted under law to do so, JMG will promptly notify you of and follow your direction with respect to any third-party effort, by subpoena or otherwise, to gain access to any document or information pertaining to this matter. You and the client agree to reimburse JMG for any fees or expenses JMG incurs as a result or in the course of its response, including but not limited to JMG's fees related to time spent by JMG employees, JMG's out of pocket expenses and the cost of legal representation for JMG.

All communications between JMG and your firm, as well as between JMG and the client, shall be privileged and confidential and made solely for the purpose of assisting your firm in rendering legal advice to the client.

Please return an executed copy of this letter to me as soon as possible.

We look forward to working with you on this matter.

Sincerely,

Andrew B. Melnick
General Counsel


BY: _____
David P. Dean, Esq.
James & Hoffman, P.C.

SEIU-A  0048

Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS,<br><br>Defendants. | No. 06 C 3337<br><br>Hon. John F. Grady |

## DECLARATION OF DAVID L. HANSELMAN

I, David L. Hanselman, Jr., declare and state as follows:

1.      I am a partner in the law firm of McDermott Will & Emery LLP ("McDermott") and am one of the attorneys representing defendant Resurrection Health Care ("Resurrection") in this action.  I have personal knowledge of the facts set forth in this declaration.

2.      On September 20, 2006, Plaintiffs served their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).  These disclosures listed 174 individuals that purportedly had discoverable information to support Plaintiffs' claims.  On October 4, 2006, pursuant to the Court's order to provide more specific information for the individuals listed in their initial disclosures, Plaintiffs supplemented their disclosures to include the last known

employer and position of the individuals listed in their initial disclosures. These supplemental

initial disclosures listed several current and former Resurrection employees.

3.    Three McDermott attorneys – Amy J. Carletti, Stephanie L. Poulos, and I –

interviewed several current and former Resurrection employees listed on Plaintiffs' supplemental

initial disclosures.

4.    One former Resurrection employee told Ms. Carletti and I that he received a

telephone call prior to the filing of this lawsuit from an individual at a firm called the James

Mintz Group in Washington, DC. According to the former Resurrection employee, this

individual asked him if he would be willing to complete a quick survey for a "Nursing Against

the Odds" article. Several months later, the same Mintz Group representative and one of

Plaintiffs' attorneys, David P. Dean, met with the former Resurrection employee and presented

him with a draft declaration, which purported to reflect information that the employee had

provided in his answers to the "Nursing Against the Odds" survey. According to the former

Resurrection employee, the draft declaration was exaggerated and took out of context statements

he made in his telephone call with the individual from the Mintz Group. According to this

employee, Mr. Dean tried to persuade him to sign the declaration and, when he refused, offered

to draft a new one. The employee refused to sign the declaration. Mr. Dean left the employee

with a copy of the declaration, but the employee did not sign it.

5.    On January 31, 2007, Ms. Carletti and I had a meet and confer with Thomas J.

Dove at the offices of Miller Law LLC in Chicago, Illinois. In addition to Mr. Dove, Marvin A.

Miller and Matthew E. Van Tine were present for portions of the meet and confer on behalf of

Plaintiffs. At this meet and confer, Ms. Carletti and I informed Mr. Dove that Resurrection did

not believe that the names, addresses, telephone numbers of its registered nurses were relevant

and that Resurrection had serious concerns about producing such information. As a consequence, Ms. Carletti and I told Mr. Dove that Resurrection intended to redact names, addresses, telephone numbers, and social security numbers from its document production. In response, Mr. Dove told us that he was "not interested" in this information and suggested that we propose additional language to the Stipulation and Protective Order Governing the Production and Exchange of Confidential Information that would address Resurrection's concerns.

6.      Later in the day on January 31, 2007, I sent an e-mail to counsel for the other Defendants summarizing Resurrection's meeting with Mr. Dove. A copy of this e-mail is attached to this declaration as Exhibit 1. The pertinent portion of the e-mail states:

> Redactions. We told Dove we intended to redact names, addresses, and social security numbers. Dove did not reject this outright, but suggested that we proffer language to be added to the protective order, or as a side agreement thereto, to address the specific concerns we have. We told him we'd take that under consideration as well.

7.      Resurrection ultimately decided that the best way to protect the privacy interests of its employees and the labor relations interests of its hospitals was to redact the names, addresses, telephone numbers, and social security numbers from its document and database productions. On March 13, 2007, Resurrection made its first production of documents to Plaintiffs. This production contained documents that had personal identifying information redacted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing representations are true and correct.

Executed on June 29, 2007

David L. Hanselman, Jr.

CHI99 4846992-1.037442.0097

-3-

# Exhibit 1

David L
Hanselman/CHI/MWE

01/31/2007 06:25 PM

To          REDACTED

cc

bcc

Subject   Summary Meet and Confer

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* PRIVILEGED AND CONFIDENTIAL \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We wanted to give the group a quick and dirty summary of our meet and confer with Dove this morning.

REDACTED

REDACTED

6. Redactions. We told Dove we intended to redact names, addresses, and social security numbers. Dove did not reject this outright, but suggested that we proffer language to be added to the protective order, or as a side agreement thereto, to address the specific concerns we have. We told him we'd take that under consideration as well.

REDACTED

Yours,

David L. Hanselman, Esq.
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL  60606
(312) 372-2000 (main)
(312) 984-3610 (direct)
(312) 984-7700 (facsimile)
dhanselman@mwe.com

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

IRS Circular 230 Disclosure:  To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 06 C 3337<br><br>Hon. John F. Grady |

## DECLARATION OF STEPHANIE L. POULOS

I, Stephanie L. Poulos, declare and state as follows:

1.     I am an associate in the law firm of McDermott Will & Emery LLP ("McDermott") and am one of the attorneys representing defendant Resurrection Health Care ("Resurrection") in this action. I have personal knowledge of the facts set forth in this declaration.

2.     On September 20, 2006, Plaintiffs served their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1). These disclosures listed 174 individuals that purportedly have discoverable information to support Plaintiffs' claims. On October 4, 2006, pursuant to the Court's order to provide more specific information on the individuals listed in

their initial disclosures, Plaintiffs supplemented their disclosures to include the last known

employer and position of the individuals listed in their initial disclosures. These supplemental

initial disclosures listed several current and former Resurrection employees.

3.    Three McDermott attorneys – David L. Hanselman, Amy J. Carletti, and I –

interviewed several current and former Resurrection employees listed on Plaintiffs' supplemental

initial disclosures.

4.    One current Resurrection employee told me that she had received a telephone call

in approximately January 2006 from a man who represented that he was conducting a survey on

nurse compensation. According to the Resurrection employee, the conversation focused on

nurse recruiting. Several months later, this employee received a telephone call from a law firm

informing her about this lawsuit and telling her that the same man she spoke with in January

2006 would contact her regarding the information she had provided. Approximately one week

later, the employee received a call from the man, who asked if he could come to her house and

talk with her. The employee refused, and she has not been contacted by anyone except for

McDermott attorneys about the lawsuit since.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing representations are true and correct.

Executed on June 29, 2007

Stephanie L. Poulos

Exhibit 7

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 1 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Memo from M.J. Carlson, D. Dean, K. Feiock to Institute for Women's Policy Research re Research Tasks | 2/4/2005 | |
| 2 | SEIU | WITHDRAWN | | Email from D. Dean to A. Anderson, J. Cohen, M. Kapsa, L. Tran (SEIU), H. Leland re IWPR Research Proposal (redacted SEIU-CH 3197) | 3/3/2005 | |
| 3 | SEIU | WITHDRAWN | | Email from D. Dean to M.J. Carlson, A. Anderson, J. Cohen, M. Kapsa, L. Tran, H. Leland re IWPR Research Proposal (redacted SEIU-CH 3204) | 3/3/2005 | |
| 4 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Memo from D. Dean re Questions for IWPR on Its Proposal to Provide Litigation Support Services | 4/5/2005 | |
| 5 | SEIU | WITHDRAWN | | Email from J. Cohen to M. Henry, T. Bradley (SEIU), A. Anderson re National Nurse Wage Campaign (redacted portions SEIU-CH 3196) | 8/3/2005 | |
| 6 | Mintz Group | (1) Mintz-related documents | CH000539 – CH000540 | Draft Engagement letter to James & Hoffman | 10/11/2005 | |
| 7 | SEIU | (3) Factual research by Plaintiff counsel | | Email from K. Feiock to D. Dean re Calculation of Lost Wages and Attached Charts | 10/14/2005 | |
| 8 | Mintz Group | (1) Mintz-related documents | CH001474 – CH001475 | Collusion Levels Sheet | 10/18/2005 | |
| 9 | Mintz Group | (1) Mintz-related documents | CH001476 – CH001478 | Collusion Levels Sheet | 10/20/2005 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| **10** | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 10/24/2005 | |
| **11** | Mintz Group | (1) Mintz-related documents | CH000549 – CH000553 | Research Memorandum | 10/26/2005 | |
| **12** | Mintz Group | (1) Mintz-related documents | CH001041 – CH001045 | Research Memorandum | 10/26/2005 | |
| **13** | Mintz Group | (1) Mintz-related documents | CH001095 – CH001124 | Chart:  Witness Notes | 10/27/2005 | |
| **14** | Mintz Group | (1) Mintz-related documents | CH001162 – CH001172 | Chart:  Witness Notes | 10/27/2005 | |
| **15** | Mintz Group | (1) Mintz-related documents | CH001268 – CH001271 | Chart:  Witness Notes | 10/27/2005 | |
| **16** | Mintz Group | (1) Mintz-related documents | CH001276 – CH001278 | Chart:  Witness Notes | 10/27/2005 | |
| **17** | Mintz Group | (1) Mintz-related documents | CH001279 – CH001281 | Chart:  Witness Notes | 10/27/2005 | |
| **18** | Mintz Group | (1) Mintz-related documents | CH001446 – CH001473 | Chart:  Witness Notes | 11/2/2005 | |
| **19** | SEIU | (1) Mintz-related documents | | Working Notes of Potential Witnesses prepared by the Mintz Group | 11/2/2005 | |
| **20** | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 11/8/2005 | |
| **21** | SEIU | (1) Mintz-related documents | | Letter from J. Mintz to D. Dean re October 2005 Invoice | 11/17/2005 | |
| **22** | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 12/9/2005 | |
| **23** | SEIU | (1) Mintz-related documents | | Letter from J. Mintz to D. Dean re November 2005 Invoice | 12/13/2005 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 24 | Mintz Group | (1) Mintz-related documents | CH001027 – CH001029 | Interview Notes | 1/12/2006 | |
| 25 | Mintz Group | (1) Mintz-related documents | CH001254 | Online Article Printout | 1/13/2006 | |
| 26 | Class Plaintiffs | (1) Mintz-related documents | P 0116 – P 0118 | Interview Memorandum | 1/17/2006 | |
| 27 | Mintz Group | (1) Mintz-related documents | CH000444 – CH000446 | Interview Memorandum | 1/17/2006 | |
| 28 | Mintz Group | (1) Mintz-related documents | CH001023 | Interview Notes | 1/17/2006 | |
| 29 | Mintz Group | (1) Mintz-related documents | CH001286 – CH001290 | Interview Notes | 1/17/2006 | |
| 30 | Mintz Group | (1) Mintz-related documents | CH001544 – CH001546 | Interview Memorandum | 1/17/2006 | |
| 31 | SEIU | (1) Mintz-related documents | | Memo from C. Weil (Mintz), J. Mintz to D. Dean re Interviews in Chicago | 1/17/2006 | |
| 32 | Class Plaintiffs | (1) Mintz-related documents | P 0128 – P 0129 | Interview Memorandum | 1/18/2006 | |
| 33 | Mintz Group | (1) Mintz-related documents | CH000434 – CH000435 | Interview Memorandum | 1/18/2006 | |
| 34 | Mintz Group | (1) Mintz-related documents | CH000991 – CH000992 | Interview Memorandum | 1/18/2006 | |
| 35 | Mintz Group | (1) Mintz-related documents | CH001021 – CH001022 | Interview Memorandum | 1/18/2006 | |
| 36 | Mintz Group | (1) Mintz-related documents | CH001243 | Email with JMG | 1/18/2006 | |
| 37 | Mintz Group | (1) Mintz-related documents | CH001244 | Employee Listing | 1/18/2006 | |
| 38 | Mintz Group | (1) Mintz-related documents | CH001534 – CH001535 | Interview Memorandum | 1/18/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 39 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 1/18/2006 | |
| 40 | Class Plaintiffs | (1) Mintz-related documents | P 0102 – P 0106 | Interview Memorandum | 1/19/2006 | |
| 41 | Class Plaintiffs | (1) Mintz-related documents | P 0169 – P 0172 | Interview Memorandum | 1/19/2006 | |
| 42 | Mintz Group | (1) Mintz-related documents | CH000391 – CH000394 | Interview Memorandum | 1/19/2006 | |
| 43 | Mintz Group | (1) Mintz-related documents | CH000453 – CH000457 | Interview Memorandum | 1/19/2006 | |
| 44 | Mintz Group | (1) Mintz-related documents | CH001233 – CH001241 | Interviewee Contact Info | 1/19/2006 | |
| 45 | Mintz Group | (1) Mintz-related documents | CH001491 – CH001494 | Interview Memorandum | 1/19/2006 | |
| 46 | Mintz Group | (1) Mintz-related documents | CH001553 – CH001557 | Interview Memorandum | 1/19/2006 | |
| 47 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie (Mintz) to D. Dean re Interviews in Chicago | 1/19/2006 | |
| 48 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 1/19/2006 | |
| 49 | Mintz Group | (1) Mintz-related documents | CH001223 – CH001230 | Witness Search & Results | 1/20/2006 | |
| 50 | Mintz Group | (1) Mintz-related documents | CH001256 – CH001260 | Database Comprehensive Report | 1/20/2006 | |
| 51 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Draft Memo from K. Feiock to D. Dean, K. Krieger, S. Bajkowski re Ethical Considerations in Conducting Investigations in Illinois | 1/20/2006 | |
| 52 | Mintz Group | (1) Mintz-related documents | CH000412 – CH000415 | Interview Memorandum | 1/24/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 53 | Mintz Group | (1) Mintz-related documents | CH000484 – CH000487 | Interview Memorandum | 1/24/2006 | |
| 54 | Mintz Group | (1) Mintz-related documents | CH001512 – CH001515 | Interview Memorandum | 1/24/2006 | |
| 55 | Mintz Group | (1) Mintz-related documents | CH001584 – CH001587 | Interview Memorandum | 1/24/2006 | |
| 56 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony (Mintz) to D. Dean re Interviews in Chicago | 1/24/2006 | |
| 57 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 1/24/2006 | |
| 58 | Mintz Group | (1) Mintz-related documents | CH001034 | Internal Email | 1/25/2006 | |
| 59 | Class Plaintiffs | (1) Mintz-related documents | P 0119 – P 0122 | Interview Memorandum | 1/26/2006 | |
| 60 | Class Plaintiffs | (1) Mintz-related documents | P 0141 – P 0144 | Interview Memorandum | 1/26/2006 | |
| 61 | Mintz Group | (1) Mintz-related documents | CH000419 – CH000422 | Interview Memorandum | 1/26/2006 | |
| 62 | Mintz Group | (1) Mintz-related documents | CH000440 – CH000443 | Interview Memorandum | 1/26/2006 | |
| 63 | Mintz Group | (1) Mintz-related documents | CH000488 – CH000491 | Interview Memorandum | 1/26/2006 | |
| 64 | Mintz Group | (1) Mintz-related documents | CH000492 – CH000495 | Interview Memorandum | 1/26/2006 | |
| 65 | Mintz Group | (1) Mintz-related documents | CH001173 – CH001187 | Chart: Interview Notes & Interviewee Contact Info | 1/26/2006 | |
| 66 | Mintz Group | (1) Mintz-related documents | CH001519 – CH001522 | Interview Memorandum | 1/26/2006 | |
| 67 | Mintz Group | (1) Mintz-related documents | CH001540 – CH001543 | Interview Memorandum | 1/26/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 68 | Mintz Group | (1) Mintz-related documents | CH001588 – CH001591 | Interview Memorandum | 1/26/2006 | |
| 69 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie (Mintz) to D. Dean re Interviews in Chicago | 1/26/2006 | |
| 70 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 1/26/2006 | |
| 71 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 1/26/2006 | |
| 72 | Class Plaintiffs | (1) Mintz-related documents | P 0180 – P 0182 | Interview Memorandum | 1/27/2006 | |
| 73 | Mintz Group | (1) Mintz-related documents | CH000377 – CH000379 | Interview Memorandum | 1/27/2006 | |
| 74 | Mintz Group | (1) Mintz-related documents | CH001005 – CH001007 | Interview Notes | 1/27/2006 | |
| 75 | Mintz Group | (1) Mintz-related documents | CH001231 | Database Comprehensive Report | 1/27/2006 | |
| 76 | Mintz Group | (1) Mintz-related documents | CH001245 | Witness Search & Results | 1/27/2006 | |
| 77 | Mintz Group | (1) Mintz-related documents | CH001246 – CH001248 | Database Comprehensive Report | 1/27/2006 | |
| 78 | Mintz Group | (1) Mintz-related documents | CH001272 – CH001273 | Online Article Printout | 1/27/2006 | |
| 79 | Mintz Group | (1) Mintz-related documents | CH001320 | Interview Notes | 1/27/2006 | |
| 80 | Mintz Group | (1) Mintz-related documents | CH001480 – CH001482 | Interview Memorandum | 1/27/2006 | |
| 81 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 1/27/2006 | |
| 82 | Class Plaintiffs | (1) Mintz-related documents | P 0134 – P 0137 | Interview Memorandum | 1/30/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 83 | Mintz Group | (1) Mintz-related documents | CH000426 – CH000429 | Interview Memorandum | 1/30/2006 | |
| 84 | Mintz Group | (1) Mintz-related documents | CH000979 – CH000983 | Interview Memorandum | 1/30/2006 | |
| 85 | Mintz Group | (1) Mintz-related documents | CH001025 – CH001026 | Interview Notes | 1/30/2006 | |
| 86 | Mintz Group | (1) Mintz-related documents | CH001274 | Online Article Printout | 1/30/2006 | |
| 87 | Mintz Group | (1) Mintz-related documents | CH001321 – CH001322 | Interview Notes | 1/30/2006 | |
| 88 | Mintz Group | (1) Mintz-related documents | CH001526 – CH001529 | Interview Memorandum | 1/30/2006 | |
| 89 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 1/30/2006 | |
| 90 | SEIU | (1) Mintz-related documents | | Letter from J. Mintz to D. Dean re December 2005 Invoice | 1/31/2006 | |
| 91 | Class Plaintiffs | (1) Mintz-related documents | P 0110 – P 0112 | Interview Memorandum | 2/1/2006 | |
| 92 | Class Plaintiffs | (1) Mintz-related documents | P 0126 – P 0127 | Interview Memorandum | 2/1/2006 | |
| 93 | Class Plaintiffs | (1) Mintz-related documents | P 0154 – P 0157 | Interview Memorandum | 2/1/2006 | |
| 94 | Class Plaintiffs | (1) Mintz-related documents | P 0173 – P 0174 | Interview Memorandum | 2/1/2006 | |
| 95 | Mintz Group | (1) Mintz-related documents | CH000389 – CH000390 | Interview Memorandum | 2/1/2006 | |
| 96 | Mintz Group | (1) Mintz-related documents | CH000402 – CH000405 | Interview Memorandum | 2/1/2006 | |
| 97 | Mintz Group | (1) Mintz-related documents | CH000436 – CH000437 | Interview Memorandum | 2/1/2006 | |
| 98 | Mintz Group | (1) Mintz-related documents | CH000447 – CH000449 | Interview Memorandum | 2/1/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 99 | Mintz Group | (1) Mintz-related documents | CH000501 – CH000502 | Interview Memorandum | 2/1/2006 | |
| 100 | Mintz Group | (1) Mintz-related documents | CH000543 – CH000548 | Interview Memorandum | 2/1/2006 | |
| 101 | Mintz Group | (1) Mintz-related documents | CH001249 – CH001253 | Witness Search & Results | 2/1/2006 | |
| 102 | Mintz Group | (1) Mintz-related documents | CH001275 | Witness Search & Results | 2/1/2006 | |
| 103 | Mintz Group | (1) Mintz-related documents | CH001489 – CH001490 | Interview Memorandum | 2/1/2006 | |
| 104 | Mintz Group | (1) Mintz-related documents | CH001502 – CH001505 | Interview Memorandum | 2/1/2006 | |
| 105 | Mintz Group | (1) Mintz-related documents | CH001536 – CH001537 | Interview Memorandum | 2/1/2006 | |
| 106 | Mintz Group | (1) Mintz-related documents | CH001547 – CH001549 | Interview Memorandum | 2/1/2006 | |
| 107 | Mintz Group | (1) Mintz-related documents | CH001597 – CH001598 | Interview Memorandum | 2/1/2006 | |
| 108 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/1/2006 | |
| 109 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/1/2006 | |
| 110 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/1/2006 | |
| 111 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/1/2006 | |
| 112 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/1/2006 | |
| 113 | Class Plaintiffs | (1) Mintz-related documents | P 0095 – P 0097 | Interview Memorandum | 2/2/2006 | |
| 114 | Class Plaintiffs | (1) Mintz-related documents | P 0151 – P 0153 | Interview Memorandum | 2/2/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 115 | Mintz Group | (1) Mintz-related documents | CH000406 – CH000408 | Interview Memorandum | 2/2/2006 | |
| 116 | Mintz Group | (1) Mintz-related documents | CH000462 – CH000464 | Interview Memorandum | 2/2/2006 | |
| 117 | Mintz Group | (1) Mintz-related documents | CH001002 – CH001004 | Interview Memorandum | 2/2/2006 | |
| 118 | Mintz Group | (1) Mintz-related documents | CH001030 – CH001031 | Interview Notes | 2/2/2006 | |
| 119 | Mintz Group | (1) Mintz-related documents | CH001054 | Internal Email | 2/2/2006 | |
| 120 | Mintz Group | (1) Mintz-related documents | CH001261 – CH001267 | Employee Listings | 2/2/2006 | |
| 121 | Mintz Group | (1) Mintz-related documents | CH001339 – CH001340 | Interview Notes | 2/2/2006 | |
| 122 | Mintz Group | (1) Mintz-related documents | CH001506 – CH001508 | Interview Memorandum | 2/2/2006 | |
| 123 | Mintz Group | (1) Mintz-related documents | CH001562 – CH001564 | Interview Memorandum | 2/2/2006 | |
| 124 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/2/2006 | |
| 125 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/2/2006 | |
| 126 | Class Plaintiffs | (1) Mintz-related documents | P 0165 – P 0168 | Interview Memorandum | 2/3/2006 | |
| 127 | Class Plaintiffs | (1) Mintz-related documents | P 0175 – P 0177 | Interview Memorandum | 2/3/2006 | |
| 128 | Mintz Group | (1) Mintz-related documents | CH000382 – CH000384 | Interview Memorandum | 2/3/2006 | |
| 129 | Mintz Group | (1) Mintz-related documents | CH000999 – CH001001 | Interview Memorandum | 2/3/2006 | |
| 130 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/3/2006 | |

**REVISED EXHIBIT A TO PLAINTIFFS' SUR-REPLY BRIEF**

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 131 | SEIU | (1) Mintz-related documents | | Table of Interviews of Potential Witnesses Prepared by the Mintz Group | 2/3/2006 | |
| 132 | Mintz Group | (1) Mintz-related documents | CH001014 – CH001015 | Interview Notes | 2/7/2006 | |
| 133 | Mintz Group | (1) Mintz-related documents | CH001323 – CH001324 | Interview Notes | 2/7/2006 | |
| 134 | Class Plaintiffs | (1) Mintz-related documents | P 0123 – P 0125 | Interview Memorandum | 2/8/2006 | |
| 135 | Class Plaintiffs | (1) Mintz-related documents | P 0158 – P 0161 | Interview Memorandum | 2/8/2006 | |
| 136 | Mintz Group | (1) Mintz-related documents | CH000398 – CH000401 | Interview Memorandum | 2/8/2006 | |
| 137 | Mintz Group | (1) Mintz-related documents | CH000468 – CH000470 | Interview Memorandum | 2/8/2006 | |
| 138 | Mintz Group | (1) Mintz-related documents | CH000993 – CH000995 | Interview Memorandum | 2/8/2006 | |
| 139 | Mintz Group | (1) Mintz-related documents | CH000996 – CH000998 | Interview Memorandum | 2/8/2006 | |
| 140 | Mintz Group | (1) Mintz-related documents | CH001010 | Interview Notes | 2/8/2006 | |
| 141 | Mintz Group | (1) Mintz-related documents | CH001011 – CH001013 | Interview Memorandum | 2/8/2006 | |
| 142 | Mintz Group | (1) Mintz-related documents | CH001498 – CH001501 | Interview Memorandum | 2/8/2006 | |
| 143 | Mintz Group | (1) Mintz-related documents | CH001568 – CH001570 | Interview Memorandum | 2/8/2006 | |
| 144 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/8/2006 | |
| 145 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/8/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| **146** | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Email from K. Feiock to D. Dean, K. Krieger re Ethical Considerations in Conducting Investigations in Illinois | 2/8/2006 | |
| **147** | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Email from D. Dean to K. Feiock, K. Krieger re Ethical Considerations in Conducting Investigations in Illinois | 2/8/2006 | |
| **148** | Class Plaintiffs | (1) Mintz-related documents | P 0130 – P 0133 | Interview Memorandum | 2/9/2006 | |
| **149** | Class Plaintiffs | (1) Mintz-related documents | P 0138 – P 0140 | Interview Memorandum | 2/9/2006 | |
| **150** | Class Plaintiffs | (1) Mintz-related documents | P 0178 – P 0179 | Interview Memorandum | 2/9/2006 | |
| **151** | Mintz Group | (1) Mintz-related documents | CH000380 – CH000381 | Interview Memorandum | 2/9/2006 | |
| **152** | Mintz Group | (1) Mintz-related documents | CH000423 – CH000425 | Interview Memorandum | 2/9/2006 | |
| **153** | Mintz Group | (1) Mintz-related documents | CH000430 – CH000433 | Interview Memorandum | 2/9/2006 | |
| **154** | Mintz Group | (1) Mintz-related documents | CH001523 – CH001525 | Interview Memorandum | 2/9/2006 | |
| **155** | Mintz Group | (1) Mintz-related documents | CH001530 – CH001533 | Interview Memorandum | 2/9/2006 | |
| **156** | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/9/2006 | |
| **157** | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/9/2006 | |
| **158** | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/9/2006 | |
| **159** | Mintz Group | (1) Mintz-related documents | CH000984 – CH000987 | Interview Memorandum | 2/10/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 160 | Mintz Group | (1) Mintz-related documents | CH001188 – CH001194 | Witness Search & Results | 2/10/2006 | |
| 161 | Class Plaintiffs | (1) Mintz-related documents | P 0098 – P 0101 | Interview Memorandum | 2/13/2006 | |
| 162 | Class Plaintiffs | (1) Mintz-related documents | P 0208 – P 0209 | Interview Memorandum | 2/13/2006 | |
| 163 | Mintz Group | (1) Mintz-related documents | CH000438 – CH000439 | Interview Memorandum | 2/13/2006 | |
| 164 | Mintz Group | (1) Mintz-related documents | CH000458 – CH000461 | Interview Memorandum | 2/13/2006 | |
| 165 | Mintz Group | (1) Mintz-related documents | CH000988 – CH000990 | Interview Memorandum | 2/13/2006 | |
| 166 | Mintz Group | (1) Mintz-related documents | CH001058 | Internal Email | 2/13/2006 | |
| 167 | Mintz Group | (1) Mintz-related documents | CH001282 – CH001285 | Comprehensive Report | 2/13/2006 | |
| 168 | Mintz Group | (1) Mintz-related documents | CH001538 – CH001539 | Interview Memorandum | 2/13/2006 | |
| 169 | Mintz Group | (1) Mintz-related documents | CH001558 – CH001561 | Interview Memorandum | 2/13/2006 | |
| 170 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/13/2006 | |
| 171 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, J. Mintz to D. Dean re Interviews in Chicago | 2/13/2006 | |
| 172 | Class Plaintiffs | (1) Mintz-related documents | P 0162 – P 0164 | Interview Memorandum | 2/14/2006 | |
| 173 | Mintz Group | (1) Mintz-related documents | CH000395 – CH000397 | Interview Memorandum | 2/14/2006 | |
| 174 | Mintz Group | (1) Mintz-related documents | CH000478 – CH000480 | Interview Memorandum | 2/14/2006 | |
| 175 | Mintz Group | (1) Mintz-related documents | CH000499 – CH000500 | Interview Memorandum | 2/14/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 176 | Mintz Group | (1) Mintz-related documents | CH001495 – CH001497 | Interview Memorandum | 2/14/2006 | |
| 177 | Mintz Group | (1) Mintz-related documents | CH001578 – CH001580 | Interview Memorandum | 2/14/2006 | |
| 178 | Mintz Group | (1) Mintz-related documents | CH001595 – CH001596 | Interview Memorandum | 2/14/2006 | |
| 179 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/14/2006 | |
| 180 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, K. McKenzie to D. Dean re Interviews in Chicago | 2/14/2006 | |
| 181 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/14/2006 | |
| 182 | Class Plaintiffs | (1) Mintz-related documents | P 0107 – P 0109 | Interview Memorandum | 2/15/2006 | |
| 183 | Class Plaintiffs | (1) Mintz-related documents | P 0148 – P 0150 | Interview Memorandum | 2/15/2006 | |
| 184 | Mintz Group | (1) Mintz-related documents | CH000450 – CH000452 | Interview Memorandum | 2/15/2006 | |
| 185 | Mintz Group | (1) Mintz-related documents | CH000465 – CH000467 | Interview Memorandum | 2/15/2006 | |
| 186 | Mintz Group | (1) Mintz-related documents | CH000496 – CH000498 | Interview Memorandum | 2/15/2006 | |
| 187 | Mintz Group | (1) Mintz-related documents | CH001550 – CH001552 | Interview Memorandum | 2/15/2006 | |
| 188 | Mintz Group | (1) Mintz-related documents | CH001565 – CH001567 | Interview Memorandum | 2/15/2006 | |
| 189 | Mintz Group | (1) Mintz-related documents | CH001592 – CH001594 | Interview Memorandum | 2/15/2006 | |
| 190 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/15/2006 | |
| 191 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/15/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 192 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/15/2006 | |
| 193 | Barbara Bergmann | (1) Mintz-related documents | | Table: Notes on interviews of potential witnesses prepared by investigators from the Mintz Group | 2/16/2006 | |
| 194 | Mintz Group | (1) Mintz-related documents | CH000503 – CH000505 | Interview Memorandum | 2/16/2006 | |
| 195 | Mintz Group | (1) Mintz-related documents | CH001599 – CH001601 | Interview Memorandum | 2/16/2006 | |
| 196 | SEIU | (1) Mintz-related documents | | Working Notes of Potential Witnesses from Chicago Prepared by the Mintz Group | 2/16/2006 | |
| 197 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/16/2006 | |
| 198 | SEIU | (1) Mintz-related documents | | Table of Interviews of Potential Witnesses Prepared by the Mintz Group | 2/16/2006 | |
| 199 | Class Plaintiffs | (1) Mintz-related documents | P 0113 – P 0115 | Interview Memorandum | 2/17/2006 | |
| 200 | Mintz Group | (1) Mintz-related documents | CH000471 – CH000473 | Interview Memorandum | 2/17/2006 | |
| 201 | Mintz Group | (1) Mintz-related documents | CH001571 – CH001573 | Interview Memorandum | 2/17/2006 | |
| 202 | SEIU | (1) Mintz-related documents | | Email from C. Weil to D. Dean and J. Mintz re Interviews in Chicago | 2/17/2006 | |
| 203 | SEIU | (1) Mintz-related documents | | Memo from C. Weil, A. Anthony to D. Dean re Interviews in Chicago | 2/17/2006 | |
| 204 | Mintz Group | (1) Mintz-related documents | CH000416 – CH000418 | Interview Memorandum | 2/19/2006 | |
| 205 | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 2/21/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 206 | Mintz Group | (1) Mintz-related documents | CH001402 | Approvals | 2/23/2006 | |
| 207 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from D. Dean to M. Rickling, M. Kapsa re Request for Data on Chicago Hospitals | 2/23/2006 | |
| 208 | SEIU | (1) Mintz-related documents | | Letter from J. Mintz to D. Dean re January 2006 Invoice | 2/24/2006 | |
| 209 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Rickling to D. Dean, M. Kapsa re Request for Data on Chicago Hospitals | 2/24/2006 | |
| 210 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from D. Dean to M. Rickling, M. Kapsa re Request for Data on Chicago Hospitals | 2/24/2006 | |
| 211 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Email from K. Feiock to D. Dean, K. Krieger re Ethical Considerations in Conducting Investigations in Illinois | 2/26/2006 | |
| 212 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Rickling to D. Dean, M. Kapsa re Request for Data on Chicago Hospitals | 2/26/2006 | |
| 213 | Mintz Group | (1) Mintz-related documents | CH001060 | Internal Email | 2/27/2006 | |
| 214 | SEIU | (5) Invoices revealing attorney work | | James & Hoffman Invoice to SEIU (redacted SEIU-CH 1-2) | 2/28/2006 | |
| 215 | Mintz Group | (1) Mintz-related documents | CH001020 | Follow-Up Template | 3/6/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 216 | Mintz Group | (1) Mintz-related documents | CH001056 – CH001057 | Handwritten Notes | 3/7/2006 | |
| 217 | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 3/7/2006 | |
| 218 | Mintz Group | (1) Mintz-related documents | CH001483 – CH001484 | Interview Memorandum | 3/9/2006 | |
| 219 | SEIU | (1) Mintz-related documents | | Draft Interview Template for Mintz Investigators prepared by the Mintz Group | 3/9/2006 | |
| 220 | SEIU | (1) Mintz-related documents | | Email from C. Weil to D. Small and D. Dean re Template for Phone Calls to Witnesses | 3/15/2006 | |
| 221 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from K. Feiock to M. Rickling (SEIU), M. Kapsa, D. Dean re Information on MSAs for Use in Drafting Complaint | 3/17/2006 | |
| 222 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from K. Feiock to M. Rickling, M. Kapsa, D. Dean re Information on MSAs for Use in Drafting Complaint | 3/17/2006 | |
| 223 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Rickling to K. Feiock, M. Kapsa, D. Dean re Information on MSAs for Use in Drafting Complaint | 3/17/2006 | |
| 224 | Mintz Group | (1) Mintz-related documents | CH001516 – CH001518 | Interview Memorandum | 3/19/2006 | |
| 225 | SEIU | (1) Mintz-related documents | | Email from C. Weil to D. Dean Attaching Chart of Interviews of Witnesses | 3/20/2006 | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 226 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Rickling to K. Feiock, M. Kapsa, D. Dean re Information on MSAs for Use in Drafting Complaint | 3/23/2006 | |
| 227 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from D. Dean to M. Rickling, K. Feiock, M. Kapsa re Information on MSAs for Use in Drafting Complaint | 3/26/2006 | |
| 228 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Kapsa to M. Rickling, K. Feiock, , D. Dean re Information on MSAs for Use in Drafting Complaint | 3/27/2006 | |
| 229 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from K. Feiock to M. Kapsa, D. Dean, M. Rickling re Information on MSAs for Use in Drafting Complaint | 3/27/2006 | |
| 230 | Mintz Group | (1) Mintz-related documents | CH001403 – CH001416 | Chart:  Witness Notes | 3/29/2006 | |
| 231 | Mintz Group | (1) Mintz-related documents | CH001417 – CH001431 | Chart:  Witness Notes | 3/29/2006 | |
| 232 | Mintz Group | (1) Mintz-related documents | CH001432 – CH001445 | Chart:  Witness Notes | 3/29/2006 | |
| 233 | SEIU | (1) Mintz-related documents | | Email from C. Weil to D. Dean Attaching Chart of Identified Staff Nurses | 3/29/2006 | |
| 234 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from M. Rickling to K. Feiock, M. Kapsa, D. Dean re Information on MSAs for Use in Drafting Complaint | 3/30/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 235 | SEIU | (4) Plaintiff communications w/ SEIU Research | | Email from K. Feiock to M. Kapsa, D. Dean, M. Rickling re Information on MSAs for Use in Drafting Complaint | 3/31/2006 | |
| 236 | SEIU | (5) Invoices revealing attorney work | | James & Hoffman Invoice to SEIU (redacted SEIU-CH 3-4) | 3/31/2006 | |
| 237 | SEIU | (3) Factual research by Plaintiff counsel | | Table re Lost RN Wages by MSA (prepared by James & Hoffman) | 4/1/2006 | |
| 238 | Class Plaintiffs | (1) Mintz-related documents | P 0145 – P 0147 | Interview Memorandum | 4/19/2006 | |
| 239 | Mintz Group | (1) Mintz-related documents | CH000409 – CH000411 | Interview Memorandum | 4/19/2006 | |
| 240 | Mintz Group | (1) Mintz-related documents | CH000481 – CH000483 | Interview Memorandum | 4/19/2006 | |
| 241 | Mintz Group | (1) Mintz-related documents | CH001509 – CH001511 | Interview Memorandum | 4/19/2006 | |
| 242 | Mintz Group | (1) Mintz-related documents | CH001581 – CH001583 | Interview Memorandum | 4/19/2006 | |
| 243 | SEIU | (1) Mintz-related documents | | Email from C. Weil to D. Dean and J. Mintz re Interview in Chicago | 4/19/2006 | |
| 244 | SEIU | (5) Invoices revealing attorney work | | James & Hoffman Invoice to SEIU (redacted SEIU-CH 5) | 4/30/2006 | |
| 245 | Mintz Group | (1) Mintz-related documents | CH000939 | Transaction Inquiry | 10/18/2006 | |
| 246 | Class Plaintiffs | (1) Mintz-related documents | P 0210 – P 0213 | Interview Memorandum | 10/18/2006 | |
| 247 | SEIU | (3) Factual research by Plaintiff counsel | | Table re Lost RN Wages by MSA (prepared by James & Hoffman) | Approx. 2/2006 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| **248** | SEIU | (1) Mintz-related documents | | Working Notes on Former Employees from Chicago Hospitals Prepared by Mintz Group | Approx. 3/2006 | |
| **249** | Mintz Group | (1) Mintz-related documents | CH000940 | Bankruptcy Notice | Date discovered and printed unknown, underlying document dated 1/15/2003 | |
| **250** | Mintz Group | (1) Mintz-related documents | CH001372 – CH001400 | Chicago Healthcare Presentation Printout | Date discovered and printed unknown, underlying document dated 2002 | |
| **251** | Mintz Group | (1) Mintz-related documents | CH001061 – CH001065 | Online Article Printout | Date discovered and printed unknown, underlying document dated 6/30/2000 | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 252 | Mintz Group | (1) Mintz-related documents | CH000923 – CH000932 | Survey Questionnaire | Date given to Mintz by Plaintiffs' counsel approx. October 2005, underlying document dated 8/4/2005 | |
| 253 | Mintz Group | (1) Mintz-related documents | CH000363 – CH000372 | Nurse Survey | Date given to Mintz by Plaintiffs' counsel approx. October 2005, underlying document dated 8/4/2005 | |
| 254 | Class Plaintiffs | (1) Mintz-related documents | n/a | Identities of witnesses interviewed by Plaintiffs' counsel and/or their agents | n/a | |
| 255 | Barbara Bergmann | (1) Mintz-related documents | | Memo from B. Bergmann to D. Dean re Sample Questions for Interviewers | Undated | |
| 256 | Mintz Group | (1) Mintz-related documents | CH000001 – CH000035 | Spreadsheet re Hospital Lists | Undated | |
| 257 | Mintz Group | (1) Mintz-related documents | CH000159 – CH000343 | Chart:  Hospital Listings | Undated | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 258 | Mintz Group | (1) Mintz-related documents | CH000344 – CH000362 | Chart: Interviewee Names, Addresses, Phone # | Undated | |
| 259 | Mintz Group | (1) Mintz-related documents | CH000374 – CH000376 | Interview Preparation Sheet | Undated | |
| 260 | Mintz Group | (1) Mintz-related documents | CH000506 – CH000538 | Investigator Notes | Undated | |
| 261 | Mintz Group | (1) Mintz-related documents | CH000554 | Hospital Assets/Income List | Undated | |
| 262 | Mintz Group | (1) Mintz-related documents | CH000555 – CH000589 | Spreadsheet re Hospital Lists (Expenses/Income/Assets) | Undated | |
| 263 | Mintz Group | (1) Mintz-related documents | CH000713 – CH000903 | Spreadsheet re Hospital Lists | Undated | |
| 264 | Mintz Group | (1) Mintz-related documents | CH000904 – CH000922 | Chart: Interviewee Contact Info | Undated | |
| 265 | Mintz Group | (1) Mintz-related documents | CH000936 – CH000938 | Interview Preparation Sheet | Undated | |
| 266 | Mintz Group | (1) Mintz-related documents | CH000952 – CH000953 | Investigator Notes | Undated | |
| 267 | Mintz Group | (1) Mintz-related documents | CH000963 – CH000967 | Investigative Notes | Undated | |
| 268 | Mintz Group | (1) Mintz-related documents | CH000968 – CH000969 | Draft Declaration | Undated | |
| 269 | Mintz Group | (1) Mintz-related documents | CH000970 – CH000972 | Handwritten Notes | Undated | |
| 270 | Mintz Group | (1) Mintz-related documents | CH000973 – CH000974 | Witness Memorandum | Undated | |
| 271 | Mintz Group | (1) Mintz-related documents | CH000975 – CH000978 | Interview Notes | Undated | |
| 272 | Mintz Group | (1) Mintz-related documents | CH001008 – CH001009 | Interview Notes | Undated | |
| 273 | Mintz Group | (1) Mintz-related documents | CH001016 – CH001017 | Interview Analysis | Undated | |

REVISED EXHIBIT A
TO PLAINTIFFS' SUR-REPLY BRIEF

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 274 | Mintz Group | (1) Mintz-related documents | CH001018 – CH001019 | Interview Notes | Undated | |
| 275 | Mintz Group | (1) Mintz-related documents | CH001024 | Phone Interview Template | Undated | |
| 276 | Mintz Group | (1) Mintz-related documents | CH001032 – CH001033 | Interview Notes | Undated | |
| 277 | Mintz Group | (1) Mintz-related documents | CH001035 – CH001038 | Handwritten Notes | Undated | |
| 278 | Mintz Group | (1) Mintz-related documents | CH001039 | Phone Interview Template | Undated | |
| 279 | Mintz Group | (1) Mintz-related documents | CH001040 | Internal Email | Undated | |
| 280 | Mintz Group | (1) Mintz-related documents | CH001046 – CH001047 | Health Center Market Shares Chart | Undated | |
| 281 | Mintz Group | (1) Mintz-related documents | CH001048 | Handwritten Notes | Undated | |
| 282 | Mintz Group | (1) Mintz-related documents | CH001049 – CH001050 | Witness/Hospital Lists | Undated | |
| 283 | Mintz Group | (1) Mintz-related documents | CH001051 – CH001053 | Investigative Notes | Undated | |
| 284 | Mintz Group | (1) Mintz-related documents | CH001059 | Handwritten Notes | Undated | |
| 285 | Mintz Group | (1) Mintz-related documents | CH001066 – CH001094 | Chart:  Interviewee Contact Info | Undated | |
| 286 | Mintz Group | (1) Mintz-related documents | CH001125 – CH001161 | Chart:  Interview Notes & Interviewee Contact Info | Undated | |
| 287 | Mintz Group | (1) Mintz-related documents | CH001195 – CH001222 | Database Comprehensive Report | Undated | |
| 288 | Mintz Group | (1) Mintz-related documents | CH001242 | Personal Profile | Undated | |
| 289 | Mintz Group | (1) Mintz-related documents | CH001255 | Personal Profile | Undated | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 290 | Mintz Group | (1) Mintz-related documents | CH001291 – CH001319 | Handwritten Notes | Undated | |
| 291 | Mintz Group | (1) Mintz-related documents | CH001325 – CH001338 | Handwritten Notes | Undated | |
| 292 | Mintz Group | (1) Mintz-related documents | CH001341 – CH001342 | Interview Notes | Undated | |
| 293 | Mintz Group | (1) Mintz-related documents | CH001343 – CH001353 | Investigative Notes | Undated | |
| 294 | Mintz Group | (1) Mintz-related documents | CH001354 – CH001355 | Interview Notes | Undated | |
| 295 | Mintz Group | (1) Mintz-related documents | CH001356 – CH001370 | Investigative Notes | Undated | |
| 296 | SEIU | (1) Mintz-related documents | | List of Former Employees of Chicago Hospitals Prepared by Mintz Group | Undated | |
| 297 | SEIU | (1) Mintz-related documents | | List of Former Employees of Chicago Hospitals Prepared by Mintz Group | Undated | |
| 298 | SEIU | (1) Mintz-related documents | | List of Former Employees of Chicago Hospitals Prepared by Mintz Group | Undated | |
| 299 | SEIU | (1) Mintz-related documents | | List of Former Employees of Chicago Hospitals Prepared by Mintz Group | Undated | |
| 300 | SEIU | (1) Mintz-related documents | | List of Former Employees of Chicago Hospitals Prepared by Mintz Group | Undated | |
| 301 | SEIU | (1) Mintz-related documents | | Working Notes on Former Employees from Chicago Hospitals Prepared by Mintz Group | Undated | |

| ENTRY | PRODUCING PARTY | CATEGORY | BATES NUMBERS | DESCRIPTION | DATE | |
|---|---|---|---|---|---|---|
| 302 | SEIU | (1) Mintz-related documents | | Working Notes on Former Employees from Chicago Hospitals Prepared by Mintz Group | Undated | |
| 303 | Barbara Bergmann | (2) Legal Memoranda by Plaintiff Counsel | | Draft complaint for nurse antitrust lawsuits | Undated | |
| 304 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Request for Proposals to Identify Data Showing Evidence of Collusion Among Hospitals | Undated | |
| 305 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Notes Prepared by James & Hoffman re Necessary Research for Antitrust Lawsuit | Undated | |
| 306 | SEIU | (3) Factual research by Plaintiff counsel | | Table re Ranking of MSAs (prepared by James & Hoffman) | Undated | |
| 307 | SEIU | (3) Factual research by Plaintiff counsel | | Table re RN Wages Damages Analysis (prepared by K. Feiock) | Undated | |
| 308 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Draft nurse wage antitrust litigation complaint | Undated | |
| 309 | SEIU | (3) Factual research by Plaintiff counsel | | Statistical ranking of cities (prepared by attorneys at James & Hoffman) | Undated | |
| 310 | SEIU | (2) Legal Memoranda by Plaintiff Counsel | | Draft complaint | Undated | |

Exhibit 8

## JAMES & HOFFMAN

A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4704

(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com



Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Felock
_____
Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman
* Not Admitted in DC

ejames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
kbfelock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

## FACSIMILE COVER SHEET

### PLEASE DELIVER IMMEDIATELY:

To:    Jamie Cohen
       SEIU Nurse Alliance

Facsimile Number:  202-350-6619

From: Mary Joyce Carlson

Client Number:        5200.069

Number of pages, including cover sheet: 3

Date: January 30, 2006          Time: 2:21 pm

Contact: The Receptionist at (202) 496-0500 if problems occur.

_____

MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY
CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW.  IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING
THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA
U.S. POSTAL SERVICE.  THANK YOU.

Confidential Attorney/Client Communication

## ADVICE TO SEIU ORGANIZERS ON REFERRING NURSES TO COUNSEL

SEIU has asked for advice on how best to refer nurses to counsel, if those nurses suspect they may have been the victims of hospital collusion on wages.

**I.    After talking about the overall Value Nurse, Value Care campaign, organizers may make the following points about potential litigations to nurses who have been on staff at acute care hospitals sometime during the last four years (members or nonmembers).** (Use judgment so that management is not immediately notified).

1. As part of its ongoing concern about nurse issues, and in response to various complaints, SEIU undertook an investigation of inappropriate information sharing and nurse wage suppression among hospitals.

2. SEIU's lawyers asked antitrust and class action specialists at an outside firm to confirm whether the results of the investigations revealed that hospitals in certain places conspire to maintain nurse wage levels at artificially low levels in violation of the antitrust laws.

3. If a nurse is interested in exploring her or his legal rights on this topic, ask: **"Would it be OK if we share your name and address with lawyers who are working on preparing an antitrust lawsuit against the hospitals so that they can mail you some written information that complies with the [name of state] rules for lawyer advertising and communication?"** If so, have the nurse sign some version of the sign-in sheet attached to this memo.

4. FAX sign-in sheets to James & Hoffman: 202-496-0555 (fax); 202-496-0500 (ph).

**II.    PROHIBITIONS**

You should avoid saying things that could lead to either of two mis-perceptions:

1. **It is important SEIU not be mis-perceived as controlling the antitrust litigations. It doesn't.** The litigations will be brought on behalf of nurses in an metropolitan area and the lawyers will act solely in those nurses' interests. SEIU will not control the timing of the suits, the prosecution of the suits, or their resolution.

2. **It is important SEIU not be mis-perceived as acting _as an agent_ for some particular attorneys in referring nurses, soliciting legal business, and/or stirring up litigation.** SEIU is referring nurses to lawyers to help the nurses assert their rights because that is part of SEIU's own mission, not on behalf of any lawyers or groups of lawyers.

3. Also, you should **not** try to answer questions about the lawsuits. E.g. "What money might I get from the suit?  What legal protections would I have as a plaintiff?" **Instead, you should suggest that the person ask the lawyers all their questions, after they get the mailing about the litigations.**

SEIU-A  0012

## SIGN-UP SHEET FOR FURTHER INFORMATION

By signing below, I ask that my name and address be shared with lawyers who are working on preparing an antitrust lawsuit so that they can mail me some written information that complies with the state rules for lawyer advertising and communications.

| Name | Address | Phone Number |
|------|---------|--------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

SEIU-A  0013

Exhibit 9

5200
coll.



**Stronger Together**

October 31, 2006

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC 20036

RE:    Nurse Wage Antitrust Litigation
       Special Project No. 280U-HSVRNLGL(R3)

Dear David:

This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") and your firm with respect to the matters referenced above.

SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of $165 per attorney hour. Paralegal hours are billed at a rate of $75 per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to me, Norm Gleichman at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD 202.898.3481
www.SEIU.org

SEIU-A  0001

David Dean, Esq.
October 31, 2006
Page Two

SEIU is funding this litigation through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU pays to your firm in this matter will be reimbursed, prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. By funding this *litigation*, SEIU is sharing in the risk inherent in these litigations and thus expects: 1) to share in any fee recovery, if any, obtained above and beyond those amounts advanced by SEIU in the litigation, pursuant to the sharing agreement provided below; and 2) that J&H will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

As to the first matter, by signing this letter of understanding below, your firm agrees to the following agreements. First, your office agrees that SEIU will be repaid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and beyond the amounts advanced by SEIU ("FEE PREMIUM") in the following manner. After repayment of costs and fees for a litigation, if any FEE PREMIUM remains, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining *25%* returned to the SEIU to compensate SEIU for the interest on the amounts advanced and other risk taken by agreeing to subsidize this litigation. Thank you for your assistance in this matter. We look forward to working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: _____ ( 10|3|06 )

---

[1] The *FEE* PREMIUM only concerns amounts paid to your firm for hours worked by your firm. This term contemplates that any division of fees between other attorneys and your office will occur prior to the application of this provision of the agreement.

# Exhibit 10

Jamie Cohen 30(b)(6)              CONFIDENTIAL              September 24, 2007
                                 Washington, DC

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

-------------------------------------X

MARISSA MADERAZO, et al.,            :

              Plaintiffs,          :

          v.                  : No. SA06CA053OG

VANGUARD HEALTH SYSTEMS a/k/a        :

BAPTIST HEALTH SYSTEMS, et al.,      :

            Defendants.          :

-------------------------------------X

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

-------------------------------------X

WENDY FLEISCHMAN, et al.,            :

            Plaintiffs,          :

          v.                  : No.

ALBANY MEDICAL CENTER, et al.,       : 06-cv-00765-TJM-DRH

            Defendants.          :

-------------------------------------X

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                             Washington, DC

Page 2

1                  IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF TENNESSEE

3                         MEMPHIS DIVISION

4      -----------------------------------X

5      SUZANNE C. CLARKE, et al.,              :

6                         Plaintiffs,          :

7                    v.                        :

8      BAPTIST MEMORIAL HEALTH CARE          : No.   2:06-cv-2377

9      CORPORATION, et al.,                    :

10                       Defendants.          :

11     -----------------------------------X

12                  IN THE UNITED STATES DISTRICT COURT

13                EASTERN DISTRICT OF MICHIGAN

14                        SOUTHERN DIVISION

15     -----------------------------------X

16     PAT CASON-MERENDA, et al.,              :

17                       Plaintiffs,          : Civil Action No.

18                    v.                      : 2:06-cv-15601-GER-

19     DETROIT MEDICAL CENTER, et al.,       : DAS

20                       Defendants.          :

21     -----------------------------------X

22

Page 3

1                    IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF ILLINOIS

3        ------------------------------------X

4        LISA REED, et al.,                    :

5                         Plaintiffs,          :

6                    v.                        : No. 06-cv-3337

7        ADVOCATE HEALTH CARE, et al.,         :

8                         Defendants.          :

9        ------------------------------------X

10                            Washington, D.C.

11                            Monday, September 24, 2007

12              30(b)(6) Videotape deposition of JAMIE COHEN, a

13       witness herein, called for examination by counsel for

14       Defendants in the above-entitled matter, pursuant to notice,

15       the witness being duly sworn by DENNIS A. DINKEL, a Notary

16       Public in and for the District of Columbia, taken at the

17       offices of Jones Day, 51 Louisiana Avenue, N.W., Washington,

18       D.C. at 9:16 a.m., Monday, September 24, 2007, and the

19       proceedings being taken down by Stenotype by DENNIS A.

20       DINKEL, FAPR, CRR, and transcribed under his direction.

21

22

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                              Washington, DC

Page 21

1        Q.    Okay.  Have you ever gone by any other

2     name?

3        A.    No.

4        Q.    What is your current home address?

5        A.    My current loam address is 1315 Iris

6     Street, Northwest, Washington, D.C., 20012.

7        Q.    Okay.  My understanding is that you are

8     currently employed by the SEIU; is that correct?

9        A.    That's correct.

10       Q.    In what capacity are you employed?

11       A.    I direct the Nurse Alliance of SEIU.

12       Q.    Do you have a particular title that goes

13    with that?

14       A.    Director.

15       Q.    Director?  That would be a good name for

16    the person who directs the Nurse Alliance.

17             Have you ever been involved in a lawsuit?

18       A.    No.

19       Q.    Have you ever been deposed before?

20       A.    No.

21       Q.    Let me hand you what's been marked

22    Exhibits 1 through 5.

Page 43

1    Alliance has an outreach program where we communicate

2    the work we're doing around improving the profession

3    and improving patient care as outreach to nonunion

4    nurses.

5              How does that advance the SEIU's goal of

6    organizing unorganized nurses?

7        A.    Our job through the Nurse Alliance is to

8    advocate on issues that are important to all nurses

9    not just the nurses that are organized but to -- all

10   nurses about improving patient care standards and

11   patient safety.

12       Q.    I understand what the Nurse Alliance does

13   and you stated a number of different things regarding

14   the message you're trying to convey.  I'm trying to

15   drill down a little bit deeper.  How does that help

16   the SEIU in its efforts to organize the unorganized

17   nurses?

18       A.    Well, I think in SEIU, we kind of have a

19   unique situation, because we're the second largest

20   nurse organization in the country, but nobody really

21   knows that, because we're part of an industrial

22   health care model.  So it is very important for us to

Page 44

1    brand ourselves as a national nurse organization

2    that's advocating on patient care issues, patient

3    safety, and -- which is why we kind of amplify,

4    broadcast out on these issues to nonunion nurses.

5         Q.    When was the Nurse Alliance first created?

6         A.    The Nurse Alliance in its current form

7    or --

8         Q.    Current form?

9         A.    In 2000.

10        Q.    Okay.  And when it was developed in its

11   current form, was there any discussion regarding how

12   the development of the Nurse Alliance would advance

13   the organization of unorganized nurses?

14        A.    Yes.

15        Q.    And what was discussed?

16        A.    We discussed that there are 1.2 million

17   unorganized nurses in the United States; and that if

18   nurses were to have a powerful voice on the job, it

19   was important they understood and knew about what

20   nurses in collective bargaining were doing.

21        Q.    That's the statement of what the Nurse

22   Alliance is.

Page 60

1    collusion between hospitals??

2        A.    Can you ask the question again, please?

3        Q.    Sure.  Let me ask it a different way:

4    Have you played any role as the director of the Nurse

5    Alliance in the investigation of alleged collusion

6    regarding nurse compensation between hospitals?

7        A.    Yes.

8        Q.    What has your role been?

9        A.    My role was to coordinate the wage

10   campaign.

11       Q.    What do you mean by coordinate the wage

12   campaign?

13       A.    I -- the wage campaign is a national issue

14   advocacy campaign that's part of our work to address

15   the nursing shortage.

16       Q.    Did you play any role in the investigation

17   of the possibility of litigation relating to alleged

18   collusion between hospitals with respect to nurse

19   compensation?

20       A.    I don't understand the question.  Can you

21   ask it to me again?

22       Q.    Okay.  Do you understand that we are here

Page 63

1    specifically to the field research?

2        Q.    No.  I am referring to what you had

3    testified to as the collection of information that

4    you passed on to James & Hoffman.  What role did you

5    play in the collection of that information is all I'm

6    trying to get at?

7        A.    I helped coordinate that.  There were

8    other staff who were working on this.

9        Q.    Did you consider yourself the point

10   person?

11       A.    Yes, I did.

12       Q.    Okay.  As the point person in collecting

13   the information that was provided to James & Hoffman,

14   were there particular individuals at James & Hoffman

15   that you worked with?

16       A.    Mary Joyce Carlson, David Dean, and Katie

17   Feiock.

18       Q.    Anybody else?

19       A.    Not that I can remember.

20       Q.    And those individuals were acting as SEIU

21   counsel; is that correct?

22       A.    That's correct.

Page 76

1    record?  When you guys whisper, the mikes are capable

2    of picking that up.  I don't know if you guys want to

3    go off the record for that.

4            MR. WEINBERG:  Let's go off the record.

5            THE VIDEOGRAPHER:  The time is 10:46 a.m.

6    and we are off the record.

7            (Discussion off the record.)

8            THE VIDEOGRAPHER:  The time is 10:47 a.m.

9    We are back on the record.

10   BY MR. SHUMAKER:

11       Q.    Ms. Cohen, after conferring with counsel,

12   can you answer my question?

13       A.    Yes, but I'm going to ask you to repeat it

14   for me one more time.

15       Q.    Do you know whether the SEIU provides

16   financial support to the nurse wage antitrust

17   lawsuits?

18       A.    We continue to provide support to

19   James & Hoffman.

20       Q.    In what sense?

21       A.    Financial support.

22       Q.    What form does that take?

Page 77

1        A.      We're paying for their fees.

2        Q.      Okay.  Anything else?

3        A.      No.

4        Q.      Is the SEIU paying for the consultants

5     retained by plaintiffs in this case?

6        A.      Who are you referring to?

7        Q.      The Mintz Group, experts retained yet to

8     be identified.  Do you know?

9                MR. TOMPKINS:  Object to the form of the

10    question.

11               THE WITNESS:  Can you ask the question to

12    me again?

13    BY MR. SHUMAKER:

14       Q.      Sure.  Do you know if the SEIU is paying

15    any fees for any consultant or expert retained by

16    plaintiffs in these cases?

17       A.      Can you tell me, are you asking me

18    specifically?  Or --

19       Q.      I'm asking you generally.

20       A.      Yes.

21       Q.      Who are they paying for?

22       A.      SEIU authorized payment to James & Hoffman

Page 78

1    for the Mintz Group.

2          Q.    Anything else?

3          A.    No.

4          Q.    Are they continuing to pay for the work

5    done by the Mintz Group?

6          A.    No.

7          Q.    Do you know when that stopped?

8          A.    No.

9          Q.    Other than the payment of

10   James & Hoffman's legal fees, is there any other

11   financial support being provided by the SEIU?

12         A.    I'm sorry.  Can you ask that again.

13         Q.    Sure.  Other than the payment of

14   James & Hoffman's legal fees, is there any financial

15   support being provided by the SEIU?

16         A.    To James & Hoffman?

17         Q.    On behalf of the lawsuit at all?

18         A.    No.

19         Q.    Am I correct that the SEIU determines

20   whether it does continued to pay the legal fees of

21   James & Hoffman?

22         A.    That's correct.

Page 87

1    working for many years on trying to address the

2    crisis in care and the nurse shortage; and were

3    interested in looking at the role that wages play.

4        Q.    Okay.  Did it interest you with respect to

5    how the advancement of this theory might impact the

6    SEIU's organizational goals?

7        A.    Yes.

8        Q.    How did it interest the SEIU?

9        A.    In terms of our organizational goals?

10       Q.    Yes, ma'am.

11       A.    We thought it was -- could be an important

12   part of the work we were doing to brand ourselves as

13   a national organization that was addressing issues

14   that were of concern to nurses.

15       Q.    At the time that this article came to your

16   attention, was it discussing the possibility of

17   litigation?

18            MR. WEINBERG:  Maybe I didn't hear it

19   correctly, but I object to the form of the question.

20            THE WITNESS:  Can you repeat the question?

21   BY MR. SHUMAKER:

22       Q.    Sure.

Page 104

1    question is the meeting is over.  The SEIU was going

2    to take action.  Did they take any action at that

3    time to determine whether she had any evidence to

4    support her theory?

5              THE WITNESS:  Yes.  We wanted her to come

6    meet with us to discuss her article and her findings.

7    BY MR. SHUMAKER:

8         Q.    Who contacted her?

9         A.    I can't recall.

10        Q.    Did you contact her?

11        A.    I can't remember.

12        Q.    The meeting was set up, I take it, with

13   Ms. Bergmann?

14        A.    That's correct.

15        Q.    When was that meeting?

16        A.    I think late August or early September.

17        Q.    Okay.  Did -- had Ms. Bergmann had any

18   prior contact with the SEIU?

19        A.    Not that I'm aware of.

20        Q.    Did the SEIU request any additional

21   material from Ms. Bergmann in advance of the meeting

22   that you had set up to discuss her theory?

Jamie Cohen 30(b)(6)            CONFIDENTIAL            September 24, 2007
                               Washington, DC

Page 75

1    continue our efforts around public education

2    materials and advocacy.

3         Q.    Do you provide any other support?

4         A.    No.

5         Q.    Do you provide financial support?

6              MR. WEINBERG:  May I have a moment?

7              MR. SHUMAKER:  I would prefer not to have

8    consultation between the witness and counsel while

9    the question is pending.

10              MR. WEINBERG:  Fine.  I'm trying to make

11   your job easier.

12   BY MR. SHUMAKER:

13        Q.    Let me ask the question again:  Do you

14   know whether the SEIU provides financial support to

15   the nurse wage antitrust lawsuits?

16        A.    Can I confer with my counsel for a minute?

17              MR. SHUMAKER:  I would prefer that you

18   didn't; but if you feel that you have to, I am not

19   going to stop you.

20              THE WITNESS:  Okay.

21              (Witness and counsel confer.)

22              THE VIDEOGRAPHER:  Should we go off the

Page 118

1    BY MR. SHUMAKER:

2        Q.    Ms. Cohen, I've handed you an e-mail dated

3    July 16, 2002 from Professor Bergmann to Heidi

4    Hartmann, subject dinner.

5              Do you see that?

6        A.    Yes.

7        Q.    And the Bates number is Bergmann-DET

8    00621.  Have you ever seen this document before?

9        A.    No, I have not.

10       Q.    Okay.  I just want to direct you to the

11   last line where Professor Bergmann writes there could

12   be billions involved.  Do you see that?

13       A.    Yes.

14       Q.    Do you recall Professor Bergmann ever

15   indicating to the SEIU that there billions might be

16   involved?

17       A.    No.

18       Q.    Did she ever indicate to you that there

19   was the possibility of substantial monetary

20   compensation as a result of a lawsuit?

21       A.    No.

22       Q.    Were you aware that she tried to interest

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                              Washington, DC

Page 124

1        Q.    Sure.  Did the SEIU come to any conclusion

2    regarding its desire to pursue Professor Bergmann's

3    theory?

4        A.    Yes.

5        Q.    What did it conclude?

6        A.    We thought that we had been addressing as

7    part of our national issue advocacy campaign all of

8    the issues around the nursing shortage and the crisis

9    in care and that we wanted to take a look at how

10   wages played into this.

11       Q.    Did it decide the best course of action to

12   investigate the theory raised by Professor Bergmann?

13       A.    Would you repeat the question?

14       Q.    Yes.

15             MR. WEINBERG:  I object to the form of the

16   question.  It would be helpful if you put a time

17   frame on these questions.

18   BY MR. SHUMAKER:

19       Q.    Immediately following -- let me rephrase.

20             Following the meeting with Professor

21   Bergmann in July 2004, do you recall any discussion

22   regarding the manner in which the SEIU would

Jamie Cohen 30(b)(6)              CONFIDENTIAL              September 24, 2007
                                 Washington, DC

Page 131

1          THE WITNESS:  I had a general idea why

2     Professor Farber had been retained by

3     James & Hoffman.

4     BY MR. SHUMAKER:

5          Q.    Okay.  Now, before I ask my next question,

6     was there something you wanted to correct following

7     discussion with counsel?

8          A.    You had asked me in that last session,

9     this previous hour, one question about I think one of

10    our organizational goals, and if the nurse wage

11    campaign would help with organizing.

12              And I just wanted to clarify again that

13    that was around branding SEIU as a nurse organization

14    that was addressing issues that were critical to

15    nurses.

16              And that really involved organizing that

17    was off in the future.

18         Q.    What do you mean by it was designed around

19    branding SEIU?

20         A.    I think I had testified earlier that SEIU

21    has a unique situation.  We're the second largest

22    nurse organization in the country yet very few nurses

Page 132

```
 1    know that because we are part of an industrial health

 2    care union.  So branding ourselves as a national

 3    nurse organization that's addressing issues that are

 4    critical to nurses is an important part of what we

 5    do.

 6         Q.    What do you mean by this organization is

 7    something in the future?

 8         A.    What I said was it was pertaining to

 9    organizing that was off in the future.  We're

10    communicating to lots of nurses.

11         Q.    Okay.  And just to make sure I understand

12    what you're saying, you're saying that the Nurse

13    Alliance and the message it is seeking to convey

14    is -- it's hoped to help your organizing efforts in

15    the future; is that correct?

16         A.    That our branding attempts are to let

17    nurses know that there's a national nurse

18    organization that's addressing issues that are of

19    concern to them.

20         Q.    And you hope that that effort will lead to

21    future organization, correct?

22         A.    Part of it, yes.  That's correct.
```

Page 133

1        Q.    What part of it is not?

2        A.    Well, we want to also be an organization

3    that's helping fix problems for nurses everywhere.

4        Q.    And you wouldn't have any objection to

5    having nurses that are unorganized become organized

6    under the SEIU now, correct?

7        A.    That's correct.

8        Q.    And, in fact, you're involved in active

9    organization efforts throughout the country, correct?

10       A.    That's correct.

11       Q.    Are you actively organizing nurses in

12   Detroit?

13       A.    No.

14       Q.    Is a sister union of yours seeking to

15   organize nurses in Detroit?

16             MR. WEINBERG:  Object to the form of the

17   question.

18             THE WITNESS:  Do you mean sister union, a

19   union that's affiliated with us?

20   BY MR. SHUMAKER:

21       Q.    No.  Do you know of any other union in the

22   Detroit area seeking to unionize nurses?

Page 159

1    somewhat nuanced legal issue.

2            And so I object to the line of questioning

3    that it is entirely inappropriate.

4    BY MR. SHUMAKER:

5        Q.    Do you know, Ms. Cohen, if Professor

6    Bergmann fulfilled her obligation to provide support

7    of litigation efforts?

8            MR. WEINBERG:  Object to the form of the

9    question.

10           THE WITNESS:  I don't know.

11   BY MR. SHUMAKER:

12       Q.    Did the SEIU pay Professor Bergmann the

13   $30,000 contemplated by this agreement?

14       A.    Yes.

15       Q.    Did it have any objection to the work she

16   performed?

17       A.    No.

18       Q.    Do you recall any discussion where someone

19   said hey, she didn't carry the ball with respect to

20   this litigation?  Anything like that happen?

21       A.    To the litigation?  Are you asking me?

22       Q.    Yes, ma'am.

Page 193

1              MR. WEINBERG:  Object to the form of the

2    question.

3              MR. TOMPKINS:  I didn't understand it.

4              MR. SHUMAKER:  I'll rephrase it.

5    BY MR. SHUMAKER:

6         Q.   This says why are we so intent on going

7    public before we file our lawsuit.  Do you see that?

8         A.   Yes.

9         Q.   Did the SEIU ever consider the nurse

10   compensation cases to be their lawsuits?

11        A.   Absolutely not.

12        Q.   Did you ever talk to Ms. Buchanan or

13   Ms. Tran as to whether or not they felt that?

14        A.   No, I did not.

15        Q.   If you go back to the first page,

16   Ms. Cohen?

17             See where it says questions on the first

18   bullet point?

19        A.   Yes.

20        Q.   And it states what exactly is the

21   prefiling article proposed by Jamie and Arne.

22             Do you see that?

Jamie Cohen 30(b)(6)         CONFIDENTIAL         September 24, 2007
                           Washington, DC

Page 202

1        Q.    Is it your testimony, Ms. Cohen, that the

2    organization of unorganized nurses had absolutely

3    nothing to do with the SEIU's support of the

4    investigation into the allegations of the nurse

5    compensation cases?

6        A.    I testified earlier that one of the goals

7    of the campaign was to brand SEIU nationally so

8    nurses would see us as a national organization that

9    was trying to solve real problems that they face on

10   the job, and that down the road, off in the future,

11   maybe it would lead to organizing.

12            We didn't know the answer to that.

13       Q.    Is it your testimony under oath here,

14   Ms. Cohen, that the impact of developing information

15   suggesting that employers colluded had absolutely

16   nothing to do with your support of the nurse

17   compensation cases?

18            MR. WEINBERG:  I object to the form of the

19   question.  She just answered your question.

20   BY MR. SHUMAKER:

21       Q.    Can you answer my question?

22       A.    Yeah.  I didn't understand the way you

Page 203

1     were asking the question.  It had too many double

2     negatives in it.

3          Q.    Is it your testimony under oath here,

4     Ms. Cohen, that the impact of developing information

5     suggesting that employers colluded had absolutely

6     nothing to do with your support of the nurse

7     compensation cases?

8               MR. WEINBERG:  Object to the form of the

9     question.

10              THE WITNESS:  It was not around the

11    support of the litigation.  It was around the

12    opportunities that the wage campaign presented for us

13    branding ourselves nationally.

14    BY MR. SHUMAKER:

15         Q.    Let's go up to the first sentence,

16    Ms. Cohen.  We talked about earlier about the SEIU

17    targeting particular markets and you said that there

18    was no targeting.

19              Do you recall that?

20              MR. WEINBERG:  You have to qualify what

21    you just -- what you just said.  I mean, she said

22    there was no targeting their communications strategy

Jamie Cohen 30(b)(6)              CONFIDENTIAL              September 24, 2007
                                 Washington, DC

Page 215

1        A.    It was by MSA by population size.

2        Q.    Did you then seek to winnow down that list

3    of 60 to a particular number of markets for any

4    purpose?

5        A.    For any purpose?  Or are we still talking

6    about the initial research?

7        Q.    For the initial research that the SEIU was

8    performing, you had this list of 60, did you seek to

9    winnow them down for any particular purpose?

10       A.    Yes.

11       Q.    What was the reason you sought to winnow

12   down that list of 60?

13       A.    When we consulted with the Feldman Group

14   about doing the survey, we wanted Feldman to actually

15   survey in all of the 60 markets.  But when they told

16   us the cost of it, which was astronomical, we

17   narrowed down the list from there.

18       Q.    And how did you go about narrowing down

19   the list?

20       A.    We narrowed down the list based on both

21   trying to stay true to the intent of doing it by

22   ranking, by the top markets down based on population

Page 216

1    size; but also included markets that we thought it

2    was important for us to do branding in.

3         Q.    So let me make sure I understand that.

4    You winnowed down the markets based upon population

5    size, and to what extent these were markets that you

6    wanted to do branding; is that correct?

7         A.    I just want to clarify, that what we tried

8    to do was that the goal and intent was to base it on

9    the top rankings, so that it was ranked, you know,

10   from the top down by population size.  But we also

11   included a few other markets where it was important

12   for us to do some branding work.

13        Q.    Why was it important to include those

14   markets that you wanted to do branding?

15        A.    Because during this time period, the

16   California Nurses Association -- which is a nurse

17   organization that's based in California -- was

18   starting to do outreach to nurses across the country

19   through an organization called the NNOC.  And we were

20   concerned about competition with the California

21   Nurses Association in branding.

22        Q.    How did you determine which markets you

Jamie Cohen 30(b)(6)         CONFIDENTIAL         September 24, 2007
                            Washington, DC

Page 217

1   were interested in to increase your branding?

2        A.    Well, they were part of the list of 60

3   major markets where SEIU has an interest in building

4   our work.

5        Q.    Okay.  Was this list of 60, were all of

6   those 60 areas where the SEIU was interested in

7   increasing its branding?

8        A.    Yes.

9        Q.    Okay.  These 60 weren't simply the 60

10  largest cities; is that fair to say?

11       A.    Markets.

12       Q.    Markets.  Okay.  So the answer to my

13  question, this list of 60 was not simply listed by

14  population size, correct?

15       A.    They were -- the goal was to rank them

16  by -- we were trying to identify the top 60 markets

17  by population size, so we were trying to -- they were

18  based on MSAs, metropolitan statistical areas, which

19  don't match in a perfect kind of match, city by city.

20       Q.    And just to be clear, the top 60 that you

21  listed by population size, that was the top 60 for

22  which you wanted to push the SEIU branding?

Jamie Cohen 30(b)(6)              CONFIDENTIAL              September 24, 2007
                                  Washington, DC

Page 218

1        A.      That's correct.

2        Q.      And then once you had that list of 60, am

3    I correct that you did some winnowing down of that

4    list that you could more focus the Feldman Group's

5    efforts, correct?

6        A.      Well, we had to do it because of costs,

7    because it was just astronomical to do polling in 60

8    markets.

9        Q.      And how did you do that winnowing?

10       A.      We winnowed down, like I just said, where

11   we went primarily by the top ranking.  We took the

12   number down from 60 to, I think it was 24.

13       Q.      So the 24 was simply the 24 largest

14   markets?

15       A.      That's what the goal was.  And then we

16   included a few others where we thought it was

17   important for us to do branding.

18       Q.      Do you recall which markets were not one

19   of the top 24, but which you thought were important

20   for branding?

21       A.      I'm going to -- I can't remember, you

22   know, off the top of my head.

Page 227

1    high wages, then there would be low vacancy rates.

2    And the reverse would be true, if there were markets

3    where there would be low wages, then the theory was

4    that there would be high nurse vacancy rates.

5        Q.    To marry that testimony with what we

6    talked about earlier, once you got the list of 60

7    that is ranked in the manner you described by Farber,

8    did you simply take the top 24 from that list and

9    hand them to the Feldman group?

10       A.    It was a mix of the 24, plus the places

11   where it was important to do branding.

12       Q.    That's what I would have guessed, but I

13   wanted to make sure.

14             Do you know if the SEIU paid for that work

15   by the Farber group?

16       A.    We paid for that through our relationship

17   with James & Hoffman.  In this case, normally, in

18   this case, the bill from Farber came to

19   James & Hoffman and James & Hoffman sent us the

20   invoice and we paid it.

21       Q.    So the SEIU paid for this work conducted

22   by Farber through James & Hoffman?

Page 228

1      A.    That's correct.

2      Q.    The ranking that Professor Farber did, was

3    it ranked by vacancy rate, wage rate, combination of

4    both, do you recall?

5      A.    I don't recall, but I think it was ranked

6    in the order of where it showed the match of lowest

7    wages to highest vacancy rates.

8      Q.    While we're talking about this, and if you

9    could set the exhibit we have marked aside, let me

10   see if I can focus our discussion.

11                          (A document was marked for

12                           identification as Exhibit

13                           No. SEIU 14.)

14        MR. SHUMAKER:  We'll come back to Exhibit

15   13, Ms. Cohen.  For the record, what I've handed to

16   you marked Exhibit 14 is a -- appears to be an Excel

17   spreadsheet that says wage comparison 30 largest

18   MSAs, November 2003, SEIU-DET 03258 to 3259.

19        MR. WEINBERG:  Before you go to this, this

20   is what Rickling is going to testify to.

21        MR. SHUMAKER:  Okay.  I appreciates that.

22   I want to ask her if she understands what this is.

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                              Washington, DC

Page 234

1       Q.    Do you recall why you were interested in

2    getting Ms. Hartmann involved?

3       A.    Well, we were looking at involving Heidi

4    Hartmann and IWPR because of the expertise that IWPR

5    has on women and economics and women in the labor

6    market.

7       Q.    At this meeting that's being discussed

8    here, at which Mary Joyce Carlson and David Dean

9    appear to be -- or will be attending, do you know who

10   they would be representing when they attended that

11   meeting?

12            MR. TOMPKINS:  Object to the form of the

13   question.

14            THE WITNESS:  I don't know.

15   BY MR. SHUMAKER:

16      Q.    Okay.  When you communicated with

17   Ms. Carlson, did she ever indicate to you at any

18   point in time that she was acting as plaintiffs'

19   counsel in her discussions with you?

20            MR. WEINBERG:  Are you talking about in

21   this time period or any time period?

22            MR. SHUMAKER:  Any time period.

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                              Washington, DC

Page 235

1          THE WITNESS:  I would call privilege on

2    that discussion.

3    BY MR. SHUMAKER:

4          Q.    Let me ask you this -- let me ask it this

5    way.  Your counsel didn't object as privileged.  I

6    just want to make that clear.

7                Has Ms. Carlson ever in discussion with

8    you delineate her role as counsel for plaintiffs and

9    counsel for the SEIU?

10         A.    Are you saying at times she would say to

11   me I'm counsel for plaintiffs, and I'm counsel for

12   SEIU?  I think I always understood that she was

13   counsel to SEIU.

14         Q.    Okay.  Did she ever indicate to you that

15   she was counsel for plaintiffs?

16         A.    I knew that James & Hoffman was going to

17   be working on the litigation.

18         Q.    Did she in any way delineate for you when

19   she was acting for SEIU and when she was acting for

20   plaintiffs?

21         A.    Always in my interactions with Mary Joyce,

22   it was as counsel to SEIU.

Alderson Reporting
1-800-FOR-DEPO

Jamie Cohen 30(b)(6)      CONFIDENTIAL      September 24, 2007
Washington, DC

Page 236

```
 1        Q.    In your discussions with Mr. Dean, did he

 2   ever delineate for you when he was acting for

 3   plaintiffs and when he was acting for the SEIU?

 4        A.    I felt it was always clear when I was

 5   engaged in discussions with David Dean that he was

 6   counsel to SEIU.

 7        Q.    Did he ever indicate to you at any

 8   particular time in a discussion that I am

 9   representing plaintiffs at this point in time?

10        A.    No.

11        Q.    Did he ever explain to you any particular

12   conflict that may exist between his representation of

13   plaintiffs and his representation of the SEIU?

14              MR. TOMPKINS:  Object to the form of the

15   question.

16              MR. WEINBERG:  I think we're getting -- I

17   understand that it's entirely appropriate for you to

18   find out who had a relationship with whom, so that

19   you can get to privilege.  But whether you went a

20   step beyond that when you start getting into

21   discussions that may or may not have been had about

22   conflict, and I don't think that's appropriate.  And
```

Page 272

1        A.    Yes.

2        Q.    Do you know whether it was the intention

3   as of January 27, 2005, that antitrust lawsuits would

4   be filed in April of 2006?

5              MR. WEINBERG:  Object to the form of the

6   question.

7              MR. TOMPKINS:  I join in the objection.

8              THE WITNESS:  This was a, you know, memo

9   that was put together by SEIU staff who were guessing

10  at something that was being controlled by

11  James & Hoffman and the other law firms that were

12  involved in making the decisions about the

13  litigation.

14  BY MR. SHUMAKER:

15       Q.    Let me rephrase my question.  I think I

16  may have misstated the year that I was referring to.

17             Do you know whether it was the intention

18  as of January 27, 2005 that antitrust lawsuits would

19  be filed in April of 2005?

20             MR. WEINBERG:  Object to the form of the

21  question.

22             MR. TOMPKINS:  I'll join the objection.

Page 273

1              THE WITNESS:  I don't know.  Again, this

2      was written by SEIU staff.  We didn't have any

3      control over the filing of the lawsuits.

4      BY MR. SHUMAKER:

5          Q.    Did you have -- when you reviewed this

6      memo, did you inform anyone that we have no control

7      over the filing of the lawsuits?

8          A.    Yes.  Our staff knew that.

9          Q.    Did you mark that up on this memorandum?

10         A.    No.

11         Q.    Is there a particular reason why you did

12     not?

13         A.    No.

14         Q.    Did you think it was correct to say that

15     the SEIU would file lawsuits in April?

16             MR. WEINBERG:  Object to the form of the

17     question.

18             THE WITNESS:  SEIU understood that the law

19     firm had decision and control over when the lawsuits

20     would be filed.

21     BY MR. SHUMAKER:

22         Q.    Do you recall when -- let me back up.

Jamie Cohen 30(b)(6)              CONFIDENTIAL              September 24, 2007
                                 Washington, DC

                                                              Page 274

  1              But it's your understanding, Ms. Cohen,

  2      that this reference to file lawsuits refers to

  3      James & Hoffman filing lawsuits on behalf of a class

  4      of nurses?

  5              MR. WEINBERG:  Object to the form of the

  6      question.

  7              THE WITNESS:  I wasn't sure I understood

  8      the question.

  9      BY MR. SHUMAKER:

 10         Q.    This reference under April to file

 11      lawsuits, is it your understanding that this refers

 12      to James & Hoffman filing lawsuits on behalf of the

 13      class of nurses?

 14              MR. WEINBERG:  Object to the form of the

 15      question.

 16              THE WITNESS:  We didn't know.

 17      BY MR. SHUMAKER:

 18         Q.    At this point in time, the SEIU did not

 19      know?

 20         A.    That is correct.

 21         Q.    Who the lawsuits would be filed on behalf

 22      of?

Jamie Cohen 30(b)(6)            CONFIDENTIAL            September 24, 2007
                                Washington, DC

Page 275

1          A.     Well, we knew that they would be filed on

2     behalf of nurse plaintiffs.

3          Q.     Okay.  Have you ever seen any writing

4     prior to January 2005 that indicates that?

5          A.     Anything in writing?

6          Q.     Yes, ma'am.

7          A.     Not that I can recall.

8          Q.     And you prepared for this deposition for

9     12 hours, I recall you testified.

10               Did you see any document during that

11    preparation that indicated to you that these lawsuits

12    were going to be filed on behalf of nurses prior to

13    January 2005?

14         A.     Are you --

15               MR. TOMPKINS:  Object to the form of the

16    question.

17               MR. WEINBERG:  I do as well.

18               THE WITNESS:  I don't understand what

19    you're asking me, because it felt like there were two

20    questions in there.

21    BY MR. SHUMAKER:

22         Q.     That's fair.  This document is dated

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 24, 2007
                          Washington, DC

Page 276

1     January 27, 2005, correct?

2         A.     Correct.

3         Q.     Did you ever see any document in

4     preparation for your deposition or at any time that

5     indicated that the idea was for the antitrust

6     lawsuits to be filed on behalf of a class of nurses?

7         A.     No.

8         Q.     Am I correct that as of this time, January

9     2005, no named plaintiffs had been identified?

10        A.     That's correct.

11        Q.     No Cohen Milstein involvement at this

12    point?

13        A.     That's correct.

14        Q.     The only counsel involved would be

15    James & Hoffman, correct?

16        A.     That's correct.

17        Q.     And the SEIU was paying the legal fees of

18    James & Hoffman at that time?

19        A.     That's correct.

20        Q.     Ms. Cohen, do you recall when the IWPR was

21    first retained by the SEIU?

22        A.     I believe it was early '05.

Page 277

1        Q.     Why were they retained?

2        A.     They were retained to help us with the

3    public education and advocacy part of the campaign,

4    and to compile a report that would be used for the

5    public education and advocacy around the nurse wage

6    campaign.

7        Q.     Were they retained for any other purpose?

8        A.     No.

9        Q.     Were they retained to assist in the

10   antitrust litigation in any way?

11       A.     No.

12                              (A document was marked for

13                              identification as Exhibit

14                              No. SEIU 16.)

15              MR. SHUMAKER:  For the record, Ms. Cohen,

16   I handed you what's been marked Exhibit 16, document

17   number NW-ALB 001135 through 1136, appears to be a

18   retention agreement between the IWPR and

19   James & Hoffman.

20              Have you ever seen this before?

21              MR. WEINBERG:  I object to the form of the

22   question.

Page 284

```
 1    to weigh in there.  I've been trying to be quiet

 2    here.

 3              MR. WEINBERG:  And I have been trying to

 4    be helpful, but you do what you want to do.

 5    BY MR. SHUMAKER:

 6        Q.    Ms. Cohen, you testified earlier that it

 7    was your understanding that the IWPR never did any

 8    work for the SEIU relating to the antitrust

 9    litigation; is that correct?

10        A.    That's correct.

11        Q.    We're looking at a document here where it

12    indicates that the IWPR was being asked to assist

13    regarding potential nurse wage antitrust litigations

14    as indicated by the signature of David Dean for the

15    SEIU, correct?

16        A.    Correct.

17        Q.    Is it still your testimony, Ms. Cohen,

18    that the IWPR never did any work in support of the

19    litigations for the SEIU?

20        A.    That is correct.  The way I understood

21    this was that James & Hoffman had considered using

22    IWPR to help provide assistance on possible
```

Page 285

1    litigation, and then decided not to use them in that

2    capacity.

3        Q.    Okay.  And they were planning on using

4    them for possible litigation on behalf of the SEIU,

5    correct?

6        A.    That's correct.

7              MR. TOMPKINS:  Object to the form of that

8    question.

9              MR. WEINBERG:  I object to the form of the

10   question as well.

11             MR. TOMPKINS:  It is susceptible to at

12   least two meanings.

13   BY MR. SHUMAKER:

14       Q.    Do you recall any discussion, Ms. Cohen,

15   regarding the possibility of the IWPR providing any

16   support to the SEIU relating to potential nurse wage

17   antitrust litigations?

18       A.    I would have to say that's a privileged

19   discussion.

20       Q.    Do you recall when that discussion was

21   that you are testifying about?

22       A.    Sometime generally around late '04,

Page 298

1    support of what they were retained to do here with

2    respect to number 2?

3         A.    Yes.

4         Q.    What was the name of that document?

5         A.    Solving the Nurse Shortage Through Higher

6    Wages.

7         Q.    And the SEIU paid the IWPR for that work,

8    correct?

9         A.    That's correct.

10        Q.    Do you know how much they paid them?

11        A.    We paid them 105,000.

12        Q.    And that was simply for the work relating

13   to the creation and preparation of that report?

14        A.    That's correct.

15        Q.    Did you pay them any other funds relating

16   to nurse compensation?

17        A.    As part of the wage campaign, Dr. Hartmann

18   and Dr. Lovell did some presentations around the wage

19   campaign, and we paid for some of their fees for

20   travel and honorarium.

21        Q.    Did you pay for their substantive work in

22   that regard or just expenses?

Jamie Cohen 30(b)(6)                CONFIDENTIAL                September 24, 2007
                                  Washington, DC

                                                                        Page 299

    1        A.    Just their expenses.

    2        Q.    Is $105,000 the total amount of

    3   compensation that the SEIU has paid the IWPR for its

    4   work on the nurse compensation matter?

    5        A.    On the report, in addition to paying for

    6   their expenses to do these trainings.

    7        Q.    Okay.  Was someone else retained by the

    8   SEIU to explore data that may show evidence of

    9   collusion among hospitals within metropolitan areas?

   10        A.    I testified earlier that we used other

   11   consultants who helped us in collecting information

   12   and research.

   13        Q.    Okay.  Is there a particular consultant

   14   that explored data showing evidence of collusion

   15   among hospitals in metropolitan areas?

   16        A.    That was hired by SEIU?

   17        Q.    Yes, ma'am.

   18        A.    No.

   19        Q.    So this topic number 1 on NW-ALB 001073,

   20   that was never acted upon?

   21        A.    Can you ask me again?  I'm not sure I

   22   understand what you're asking.

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 25, 2007
                               Washington, DC

                                                            Page 326

                IN THE UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF TEXAS

                      SAN ANTONIO DIVISION

-----------------------------------X

    MARISSA MADERAZO, et al.,            :

                   Plaintiffs,           :

                v.                       : No. SA06CA053OG

    VANGUARD HEALTH SYSTEMS a/k/a        :

    BAPTIST HEALTH SYSTEMS, et al.,      :

                   Defendants.           :

-----------------------------------X

                IN THE UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF NEW YORK

-----------------------------------X

    WENDY FLEISCHMAN, et al.,            :

                   Plaintiffs,           :

                v.                       : No.

    ALBANY MEDICAL CENTER, et al.,       : 06-cv-00765-TJM-DRH

                   Defendants.           :

-----------------------------------X

Page 327

1                    IN THE UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF TENNESSEE

3                             MEMPHIS DIVISION

4      - - - - - - - - - - - - - - - - - - - - - - - - -X

5      SUZANNE C. CLARKE, et al.,            :

6                         Plaintiffs,        :

7                    v.                       :

8      BAPTIST MEMORIAL HEALTHCARE           : No.  2:06-cv-2377

9      CORPORATION, et al.,                  :

10                        Defendants.        :

11     - - - - - - - - - - - - - - - - - - - - - - - - -X

12                   IN THE UNITED STATES DISTRICT COURT

13                 EASTERN DISTRICT OF MICHIGAN

14                         SOUTHERN DIVISION

15     - - - - - - - - - - - - - - - - - - - - - - - - -X

16     PAT CASON-MERENDA, et al.,            :

17                         Plaintiffs,        : Civil Action No.

18                    v.                       : 2:06-cv-15601-GER-

19     DETROIT MEDICAL CENTER, et al.,       : DAS

20                        Defendants.        :

21     - - - - - - - - - - - - - - - - - - - - - - - - -X

22

Jamie Cohen 30(b)(6)          CONFIDENTIAL          September 25, 2007
Washington, DC

Page 328

1                  IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF ILLINOIS

3       ------------------------------------X

4       LISA REED, et al.,                   :

5                       Plaintiffs,          :

6               v.                   : No. 06-cv-3337

7       ADVOCATE HEALTH CARE, et al.,        :

8                       Defendants.          :

9       ------------------------------------X

10                            Washington, D.C.

11                            Tuesday, September 25, 2007

12              Continued 30(b)(6) videotape deposition of JAMIE

13      COHEN, a witness herein, called for examination by counsel

14      for Defendants in the above-entitled matter, pursuant to

15      notice, the witness being duly sworn by DENNIS A. DINKEL, a

16      Notary Public in and for the District of Columbia, taken at

17      the offices of Jones Day, 51 Louisiana Avenue, N.W.,

18      Washington, D.C. at 9:16 a.m., September 25, 2007, and the

19      proceedings being taken down by Stenotype by DENNIS A.

20      DINKEL, FAPR, CRR, and transcribed under his direction.

21

22

Page 442

1    that was around wages and the role it played in the

2    nurse shortage.

3    BY MR. SHUMAKER:

4        Q.    That's wonderful.  I'm simply trying to

5    ask a different question.  In light of the views of

6    the nurses, as expressed in these four surveys, did

7    the SEIU have any second thoughts about supporting

8    nurse wage litigations?

9            MR. WEINBERG:  Object to the form of the

10   question.

11           MR. TOMPKINS:  Yes.  Object to the form.

12           THE WITNESS:  Again, I can't parse out

13   about the entirety of these four surveys because

14   these surveys were not specific just to litigation,

15   supporting litigation.

16           They were surveys done around a

17   comprehensive campaign around the nurse shortage

18   where we were looking at the issue of wages and also

19   looking at our -- you know, looking again, like we've

20   done in the past, around branding, around

21   organization and image.

22   BY MR. SHUMAKER:

Exhibit 11

5200
con.



**SEIU**
**Stronger Together**

October 31, 2006

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC 20036

RE:    Nurse Wage Antitrust Litigation
       Special Project No. 280U-HSVRNLGL(R3)

Dear David:

This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") and your firm with respect to the matters referenced above.

SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of *$165* per attorney hour. Paralegal hours are billed at a rate of *$75* per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to me, Norm Gleichman at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

SEIU-CH 0648

David Dean, Esq.
October 31, 2006
Page Two

SEIU is funding this litigation through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU pays to your firm in this matter will be reimbursed, prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. By funding this *litigation,* SEIU is sharing in the risk inherent in these litigations and thus expects: 1) to share in any fee recovery, if any, obtained above and beyond those amounts advanced by SEIU in the litigation, pursuant to the sharing agreement provided below; and 2) that J&H will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

As to the first matter, by signing this letter of understanding below, your firm agrees to the following agreements. First, your office agrees that SEIU will be repaid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and beyond the amounts advanced by SEIU) ("FEE PREMIUM") in the following manner. After repayment of costs and fees for a litigation, if any FEE PREMIUM remains, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining *25%* returned to the SEIU to compensate SEIU for the interest on the amounts advanced and other risk taken by agreeing to subsidize this litigation. Thank you for your assistance in this matter. We look forward to working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: _____ ( 10|3-|06 )

---

[1] The *FEE* PREMIUM only concerns amounts paid to your firm for hours worked by your firm. This term contemplates that any division of fees between other attorneys and your office will occur prior to the application of this provision of the agreement.

Exhibit 12

# Press Releases

Print 🖨

**FOR IMMEDIATE RELEASE**
June 20, 2006

**CONTACT**
Stephanie Mueller
202-730-7842

# MAJOR CLASS ACTION LAWSUITS FILED IN FOUR CITIES ALLEGE HOSPITALS COLLUDED TO HOLD DOWN NURSE WAGES

## To Ensure Nurses are Valued and Rewarded On the Job, Nurse Alliance of SEIU Helped Expose Pay Issues Leading to Suits

WASHINGTON, DC – Major class action lawsuits were filed today against national hospital corporations in four cities – Chicago, Memphis, San Antonio, and Albany, N.Y – alleging that they have colluded illegally to hold down nurse wages.

The Service Employees International Union (SEIU) was invited to join with the Washington, D.C. law firm of Cohen, Milstein, Hausfeld & Toll, PLLC in announcing the suits because of the work the Nurse Alliance of SEIU did to help expose the wage issues that led to today's filings.

"Nurses are the central nervous system of health care. We provide the day-to-day care that is so important to helping people get well," said Cathy Singer-Glasson, RN, President of the Nurse Alliance of SEIU. "But I have seen so many nurses leave the profession they love because of working conditions that make it harder to give our patients the care they deserve. Now we find out through these lawsuits that while nurses were fighting for our patients, some hospitals may have been working illegally to hold down our wages."

The Nurse Alliance, which has more than 84,000 nurse members in 23 states, is seeking to work with hospitals to improve inadequate nurse wages and difficult working conditions that have driven RNs from the beside and led to a shortage of nurses who are willing to work in hospitals. In 2004, more than 500,000 nurses chose to work outside of the nursing profession, despite an anticipated need of more than one million nurses by 2014.

"With the health care industry making more than $26 billion in profits in 2004, we can do better," said Andy Stern, SEIU International President. "The people who pay for the illegal practices laid out in these lawsuits are nurses and patients – nurses through short staffing and inadequate wages, and patients through decreased time with RNs and a greater risk of complications.

"If we are going to solve the health care crisis in this country, illegal activity like this has to stop, and all of us have to work together to find solutions," he said.

The Nurse Alliance of SEIU unveiled a new white paper in March, Solving the Nursing Shortage through Higher Wages, from the Institute for Women's Policy Research, citing low pay, short staffing, and mandatory overtime as conditions that have caused nurses to leave the bedside. The report showed how raising nurse

**SEIU-CH 0587**

salaries will help draw more nurses back to the profession. That research, combined with work that the Nurse Alliance's Value Care, Value Nurses initiative has done to publicize the issue with nurses, helped expose the problems brought to light by the lawsuits. More information, including a copy of the IWPR report, is available online at www.ValueCareValueNurses.org.

With more than 84,000 nurses in 23 states, the Nurse Alliance is one of the largest nursing organizations in the country. Through its Value Care, Value Nurses initiative, nurses are uniting across the country to pursue any and all solutions to bring nurses back to the bedside and raise the standard of care – from enforcement of existing laws, to calling for new legislation protecting nurses and patients, to giving nurses a voice in the delivery of patient care.

### ###

The Nurse Alliance of SEIU is a national organization by, for and of nurses. With more than 84,000 nurses in 23 states, we are raising standards for the nursing profession and improving patient care through nurse-to-nurse outreach, advocacy, and partnerships with community supporters, hospitals, and elected officials. www.nursealliance.org

Browse by Year | 2007 | ▓ BROWSE

SEIU-CH 0588

## MEDIA ADVISORY

| | |
|---|---|
| June 15, 2006 | **Contact:** Deborah Schwartz<br>Cohen, Milstein, Hausfeld & Toll<br>301 897-8838 or 240 355-8838 |

### Major Class Action Lawsuits Against National Health Care Providers to Be Announced Tuesday, June 20 at Noon EDT

**WHAT:** On Tuesday, June 20 at 12:00 noon EDT, one of the nation's premier class action law firms, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. (CMHT), will detail four major class action lawsuits it is filing that day. CMHT will be joined at the press conference by the nation's largest and fastest growing union in the country, the Service Employees International Union (SEIU), and by the National Council of Women's Organizations, both of which will address health and employment issues implicated by the lawsuits.

**WHEN:** Tuesday, June 20 at 12:00 noon EDT

**WHERE:** Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
6th Floor, West Tower
Washington, D.C.

**WHO:** Participants will include:
Daniel A. Small, Partner, Cohen, Milstein, Hausfeld & Toll, PLLC
Andrew L. Stern, International President, SEIU
Cathy Singer, RN, President, Nurse Alliance of SEIU
Susan Scanlan, Chair, National Council of Women's Organizations

For decades, Cohen, Milstein, Hausfeld & Toll, P.L.L.C has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the U.S. for violations of antitrust, securities, environmental, consumer protection, civil rights/discrimination, ERISA and human rights laws.

With 1.8 million members, SEIU is the fastest-growing union in North America. Focused on uniting workers in three sectors to improve their lives and the services they provide, SEIU is the largest health care union, including hospitals, nursing homes, and home care; the largest property services union, including building cleaning and security; and the second largest public employee union.

NCWO is a nonpartisan, nonprofit umbrella organization of groups that collectively represent over ten million women across the United States. The only national coalition of its kind, NCWO is a tax-exempt organization with twenty years' experience uniting American women's groups.

For more information, visit www.cmht.com, www.seiu.org and www.womensorganizations.org.

<center>###</center>

SEIU-CH 0589

**The New York Times, Steven Greenhouse, June 21, 2006**
-San Francisco Chronicle, 6/21
-BenefitsNext, 6/21

**Chicago Tribune, Stephen Franklin, June 21, 2006**

**Wall Street Journal, Kris Maher, June 20, 2006**

**Albany Times Union, Eric Anderson, June 21, 2006**

**San Antonio Express-News, Travis E. Poling, June 20, 2006**

**Houston Chronicle, Cary O'Reilly, June 21, 2006**

**Crain's Chicago Business, Mike Colias, June 20, 2006**

**Tennessean, Todd Pack, June 20, 2006**
-Dickson Herald, TN, 6/20
-Gallatin News Examiner, TN, 6/20
-Hendersonville Star News, TN, 6/20
-Ashland City Times, TN, 6/20

**Reuters, Kim Dixon, June 20, 2006**
-Los Angeles Times, 6/20
-Boston Globe, 6/21
-San Diego Union Tribune, 6/20
-Macon Daily, GA 6/20
-Reuters.uk 6/20
-The Peninsula (Qatar English Daily), 6/21
-MSNBC
-CNNMoney
-ABCNews
-Medscape
-Civilrights.org

**The Associated Press, Candice Choi, June 20, 2006**
-Houston Chronicle, 6/20
-Fort Wayne Journal Gazette, TX, 6/21
-Fort Worth Star Telegram, TX, 6/20
-Austin-American Statesman, 6/20
-Centre Daily Times, PA, 6/20
-Belleville News-Democrat, IL, 6/20
-Newsday, 6/20
-BusinessWeek, 6/20
-commericalappeal.com, 6/20
-ABC7Chicago

SEIU-CH 0590

Exhibit 13

New York Times
June 21, 2006

Suit Claims Hospitals Fixed Nurses' Pay

By STEVEN GREENHOUSE
<http://topics.nytimes.com/top/reference/timestopics/people/g/steven_gr
eenhouse/index.html?inline=nyt-per>

Nurses filed class-action lawsuits yesterday against hospitals in
Chicago, Memphis, San Antonio and Albany, asserting that the hospitals
had violated federal antitrust laws by conspiring to hold down nurses'
wages.

The lawsuits maintain that hospitals in each city agreed not to pay
their registered nurses above a certain amount and exchanged
information about how much they were paying their nurses.

Lawyers for the nurses said the hospitals had artificially depressed
wages by hundreds of millions of dollars in Chicago and Memphis and by
tens of millions of dollars in San Antonio and Albany.

"The hospitals in Albany, Chicago, Memphis and San Antonio have decided
to increase their profits on the backs of their nurses," said Daniel A.
Small, the lead lawyer for the nurses. "Nurse pay should be set by the
market, not by a secret agreement among hospitals."

The nurses' lawyers filed separate but similar lawsuits in federal
court in each of the four cities, charging separate conspiracies in
each city. The sued hospitals either said they had done nothing wrong
or said they would not comment because they had not seen the legal
papers.

"It's important for our employees and our community to know this is
completely without merit," said Echelle Lane Rutschman, a spokeswoman
for the Baptist Memorial Health Care Corporation in Memphis, one of the
two hospital chains sued in that city. "We use industry-standard, legal
practices to adjust salaries. Our salaries are market-based, and we use
many methods to determine fair, competitive, compensation packages."

Gregory McGarry, the chief spokesman for a defendant, Albany Medical
Center, said, "These allegations are completely unfounded, and we will
contest them vigorously."

Lisa Reed, a plaintiff in the Illinois lawsuit, said that low wages
were aggravating the nursing shortage.

"All of this has led to more of my nurse colleagues becoming travel
agents, consultants and real estate agents," said Ms. Reed, a nurse at
Advocate South Suburban Hospital in Hazel Crest, Ill., a Chicago
suburb.

"Nurses today are frustrated with the increasingly difficult working
conditions," she said. "When we ask for more nurses, they say it's not
in the budget."

**SEIU-CH 0592**

Speaking at a news conference in Washington, where his firm is based, Mr. Small asserted that an antitrust conspiracy had cost nurses in Memphis $14,000 each annually, in Albany $6,200 each, in Chicago $5,400 each and in San Antonio $1,300 each.

Mr. Small said his firm had conducted an investigation in which human resources officials, recruiters and others provided evidence of a wage-fixing conspiracy. He said human resources officials at hospitals in different cities had talked with each other by phone or at industry meetings to share salary information and to agree not to raise salaries to steal nurses from each other.

Mr. Small said, "We are continuing our investigation in other cities with the possibility that there will be additional cases filed."

He said his firm became involved in the case after nurses in the various hospitals became suspicious about similarities in wages.

Mr. Small said the Service Employees International Union <http://topics.nytimes.com/top/reference/timestopics/organizations/s/service_employees_international_union/index.html?inline=nyt-org> , which is trying to unionize nurses, had provided information and sources that helped his firm's investigation.

"Who pays for all this illegality and conspiracy?" asked Andrew Stern, the union's president. "We all do. Nurses pay for it in terms of short staffing and inadequate wages, and patients pay for it through decreased time with R.N.'s."

Caryn Stancik, a spokeswoman for the Metropolitan Chicago Healthcare Council, acknowledged that her group conducted periodic surveys about employee salaries at many hospitals. But she said it was an innocent exercise that helped hospitals understand the marketplace and develop compensation packages.

"We do what many other associations do," Ms. Stancik said. "We conduct salary surveys, and all of the surveyed information is gathered totally within the guidelines of the antitrust laws."

Copyright 2006 <http://www.nytimes.com/ref/membercenter/help/copyright.html>  The New York Times Company <http://www.nytco.com/>

# Wall Street Journal
## Lawsuits Allege Wide Collusion On Nurses' Pay
**By KRIS MAHER**
*June 21, 2006; Page B2*

Four lawsuits filed in federal courts in four cities allege that hospital systems colluded to keep nurses' pay artificially low despite concerns of a nursing shortage.

**SEIU-CH 0593**

The suits, which seek class-action status. allege the systems shared information on pay practices with an understanding that they wouldn't outbid one another to recruit nurses.

The lawsuits -- put together with the help of the Service Employees International Union, which represents nurses and others -- were filed yesterday in Chicago, San Antonio, Memphis, Tenn., and Albany, N.Y., against more than 17 hospitals and allege that they violated antitrust laws.

Several thousand nurses in each city could be eligible to participate if class-action status is granted, said Daniel Small, a partner at Cohen, Milstein, Hausfeld & Toll PLLC, in Washington, D.C., which brought the suits. The accusations are based on information lawyers gathered from interviews with dozens of former and current system employees, Mr. Small said. The estimated wage losses came from economists, he said.

Echelle Rutschman, a spokeswoman for Baptist Memorial Health Care Corp., a Memphis regional health-care system named in one lawsuit, said the suit is "completely without merit." She added, "We use industry-standard, legal practices to adjust salaries." Bill Van Slyke, a spokesman for Healthcare Association of New York State, which represents more than 550 nonprofit and public hospitals, called the allegations "outrageous" and added he thought the lawsuits were fueled by SEIU's organizing interests.

Median weekly cash earnings for registered nurses rose to $931 a week last year, up from $781 a week in 2000, according to the Bureau of Labor Statistics.

A union-commissioned study released in March by the Institute for Women's Policy Research found that wages for nurses employed in hospitals fell from 2003 to 2004.

According to the American Hospital Association, U.S. hospitals needed roughly 118,000 registered nurses to fill vacant positions as of December 2005.

# Nurses file suits on wages

## Hospitals collude to restrain pay, they say

**By Stephen Franklin**
Tribune staff reporter
*Published June 21, 2006*

In a legal maneuver to try to boost nurses' salaries, federal class-action lawsuits filed Tuesday accused hospitals in Chicago and three other U.S. cities of colluding to hold nurses' wages down.

As a result of the hospitals' actions, nurses allegedly suffered wage losses of about $5,000 a year in Chicago and an average of $6,000 yearly in the cities affected, said Dan Small, an attorney with the Washington law firm that filed the cases on behalf of nurses in Chicago, Memphis, San Antonio and Albany, N.Y.

Hospital officials, relying on local wage surveys, allegedly agreed informally not to compete over nurses' wages, according to Small. He said the lawsuits were based on interviews with dozens of current and former hospital officials, and could lead to similar actions in other cities.

**SEIU-CH 0594**

"Nobody said we have a formal agreement that we won't compete," he said. Rather, he said the hospitals have relied on alleged "assurances and understandings" that they would not outbid each other.

If successful, the price tag for the lawsuits could run into the "hundreds of millions of dollars" for back wages and legal fees, Small predicted

In Chicago, the lawsuit was filed on behalf of Lisa Reed, a nurse at Advocate South Suburban Hospital in Hazel Crest, and Mary McDowell, a nurse at Advocate Christ Medical Center in Oak Lawn.

The facilities targeted in the four lawsuits include both giant health-care systems and small local hospitals.

Named in the Chicago-area lawsuit were Advocate Health Care, Children's Memorial Hospital, Evanston Northwestern Healthcare, Michael Reese Hospital, Resurrection Health Care and University of Chicago Hospitals.

Several of the Chicago-area facilities named in the lawsuit rejected the charges, while others declined to comment, saying they were studying the allegations.

"We think the lawsuit is totally without merit. We have immense respect for our nurses and we pay them appropriately," the University of Chicago Hospitals said in a statement.

Officials at Children's Memorial Hospital also denied the charges, and said they were surprised to be named in the lawsuit because the hospital's nursing vacancy and turnover rates are among the lowest of the nation's children's hospitals.

They said the nursing turnover rate last year at Children's was 1.5 percent, compared with 6.5 percent for similar hospitals across the U.S.

The lawsuit claims that Chicago-area hospital officials, in direct conversations or at professional meetings, have consulted about the wages paid to nurses. The result, according to the lawsuit, is that nurses' salaries have been "restrained" and kept within a "narrow band."

"These lawsuits reveal that there are certain ways nurses are not valued in our country, and we say that has to stop," said Andy Stern, president of the Service Employees International Union, which represents about 84,000 nurses in the U.S.

One of at least four unions competing for nurses' loyalty across the U.S., the SEIU has been embroiled in several organizing battles, including a lengthy one at Advocate Health Care. Among the local hospitals named in the lawsuit, only the University of Chicago Hospitals has unionized nurses, SEIU officials believe, though they belong to the Illinois Nurses Association, not the SEIU.

The union did not take part in the legal action, an SEIU official explained, because they are class actions filed only on behalf of the individual nurses whose pay was affected.

The SEIU financed a study released in March by the Institute for Women's Policy Research that examined wage problems facing nurses, and Small said his law firm used the findings to conduct its own research.

Heidi Hartman, head of the Institute for Women's Policy Research, said her group's study led to the conclusion that "something seems to be holding nurses' wages down."

One reason for this, she suggested, could be collusion by health-care officials. Another, she added, could be "the tradition of paying lower wages for women." As she pointed out, more than

SEIU-CH 0595

nine out of 10 of the nation's nurses are women.

But the lawsuits contend that it was not tradition, but rather calculated decision-making by hospital officials that led them to swap information about wages in order to plan their budgets.

The lawsuit said "informal discussions" about nurses' salaries have come up among Chicago-area nursing recruiters at meetings sponsored by the Human Resources Management Association of Chicago.

In response to the lawsuit, the association, which represents 140 Chicago-area hospitals and health-care organizations, said it has been conducting salary surveys for the last 30 years that comply with the government's antitrust guidelines.

In the early 1990s the Justice Department reached an agreement with several Utah hospitals over alleged collusion over nurses' wages and set guidelines on sharing information about wages, Small said.

----------

sfranklin@tribune.com

# Lawsuit alleges hospitals conspired to suppress nurses' wages

By CANDICE CHOI
Associated Press Writer

June 20, 2006, 8:33 PM EDT

ALBANY, N.Y. -- Class-action lawsuits filed Tuesday accused hospitals in four states of secretly exchanging payroll information to keep nurses' wages low.

The suits, filed by a Washington, D.C., law firm on behalf of individual nurses in Albany, Chicago, San Antonio and Memphis, Tenn., claim human resource employees at several hospitals in each state telephoned each other over at least the past four years to trade detailed information on wages.

"There was a regular, systemic exchange of wage information through human resource employees, trade associations and other means," said Daniel Small, a lawyer representing the nurses.

Preliminary estimates by the firm claim nurses in the Albany area were underpaid by about $6,000 a year. Nurses in Chicago lost $5,000 a year, while nurses in San Antonio lost $1,300 a year and those in Memphis, Tenn. lost $14,000 a year, according to the firm.

The suit seeks compensation for lost wages and damages.

Named in the suit filed in U.S. District Court in Albany are Albany Medical Center, St. Peter's Hospital in Albany, Ellis Hospital in Schenectady, Northeast Health, Ascension Health and Catholic Health East in Albany.

Together, the institutions employ about three-quarters of the approximately 3,600 full-time registered nurses working in the area.

Greg McGarry, spokesman for Albany Medical Center, said the allegations were "completely unfounded" and that the hospital planned to fight the charges.

The hospitals named in the Chicago suit are Advocate Health Care, Children's Memorial Hospital, Evanston Northwestern Healthcare, Michael Reese Hospital, Resurrection Health Care and University of Chicago Hospitals.

SEIU-CH 0596

In Memphis, Baptist Memorial Hospital and Methodist Healthcare are named in the suit.

Echelle Rutschman, a spokeswoman for Baptist Memorial Health Care Corp., told the Wall Street Journal the suit is "completely without merit."

Hospital Corporation of America, Vanguard Health System, Inc. and Christus Santa Rosa Health Care were named in the San Antonio suit.

"Nurse wages are an issue across the country, and a symptom of what's driving nurses from the bedside," said Cynthia Singer-Glasson, president of the Nurse Alliance of the Service Employees International Union. "It's not a healthy situation for patients."

The group represents 84,000 nurses in 23 states.

Copyright 2006 Newsday Inc.
http://chicagobusiness.com/cgi-bin/news.pl?rssFeed=news&id=21048
Crain's Chicago Business
June 21, 2006

# Area hospitals tried to fix nurses' wages, suit says

(Crain's) - Attorneys for registered nurses in Chicago sued several area hospital systems Tuesday, charging they shared information about wages in a conspiracy to suppress nurses' pay.

The lawsuit, filed Tuesday in U.S. District Court in Chicago, seeks class action status and names <u>Advocate Health Care,</u> Resurrection Health Care, Evanston Northwestern Healthcare, University of Chicago Hospitals, Children's Memorial Hospital and Michael Reese Hospital.

Plaintiffs' attorneys say the complaint stems from investigative work by the Service Employees International Union (SEIU), which has been trying for years to organize workers at Oak Brook-based Advocate, the Chicago area's largest health system. Attorneys at Washington, D.C.-based Cohen, Milstein, Hausfeld & Toll, which filed the complaint, say the law firm is footing the legal bills but that SEIU laid the groundwork for the complaint.

Similar federal complaints were filed Tuesday against a total of at least a dozen other large health systems in Memphis, San Antonio and Albany, NY.

SEIU officials during a conference call with reporters said the lawsuits are unrelated to organizing efforts at any of the hospitals. University of Chicago Hospitals is the only defendant hospital in Chicago that has unionized nurses.

Plaintiffs allege the hospitals violated federal antitrust laws by sharing wage information in an effort to fix wages and avoid having to boost salaries to recruit hard-to-find

SEIU-CH 0597

registered nurses. They claim the alleged collusion has exacerbated the area's nursing shortage, because the facilities aren't paying enough to keep nurses in the profession.

A spokesman for Children's Memorial says the Lincoln Park hospital "is in full compliance with all federal laws pertaining to establishing wages." Other Chicago hospitals named in the suit could not be reached or wouldn't comment because they hadn't seen the complaint.

The plaintiffs want to be paid unspecified damages, plus interest and attorneys' fees. The alleged collusion curbed pay for Chicago-area registered nurses by an average of $5,000 a year, according to Daniel Small, a plaintiffs' attorney. He said the average RN salary in the Chicago market is $49,000.

Small said human resource workers, recruiters and other employees at the hospitals for years have exchanged wage information over the phone or at trade conferences and used the information to come to "an understanding" not to compete with each other on nurses' wages. He said the findings came from interviews with dozens of former and current employees in each city.

Plaintiffs in the Chicago suit are Lisa Reed, a registered nurse at Advocate South Suburban Hospital, and Mary McDowell. who worked as an RN at Advocate Christ Medical Center for 13 years until last year.

The suit seeks class action status, which would allow any RN who has worked for any of the defendant hospitals named in the complaint since June 20, 2002, to join suit.

In March, the SEIU organized 84,000 nurses nationally to create the Nurse Alliance of the SEIU, which advocates better pay and working conditions for registered nurses to help alleviate a national nursing shortage that leaders say threatens patient safety.

## Modern Health Care
## Nurses sue hospitals, allege antitrust violations

Story posted June 20, 2006 05:00 PM EDT

Class-action lawsuits have been filed against hospitals in Chicago, Memphis, Tenn., Albany, N.Y., and San Antonio alleging that the hospitals conspired to depress nurses' wages. The lawsuits claim that the hospitals deliberately and systematically exchanged nonpublic information about the wages each was paying its nurses through phone calls and written surveys. "They were using this information not to compete, but to match wages at artificially low levels," said Daniel Small, a partner with Cohen, Milstein, Hausfeld & Toll, who is representing plaintiffs in the four cities. He alleged during a teleconference that nurses in each of these cities have collectively been underpaid millions of dollars by the hospitals. The lawsuits were filed after counsel for the plaintiffs reviewed an investigation by the Service Employees International Union and determined

SEIU-CH 0598

that these types of activities constituted a violation of federal antitrust laws. When asked if the SEIU was trying to leverage the lawsuit to get these hospitals to agree to unionize their registered nurses, Small replied, "This is really about getting nurses back to the bedside." The American Hospital Association was unable to be reached for comment at deadline. To see the class-action complaints, go to: cmht.com/cases_nursewages.php. -- *by Jennifer Lubell*

http://www.modernhealthcare.com/news.cms?newsId=5286&potId=BN

The Business Review (Albany) - June 20, 2006
http://albany.bizjournals.com/albany/stories/2006/06/19/daily17.html

**BUSINESS PULSE SURVEY:**
Will property tax proposals leave out businesses?

# Area hospitals sued over nurse pay conspiracy allegations

The Business Review (Albany) - 2:09 PM EDT Tuesday

A Washington, D.C., law firm has filed a class action lawsuit against hospital systems in the Albany, N.Y., market, claiming they conspired to keep nurses' wages at artificially low levels.

The lawsuit, which was duplicated in Chicago, Memphis, Tenn., and San Antonio, names Albany Medical Center, St. Peter's Hospital in Albany, Ellis Hospital in Schenectady, Northeast Health and Seton Health Inc. Northeast is parent to Albany Memorial Hospital and Samaritan Hospital in Troy, N.Y. Seton is parent to St. Mary's Hospital in Troy. These institutions employ about three-quarters of the registered nurses working at area hospitals.

The lead plaintiff in the case is Marjory Unger, a registered nurse at Albany Medical Center.

The suit, filed in U.S. District Court in Albany by the law firm of Cohen Milstein Hausfeld & Toll P.L.L.C., invokes federal antitrust laws. It claims the hospitals have, for about four years, secretly exchanged detailed, non-public information about the wages each was paying its nurses, allowing the hospitals as a group to suppress nurse pay.

"Nurse pay should be set by the market, not by a secret agreement among hospitals," said Daniel A. Small, a partner at Cohen Milstein.

Small estimated that based on preliminary estimates, nurses in the Albany area have been underpaid by about $6,000 per year. The suit is requesting a jury trial, with the goal of forcing the hospitals to pay the nurses' lost compensation.

SEIU-CH 0599

This is a printer friendly version of an article from the **The Tennessean**. To print this article open the file menu and choose Print.

< < Back

# Nurses union pushes lawsuits against HCA, other hospital chains
## 4 suits allege HCA, others conspire to keep salaries low

By TODD PACK
Staff Writer

Published: Tuesday, 06/20/06

A union embroiled in contract talks with HCA Inc. in California has helped a nurse sue an affiliate of the company in Te: grounds that it conspired with other hospital owners to keep wages down.

In one of four similar lawsuits filed Tuesday against hospital systems nationwide, the nurse accuses the company's San / affiliate of sharing salary information with Vanguard Health Systems and Christus Santa Rosa Health Care Corp., both o operate in the San Antonio market.

HCA, the nation's largest for-profit hospital chain, and Vanguard are based in Nashville. Company officials didn't imme return calls or comment on the potential class-action lawsuit.

Nurses represented by the same Washington, D.C., law firm brought similar actions against hospital systems in Memphi: and Albany, N.Y.

Daniel Small, an attorney with the firm, Cohen. Milstein, Hausfeld & Toll, said the hospitals "have decided to increase tl on the backs of their nurses."

"We all know that health care costs are on the rise," he said, but wages should be set "by the market, not by a secret agre among hospitals."

In a conference call, he said the Service Employees International Union had provided much of the research that led to the

Last month, the SEIU clashed with HCA over whether union members could criticize the company at its annual meeting Nashville.

Union leaders said about 10 members flew to Nashville to attend the annual meeting, but soon after arriving, they learned arbitrator had ruled they wouldn't be allowed to discuss their concerns about the company outside the state of California.

The SEIU accused the company of obtaining a gag order against its members. HCA disputed the union's version of even union had previously agreed "to keep local issues local."

Published: Tuesday, 06/20/06

**SEIU-CH 0600**

**Print this article**                                                                        Close This Window

## Hospitals sued in class action over nurse pay

Tue Jun 20, 2006 8:01 PM BST

By Kim Dixon

CHICAGO (Reuters) - Nurses backed by the biggest U.S. health-care union on Tuesday filed four class-action lawsuits against some of the biggest U.S. hospitals, including No. 1 chain HCA Inc., claiming they conspired to depress wages for nurses amid a national shortage.

The lawsuits, which also target the biggest U.S. Catholic hospital system, Ascension Health, charge that the hospitals regularly discussed nurses' wages in meetings, over the telephone and in written surveys, in an effort to coordinate and suppress pay.

The suits, filed in federal courts in Chicago; Memphis, Tennessee; Albany, New York; and San Antonio, Texas, seek back compensation and legal costs totaling "hundreds of millions of dollars" under federal antitrust laws.

"We have HR (human resources) employees calling their counterparts at competitor hospitals, asking for and receiving detailed and current information about the wages these hospitals are paying their nurses," said Daniel Small, a partner at the law firm representing the plaintiffs, which is seeking class-action status.

"The hospitals have reached an understanding that they will use this information not to compete," Small said.

Information from the Service Employees International Union, which organizes nurses and other health-care workers, led to the investigations and the lawsuits.

Lawyers for the plaintiffs interviewed dozens of current and former hospital employees in each market, including some at the executive level, in preparing the suits that were filed against about 20 unionized and non-unionized hospital systems in the four cities.

Spokesmen for the American Hospital Association, which represents most U.S. hospitals, were not immediately available for comment.

A spokesman for Nashville, Tennessee-based HCA, which runs 180 hospitals and was named in the Texas lawsuit, was not immediately available for comment.

Other major hospital systems named in the suits include Catholic Health East, university-affiliated University of Chicago hospitals and Evanston Northwestern Healthcare, and privately held Vanguard Health Systems.

Demand for full-time registered nurses exceeds supply by nearly 170,000 nurses this year, according to the American Hospital Association. That shortfall is expected to widen to more than 1 million by 2020, the trade group estimates.

Wage increases for nurses have been insignificant during the decade-long shortage, experts said. Wages stagnated in 2003 and then fell 6.4 percent in 2004, leading to a decline in nurses working at hospitals, according to the Institute for Women's Policy Research.

Experts disagree on how to resolve the nursing shortage. Some say higher wages are the key, while others note that heavy workloads, lack of respect, and understaffed hospital environments make the career unattractive.

SEIU-CH 0601

© Reuters 2006. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

Close This Window

# Registered nurses hit three San Antonio hospitals with lawsuit

*Web Posted: 06/20/2006 03:04 PM CDT*

**Travis E. Poling**
**Express-News Business Writer**

Three San Antonio hospital systems were hit with a class-action lawsuit today in federal court alleging that they conspired to keep wages down for registered nurses.

Baptist Health System, Methodist Healthcare System and Christus Santa Rosa Health Care Corp. were named as defendants in a suit filed on behalf of a San Antonio RN and other nurses.

The lawsuit is one of four filed Tuesday by Washington, D.C., firm Cohen, Milstein, Hausfeld & Toll. The others were against hospital systems in Chicago; Memphis, Tenn.; and Albany, N.Y.

Beginning before June 2002, the suit alleges, the hospital companies regularly exchanged data on RN compensation, agreed not compete on wages and paid nearly the same rates within $1 an hour of each other.

Spokeswomen for Baptist and parent company Vanguard Health Systems said they were unaware of the lawsuit.

Methodist spokeswoman Palmira Arellano said executives from the competing hospital systems have discussed how to deal with the nursing shortage by doing things like creating scholarships for prospective nurses, but "we don't lay out on the table our compensation schedules."

A Christus Santa Rosa spokesperson could not be reached immediately for comment.

According to the plaintiffs' law firm, wages were depressed an estimated $1,300 a year in San Antonio, $6,000 a year in Albany, $5,000 in Chicago and $14,000 in Memphis.

Plaintiff lawyer Daniel Small said the hospital executives and human resources personnel were engaged in anti-trust activity by sharing information. The two counts in the lawsuit include conspiracy to depress wages and conspiracy to exchange compensation information, both of which are in violation of the Sherman Antitrust Act.

"The hospitals in Albany, Chicago, Memphis and San Antonio have decided to increase their profits on the backs of their nurses," Small said. "We all know that health-care costs are on the rise, but denying a fair wage to the very people with front line responsibility for patient care is not

SEIU-CH 0602

the way to contain these costs. Nurse pay should be set by the market, not by a secret agreement among hospitals."

tpoling@express-news.net

Online at:
http://www.mysanantonio.com/news/metro/stories/MYSA062006.hospitalsuit.en.a5ea0cce.html

# Nurses sue hospitals in four cities

NEW YORK, June 21 (UPI) -- Hospitals in four U.S. cities are being sued by nurses whose class-action lawsuits accuse the facilities' leaders of conspiring to suppress wages.

Lawyers for the nurses say hospitals in Chicago, Memphis, San Antonio and Albany, N.Y., conspired to depress wages by hundreds of millions of dollars, The New York Times reported Wednesday. The lawyers also filed separate but similar lawsuits in federal court in each of the four cities.

The Service Employees International Union, which is trying to unionize nurses, gave critical information and sources to the plaintiffs' lawyers as they prepared for the litigation.

Daily Labor Report
June 21, 2006

# Class Action Suits Allege Conspiracy By Hospitals to Depress Nurse Wages

Tony Perriello

Nurses in four major cities June 20 filed proposed class action lawsuits against several major hospitals and chains, alleging that the hospitals within each city conspired to exchange compensation information and depress their wages in violation of the Sherman Antitrust Act (*Unger v. Albany Med. Ctr.,* N.D.N.Y., docket number unavailable, *complaint filed* 6/20/06; *Clarke v. Baptist Mem. Healthcare Corp.,* W.D. Tenn., docket number unavailable, *complaint filed* 6/20/06; *Reed v. Advocate Health Care,* N.D. Ill., No. 06C 3337, *complaint filed* 6/20/06; *Maderazo v. Vanguard Health Sys.,* W.D. Tex., No. SA06CA0535G, *complaint filed* 6/20/06).
The lawsuits were filed in federal district court against between five and seven hospitals and national health care corporations in each of four cities--Albany, N.Y., Memphis, Tenn., Chicago, and San Antonio. The classes consist of all registered nurses employed

SEIU-CH 0603

by the alleged co-conspirators from June 20, 2002, until the present. The lawsuits seek back compensation and legal costs. The lawsuits were announced at a June 20 press conference by Washington, D.C., law firm Cohen, Milstein, Hausfeld and Toll, which is representing the plaintiffs. Joining Daniel A. Small, a partner at the firm, at the press conference were Andrew L. Stern, president of Service Employees International Union, Cathy Singer, president of the Nurse Alliance of SEIU, and Susan Scanlan of the National Council of Women's Organizations.
Representatives of the American Hospital Association and defendant hospitals were not immediately available for comment.

### Allegations Charge Information Sharing

The complaints charge that conspiring hospitals within each city agreed to exchange, and regularly exchanged, detailed and non-public information about the wage rates each is paying or will pay to its registered nurses, and that there was agreement and understanding among the hospitals that the information was being shared for the purpose of keeping nurse wages contained.
According to Small, the cases do not overlap, and the evidence showing the conspiracy among hospitals in one city is separate and different from the evidence proving conspiracy in other cities.
The methods used to implement the alleged conspiracy were similar, however. The complaints allege that the information was transferred through meetings at trade shows, telephone conversations among the hospitals' human resources staffs, and written or oral surveys about wages, the results of which were circulated among the hospitals.
Small said that he worked with an economist who had public data about the markets in the cities where the hospitals are located, and that the economist did a rough cut estimate of damages. He said that the data compares wages in cities where lawsuits have been filed with wages in other cities, where they saw no indication of conspiracy.
According to Small's preliminary estimates, nurses in Albany have been underpaid on average by approximately $6,000 annually; by approximately $5,000 annually in Chicago; by approximately $1,300 annually in San Antonio, and by approximately $14,000 annually in Memphis.
"A conspiracy is not a legitimate cost-saving initiative," Small said. "This is an example of large health care systems taking extreme advantage of a vulnerable but critical component of the American health care system."

### Union Investigation Sparked Lawsuit

SEIU-CH 0604

Research funded by Nurse Alliance, which organizes health care workers, and conducted by the Institute for Women's Policy Research into the shortage of nurses and the issue of low wages, was partly the genesis for the lawsuits. Nurse Alliance reports membership of 84,000 nurses in 23 states.

"Nurses are the central nervous system of health care," Singer told reporters. "We provide the day-to-day care that is so important to helping people get well."

"But I have seen so many nurses leave the profession they love because of working conditions that make it harder to give our patients the care they deserve. Now we find out through these lawsuits that while nurses were fighting for our patients, some hospitals may have been working illegally to hold down our wages.""

Evidence of the alleged conspiracies was obtained, Small said, through scores of interviews with current and former hospital employees and executives with direct knowledge of the conspiracies.

According to the American Hospital Association, demand for full-time registered nurses exceeds supply by nearly 170,000 this year, and the shortage is expected to increase.

But according to SEIU's Stern, the problem is not that there are not enough nurses to go around.

"We don't have a nursing shortage in this county," Stern said. "We have a shortage of nurses willing to work in our country's hospitals. We need a system that values care and values nurses."

The conspiracy issue is neither new nor confined to the cities mentioned in these lawsuits. In 1994, the Justice Department reached a settlement with a group of hospitals in Utah that included an agreement by the hospitals not to exchange information.

Reacting to the news about the lawsuits, Marcia D. Greenberger, co-president of the National Women's Law Center, said in a statement that nurses, as a vital part of our health care networks, should be paid adequately and fairly.

"Failing to pay nurses fairly does a disservice to the hardworking nurses, both women [and] men, and to the nation's patients whose quality of care suffers when hospitals have insufficient staffing levels," Greenberger said. "Patients also are deprived of the best and the brightest because many nurses have to face the choice of leaving the field or compromising their financial security."

Small said that investigations into possible conspiracies among hospitals in other cities are currently under way.

*Text of one of the complaints, which is substantially similar to all of the others, appears in Section E.*

SEIU-CH 0605

FOR IMMEDIATE RELEASE
June 20, 2006

Contacts:
Stephanie Mueller, 202-730-7842
Jennifer Coate, 510-517-1434

# Major Class Action Lawsuits Filed in Four Cities Allege Hospitals Colluded To Hold Down Nurse Wages

## To Ensure Nurses are Valued and Rewarded On the Job, Nurse Alliance of SEIU Helped Expose Pay Issues Leading to Suits

**WASHINGTON, DC** – Major class action lawsuits were filed today against national hospital corporations in four cities – Chicago, Memphis, San Antonio, and Albany, N.Y – alleging that they have colluded illegally to hold down nurse wages.

The Service Employees International Union (SEIU) was invited to join with the Washington, D.C. law firm of Cohen, Milstein, Hausfeld & Toll, PLLC in announcing the suits because of the work the Nurse Alliance of SEIU did to help expose the wage issues that led to today's filings.

"Nurses are the central nervous system of health care. We provide the day-to-day care that is so important to helping people get well," said Cathy Singer-Glasson, RN, President of the Nurse Alliance of SEIU. "But I have seen so many nurses leave the profession they love because of working conditions that make it harder to give our patients the care they deserve. Now we find out through these lawsuits that while nurses were fighting for our patients, some hospitals may have been working illegally to hold down our wages."

The Nurse Alliance, which has more than 84,000 nurse members in 23 states, is seeking to work with hospitals to improve inadequate nurse wages and difficult working conditions that have driven RNs from the beside and led to a shortage of nurses who are willing to work in hospitals. In 2004, more than 500,000 nurses chose to work outside of the nursing profession, despite an anticipated need of more than one million nurses by 2014.

"With the health care industry making more than $26 billion in profits in 2004, we can do better," said Andy Stern, SEIU International President. "The people who pay for the illegal practices laid out in these lawsuits are nurses and patients – nurses through short staffing and inadequate wages, and patients through decreased time with RNs and a greater risk of complications.

**SEIU-CH 0606**

"If we are going to solve the health care crisis in this country, illegal activity like this has to stop, and all of us have to work together to find solutions," he said.

The Nurse Alliance of SEIU unveiled a new white paper in March, *Solving the Nursing Shortage through Higher Wages*, from the Institute for Women's Policy Research, citing low pay, short staffing, and mandatory overtime as conditions that have caused nurses to leave the bedside. The report showed how raising nurse salaries will help draw more nurses back to the profession. That research, combined with work that the Nurse Alliance's Value Care, Value Nurses initiative has done to publicize the issue with nurses, helped expose the problems brought to light by the lawsuits. More information, including a copy of the IWPR report, is available online at www.ValueCareValueNurses.org.

With more than 84,000 nurses in 23 states, the Nurse Alliance is one of the largest nursing organizations in the country. Through its Value Care, Value Nurses initiative, nurses are uniting across the country to pursue any and all solutions to bring nurses back to the bedside and raise the standard of care – from enforcement of existing laws, to calling for new legislation protecting nurses and patients, to giving nurses a voice in the delivery of patient care.

# # #

*www.NurseAlliance.org*

http://www.nytimes.com/2006/06/21/us/21nurses.html?_r=1&oref=slogin

The New York Times

June 21, 2006

# Suit Claims Hospitals Fixed Nurses' Pay

STEVEN GREENHOUSE

Nurses filed class-action lawsuits yesterday against hospitals in Chicago, Memphis, San Antonio and Albany, asserting that the hospitals had violated federal antitrust laws by conspiring to hold down nurses' wages.

The lawsuits maintain that hospitals in each city agreed not to pay their registered nurses above a certain amount and exchanged information about how much they were paying their nurses.

Lawyers for the nurses said the hospitals had artificially depressed wages by hundreds of millions of dollars in Chicago and Memphis and by tens of millions of dollars in San Antonio and Albany.

"The hospitals in Albany, Chicago, Memphis and San Antonio have decided to increase their profits on the backs of their nurses." said Daniel A. Small, the lead lawyer for the nurses. "Nurse pay should be set by the market, not by a secret agreement among hospitals."

The nurses' lawyers filed separate but similar lawsuits in federal court in each of the four cities, charging separate conspiracies in each city. The sued hospitals either said they had done nothing wrong or said they would not comment because they had not seen the legal papers.

"It's important for our employees and our community to know this is completely without merit," said Echelle Lane Rutschman, a spokeswoman for the Baptist Memorial Health Care Corporation in Memphis, one of the two hospital chains sued in that city. "We use industry-standard, legal practices to adjust salaries. Our salaries are market-based, and we use many methods to determine fair, competitive, compensation packages."

Gregory McGarry, the chief spokesman for a defendant, Albany Medical Center, said, "These allegations are completely unfounded, and we will contest them vigorously."

SEIU-CH 0608

Lisa Reed, a plaintiff in the Illinois lawsuit, said that low wages were aggravating the nursing shortage.

"All of this has led to more of my nurse colleagues becoming travel agents, consultants and real estate agents," said Ms. Reed, a nurse at Advocate South Suburban Hospital in Hazel Crest, Ill., a Chicago suburb.

"Nurses today are frustrated with the increasingly difficult working conditions," she said. "When we ask for more nurses, they say it's not in the budget."

Speaking at a news conference in Washington, where his firm is based, Mr. Small asserted that an antitrust conspiracy had cost nurses in Memphis $14,000 each annually, in Albany $6,200 each, in Chicago $5,400 each and in San Antonio $1,300 each.

Mr. Small said his firm had conducted an investigation in which human resources officials, recruiters and others provided evidence of a wage-fixing conspiracy. He said human resources officials at hospitals in different cities had talked with each other by phone or at industry meetings to share salary information and to agree not to raise salaries to steal nurses from each other.

Mr. Small said, "We are continuing our investigation in other cities with the possibility that there will be additional cases filed."

He said his firm became involved in the case after nurses in the various hospitals became suspicious about similarities in wages.

Mr. Small said the Service Employees International Union, which is trying to unionize nurses, had provided information and sources that helped his firm's investigation.

"Who pays for all this illegality and conspiracy?" asked Andrew Stern, the union's president. "We all do. Nurses pay for it in terms of short staffing and inadequate wages, and patients pay for it through decreased time with R.N.'s."

Caryn Stancik, a spokeswoman for the Metropolitan Chicago Healthcare Council, acknowledged that her group conducted periodic surveys about employee salaries at many hospitals. But she said it was an innocent exercise that helped hospitals understand the marketplace and develop compensation packages.

SEIU-CH 0609

"We do what many other associations do." Ms. Stancik said. "We conduct salary surveys, and all of the surveyed information is gathered totally within the guidelines of the antitrust laws."

<u>Table of Contents</u>

SEIU-CH 0610

The Wall Street Journal
June 21, 2006

# Lawsuits Allege Wide Collusion On Nurses' Pay

KRIS MAHER

Four lawsuits filed in federal courts in four cities allege that hospital systems colluded to keep nurses' pay artificially low despite concerns of a nursing shortage.

The suits, which seek class-action status, allege the systems shared information on pay practices with an understanding that they wouldn't outbid one another to recruit nurses.

The lawsuits -- put together with the help of the Service Employees International Union, which represents nurses and others -- were filed yesterday in Chicago, San Antonio, Memphis, Tenn., and Albany, N.Y., against more than 17 hospitals and allege that they violated antitrust laws.

Several thousand nurses in each city could be eligible to participate if class-action status is granted, said Daniel Small, a partner at Cohen, Milstein, Hausfeld & Toll PLLC, in Washington, D.C., which brought the suits. The accusations are based on information lawyers gathered from interviews with dozens of former and current system employees, Mr. Small said. The estimated wage losses came from economists, he said.

Echelle Rutschman, a spokeswoman for Baptist Memorial Health Care Corp., a Memphis regional health-care system named in one lawsuit, said the suit is "completely without merit." She added, "We use industry-standard, legal practices to adjust salaries." Bill Van Slyke, a spokesman for Healthcare Association of New York State, which represents more than 550 nonprofit and public hospitals, called the allegations "outrageous" and added he thought the lawsuits were fueled by SEIU's organizing interests.

Median weekly cash earnings for registered nurses rose to $931 a week last year, up from $781 a week in 2000, according to the Bureau of Labor Statistics.

A union-commissioned study released in March by the Institute for Women's Policy Research found that wages for nurses employed in hospitals fell from 2003 to 2004.

According to the American Hospital Association, U.S. hospitals needed roughly 118,000 registered nurses to fill vacant positions as of December 2005.

Table of Contents

http://www.chicagotribune.com/business/chi-0606210164jun21,1,6424524.story?track=rss
Chicago Tribune
June 21, 2006

# Nurses file suits on wages
## Hospitals collude to restrain pay, they say

Stephen Franklin

In a legal maneuver to try to boost nurses' salaries, federal class-action lawsuits filed Tuesday accused hospitals in Chicago and three other U.S. cities of colluding to hold nurses' wages down.

As a result of the hospitals' actions, nurses allegedly suffered wage losses of about $5,000 a year in Chicago and an average of $6,000 yearly in the cities affected, said Dan Small, an attorney with the Washington law firm that filed the cases on behalf of nurses in Chicago, Memphis, San Antonio and Albany, N.Y.

Hospital officials, relying on local wage surveys, allegedly agreed informally not to compete over nurses' wages, according to Small. He said the lawsuits were based on interviews with dozens of current and former hospital officials, and could lead to similar actions in other cities.

"Nobody said we have a formal agreement that we won't compete," he said. Rather, he said the hospitals have relied on alleged "assurances and understandings" that they would not outbid each other.

If successful, the price tag for the lawsuits could run into the "hundreds of millions of dollars" for back wages and legal fees, Small predicted

In Chicago, the lawsuit was filed on behalf of Lisa Reed, a nurse at Advocate South Suburban Hospital in Hazel Crest, and Mary McDowell, a nurse at Advocate Christ Medical Center in Oak Lawn.

The facilities targeted in the four lawsuits include both giant health-care systems and small local hospitals.

Named in the Chicago-area lawsuit were Advocate Health Care, Children's Memorial Hospital, Evanston Northwestern Healthcare, Michael Reese Hospital, Resurrection Health Care and University of Chicago Hospitals.

Several of the Chicago-area facilities named in the lawsuit rejected the charges, while others declined to comment, saying they were studying the allegations.

"We think the lawsuit is totally without merit. We have immense respect for our nurses and we pay them appropriately," the University of Chicago Hospitals said in a statement.

SEIU-CH 0612

Officials at Children's Memorial Hospital also denied the charges, and said they were surprised to be named in the lawsuit because the hospital's nursing vacancy and turnover rates are among the lowest of the nation's children's hospitals.

They said the nursing turnover rate last year at Children's was 1.5 percent, compared with 6.5 percent for similar hospitals across the U.S.

The lawsuit claims that Chicago-area hospital officials, in direct conversations or at professional meetings, have consulted about the wages paid to nurses. The result, according to the lawsuit, is that nurses' salaries have been "restrained" and kept within a "narrow band."

"These lawsuits reveal that there are certain ways nurses are not valued in our country, and we say that has to stop," said Andy Stern, president of the Service Employees International Union, which represents about 84,000 nurses in the U.S.

One of at least four unions competing for nurses' loyalty across the U.S., the SEIU has been embroiled in several organizing battles, including a lengthy one at Advocate Health Care. Among the local hospitals named in the lawsuit, only the University of Chicago Hospitals has unionized nurses, SEIU officials believe, though they belong to the Illinois Nurses Association, not the SEIU.

The union did not take part in the legal action, an SEIU official explained, because they are class actions filed only on behalf of the individual nurses whose pay was affected.

The SEIU financed a study released in March by the Institute for Women's Policy Research that examined wage problems facing nurses, and Small said his law firm used the findings to conduct its own research.

Heidi Hartman, head of the Institute for Women's Policy Research, said her group's study led to the conclusion that "something seems to be holding nurses' wages down."

One reason for this, she suggested, could be collusion by health-care officials. Another, she added, could be "the tradition of paying lower wages for women." As she pointed out, more than nine out of 10 of the nation's nurses are women.

But the lawsuits contend that it was not tradition, but rather calculated decision-making by hospital officials that led them to swap information about wages in order to plan their budgets.

The lawsuit said "informal discussions" about nurses' salaries have come up among Chicago-area nursing recruiters at meetings sponsored by the Human Resources Management Association of Chicago.

In response to the lawsuit, the association, which represents 140 Chicago-area hospitals

SEIU-CH 0613

and health-care organizations, said it has been conducting salary surveys for the last 30 years that comply with the government's antitrust guidelines.

In the early 1990s the Justice Department reached an agreement with several Utah hospitals over alleged collusion over nurses' wages and set guidelines on sharing information about wages, Small said.

Table of Contents

SEIU-CH 0614

http://www.mysanantonio.com/business/stories/MYSA062106.1E.BIZnurses.lawsuit.e57
5e5.html
 San Antonio Express-News
June 21, 2006

# 3 local hospitals sued over RN pay

Travis E. Poling

Three San Antonio hospital systems were hit with a class-action claim Tuesday in federal court alleging that they conspired to keep wages down for registered nurses.

Baptist Health System, Methodist Healthcare System and Christus Santa Rosa Health Care Corp. were named as defendants in a lawsuit filed on behalf of a San Antonio RN and other nurses. All three denied the claims, and one executive called the allegations "unthinkable."

The lawsuit is one of four filed Tuesday by Washington firm Cohen, Milstein, Hausfeld & Toll. The others were against hospital systems in Chicago; Memphis, Tenn.; and Albany, N.Y.

According to the plaintiffs' law firm, wages were depressed an estimated $1,300 a year in San Antonio, $6,000 a year in Albany, $5,000 in Chicago, and $14,000 in Memphis.

The U.S. Bureau of Labor Statistics reports the mean hourly wage of registered nurses in San Antonio in 2005 was $25.28.

A lawyer for the nurses said they are seeking about $52 million for four years of back wages. If a jury finds in favor of a federal antitrust claim, lawyers and RNs in San Antonio would collect triple damages of as much as $156 million.

Beginning sometime before June 2002, the suit alleges, the hospital companies regularly exchanged data on RN compensation, agreed not to compete on wages, and paid nearly the same rates — within $1 an hour of each other.

Andy Stern, president of the Service Employees International Union, said the lawsuits are based on interviews with former and current hospital executives and nurses and that more lawsuits will follow in other cities.

"If the market is supposed to work through supply and demand, and the supply is low, the demand is high, but the wages are flat, then something is wrong," Stern said.

Marissa Maderazo, who has been an RN at Methodist Children's Hospital, is listed as the plaintiff. Other RNs can join the suit if a judge certifies it as a class action. It could take as long as a year before a decision on certification is made.

SEIU-CH 0615

Reached at home, Maderazo said her lawyers had instructed her not to talk to anyone who called about the lawsuit.

Baptist Health said it's confident the suit is without merit.

"Plaintiffs and their attorneys have had months to draft this complaint; for BHS to respond to the specifics of this is inappropriate," Baptist and its Nashville-based parent, Vanguard Health Systems, said in a written statement.

"Ultimately, BHS believes that this suit is part of a multi-city public relations ploy by a Washington, D.C.-based labor union attempting to unionize nurses and other service workers in San Antonio and elsewhere," the company said.

In May, the national Service Employees International Union organized a rally in San Antonio to discuss the nursing shortage and protest working conditions and nurse-to-patient ratios.

Nurses' lawyer Daniel Small said the union is interested in the issues addressed by the lawsuits but is not directly involved.

Methodist CEO John Hornbeak called the legal action "an unfortunate attempt to discredit the major health care systems in San Antonio — the hospitals who constitute the largest economic generator in the city and the same hospitals who provide millions of dollars in charity care for the least-served in the community. The allegations are unthinkable."

Hornbeak said Methodist treats employees fairly when it comes to wages and benefits.

"Our pay scale for our nurses takes into account a wide range of information, including state and regional data; the ultimate total pay of a staff nurse is comprised of much more than a base salary," he said.

A statement from Christus Santa Rosa said it reviews compensation periodically and makes adjustments to "maintain competitive wage rates for all employees, including registered nurses."

"Our 137-year health care ministry to the San Antonio community is enhanced by the organization's ability to recruit and retain qualified caregivers by paying competitive wages and providing comprehensive employment benefits," Christus said.

Plaintiff lawyer Small said in a statement that the hospital executives and human resources personnel were engaged in antitrust activity by sharing information.

The two counts in the lawsuit include conspiracy to depress wages and conspiracy to exchange compensation information, both of which violate the Sherman Antitrust Act.

SEIU-CH 0616

"The hospitals in Albany, Chicago, Memphis and San Antonio have decided to increase their profits on the backs of their nurses," Small said.

"We all know that health care costs are on the rise, but denying a fair wage to the very people with front-line responsibility for patient care is not the way to contain these costs. Nurse pay should be set by the market, not by a secret agreement among hospitals."

Table of Contents

http://www.ashlandcitytimes.com/apps/pbcs.dll/article?AID=/20060620/BUSINESS01/6
0620014
Tennessean
June 20, 2006

# Nurses union pushes lawsuits against HCA, other hospital chains
### 4 suits allege HCA, others conspire to keep salaries low

TODD PACK

A union embroiled in contract talks with HCA Inc. in California has helped a nurse sue an affiliate of the company in Texas on grounds that it conspired with other hospital owners to keep wages down.

In one of four similar lawsuits filed Tuesday against hospital systems nationwide, the nurse accuses the company's San Antonio affiliate of sharing salary information with Vanguard Health Systems and Christus Santa Rosa Health Care Corp., both of which operate in the San Antonio market.

HCA, the nation's largest for-profit hospital chain, and Vanguard are based in Nashville. Company officials didn't immediately return calls or comment on the potential class-action lawsuit.

Nurses represented by the same Washington, D.C., law firm brought similar actions against hospital systems in Memphis, Chicago and Albany, N.Y.

Daniel Small, an attorney with the firm, Cohen, Milstein, Hausfeld & Toll, said the hospitals "have decided to increase their profits on the backs of their nurses."

"We all know that health care costs are on the rise," he said, but wages should be set "by the market, not by a secret agreement among hospitals."

In a conference call, he said the Service Employees International Union had provided much of the research that led to the lawsuits.

Last month, the SEIU clashed with HCA over whether union members could criticize the company at its annual meeting here in Nashville.

Union leaders said about 10 members flew to Nashville to attend the annual meeting, but soon after arriving, they learned that an arbitrator had ruled they wouldn't be allowed to discuss their concerns about the company outside the state of California.

The SEIU accused the company of obtaining a gag order against its members. HCA disputed the union's version of events, saying the union had previously agreed "to keep local issues local."

SEIU-CH 0618

Table of Contents

SEIU-CH 0619

http://today.reuters.com/stocks/QuoteCompanyNewsArticle.aspx?view=CN&storyID=2
006-06-20T183314Z_01_N19351909_RTRIDST_0_HEALTH-HOSPITALS-
LAWSUITS.XML&rpc=66
Reuters
June 20, 2006

# U.S. hospitals sued in class action over nurse pay

Kim Dixon

CHICAGO, June 20 (Reuters) - Nurses backed by the biggest U.S. health-care union on Tuesday filed four class-action lawsuits against some of the biggest U.S. hospitals, including No. 1 chain HCA Inc. <HCA.N>, claiming they conspired to depress wages for nurses amid a national shortage.

The lawsuits, which also target the biggest U.S. Catholic hospital system, Ascension Health, charge that the hospitals regularly discussed nurses' wages in meetings, over the telephone and in written surveys, in an effort to coordinate and suppress pay.

The suits, filed in federal courts in Chicago; Memphis, Tennessee; Albany, New York; and San Antonio, Texas, seek back compensation and legal costs totaling "hundreds of millions of dollars" under federal antitrust laws.

"We have HR (human resources) employees calling their counterparts at competitor hospitals, asking for and receiving detailed and current information about the wages these hospitals are paying their nurses," said Daniel Small, a partner at the law firm representing the plaintiffs, which are seeking class-action status.

"The hospitals have reached an understanding that they will use this information not to compete," Small said.

Information from the Service Employees International Union, which organizes nurses and other health-care workers, led to the investigations and the lawsuits.

Lawyers for the plaintiffs interviewed dozens of current and former hospital employees in each market, including some at the executive level, in preparing the suits that were filed against about 20 unionized and non-unionized hospital systems in the four cities.

Spokesmen for the American Hospital Association, which represents most U.S. hospitals, were not immediately available for comment.

SEIU-CH 0620

A spokesman for Nashville, Tennessee-based HCA, which runs 180 hospitals and was named in the Texas lawsuit, was not immediately available for comment.

Other major hospital systems named in the suits include Catholic Health East, university-affiliated University of Chicago hospitals and Evanston Northwestern Healthcare, and privately held Vanguard Health Systems.

Demand for full-time registered nurses exceeds supply by nearly 170,000 nurses this year, according to the American Hospital Association. That shortfall is expected to widen to more than 1 million by 2020, the trade group estimates.

Wage increases for nurses have been insignificant during the decade-long shortage, experts said. Wages stagnated in 2003 and then fell 6.4 percent in 2004, leading to a decline in nurses working at hospitals, according to the Institute for Women's Policy Research.

Experts disagree on how to resolve the nursing shortage. Some say higher wages are the key, while others note that heavy workloads, lack of respect, and understaffed hospital environments make the career unattractive.

Table of Contents

SEIU-CH 0621

http://biz.yahoo.com/ap/060620/nurses_wages_lawsuit.html?.v=1
The Associated Press
June 20, 2006

# Suits: Hospitals Conspired on Nurse Wages
## Lawsuits Allege Hospitals Conspired to Suppress Nurses' Wages

Candice Choi

ALBANY, N.Y. (AP) -- Lawsuits filed Tuesday accused hospitals in four states of secretly exchanging payroll information to keep nurses' wages low.

The suits, filed by a Washington, D.C., law firm on behalf of individual nurses in Albany, Chicago, San Antonio and Memphis, Tenn., claim human resource employees at several hospitals in each state telephoned each other over at least the past four years to trade detailed information on wages.

"There was a regular, systemic exchange of wage information through human resource employees, trade associations and other means," said Daniel Small, a lawyer representing the nurses.

Preliminary estimates by the firm claim nurses in the Albany area were underpaid by about $6,000 a year. Nurses in Chicago lost $5,000 a year, while nurses in San Antonio lost $1,300 a year and those in Memphis, Tenn. lost $14,000 a year, according to the firm.

The federal suits seek compensation for lost wages and damages.

Named in the suit filed in U.S. District Court in Albany are Albany Medical Center, St. Peter's Hospital in Albany, Ellis Hospital in Schenectady, Northeast Health, Ascension Health and Catholic Health East in Albany.

Together, the institutions employ about three-quarters of the approximately 3,600 full-time registered nurses working in the area.

Greg McGarry, spokesman for Albany Medical Center, said the allegations were "completely unfounded" and that the hospital planned to fight the charges.

The hospitals named in the Chicago suit are Advocate Health Care, Children's Memorial Hospital, Evanston Northwestern Healthcare, Michael Reese Hospital, Resurrection Health Care and University of Chicago Hospitals.

In Memphis, Baptist Memorial Hospital and Methodist Healthcare are named in the suit. Echelle Rutschman, a spokeswoman for Baptist Memorial Health Care Corp., a Memphis regional health-care system, told The Wall Street Journal that the suit is "completely without merit."

SEIU-CH 0622

Hospital Corporation of America, Vanguard Health System, Inc. and Christus Santa Rosa Health Care were named in the San Antonio suit.

"Nurse wages are an issue across the country, and a symptom of what's driving nurses from the bedside," said Cynthia Singer-Glasson, president of the Nurse Alliance of the Service Employees International Union. "It's not a healthy situation for patients."

The group represents 84,000 nurses in 23 states.

Table of Contents

SEIU-CH 0623

http://chicagobusiness.com/cgi-bin/news.pl?rssFeed=news&id=21048
Crain's Chicago Business
June 21, 2006

# Area hospitals tried to fix nurses' wages, suit says

(Crain's) - Attorneys for registered nurses in Chicago sued several area hospital systems Tuesday, charging they shared information about wages in a conspiracy to suppress nurses' pay.

The lawsuit, filed Tuesday in U.S. District Court in Chicago, seeks class action status and names Advocate Health Care, Resurrection Health Care, Evanston Northwestern Healthcare, University of Chicago Hospitals, Children's Memorial Hospital and Michael Reese Hospital.

Plaintiffs' attorneys say the complaint stems from investigative work by the Service Employees International Union (SEIU), which has been trying for years to organize workers at Oak Brook-based Advocate, the Chicago area's largest health system. Attorneys at Washington, D.C.-based Cohen, Milstein, Hausfeld & Toll, which filed the complaint, say the law firm is footing the legal bills but that SEIU laid the groundwork for the complaint.

Similar federal complaints were filed Tuesday against a total of at least a dozen other large health systems in Memphis, San Antonio and Albany, NY.

SEIU officials during a conference call with reporters said the lawsuits are unrelated to organizing efforts at any of the hospitals. University of Chicago Hospitals is the only defendant hospital in Chicago that has unionized nurses.

Plaintiffs allege the hospitals violated federal antitrust laws by sharing wage information in an effort to fix wages and avoid having to boost salaries to recruit hard-to-find registered nurses. They claim the alleged collusion has exacerbated the area's nursing shortage, because the facilities aren't paying enough to keep nurses in the profession.

A spokesman for Children's Memorial says the Lincoln Park hospital "is in full compliance with all federal laws pertaining to establishing wages." Other Chicago hospitals named in the suit could not be reached or wouldn't comment because they hadn't seen the complaint.

The plaintiffs want to be paid unspecified damages, plus interest and attorneys' fees. The alleged collusion curbed pay for Chicago-area registered nurses by an average of $5,000

SEIU-CH 0624

a year, according to Daniel Small, a plaintiffs' attorney. He said the average RN salary in the Chicago market is $49,000.

Small said human resource workers, recruiters and other employees at the hospitals for years have exchanged wage information over the phone or at trade conferences and used the information to come to "an understanding" not to compete with each other on nurses' wages. He said the findings came from interviews with dozens of former and current employees in each city.

Plaintiffs in the Chicago suit are Lisa Reed, a registered nurse at Advocate South Suburban Hospital, and Mary McDowell, who worked as an RN at Advocate Christ Medical Center for 13 years until last year.

The suit seeks class action status, which would allow any RN who has worked for any of the defendant hospitals named in the complaint since June 20, 2002, to join suit.

In March, the SEIU organized 84,000 nurses nationally to create the Nurse Alliance of the SEIU, which advocates better pay and working conditions for registered nurses to help alleviate a national nursing shortage that leaders say threatens patient safety.

Table of Contents

SEIU-CH 0625

http://www.modernhealthcare.com/news.cms?newsId=5286&potId=BN
Modern Healthcare
June 20, 2006

# Nurses sue hospitals, allege antitrust violations

Jennifer Lubell

Class-action lawsuits have been filed against hospitals in Chicago, Memphis, Tenn., Albany, N.Y., and San Antonio alleging that the hospitals conspired to depress nurses' wages. The lawsuits claim that the hospitals deliberately and systematically exchanged nonpublic information about the wages each was paying its nurses through phone calls and written surveys. "They were using this information not to compete, but to match wages at artificially low levels," said Daniel Small, a partner with Cohen, Milstein, Hausfeld & Toll, who is representing plaintiffs in the four cities. He alleged during a teleconference that nurses in each of these cities have collectively been underpaid millions of dollars by the hospitals. The lawsuits were filed after counsel for the plaintiffs reviewed an investigation by the Service Employees International Union and determined that these types of activities constituted a violation of federal antitrust laws. When asked if the SEIU was trying to leverage the lawsuit to get these hospitals to agree to unionize their registered nurses, Small replied, "This is really about getting nurses back to the bedside." The American Hospital Association was unable to be reached for comment at deadline. To see the class-action complaints, go to: cmht.com/cases_nursewages.php. --

Table of Contents

SEIU-CH 0626

http://www.upi.com/NewsTrack/view.php?StoryID=20060621-074404-7454r
United Press International
June 21, 2006

## Nurses sue hospitals in four cities

NEW YORK, June 21 (UPI) -- Hospitals in four U.S. cities are being sued by nurses whose class-action lawsuits accuse the facilities' leaders of conspiring to suppress wages.

Lawyers for the nurses say hospitals in Chicago, Memphis, San Antonio and Albany, N.Y., conspired to depress wages by hundreds of millions of dollars, The New York Times reported Wednesday. The lawyers also filed separate but similar lawsuits in federal court in each of the four cities.

The Service Employees International Union, which is trying to unionize nurses, gave critical information and sources to the plaintiffs' lawyers as they prepared for the litigation.

Table of Contents

SEIU-CH 0627

Daily Labor Report
June 21, 2006

# Class Action Suits Allege Conspiracy By Hospitals to Depress Nurse Wages

Tony Perriello

Nurses in four major cities June 20 filed proposed class action lawsuits against several major hospitals and chains, alleging that the hospitals within each city conspired to exchange compensation information and depress their wages in violation of the Sherman Antitrust Act (*Unger v. Albany Med. Ctr.*, N.D.N.Y., docket number unavailable, *complaint filed* 6/20/06; *Clarke v. Baptist Mem. Healthcare Corp.*, W.D. Tenn., docket number unavailable, *complaint filed* 6/20/06; *Reed v. Advocate Health Care*, N.D. Ill., No. 06C 3337, *complaint filed* 6/20/06; *Maderazo v. Vanguard Health Sys.*, W.D. Tex., No. SA06CA0535G, *complaint filed* 6/20/06).

The lawsuits were filed in federal district court against between five and seven hospitals and national health care corporations in each of four cities--Albany, N.Y., Memphis, Tenn., Chicago, and San Antonio. The classes consist of all registered nurses employed by the alleged co-conspirators from June 20, 2002, until the present. The lawsuits seek back compensation and legal costs.

The lawsuits were announced at a June 20 press conference by Washington, D.C.. law firm Cohen, Milstein, Hausfeld and Toll, which is representing the plaintiffs. Joining Daniel A. Small, a partner at the firm, at the press conference were Andrew L. Stern, president of Service Employees International Union, Cathy Singer, president of the Nurse Alliance of SEIU, and Susan Scanlan of the National Council of Women's Organizations.

Representatives of the American Hospital Association and defendant hospitals were not immediately available for comment.

### Allegations Charge Information Sharing

The complaints charge that conspiring hospitals within each city agreed to exchange, and regularly exchanged, detailed and non-public information about the wage rates each is paying or will pay to its registered nurses, and that there was agreement and

SEIU-CH 0628

understanding among the hospitals that the information was being shared for the purpose of keeping nurse wages contained.

According to Small, the cases do not overlap, and the evidence showing the conspiracy among hospitals in one city is separate and different from the evidence proving conspiracy in other cities.

The methods used to implement the alleged conspiracy were similar, however. The complaints allege that the information was transferred through meetings at trade shows, telephone conversations among the hospitals' human resources staffs, and written or oral surveys about wages, the results of which were circulated among the hospitals.

Small said that he worked with an economist who had public data about the markets in the cities where the hospitals are located, and that the economist did a rough cut estimate of damages. He said that the data compares wages in cities where lawsuits have been filed with wages in other cities, where they saw no indication of conspiracy.

According to Small's preliminary estimates, nurses in Albany have been underpaid on average by approximately $6,000 annually; by approximately $5,000 annually in Chicago; by approximately $1,300 annually in San Antonio, and by approximately $14,000 annually in Memphis.

"A conspiracy is not a legitimate cost-saving initiative," Small said. "This is an example of large health care systems taking extreme advantage of a vulnerable but critical component of the American health care system."

### Union Investigation Sparked Lawsuit

Research funded by Nurse Alliance, which organizes health care workers, and conducted by the Institute for Women's Policy Research into the shortage of nurses and the issue of low wages, was partly the genesis for the lawsuits. Nurse Alliance reports membership of 84,000 nurses in 23 states.

"Nurses are the central nervous system of health care," Singer told reporters. "We provide the day-to-day care that is so important to helping people get well."

SEIU-CH 0629

"But I have seen so many nurses leave the profession they love because of working conditions that make it harder to give our patients the care they deserve. Now we find out through these lawsuits that while nurses were fighting for our patients, some hospitals may have been working illegally to hold down our wages.""

Evidence of the alleged conspiracies was obtained, Small said, through scores of interviews with current and former hospital employees and executives with direct knowledge of the conspiracies.

According to the American Hospital Association, demand for full-time registered nurses exceeds supply by nearly 170,000 this year, and the shortage is expected to increase.

But according to SEIU's Stern, the problem is not that there are not enough nurses to go around.

"We don't have a nursing shortage in this county," Stern said. "We have a shortage of nurses willing to work in our country's hospitals. We need a system that values care and values nurses."

The conspiracy issue is neither new nor confined to the cities mentioned in these lawsuits. In 1994, the Justice Department reached a settlement with a group of hospitals in Utah that included an agreement by the hospitals not to exchange information.

Reacting to the news about the lawsuits, Marcia D. Greenberger, co-president of the National Women's Law Center, said in a statement that nurses, as a vital part of our health care networks, should be paid adequately and fairly.

"Failing to pay nurses fairly does a disservice to the hardworking nurses, both women [and] men, and to the nation's patients whose quality of care suffers when hospitals have insufficient staffing levels," Greenberger said. "Patients also are deprived of the best and the brightest because many nurses have to face the choice of leaving the field or compromising their financial security."

Small said that investigations into possible conspiracies among hospitals in other cities are currently under way.

*Text of one of the complaints, which is substantially similar to all of the others, appears in Section E.*

SEIU-CH 0630

Table of Contents

SEIU-CH 0631

Wall Street Journal Law Blog
June 21, 2006

# Lawsuit Claims Hospitals Colluded to Hold Down Nurses' Pay

Peter Lattman

In an coordinated move spanning four cities, nurses filed four federal lawsuits alleging that hospital systems conspired to keep their pay artificially low despite concerns of a nursing shortage. The suits, which seek class-action status, allege the systems shared information on pay practices with an understanding that they wouldn't outbid one another to recruit nurses. Here are reports from the WSJ and NYT.

The lawsuits — put together with the help of the Service Employees International Union, which represents nurses and others — were filed yesterday in Chicago, San Antonio, Memphis, Tenn., and Albany, N.Y., against more than 17 hospitals. The suits allege that the hospitals violated federal antitrust laws.

Cohen, Milstein, Hausfeld & Toll, in Washington, D.C., brought the suits. A spokeswoman for one of the hospitals named as a defendant said the lawsuit is "completely without merit"; another called it "outrageous."

A nurse serving as a plaintiff in one the lawsuits, told the Times that low wages were causing a nursing shortage in this country: "All of this has led to more of my nurse colleagues becoming travel agents, consultants and real estate agents."

Table of Contents



http://www.earthtimes.org/articles/show/7270.html
EarthTimes.org
June 21, 2006

# U.S. nurses file class action suits against hospitals for conspiring to fix wages

Alan Cross

NEW YORK: Nurses in the United States filed four class action lawsuits Tuesday against some of the major hospitals in the country, alleging these hospitals illegally conspired to fix their wages, depriving them of hundreds of millions of dollars.

Among the defendants is the No 1 healthcare chain in the country, the Nashville, Tennessee-based HCA Inc., which runs 180 hospitals.

The nurses are backed in their efforts by the country's largest health-care union, the Service Employees International Union.

The lawsuits alleged that the hospitals discussed nurses' wages in meetings among themselves, over telephone and in written surveys in order to coordinate and curtail the nurses' pay. The suits are filed in the federal courts in Chicago, Memphis, Tennessee, Albany, New York and San Antonio, Texas.
The lawyers for the nurses had interviewed several current and former hospital employees, including HR staff, in preparing the lawsuits, which have been filed against 20 unionized and non-unionized hospital systems in the four cities.

Among the hospitals sued, besides HCA, are Ascension Health, Catholic Health East, Resurrection Health Care, Methodist Healthcare System, Advocate Health Care and Vanguard Health Systems.

A spokesperson for HCA termed the suits as frivolous adding these were generated by a union and a law firm designed to create publicity in markets where unions are trying to get membership.

In the U.S. demand for full-time nurses exceeds supply by almost 170,000 according to estimates. Wage increases for nurses have been described as insignificant as these stagnated in 2003 and then fell in 2004.

The Washington, D.C.-based law firm, which filed the suits, estimated that nurses in the Albany area were underpaid by about $6,000 a year. Nurses in Chicago lost $5,000 a year, while nurses in San Antonio lost $1,300 a year and those in Memphis $14,000 a year.

A lawyer for the nurses said the hospitals concerned have decided to increase their profits

SEIU-CH 0633

on the backs of their nurses. "Nurse pay should be set by the market, not by a secret agreement among hospitals."

Table of Contents

SEIU-CH 0634

Exhibit 14

## Jamie Cohen

| | |
|---|---|
| **From:** | Stephanie Mueller |
| **Sent:** | Tuesday, June 20, 2006 3:53 PM |
| **To:** | Steve Trossman; Patricia Yeghissian; Barbara Rosenthal; Jamie Cohen; Dimitrios Philliou; Mary Joyce Carlson |
| **Cc:** | Jennifer Coate |
| **Subject:** | FW: Reuters article on the Wire |
| **Importance:** | High |

# REUTERS :⫶⫶

🖶 Print this article                                                                                                   Close This Window

## Hospitals sued in class action over nurse pay
Tue Jun 20, 2006 6:01 PM BST

By Kim Dixon

CHICAGO (Reuters) - Nurses backed by the biggest U.S. health-care union on Tuesday filed four class-action lawsuits against some of the biggest U.S. hospitals, including No. 1 chain HCA Inc., claiming they conspired to depress wages for nurses amid a national shortage.

The lawsuits, which also target the biggest U.S. Catholic hospital system, Ascension Health, charge that the hospitals regularly discussed nurses' wages in meetings, over the telephone and in written surveys, in an effort to coordinate and suppress pay.

The suits, filed in federal courts in Chicago; Memphis, Tennessee; Albany, New York; and San Antonio, Texas, seek back compensation and legal costs totaling "hundreds of millions of dollars" under federal antitrust laws.

"We have HR (human resources) employees calling their counterparts at competitor hospitals, asking for and receiving detailed and current information about the wages these hospitals are paying their nurses," said Daniel Small, a partner at the law firm representing the plaintiffs, which are seeking class-action status.

"The hospitals have reached an understanding that they will use this information not to compete," Small said.

Information from the Service Employees International Union, which organizes nurses and other health-care workers, led to the investigations and the lawsuits.

Lawyers for the plaintiffs interviewed dozens of current and former hospital employees in each market, including some at the executive level, in preparing the suits that were filed against about 20 unionized and non-unionized hospital systems in the four cities.

Spokesmen for the American Hospital Association, which represents most U.S. hospitals, were not immediately available for comment.

A spokesman for Nashville, Tennessee-based HCA, which runs 180 hospitals and was named in the Texas lawsuit, was not immediately available for comment.

Other major hospital systems named in the suits include Catholic Health East, university-affiliated University of Chicago hospitals and Evanston Northwestern Healthcare, and privately held Vanguard Health Systems.

Demand for full-time registered nurses exceeds supply by nearly 170,000 nurses this year, according to the American Hospital Association. That

**SEIU-CH 0639**

shortfall is expected to widen to more than 1 million by 2020, the trade group estimates.

Wage increases for nurses have been insignificant during the decade-long shortage, experts said. Wages stagnated in 2003 and then fell 6.4 percent in 2004, leading to a decline in nurses working at hospitals, according to the Institute for Women's Policy Research.

Experts disagree on how to resolve the nursing shortage. Some say higher wages are the key, while others note that heavy workloads, lack of respect, and understaffed hospital environments make the career unattractive.

© Reuters 2006. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

Close This Window

*Stacey Finkel*
*Assistant Vice President*
*Widmeyer Communications*
*1825 Connecticut Avenue, NW*
*Fifth Floor*
*Washington, DC 20009*
*202.667.0901*

SEIU-CH 0640

6/20/2006

## Jamie Cohen

| | |
|---|---|
| **From:** | Stephanie Mueller |
| **Sent:** | Tuesday, June 20, 2006 3:58 PM |
| **To:** | Barbara Rosenthal; Patricia Yeghissian; cathy glasson; Jamie Cohen |
| **Cc:** | Jennifer Coate |
| **Subject:** | FW: Tennessean article |
| **Importance:** | High |

# TENNESSEAN
*Every day matters.* .com

This is a printer friendly version of an article from the **The Tennessean**. To print this article open the file menu and choose Print.

<< Back

# Nurses union pushes lawsuits against HCA, other hospital chains
## 4 suits allege HCA, others conspire to keep salaries low

By TODD PACK
Staff Writer

Published: Tuesday, 06/20/06

A union embroiled in contract talks with HCA Inc. in California has helped a nurse sue an affiliate of the company in Texas on grounds that it conspired with other hospital owners to keep wages down.

In one of four similar lawsuits filed Tuesday against hospital systems nationwide, the nurse accuses the company's San Antonio affiliate of sharing salary information with Vanguard Health Systems and Christus Santa Rosa Health Care Corp., both of which operate in the San Antonio market.

HCA, the nation's largest for-profit hospital chain, and Vanguard are based in Nashville. Company officials didn't immediately return calls or comment on the potential class-action lawsuit.

Nurses represented by the same Washington, D.C., law firm brought similar actions against hospital systems in Memphis, Chicago and Albany, N.Y.

Daniel Small, an attorney with the firm, Cohen, Milstein, Hausfeld & Toll, said the hospitals "have decided to increase their profits on the backs of their nurses."

"We all know that health care costs are on the rise," he said, but wages should be set "by the market, not by a secret agreement among hospitals."

In a conference call, he said the Service Employees International Union had provided much of the research that led to the lawsuits.

Last month, the SEIU clashed with HCA over whether union members could criticize the company at its annual meeting here in Nashville.

SEIU-CH 0641

Union leaders said about 10 members flew to Nashville to attend the annual meeting, but soon after arriving, they learned that an arbitrator had ruled they wouldn't be allowed to discuss their concerns about the company outside the state of California.

The SEIU accused the company of obtaining a gag order against its members. HCA disputed the union's version of events, saying the union had previously agreed "to keep local issues local."

Published: Tuesday, 06/20/06

*Stacey Finkel*
*Assistant Vice President*
*Widmeyer Communications*
*1825 Connecticut Avenue, NW*
*Fifth Floor*
*Washington, DC 20009*
*202.667.0901*

SEIU-CH 0642

Exhibit 15

Mark Rickling                    CONFIDENTIAL                September 26, 2007
                                 Washington, DC

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

-------------------------------------X

MARISSA MADERAGO, et al.,            :

                Plaintiffs,          :

            v.                       :   No. SA06CA053OG

VANGUARD HEALTH SYSTEMS a/k/a        :

BAPTIST HEALTH SYSTEMS, et al.,      :

                Defendants.          :

-------------------------------------X

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

-------------------------------------X

WENDY FLEISCHMAN, et al.,            :

                Plaintiffs,          :

            v.                       :   No.

ALBANY MEDICAL CENTER, et al.,       :   06-cv-00765-TJM-DRH

                Defendants.          :

-------------------------------------X

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TENNESSEE

3                       MEMPHIS DIVISION

4    ------------------------------------X

5    SUZANNE C. CLARKE, et al.,            :

6                   Plaintiffs,            :

7              v.                          :  No.  2:06-cv-2377

8    BAPTIST MEMORIAL HEALTHCARE           :

9    CORPORATION, et al.,                  :

10                  Defendants.            :

11   ------------------------------------X

12             IN THE UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF MICHIGAN

14                    SOUTHERN DIVISION

15   ------------------------------------X

16   PAT CASON-MERENDA, et al.,            :

17                  Plaintiffs,            :  No.

18             v.                          :  2:06-cv-15601-GER-

19   DETROIT MEDICAL CENTER, et al.,       :  DAS

20                  Defendants.            :

21   ------------------------------------X

22

Mark Rickling                    CONFIDENTIAL                September 26, 2007
                                 Washington, DC

                                                                        Page 3

1                 IN THE UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF ILLINOIS

3       - - - - - - - - - - - - - - - - - - - - - - - - - -X

4       LISA REED, et al.,                        :

5                         Plaintiffs,             :

6                 v.                               :   No. 06-cv-3337

7       ADVOCATE HEALTH CARE, et al.,             :

8                         Defendants.             :

9       - - - - - - - - - - - - - - - - - - - - - - - - - -X

10                              Washington, D.C.

11                              Wednesday, September 26, 2007

12              30(b)(6) Videotape deposition of MARK RICKLING,

13      a witness herein, called for examination by counsel for

14      Defendants in the above-entitled matter, pursuant to notice,

15      the witness being duly sworn by DENNIS A. DINKEL, a Notary

16      Public in and for the District of Columbia, taken at the

17      offices of Jones Day, 51 Louisiana Avenue, N.W., Washington,

18      D.C. at 10:06 a.m., Wednesday, September 26, 2007, and the

19      proceedings being taken down by Stenotype by DENNIS A.

20      DINKEL, FAPR, CRR, and transcribed under his direction.

21

22

Mark Rickling                   CONFIDENTIAL                September 26, 2007
                                Washington, DC

Page 76

1    back to Exhibit 48?

2              And am I correct that your testimony is that the

3    SEIU research did not perform any work for counsel for

4    plaintiffs relating to the nurse litigations, correct?

5        A.    That is correct.

6        Q.    Take a look at page 6 of Exhibit 48.

7              I think it is probably easier to start at the

8    bottom, 1, 2, 3, 4, 5, 6, 7, 8 blocks up?

9        A.    E-mail from M. Rickling.

10       Q.    Yes, sir.  And that's to Ms. Feiock, Mr. Dean,

11   and Mr. Kapsa, correct?

12       A.    Yes.

13       Q.    Regarding information on MSAs for use in

14   drafting complaint, correct?

15       A.    It is.

16       Q.    Does that refresh your recollection as to

17   whether SEIU research provided any information for assisting

18   plaintiffs' counsel --

19             MR. CLASH-DREXLER:  Object to the form of the

20   question.

21             Sorry.

22   BY MR. SHUMAKER:

Mark Rickling                    CONFIDENTIAL                September 26, 2007
                               Washington, DC

Page 78

1   plaintiffs' counsel.

2            MR. CLASH-DREXLER:  Can you restate the

3   question?

4            Let me make clear -- go ahead.  Go ahead.

5   Mr. Shumaker.

6   BY MR. SHUMAKER:

7       Q.    Do you know what work is being referred to in

8   this entry on the privilege log?  And I'm referring to an

9   e-mail from yourself to Ms. Feiock, David Dean, Michael

10  Kapsa re information produced in draft and complaint dated

11  March 23, 2006 for which the SEIU has been directed by

12  counsel for plaintiffs to designate the document as attorney

13  work product?

14           MR. CLASH-DREXLER:  That's a yes or no question.

15           THE WITNESS:  Yes, I do.

16           MR. TOMPKINS:  I have no problem with a very

17  general description of what was being done.  I don't think

18  that will interfere with the work product privilege.

19  BY MR. SHUMAKER:

20      Q.    What work was done?

21      A.    We simply shared a portion of our facilities

22  database with Ms. Feiock and David Dean.

Mark Rickling                  CONFIDENTIAL              September 26, 2007
                              Washington, DC

Page 79

1       Q.      Are you aware that Mr. Feiock and David Dean at

2    the time you shared this information was acting as counsel

3    for the plaintiffs?

4       A.      No, I was not aware.

5       Q.      Did you think they were acting as couple for

6    SEIU?

7               MR. CLASH-DREXLER:  Object to the form of the

8    question.

9               THE WITNESS:  Yes, I believe so.

10   BY MR. SHUMAKER:

11      Q.      Were you aware they were going to use this in

12   furtherance of the legal complaints?

13      A.      No, I was not aware.

14      Q.      Is it fair to say then, Mr. Rickling, that

15   information was shared by the SEIU research with counsel for

16   the plaintiffs?

17      A.      I shared information with people I believed to

18   be SEIU's counsel.

19      Q.      Okay.  Did the SEIU know that any of the

20   information that was shared with its counsel would be used

21   in furtherance of the legal complaints?

22      A.      We did research.  We were going to do our own

Page 80

1    internal analysis of that research, and then we were going

2    to, at some point, turn that over to outside attorneys to

3    make their own independent analysis of that research.

4        Q.    So the research that you did that you turned

5    over to outside lawyers, are these lawyers other than

6    James & Hoffman?

7        A.    I assume so from the case, from the preparation

8    for this deposition.

9        Q.    When the SEIU shared information with

10   James & Hoffman, was its belief that it was sharing it with

11   them as counsel for the SEIU?

12            MR. CLASH-DREXLER:  Object to the form.

13   Question.

14            MR. TOMPKINS:  Object to the form.  Question.

15            THE WITNESS:  I believe I was sharing

16   information with counsel for SEIU.

17   BY MR. SHUMAKER:

18       Q.    The work that you did for the unknown outside

19   counsel that you knew would be potentially used for

20   litigations, what work was that?

21            MR. CLASH-DREXLER:  Object to the form of the

22   question.  Go ahead, Mr. Rickling.

Mark Rickling                    CONFIDENTIAL                September 26, 2007
                                 Washington, DC

1          A.      Mike -- yes.  That was my understanding that

2     Mike was going to share them with our counsel.

3          Q.      When you contacted the hospitals in Tampa, did

4     you ever indicate that the information you were seeking

5     would be shared with legal counsel?

6          A.      No, I did not.

7          Q.      When you were aware that the information you

8     collected was being shared with James & Hoffman, was your

9     understanding that James & Hoffman working as counsel for

10    the SEIU?

11         A.      That was my understanding.

12                MR. TOMPKINS:  Again, is that your

13    understanding.

14                THE WITNESS:  That's my personal understanding.

15                MR. CLASH-DREXLER:  Again so the record is

16    clear, this entire line of questioning is Mr. Rickling

17    testifying not as a representative of SEIU.

18    BY MR. SHUMAKER:

19         Q.      How many hospitals would you say you spoke with

20    in Tampa?

21         A.      Four or five.

22         Q.      Did any of them refuse to talk with you?

Alderson Reporting Company
1-800-FOR-DEPO

Exhibit 16



115 S. LaSalle Street   Suite 2910  Chicago   Illinois 60603
Tel: 312. 332..3400 Telecopier:  312.676.2676

Marvin A. Miller
mmiller@millerlawllc.com
(also admitted in New York)

November 13, 2007

**HAND DELIVERY**

Honorable John F. Grady
United States District Court
Room 2286
219 S. Dearborn St.
Chicago, IL 60604

     Re:    *Reed v. Advocate Health Care, et al., No. 06 C 3337*
            *Errata Sheets for Testimony Attached as Exhibits to Defendants' Reply Brief.*

Dear Judge Grady:

I enclose two errata sheets for deposition testimony that Defendants attached as Exhibits A and C to their "Reply Brief in Support of Defendants' Motion to Compel Production of Documents improperly withheld by Plaintiffs as Work Product."

In relevant part, the first errata sheet for Jamie Cohen corrects the following testimony attached as Exhibit A to Defendants' Reply Brief, at page 285 of Ms. Cohen's deposition:

Q.  Is it still your testimony, Ms. Cohen, that the IWPR never did any work in support of the litigation for the SEIU?

A.  That is correct.  The way I understood this was that James & Hoffman had considered using IWPR to help provide assistance on possible litigation, and then decided not to use them in that capacity.

Q.      Okay.  And they were planning on using them for possible litigation on behalf of SEIU, correct?

A.  That's correct.  No, James & Hoffman was considering IWPR to assist in litigation brought by nurse plaintiffs.

Mr. Tompkins:  Object to the form of that question.

Honorable John F. Grady
November 13, 2007
Page Two


In relevant part, the second errata sheet for Mr. Rickling corrects the following testimony attached as Exhibit C to Defendants' Reply Brief at pages 76 and 79 of Mr. Rickling's deposition:

Page 76:

Q      . . . . . And am I correct that your testimony is that the SEIU research did not perform any work for counsel for plaintiffs relating to the nurse litigations, correct?

A.   That is correct.  Upon further reflection, my testimony on behalf of SEIU is that SEIU research did perform work for counsel for the plaintiffs.  Specifically, SEIU was asked to provide data to attorneys at James & Hoffman for their use in drafting the complaint in the nurse wage lawsuits.

Page 79:

Q.   Were you aware that they were going to use this in furtherance of the legal complaint?

A.   No, I was not aware.  Upon further reflection, my testimony on behalf of the SEIU is that when I shared data from our facilities database with Ms. Feiock and Mr. Dean, they were acting as counsel for plaintiffs.

Ms. Cohen indicates in her errata sheet that she wished to clarify her testimony. Mr. Rickling indicates that his original testimony as a 30(b)(6) witness did not fully reflect SEIU's knowledge.

Sincerely,

Marvin A. Miller

MAM:kp

Enclosures

cc:    Defendants' Counsel
       (w/enclosures)
       via electronic mail

**BREDHOFF & KAISER**, P.L.L.C.

*Attorneys & Counselors*

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

805 Fifteenth Street, NW
Washington, D.C. 20005
(202) 842-2600
Facsimile: (202) 842-1888
www.bredhoff.com

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Jennifer L. Hunter
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

Laurence Gold
Patricia Polach
Susan G. Lahne
Todd E. Edelman
Sarah M. Fox
Of Counsel

Elliot Bredhoff
(1921-2004)
Henry Kaiser
(1911-1989)

November 9, 2007

<u>Via Facsimile and First-Class Mail</u>
Michael R. Shumaker
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113

Edward Feldman
Miller Shakman & Beem LLP
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601

Re:   <u>Maderazo, et al. v. VHS San Antonio Partners, L.P., et al.</u>, No. SA06CA0535
(W.D. Tex.); <u>Pat Cason-Merendo et al. v. Detroit Medical Center et. al.</u>, Civ. A.
No. 06-15601 (E.D. Mich.); <u>Unger v. Albany Medical Center, et al.</u>, No.
06CV0735 (N.D.N.Y.); <u>Clarke v. Baptist Healthcare</u>, Civ. A. No. 06-2377 (W.D.
Tenn.); <u>Lisa Reed et al. v. Advocate Health Care, et. al.</u>, Civ. A. No. 06-3337
(N.D. Ill.)

Dear Mr. Shumaker and Mr. Feldman:

Attached please find errata sheets for the depositions of Jamie Cohen and Mark Rickling.
Pursuant to an agreement with Mr. Shumaker, I will be supplying the errata sheet for Ms.
Fitzpatrick by Friday, November 16, 2007.

Please let me know if you have any questions.

Sincerely,

Matthew Clash-Drexler
Counsel for SEIU

Cc:   David Dean

Errata Pages for Deposition of Jamie Cohen

| Page # | Line # | Now Reads | Should Read | |
|---|---|---|---|---|
| 21 | 5 | loam | home | typographical error |
| 27 | 11 | Coates | Coate | typographical error |
| 28 | 8 | Coates | Coate | typographical error |
| 28 | 10 | Coates | Coate | typographical error |
| 28 | 22 | Coates | Coate | typographical error |
| 48 | 2 | That's correct. | That's correct. She is my administrative assistant. | words missing |
| 102 | 14 | No. | Yes, Sean Bajkowski and Ed James. | Clarify testimony |
| 117 | 5 | I don't remember that. | I don't remember her saying that. | words missing |
| 118 | 17 | No. | No, that was not discussed. | words missing |
| 123 | 18 | I don't recall. | I don't recall there being any such discussion. | words missing |
| 137 | 11 | No. | No. They do not. | words missing |
| 137 | 17 | No. | No. They do not. | words missing |
| 137 | 19 | No. | No. They do not. | words missing |
| 137 | 21 | No. | No. They do not. | words missing |
| 205 | 22 | No. | No. Other than the major hospital markets. | words missing |
| 285 | 6 | That's correct. | No. James and Hoffman was considering IWPR to assist in litigation brought by nurse plaintiffs. | Clarify testimony |
| 306 | 7 | Yes. | They did perform that task. | words missing |
| 307 | 6 | No. | No. IWPR did not perform that task. | words missing |
| 307 | 9 | No. | No. No one performed that task for the SEIU. | words missing |
| 308 | 8 | No. | No. It was not. | words missing |
| 389 | 4 | SEIU | SEIU was represented by James and Hoffman at that time. | Clarify testimony |
| 457 | 14 | Joyce Muscotto | Joyce Moscato | word misspelled |
| 468 | 19 | That's correct. | That's not correct. | missing word |
| 528 | 3 | Research | Researcher | words missing |
| 531 | 11 | I can't remember. | I can't remember any such discussion occuring on the nightly calls. | words missing |
| 531 | 21 | No, I don't remember. | No, I don't remember any such indication by any of the field researchers. | words missing |
| 537 | 12 | No. | No. None of the researchers indicated having difficulty getting past security. | words missing |

| 537 | 15 | No. | No, None of the researchers indicated that they had snuck | words missing |
| | | | past security. | |
| 543 | 7 | No, I don't. | No, I don't recall her raising any objection. | words missing |

_Yvonne Coker_   11-9-07
Signature/Date

District of Columbia:      SS
Subscribed and Sworn to before me, in my presence,
this 9th day of _Nov._, 2007

_[signature]_
Notary Public, D.C.

My commission expires January 31, 2012

Errata Pages for Deposition of Mark Rickling

| Page # | Line # | Now Reads | Should Read | Reason |
|--------|--------|-----------|-------------|--------|
| 64 | 19 | ah | or | typographical error |
| 66 | 14 | desire he produced that chart to | desire to get better data | incorrect wording |
| 67 | 12 | Okay. | Same objection. | wrong wording |
| 68 | 22 | metropolitan | met | typographical error |
| 72 | 19 | No, we did not. | No we did not, but I'm not sure. | words missing |
| 76 | 5 | That is correct: ··· | Upon further reflection, my testimony on behalf of SEIU is that SEIU research did perform work for counsel for the plaintiffs. Specifically, SEIU was asked to provide data to attorneys at James & Hoffman for their use in drafting the complaint in the nurse wage lawsuits. | The testimony did not fully reflect SEIU's knowledge |
| 79 | 4 | No, I was not aware. | Upon further reflection, my testimony on behalf of SEIU is that when I shared data from our facilities database with Ms. Feiock and Mr. Dean, they were acting as counsel for the plaintiffs. | The testimony did not fully reflect SEIU's knowledge |
| 81 | 9 | database given what | database was given that identified what | words missing |
| 85 | 12 | That is correct. | Upon further reflection, my testimony on behalf of SEIU is that when I shared data from our facilities database with Ms. Feiock and Mr. Dean, they were acting as counsel for the plaintiffs. | The testimony did not fully reflect SEIU's knowledge |
| 90 | 1 | BES | BLS | typographical error |
| 90 | 15 | three | thirty | typographical error |
| 92 | 15 | plain | explain | typographical error |
| 101 | 2 | it retaliations | iterations | typographical error |
| 155 | 16 | wakes | wages | typographical error |

Signature/Date  _[signature]_  11-9-07

CHERYL E. ALSTON
NOTARY PUBLIC
DISTRICT OF COLUMBIA
My Commission Expires January 31, 2012

District of Columbia:    SS
Subscribed and Sworn to before me, in my presence,
this _6th_ day _of November 2007_

_[signature]_
Notary Public, D.C.

My commission expires January 31, 2012

Exhibit 17

## BREDHOFF & KAISER, P.L.L.C.

*Attorneys & Counselors*

805 Fifteenth Street, NW
Washington, D.C. 20005
(202) 842-2600
Facsimile: (202) 842-1888
www.bredhoff.com

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Dora V. Chan
Jennifer L. Hunter
Lisa Powell
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

Laurence Gold
Patricia Polach
Sarah M. Fox
Todd E. Edelman
Of Counsel

George H. Cohen
Senior Counsel

Elliot Bredhoff
(1921-2004)
Henry Kaiser
(1911-1989)

April 6, 2007

**Via Facsimile and First-Class Mail**
Edward Feldman
Miller Shakman & Beem LLP
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601

Re:     Nonparty Subpoena Issued to the Service Employees International Union
        <u>Lisa Reed et al. v. Advocate Health Care, et. al.</u>, Civ. A. No. 06-3337 (N.D. Ill.)

Dear Mr. Feldman:

    Attached please find the SEIU's log of privileged documents with respect to the subpoena served on the SEIU in the above-referenced matter. Please let me know whether you have any questions.

                                        Sincerely,

                                        Matthew Clash-Drexler

Cc:     David Dean (via facsimile)
        Alyson Baker (via facsimile)

**SEIU Privilege Log**
Reed et al. v. Advocate Health Care, et al., Civ. A. No. 06-3337 (N.D. III.)

| DOCUMENT DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|
| Email from H. Leland (SEIU employee) to J. Cohen (SEIU employee), M.J. Carlson (James & Hoffman attorney, Counsel to Health Care Division, SEIU), M. Kapsa (SEIU employee), S. Rothstein (SEIU employee), A. Anderson (SEIU employee), D. Dean (James & Hoffman attorney) re proposed agenda for meeting with Heidi Hartman | 1/23/2005 | Attorney-Client Privilege |
| Email from D. Dean to H. Leland, J. Cohen, M.J. Carlson, M. Kapsa, S. Rothstein, A. Anderson re proposed agenda for meeting with Heidi Hartman | 1/24/2005 | Attorney-Client Privilege |
| Draft memorandum from D. Dean and K. Felock (James & Hoffman attorney) to M.J. Carlson re research tasks for antitrust litigation | 1/30/2005 | Attorney-Client Privilege |
| Memorandum from D. Dean and K. Felock to M.J. Carlson re research tasks for antitrust litigation | 2/2/2005 | Attorney-Client Privilege |
| Memorandum from M.J. Carlson, D. Dean, K. Felock to Institute for Women's Policy Research re research tasks for nurse wage antitrust litigation | 2/4/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M.J. Carlson, J. Cohen re meeting with Heidi Hartmann and IWPR | 2/9/2005 | Attorney-Client Privilege |
| Email from D. Dean to A. Anderson, J. Cohen, M. Kapsa, L. Tran (SEIU employee), H. Leland forwarding email re IWPR research proposal (redacted SEIU-CH 3197) | 3/3/2005 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Email from D. Dean to M.J. Carlson, A. Anderson, J. Cohen, M. Kapsa, L. Tran, H. Leland forwarding email re IWPR research proposal (redacted SEIU-CH 3204) | 3/3/2005 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Memorandum by D. Dean re questions for IWPR on its proposal to provide litigation support services | 4/5/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Draft memorandum from D. Dean and K. Felock to M.J. Carlson re nurse wage antitrust litigation | 4/25/2005 | Attorney-Client Privilege |
| Memorandum from D. Dean, S. Bajkowski (James & Hoffman attorney), and K. Felock to M.J. Carlson re proposed nurse wage antitrust lawsuits | 4/25/2005 | Attorney-Client Privilege |
| Email from D. Dean to M.J. Carlson re research needs to develop antitrust claims | 4/26/2005 | Attorney-Client Privilege |
| Email from D. Dean to J. Cohen re IWPR report | 5/5/2005 | Attorney-Client Privilege |
| Memorandum from D. Dean to M.J. Carlson re research needed on violation of anti-trust laws | 7/12/2005 | Attorney-Client Privilege |

BREDHOFF & KAISER          Fax:202-842-1888          Apr  6 2007  18:25      P.04

| Memorandum from D. Dean to M. Kapsa re research needs for nurse wage project | 7/27/2005 | Attorney-Client Privilege |
|---|---|---|
| Facsimile from D. Dean to M. Kapsa re interview template for nurse survey | 7/28/2005 | Attorney-Client Privilege |
| Facsimile from D. Dean to J. Cohen re research for nurse wage antitrust litigation | 7/29/2005 | Attorney-Client Privilege |
| Facsimile from D. Dean to J. Cohen re interview template for nurse survey and research needs for nurse wage project | 7/29/2005 | Attorney-Client Privilege |
| Email from J. Cohen to M. Henry, T. Bradley (SEIU employee), A. Anderson re national nurse wage campaign (redacted portions SEIU-CH 3196) | 8/3/2005 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Memorandum from E. James (James & Hoffman attorney), S. Bajkowski, and K. Felock to M. Kapsa re advice on research needs for nurse wage project | 8/4/2005 | Attorney-Client Privilege |
| Email from M.J. Carlson to D. Chu, A. Anderson, J. Cohen re estimated legal costs for antitrust lawsuit | 9/12/2005 | Attorney-Client Privilege |
| Email from K. Feiock to D. Dean regarding the calculation of lost wages and attaching charts | 10/14/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from J. Baker (counsel retained by the SEIU) to D. Dean re economic evidence in nurse antitrust litigation | 10/17/2005 | Attorney-Client Privilege |
| Memorandum from J. Baker to D. Dean re economic evidence in nurse antitrust litigation | 10/17/2005 | Attorney-Client Privilege |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 10/24/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Working Notes of Potential Witnesses prepared by The Mintz Group | 11/2/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 11/8/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Feiock to D. Dean, S. Bajkowski re notes on SEIU team meeting concerning antitrust research for Chicago | 11/11/2005 | Attorney-Client Privilege |
| Letter from J. Mintz to D. Dean attaching October 2005 invoice | 11/17/2005 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Email from J. Cohen to D. Dean, M.J. Carlson, E. Buchanan, J. Coate, L. Tran, S. Mueller (SEIU employee), B. Boyd (SEIU employee), A. Kempski (SEIU employee), I. Campbell, A. Anderson, M. Kapsa re Draft of IWPR Report | 11/28/2005 | Attorney-Client Privilege |
| Email from J. Cohen to D. Dean, M.J. Carlson, E. Buchanan, J. Coate, L. Tran, S. Mueller, B. Boyd, A. Kempski, I. Campbell, A. Anderson, M. Kapsa re Draft of IWPR Report | 11/28/2005 | Attorney-Client Privilege |

| Email from J. Cohen to M. Kapsa, A. Anderson, I. Campbell, A. Kempski, B. Boyd, S. Mueller, L. Tran, J. Coate, E. Buchanan, M.J. Carlson, D. Dean, D. Philliou, A. Young re draft of IWPR report (redacted SEIU-CH 3209) | 11/28/2005 | Attorney-Client Privilege |
|---|---|---|
| Email from J. Cohen to M. Kapsa, A. Anderson, I. Campbell, A. Kempski, B. Boyd, S. Mueller, L. Tran, J. Coate, E. Buchanan, M.J. Carlson, D. Dean, D. Philliou, A. Young re draft of IWPR report (redacted SEIU-CH 3209) | 11/30/2005 | Attorney-Client Privilege |
| Email from D. Dean to J. Scott, M.J. Carlson re payment of bills from The Mintz Group | 12/8/2005 | Attorney-Client Privilege |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 12/9/2005 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Letter from J. Mintz to D. Dean attaching November 2005 invoice | 12/13/2005 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Email from M. Kapsa to D. Dean, M.J. Carlson, J. Cohen, A. Anderson, J. Coate (SEIU employee), S. Mueller re IWPR Report (redacted SEIU-CH 3207) | 12/22/2005 | Attorney-Client Privilege |
| Memorandum from C. Weil (The Mintz Group), J. Mintz (The Mintz Group) to D. Dean re interviews in Chicago | 1/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 1/18/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie (The Mintz Group) to D. Dean re interviews in Chicago | 1/19/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 1/19/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Draft memorandum by K. Feiock to D. Dean, K. Krieger, S. Bajkowski re ethical considerations in conducting investigations in Illinois | 1/20/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony (The Mintz Group) to D. Dean re interviews in Chicago | 1/24/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 1/24/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 1/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 1/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 1/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

BREDHOFF & KAISER    Fax:202-842-1888    Apr 6 2007 18:25    P.06

| | | |
|---|---|---|
| Email from K. Feiock to D. Dean, K. Krieger (James & Hoffman attorney) regarding advice to SEIU on referring class representatives | 1/26/2006 | Attorney-Client Privilege |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 1/27/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 1/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Letter from J. Mintz to D. Dean attaching December 2005 invoice for The Mintz Group | 1/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/2/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/2/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/3/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Table of interviews of potential witnesses prepared by The Mintz Group | 2/3/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/8/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/8/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email by K. Feiock to D. Dean, K. Krieger, re ethical considerations in conducting investigations in Illinois | 2/8/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email by D. Dean to K. Feiock, K. Krieger re ethical considerations in conducting investigations in Illinois | 2/8/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/9/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

BREDHOFF & KAISER       Fax:202-842-1888       Apr  6 2007  18:25     P.07

| | | |
|---|---|---|
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/9/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/9/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/13/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, J. Mintz to D. Dean re interviews in Chicago | 2/13/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/14/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, K. McKenzie to D. Dean re interviews in Chicago | 2/14/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/14/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/15/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/15/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/15/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Working Notes of Potential Witnesses from Chicago prepared by Mintz Group | 2/16/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/16/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Table of interviews of potential witnesses prepared by The Mintz Group | 2/16/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from C. Weil to D. Dean and J. Mintz re interviews in Chicago attaching memoranda re Interviews in Chicago | 2/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum from C. Weil, A. Anthony to D. Dean re interviews in Chicago | 2/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 2/21/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Rickling, M. Kapsa re request for data on Chicago hospitals | 2/23/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Letter from J. Mintz to D. Dean attaching January 2006 invoice for The Mintz Group | 2/24/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |

| | | |
|---|---|---|
| Email from M. Rickling to D. Dean, M. Kapsa re request for data on Chicago hospitals | 2/24/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Rickling, M. Kapsa re request for data on Chicago hospitals | 2/24/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email by K. Feiock to D. Dean, K. Krieger re ethical considerations in conducting investigations in Illinois | 2/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Rickling to D. Dean, M. Kapsa re request for data on Chicago hospitals | 2/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 1-2) | 2/28/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 3/7/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Draft interview template for Mintz investigators prepared by The Mintz Group | 3/9/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from C. Weil to D. Small and D. Dean re template for phone calls to witnesses | 3/15/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Feiock to M. Rickling (SEIU employee), M. Kapsa, D. Dean re information on MSAs for use in drafting complaint | 3/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Feiock to M. Rickling, M. Kapsa, D. Dean re information on MSAs for use in drafting complaint | 3/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Rickling to K. Feiock, D. Dean, M. Kapsa re information on MSAs for use in drafting complaint | 3/17/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from C. Weil to D. Dean attaching chart of interviews of witnesses | 3/20/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Rickling to K. Feiock, D. Dean, M. Kapsa re information on MSAs for use in drafting complaint | 3/23/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Kapsa, M. Rickling, K. Feiock re information on MSAs for use in drafting complaint | 3/26/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Feiock to D. Dean re notes on Value Care Value Nurses meeting | 3/27/2006 | Attorney-Client Privilege |
| Email from M. Kapsa to D. Dean, K. Feiock, M. Rickling re information on MSAs for use in drafting complaint | 3/27/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Feiock to M. Kapsa, D. Dean, M. Rickling re information on MSAs for use in drafting complaint | 3/27/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from C. Weil to D. Dean attaching chart of identified staff nurses | 3/29/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

| | | |
|---|---|---|
| Email from M. Rickling to K. Felock, D. Dean, M. Kapsa re Information on MSAs for use in drafting complaint | 3/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from K. Felock to M. Kapsa, D. Dean, M. Rickling re information on MSAs for use in drafting complaint | 3/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 3-4) | 3/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Table: Lost RN Wages by MSA (prepared by attorneys from James & Hoffman) | 4/1/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from C. Weil to D. Dean and J. Mintz re interview in Chicago | 4/19/2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 5) | 4/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 6-7) | 5/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 8-9) | 6/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 10-11) | 7/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 12-13) | 8/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Email from D. Dean to P. Yeghissian and K. Felock re violation of DOJ antitrust guidelines | 9/29/2006 | Attorney-Client Privilege |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 14-16) | 9/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Email from P. Yeghissian to D. Dean and K. Felock re violation of DOJ antitrust guidelines | 10/2/2006 | Attorney-Client Privilege |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 17-20) | 10/31/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |
| Memorandum from N. Gleichman (SEIU attorney) to A. Stern (SEIU President), A. Burger (SEIU Secretary Treasurer), M. Henry (SEIU Executive Vice President), G. Hudson (SEIU Executive Vice President), E. Medina (SEIU Executive Vice President), T. Woodruff (SEIU Executive Vice President), and International Executive Board re document retention and production for Nurse Antitrust litigation | 11/17/2006 | Attorney-Client Privilege |
| James & Hoffman invoice to SEIU (redacted SEIU-CH 21-24) | 11/30/2006 | SEIU has been directed by counsel for plaintiffs to designate the redacted portion of the document as attorney work product |

| | | |
|---|---|---|
| Memorandum from N. Gleichman to Value Care Value Nurses Team re document retention policies for Nurse Antitrust litigation | 12/1/2006 | Attorney-Client Privilege |
| Memorandum from N. Gleichman to Value Care Value Nurses Team re document retention policies for Nurse Antitrust litigation | 12/4/2006 | Attorney-Client Privilege |
| Email from D. Dean to A. Roth (counsel retained by SEIU), R. Weinberg (counsel retained by SEIU) re transmittal of SEIU documents | 12/13/2006 | Attorney-Client Privilege |
| Email from K. Feiock to M. Clash-Drexler (Counsel retained by SEIU) re transmittal of SEIU documents | 1/4/2007 | Attorney-Client Privilege |
| Memorandum from N. Gleichman to Value Care Value Nurses Team re document retention policies | 1/12/2007 | Attorney-Client Privilege |
| Email from K. Feiock to M. Clash-Drexler, D. Dean re transmittal of SEIU documents | 1/18/2007 | Attorney-Client Privilege |
| Letter from K. Feiock to M. Clash-Drexler regarding transmittal of SEIU documents | 1/25/2007 | Attorney-Client Privilege |
| Letter from K. Feiock to M. Clash-Drexler regarding transmittal of SEIU documents | 2/6/2007 | Attorney-Client Privilege |
| Email from M. Clash-Drexler to D. Dean re determination of privilege designations on SEIU documents | 2/12/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Clash-Drexler, A. Roth, C. Tompkins (Cohen Milstein attorney), A. Baker re designation of documents as attorney work product | 2/13/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Clash-Drexler re transmittal of SEIU documents | 2/16/2007 | Attorney-Client Privilege |
| Email from D. Dean to R. Weinberg, A. Roth, M. Clash-Drexler re designation of documents as attorney work product | 2/20/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Clash-Drexler to D. Dean, K. Feiock re determination of privilege designations on SEIU documents | 3/1/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Clash-Drexler to D. Dean re determination of privilege designations on SEIU documents | 3/5/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Clash-Drexler to D. Dean re determination of privilege designations on SEIU documents | 3/6/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Clash-Drexler re determination of privilege designations on SEIU documents | 3/5/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from M. Clash-Drexler to D. Dean re determination of privilege designations on SEIU documents | 3/14/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Email from D. Dean to M. Clash-Drexler re determination of privilege designations on SEIU documents | 3/26/2007 | Attorney-Client Privilege |
| Email from M. Clash-Drexler to Alyson Baker (Cohen Milstein attorney) re designation of documents as attorney work product | 3/28/2007 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

BREDHOFF & KAISER          Fax:202-842-1888          Apr  6 2007  18:26      P.11

| | | |
|---|---|---|
| Table: Lost RN Wages by MSA (prepared by attorneys from James & Hoffman) | Approximately February 2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum by J. Baker and D. Dean re questions for nurse survey | Approximately June 2005 | Attorney-Client Privilege |
| Working Notes on Former Employees from Chicago Hospitals prepared by Mintz Group | Approximately March 2006 | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Edits by D. Dean to the SEIU retainer agreement with Barbara Bergmann | Approximately May 2005 | Attorney-Client Privilege |
| Comments by D. Dean to SEIU re draft of "The Mystery of the Nursing Shortage" by Barbara Bergmann | Approximately November 2004 | Attorney-Client Privilege |
| Draft nurse wage antitrust litigation complaint | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Request for Proposals to identify data showing evidence of collusion among hospitals | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Statistical ranking of cities (prepared by attorneys from James & Hoffman) | undated | Attorney-Client Privilege |
| Draft complaint | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Memorandum by SEIU Legal Department re explanation of SEIU's role in potential wage collusion litigation | undated | Attorney-Client Privilege |
| List of former employees of Chicago hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| List of former employees of Chicago hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| List of former employees of Chicago hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| List of former employees of Chicago hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| List of former employees of Chicago hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Working Notes on Former Employees from Chicago Hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Working Notes on Former Employees from Chicago Hospitals prepared by Mintz Group | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Table: Ranking of MSAs (prepared by attorneys from James & Hoffman) | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |
| Notes prepared by James & Hoffman attorneys re necessary research for antitrust lawsuit | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

| | | |
|---|---|---|
| Edits by James & Hoffman attorneys to SEIU letter regarding the Department of Justice anti-trust guidelines | undated | Attorney-Client Privilege |
| Draft letter prepared by SEIU sent to James & Hoffman seeking advice on letter regarding violations of Department of Justice anti-trust guidelines | undated | Attorney-Client Privilege |
| Edits by James & Hoffman attorneys to the SEIU retainer agreement with Barbara Bergmann | undated | Attorney-Client Privilege |
| Suggested edits to the SEIU retainer agreement with Barbara Bergmann prepared by Jamie Cohen and sent to D. Dean | undated | Attorney-Client Privilege |
| Table on RN wages damages analysis (prepared by K. Felock) | undated | SEIU has been directed by counsel for plaintiffs to designate the document as attorney work product |

Exhibit 18

# JAMES MINTZ GROUP, INC.
# PRIVILEGE LOG
# ALBANY

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE* |
|---|---|---|---|
| NY000001 – NY000014 | Bill for Professional Services | 4/30/06 | Work Product |
| NY000015 – NY000018 | Bill for Professional Services | 08/31/06 | Work Product |
| NY000019 – NY000030 | Bill for Professional Services | 12/15/05 | Work Product |
| NY000031 – NY000047 | Bill for Professional Services | 02/24/05 | Work Product |
| NY000048 – NY000060 | Bill for Professional Services | 01/31/06 | Work Product |
| NY000061   NY000063 | Bill for Professional Services | 07/26/06 | Work Product |
| NY000064 – NY000067 | Bill for Professional Services | 06/26/06 | Work Product |
| NY000068 – NY000081 | Bill for Professional Services | 03/31/06 | Work Product |
| NY000082 – NY000087 | Bill for Professional Services | 05/26/06 | Work Product |
| NY000088 – NY000093 | Bill for Professional Services | 12/17/05 | Work Product |
| NY000094 – NY000099 | Bill for Professional Services | 12/30/06 | Work Product |
| NY000100 – NY000105 | Bill for Professional Services | 10/31/06 | Work Product |
| NY000106 – NY000107 | Bill for Professional Services | 09/30/06 | Work Product |
| NY000108 – NY000109 | Fax to James & Hoffman regarding budget for nurse pay matter | 10/31/05 | Work Product |

---

* The James Mintz Group, Inc. has been instructed by the law firms of James & Hoffman and Cohen Milstein that the categories of documents described in this privilege log are protected by the work product privilege. The documents were prepared under the direction and supervision of lawyers from James & Hoffman and/or Cohen Milstein in anticipation of class action litigation on behalf of nurses against hospital employers and to assist the firms in rendering legal advice. The documents reflect the plans and investigative strategies of the lawyers and reveal their opinions, judgments, and thought processes.

Albany Privilege Log
Page 2 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE* |
|---|---|---|---|
| NY000110 – NY000123 | Investigator Notes | Undated | Work Product |
| NY000124 – NY000125 | Draft Engagement Letter to J&H | 10/11/05 | Work Product |
| NY000126 – NY000127 | Engagement Letter from J&H | 02/09/06 | PRODUCED |
| NY000128 | Email with J&H | 11/10/05 | Work Product |
| NY000129 | Email with J&H | 10/25/05 | Work Product |
| NY000130 – NY000131 | Draft Engagement Letter to James & Hoffman | 10/11/05 | Work Product |
| NY000132 – NY000133 | Engagement Letter from J&H | 02/09/06 | PRODUCED |
| NY000134 | Memorandum to J&H | 11/10/05 | Work Product |
| NY000135 – NY000139 | Chart reflecting phone interviews and info obtained by investigators | 11/10/05 | Work Product |
| NY000140 | Interview Template | undated | Work Product |
| NY000141-NY000142 | Interview Notes | 11/5/05 | Work Product |
| NY000143-NY000144 | Interview Notes | 11/8/05 | Work Product |
| NY000145-NY000147 | Interview Notes | 12/23/05 | Work Product |
| NY000148-NY000150 | Interview Notes | 12/20/05 | Work Product |
| NY000151-NY000153 | Interview Notes | 12/20/05 | Work Product |
| NY000154-NY000156 | Interview Notes | 12/20/05 | Work Product |
| NY000157-NY000160 | Interview Memoranda and Interviewee information | Undated | Work Product |
| NY000161-NY000169 | Interview Memoranda and Interviewee information | Undated | Work Product |
| NY000170-NY000185 | Interview Memoranda and Interviewee information | Undated | Work Product |

Albany Privilege Log
Page 3 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY000186-NY000201 | Interview Memoranda and Interviewee information | Undated | Work Product |
| NY000202-NY000209 | Phoned Interview Notes | 11/10/05 | Work Product |
| NY000210-NY000212 | Phoned Interview Notes | 11/09/05 | Work Product |
| NY000213-NY000221 | Interview Notes to Date | Various dates | Work Product |
| NY000222-NY000230 | Investigative Notes | Undated | Work Product |
| NY000231-NY000239 | Investigative Notes | Undated | Work Product |
| NY000240-NY000247 | Investigative Notes | Undated | Work Product |
| NY000248 | E-mail with JMG | 12/19/05 | Work Product |
| NY000249-NY000250 | Investigative Notes | Undated | Work Product |
| NY000251-NY000253 | Follow-up Templates | Undated | Work Product |
| NY000254 | Follow-up Templates | 11/15/06 | Work Product |
| NY000255 | Interview Template | Undated | Work Product |
| NY000256-NY000258 | New Contact Template | Undated | Work Product |
| NY000259-NY000261 | New Contact Template | Undated | Work Product |
| NY000262 | Notification Template | 06/09/06 | Work Product |
| NY000263-NY000794 | Hospital Information Lists | Undated | Work Product |
| NY000795-NY000801 | Chart: Interview Memoranda | 09/06/05 | Work Product |
| NY000802-NY000808 | Chart: Interview Memoranda | 09/09/05 | Work Product |
| NY000809-NY001488 | Chart: Hospital lists and Interviewee personal information | Undated | Work Product |
| NY001489-NY001498 | Nurse Questionnaire | 08/04/05 | Work Product |
| NY001499-NY001501 | Database Report | Undated | Work Product |
| NY001502-NY001531 | Chart: Interview Lists | Undated | Work Product |
| NY001532-NY001675 | Chart: Nurse Employment and Salary | Undated | Work Product |

Albany Privilege Log
Page 4 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE[1] |
|---|---|---|---|
| NY001676-NY001678 | Work Conditions Prep. Sheet | Undated | Work Product |
| NY001679 | Hospital listings | Undated | Work Product |
| NY001680-NY001684 | Interview Memoranda | 9/7/05 | Work Product |
| NY001685-NY001691 | Interview Memoranda | 9/905 | Work Product |
| NY001692-NY001693 | Interview Memoranda | 9/6/05 | Work Product |
| NY001694-NY002001 | Chart: Hospital Lists and Nurse Questionnaire | Undated | Work Product |
| NY002002-NY002004 | Hospital collusion level Draft | 10/18/05 | Work Product |
| NY002005-NY002006 | Hospital collusion level Draft | 10/18/05 | Work Product |
| NY002007-NY002045 | Chart: Interviews to Date | 3/20/05 | Work Product |
| NY002046-NY002098 | Chart:  Interviews to Date | 3/20/06 | Work Product |
| NY2099 | Memorandum to J&H | 11/10/05 | Work Product |
| NY002100-NY002102 | Chart reflecting phone interviews and info obtained by investigators | 11/10/05 | Work Product |
| NY002103 | Interview Template | Undated | Work Product |
| NY002104-NY002109 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY002110-NY002119 | Chart: Witness Notes | 3/29/06 | Work Product |
| NY002120-NY002121 | (Same as NY002005-NY002006) | 10/18/05 | Work Product |
| NY002122-NY002141 | Chart: Witness Notes | 11/2/05 | Work Product |
| NY002142-NY002152 | Chart: Witness Notes | 3/29/06 | Work Product |
| NY002153-NY002158 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY002159-NY002178 | Chart: Witness Notes | 11/10/05 | Work Product |
| NY002179 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY002180 | Interviewee Names and Phones #s | Undated | Work Product |
| NY002182-NY002185 | Handwritten Notes | Undated | Work Product |
| NY002186-NY002188 | E-mail Notifications list | 05/24/06 | Work Product |

Albany Privilege Log
Page 5 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY002189-NY002190 | Investigator Notes | Undated | Work Product |
| NY002191-NY002199 | Chart: Witness Notes | 11/10/05 | Work Product |
| NY002200 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY002201-NY002270 | Database Comprehensive Report (X2) | 06/19/06 | Work Product |
| NY002271 | Notification List | 05/30/06 | Work Product |
| NY002272-NY002288 | Chart: Witness List | 05/30/06 | Work Product |
| NY002289 | E-mail with J&H | 12/10/05 | Work Product |
| NY002290-NY002291 | Investigative Search Results | 12/16/05 | Work Product |
| NY002292-NY002293 | Investigative Search Results and E-mail | 12/20/05 | Work Product |
| NY002294-NY002314 | Database Comprehensive Report | 12/20/05 | Work Product |
| NY002315-NY002321 | Chart: Witness Notes | Undated | Work Product |
| N002322-NY002323 | On-Line Article Print Out | 5/19/05 | Work Product |
| NY002324 | New York Voter Information | 12/23/05 | Work Product |
| NY002325 | Property Transfer Record | 12/23/05 | Work Product |
| NY002326-NY002329 | Database Comprehensive Report | 10/26/05 | Work Product |
| NY002330-NY002335 | Database Comprehensive Report | 10/27/05 | Work Product |
| NY002336 | Database Comprehensive Report | 11/2/05 | Work Product |
| NY002337-NY002346 | Witness Search Print Outs | 11/04/05 | Work Product |
| NY002347-NY002354 | Witness Search Print Outs | 10/26/05 | Work Product |
| NY002355-NY002358 | Witness Search Print Outs | 11/2/05 | Work Product |
| NY002359-NY002378 | Database Comprehensive Report | 11/10/05 | Work Product |
| NY002379-NY002381 | Improvement Report (IHI) | 11/3/05 | Work Product |

Albany Privilege Log
Page 6 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY002382 | On-Line Article Print Out | April/May 2004 | Work Product |
| NY002383 | On-Line Article Print Out | 11/3/05 | Work Product |
| NY002384-NY002385 | On-Line Article Print Out | 1/16/04 | Work Product |
| NY002386-NY002387 | On-Line Article Print Out | 07/21/02 | Work Product |
| NY002388-NY002389 | On-Line Article Print Out | 01/05/04 | Work Product |
| NY002390-NY002392 | On-Line Article Print Out | 05/25/00 | Work Product |
| NY002393 | On-Line Article Print Out | 06/16/04 | Work Product |
| NY002394-NY002397 | Staff Directory | 10/25/05 | Work Product |
| NY002398-NY002405 | Employee Listing | 10/25/05 | Work Product |
| NY002406-NY002407 | Employee Listing | 10/25/05 | Work Product |
| NY002408-NY002409 | (Same as NY002322-NY002323) | 05/19/05 | Work Product |
| NY002410 | On-Line Article Print Out | Sept. 2004 | Work Product |
| NY002411-NY002412 | Employee Listing | 02/09/05 | Work Product |
| NY002413-NY002414 | On-Line Article Print Out | 02/05/02 | Work Product |
| NY002415-NY002416 | On-Line Article Print Out | 11/29/02 | Work Product |
| NY002417 | On-Line Article Print Out | Undated | Work Product |
| NY002418 | Witness Search Results | 10/31/05 | Work Product |
| NY002419-NY002420 | Witness Search Results | 11/4/05 | Work Product |
| NY002421-NY002431 | Witness Search Results | 10/31/05 | Work Product |
| NY002432 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY002433-NY002436 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY002437-NY002439 | Albany Nursing Magazine Print | Dec. 2002 | Work Product |
| NY002440-NY002443 | On-line Article Print Out | 12/20/05 | Work Product |
| NY002444 | Hospital Listings | Undated | Work Product |
| NY002445-NY002446 | Employee Lists | Undated | Work Product |
| NY002447-NY002448 | On-line Article Print Out | 04/01/96 | Work Product |
| NY002449 | On-line article Print Out | 08/19/96 | Work Product |

Albany Privilege Log
Page 7 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY002450 | (same as NY002444) | Undated | Work Product |
| NY002451-NY002452 | (same as NY002445-NY002446) | Undated | Work Product |
| NY002453-NY002455 | (same as NY002437-NY002439) | Dec. 2002 | Work Product |
| NY002456-NY002457 | Personal Bio. | Undated | Work Product |
| NY002458-NY002466 | Chart: Witness Notes | Undated | Work Product |
| NY002467-NY002478 | Chart: Memorialized Interviews to Date | 12/19/05 | Work Product |
| NY002479-NY002531 | Chart: Memorialized Interviews to Date | 03/20/06 | Work Product |
| NY002532-NY002545 | Follow-up Templates | Undated | Work Product |
| NY002546 | Calls to Date by MSA | 11/10/05 | Work Product |
| NY002547-NY002549 | Chart: Recruiter Information | Undated | Work Product |
| NY002550-NY002553 | Key Employee Depts. And Titles | 10/18/05 | Work Product |
| NY002554 | Approvals | 2/23/06 | Work Product |
| NY002555 | Notification List | 06/19/06 | Work Product |
| NY002556-NY002589 | Chart: Interview Lists | Undated | Work Product |
| NY002590 | Chart: Interview Bill | 10/25/05 | Work Product |
| NY002591 | Investigator Assignments | Undated | Work Product |
| NY002592 | Chart: Investigator Prices to Date | 11/18/05 | Work Product |
| NY002593 | Chart: Investigator Prices to Date | Undated | Work Product |
| NY002594-002595 | Draft memorandum regarding nurse pay investigation | 12/2/05 | Work Product |
| NY002596-NY002600 | Key Employee Depts. And Titles | 10/18/05 | Work Product |

Albany Privilege Log
Page 8 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY002601-NY002608 | Handwritten Notes | Undated | Work Product |
| NY002609-NY002611 | Investigation Highlights to Date | 11/07/05 | Work Product |
| NY002612-NY002625 | Bill for Professional Services | 04/30/06 | Work Product |
| NY002626-NY002629 | Bill for Professional Services | 08/31/06 | Work Product |
| NY002630-NY002641 | Bill For Professional Services | 12/13/05 | Work Product |
| NY002642-NY002658 | Bill for Professional Services | 02/24/06 | Work Product |
| NY002659-NY002671 | Bill for Professional Services | 01/31/06 | Work Product |
| NY002672-NY002674 | Bill for Professional Services | 07/28/06 | Work Product |
| NY002675-NY002678 | Bill for Professional Services | 06/26/06 | Work Product |
| NY002679-NY002693 | Bill for Professional Services | 03/31/06 | Work Product |
| NY002693-NY002698 | Bill for Professional Services | 05/26/06 | Work Product |
| NY002699-NY002704 | Bill for Professional Services | 11/17/05 | Work Product |
| NY002705-NY002710 | Bill for Professional Services | 11/30/06 | Work Product |
| NY002711-NY002716 | Bill for Professional Services | 10/31/06 | Work Product |
| NY002717-NY002718 | Bill for Professional Services | 09/30/06 | Work Product |
| NY002719-NY002720 | Fax to J&H regarding budget for nurse pay matter | 10/31/05 | Work Product |
| NY002721-NY002722 | Investigator Notes | Undated | Work Product |
| NY002723 | Memorandum summarizing nurse wage research | 9/14/05 | Work Product |
| NY002724 | Investigator Notes | Undated | Work Product |
| NY002725 | Email to J&H confirming conference call | 10/05/05 | Work Product |
| NY002726 | Investigative Notes | Undated | Work Product |
| NY002727 | Notes from conference call with counsel | Undated | Work Product |
| NY002728-NY002734 | Investigative Notes | Undated | Work Product |
| NY002735-NY002736 | Draft Engagement Letter | 10/11/05 | Work Product |

8

Albany Privilege Log
Page 9 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY002737-NY002738 | Engagement Letter from J&H | 02/09/06 | PRODUCED |
| NY002739 | Email from J&H regarding budget for nurse pay matter | 11/10/05 | Work Product |
| NY002740 | Email from J&H regarding nurse pay matter | 10/25/05 | Work Product |
| NY002741-NY002742 | Draft Engagement Letter to James & Hoffman | 10/11/05 | Work Product |
| NY002743-NY002744 | Engagement Letter from J&H | 02/09/06 | PRODUCED |
| NY002745 | Memorandum to J&H | 11/10/05 | Work Product |
| NY002746-NY002750 | Chart: Calls reflecting phone interviews and info obtained by investigators | 11/10/05 | Work Product |
| NY002751 | Interview Template | Undated | Work Product |
| NY002752-NY002753 | Memorandum to J&H regarding nurse interviews | 11/08/05 | Work Product |
| NY002754-NY002755 | Memorandum to J&H regarding nurse interviews | 11/08/05 | Work Product |
| NY002756-NY002758 | Memorandum to J&H regarding nurse interviews | 12/23/05 | Work Product |
| NY002759-NY002761 | Memorandum to J&H regarding nurse interviews | 12/23/05 | Work Product |
| NY002762-NY002764 | Memorandum to J&H regarding nurse interviews | 12/20/05 | Work Product |
| NY002765-NY002767 | Memorandum to J&H regarding nurse interviews | 12/20/05 | Work Product |
| NY002768-NY002771 | Interview Memoranda | Undated | Work Product |
| NY002772-NY002780 | Interview Memoranda | Undated | Work Product |
| NY002781-NY002796 | Interview Memoranda | Undated | Work Product |
| NY002797-NY002812 | Interview Memoranda | Undated | Work Product |

Albany Privilege Log
Page 10 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE* |
|---|---|---|---|
| NY002813-NY002823 | Handwritten Notes | 11/9-11/10/05 | Work Product |
| NY002824-NY002832 | Investigator Notes | Undated | Work Product |
| NY002833-NY002840 | Investigator Notes | Undated | Work Product |
| NY002841 | Email w/ JMG | 10/16/05 | Work Product |
| NY002842-NY002844 | Interview Notes | Undated | Work Product |
| NY002845-NY002846 | Email of Interview Notes | 12/19/05 | Work Product |
| NY002847-NY002859 | Interview Notes | Undated | Work Product |
| NY002860-NY002861 | Investigator Notes | Undated | Work Product |
| NY002862-NY002864 | Interview Templates | Undated | Work Product |
| NY002865 | Follow-up Template | 11/15/06 | Work Product |
| NY002866 | Interview Template | Undated | Work Product |
| NY002867-NY002869 | Interview Templates | Undated | Work Product |
| NY002870-NY002872 | Interview Templates | Undated | Work Product |
| NY002873 | Notification Templates | 06/09/06 | Work Product |
| NY002874-NY003405 | Chart: Hospital Lists | Undated | Work Product |
| NY003406-NY003407 | Emailed Interview Notes | 10/06/05 | Work Product |
| NY003408-NY003412 | Emailed Interview Notes | 10/07/05 | Work Product |
| NY003413-NY003419 | Emailed Interview Notes | 10/09/05 | Work Product |
| NY003420-NY004099 | Chart: Hospital Lists | Undated | Work Product |
| NY004100-NY004109 | Nurse Questionnaire | 08/04/05 | Work Product |
| NY004110-NY004112 | Data Report | Undated | Work Product |
| NY004113-NY004142 | Chart: Interview Lists | Undated | Work Product |
| NY004143-NY004286 | Chart: Hospital Lists | Undated | Work Product |
| NY004287-NY004289 | Interview Preparation sheet | Undated | Work Product |
| NY004290 | Hospital City Listings | Undated | Work Product |
| NY004291-NY004295 | Interview Memoranda | 9/7/05 | Work Product |
| NY004596-NY004302 | Interview Memoranda | 9/9/05 | Work Product |
| NY004303-NY004304 | Interview Memoranda | 9/6/05 | Work Product |
| NY004305-NY004612 | Chart: Hospital Lists | Undated | Work Product |

Albany Privilege Log
Page 11 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY004613-NY004615 | Hospital Collusion Level Draft | 10/20/05 | Work Product |
| NY004616-NY004617 | Hospital Collusion Level Draft | 10/18/05 | Work Product |
| NY004618-NY004656 | Memorialized Interviews to Date | 02/16/06 | Work Product |
| NY004657-NY004709 | Memorialized Interviews to Date | 3/20/06 | Work Product |
| NY004710 | Memorandum to J&H | 11/10/05 | Work Product |
| NY004711-NY004713 | Chart reflecting phone interviews and info obtained by investigators | 11/10/05 | Work Product |
| NY004714 | Interview Template | Undated | Work Product |
| NY004715-NY004720 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY004721-NY004730 | Chart: Witness Notes | 3/29/06 | Work Product |
| NY004731-NY004732 | Hospital Collusion Level Draft | 10/18/05 | Work Product |
| NY004733-NY004752 | Chart: Witness Notes | 11/02/05 | Work Product |
| NY004753-NY004763 | Chart: Witness Notes | 03/29/05 | Work Product |
| NY004764-NY004769 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY004770-NY004789 | Chart: Witness Notes | 11/10/05 | Work Product |
| NY004790 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY004791 | Investigator Notes | Undated | Work Product |
| NY004792 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY004793-NY004796 | Investigator Notes | Undated | Work Product |
| NY004797-NY004799 | E-mail Notification List | 05/24/06 | Work Product |
| NY004800-NY004801 | Investigative Notes | Undated | Work Product |
| NY004802-NY004810 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY004812-NY004881 | Database Reports | 06/19/06 | Work Product |

11

Albany Privilege Log
Page 12 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE* |
|---|---|---|---|
| NY004882 | Notification List | 05/30/06 | Work Product |
| NY004883-NY004899 | Chart: Witness Notes | 11/10/05 | Work Product |
| NY004900 | Internal Email | 12/20/05 | Work Product |
| NY004901-NY004902 | Investigative On-line Search | 12/16/05 | Work Product |
| NY004903 | Internal Email | 12/20/05 | Work Product |
| NY004904 | Investigative On-line Search | 12/16/05 | Work Product |
| NY004905-NY004925 | Database Comprehensive Reports | 12/20/05 | Work Product |
| NY004926-NY004932 | Chart: Interviewee names, addresses, phone #s | Undated | Work Product |
| NY004933-NY004934 | On-Line Article Print Out | 05/19/05 | Work Product |
| NY004935 | Voter Registration Information | 12/23/05 | Work Product |
| NY004937-NY004947 | Database Comprehensive Report | 10/26/05 | Work Product |
| NY004948 | Witness On-line Search | 11/04/05 | Work Product |
| NY004949 | Witness On-line Search | 11/04/05 | Work Product |
| NY004950-NY004957 | Witness Search and Results | 11/04/05 | Work Product |
| NY004958-NY004965 | Witness Search and Results | 10/26/05 | Work Product |
| NY004966-NY004969 | Witness Search and Results | 11/02/05 | Work Product |
| NY004970-NY004989 | Database Comprehensive Report | 11/10/05 | Work Product |
| NY004990-NY004992 | Improvement Report | 11/03/05 | Work Product |
| NY004993 | On-line article Print Out | April/May '04 | Work Product |
| NY004994 | On-line Article Print Out | 11/03/05 | Work Product |
| NY004995-NY004996 | On-line Article Print Out | 11/02/05 | Work Product |
| NY004997-NY004998 | On-line Article Print Out | 10/25/05 | Work Product |
| NY004999-NY005000 | On-line Article Print Out | 01/05/04 | Work Product |
| NY005001-NY005003 | On-line Article Print Out | 05/25/00 | Work Product |

Albany Privilege Log
Page 13 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY005004 | On-line Article Print Out | 06/16/04 | Work Product |
| NY005005-NY005008 | Staff Directory | 10/25/05 | Work Product |
| NY005009-NY005018 | Employee Listing | 10/25/05 | Work Product |
| NY005019-NY005020 | On-line Article Print Out | 05/19/05 | Work Product |
| NY005021 | On-line Article Print Out | Sept. '04 | Work Product |
| NY005022-NY005023 | Employee Listing | 10/25/05 | Work Product |
| NY005024-NY005025 | On-line Article Print Out | 02/05/05 | Work Product |
| NY005026-NY005027 | On-line Article Print Out | 11/29/02 | Work Product |
| NY005028 | On-line Article Print Out | Undated | Work Product |
| NY005029 | Investigative Search and Results | 10/31/05 | Work Product |
| NY005030-NY005031 | Investigative Search and Results | 11/04/05 | Work Product |
| NY005032-NY005042 | Investigative Search and Results | 10/31/05 | Work Product |
| NY005043 | Chart: Witness Notes | 10/21/05 | Work Product |
| NY005044-NY005047 | Chart: Witness Notes | 10/25/05 | Work Product |
| NY005048-NY005050 | Medical Magazine Article | Dec. 2002 | Work Product |
| NY005051-NY005054 | On-line Article Print Out | 12/20/05 | Work Product |
| NY005055-NY005057 | Healthcare Listings | Undated | Work Product |
| NY005058-NY005059 | On-line Article Print Out | 04/01/96 | Work Product |
| NY005060 | On-line Article Print Out | 08/19/96 | Work Product |
| NY005061-NY005063 | Healthcare Listings | Undated | Work Product |
| NY005064-NY005066 | Medical Magazine Article | Dec. 2002 | Work Product |
| NY005067-NY005068 | Personal Bio. | Undated | Work Product |
| NY005069-NY005080 | Chart: Witness Interviews | 12/19/05 | Work Product |
| NY005801-NY005089 | Chart: Witness Information | Undated | Work Product |
| NY005090-NY005142 | Memorialized Interviews to Date | 03/20/06 | Work Product |

Albany Privilege Log
Page 14 of 14

| BATES NUMBERS | DESCRIPTION | DATE | PRIVILEGE |
|---|---|---|---|
| NY005143-NY005156 | Follow-up Preparation Lists | Undated | Work Product |
| NY005157 | MSA Calls to Date | 11/10/05 | Work Product |
| NY005158-NY005160 | Chart: Recruiter Information | Undated | Work Product |
| NY005161-NY005164 | Employee Depts. And Titles | 10/18/05 | Work Product |
| NY005165 | Approvals | 02/23/06 | Work Product |
| NY005166 | Notification List | 06/19/06 | Work Product |
| NY005167-NY005200 | Chart: Witness Interviews | Undated | Work Product |
| NY005201-NY005202 | Bill for Professional Services | 10/25/05 | Work Product |
| NY005203 | Bill for Professional Services | 11/18/05 | Work Product |
| NY005204 | Bill for Professional Services | Undated | Work Product |
| NY005205-NY005206 | Phase Three Investigation Report | 12/02/05 | Work Product |
| NY005207-NY005214 | Investigator Notes | Undated | Work Product |
| NY005215-NY005217 | Investigation Highlights to Date | 11/07/05 | Work Product |
| NY005218-NY005222 | Key Employee Depts. And Titles | 10/18/05 | Work Product |

Exhibit 19

LEXSEE 1996 US DIST LEXIS 4495



Analysis
As of: Nov 15, 2007

### CHICAGO MEAT PROCESSORS, INC., Plaintiff, v. MID-CENTURY INSURANCE COMPANY AND TRUCK INSURANCE EXCHANGE, Defendants.

#### No. 95 C 4277

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1996 U.S. Dist. LEXIS 4495*

**April 9, 1996, Decided
April 10, 1996, DOCKETED**

**DISPOSITION:**    [*1]  Plaintiff's motion to compel denied in part and granted in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an insured, moved to compel the production of five documents from defendant, an insurer, in litigation related to the insurer's denial of the insured's claim for coverage under an insurance policy. The insurer asserted that the documents were protected by the attorney-client and work product privileges.

**OVERVIEW:** The insured, a meat processing plant, submitted a claim for a loss suffered when one of its refrigeration units malfunctioned. The insurer consulted with outside counsel during the investigation, and ultimately denied the insured's claim. In its resulting action, the insured filed a motion to compel production of certain documents which the insurer alleged were protected by the attorney-client privilege or by the work product doctrine. The court found that if an insurer retained the services of an attorney who essentially acted as a claims adjuster, the documents produced by the attorney during the investigation of a claim were not privileged. The court also held that the reports sought by the insured were the types of reports that the insurer would have prepared in the ordinary course of business, and therefore they were not attorney work product. As such, the court ordered the insurer to produce all or portions of the documents sought by the insured.

**OUTCOME:** The court granted the insured's motion in part, directing the insurer to produce all or parts of the five requested documents.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN1] *Fed. R. Evid. 501* requires the federal district court to apply state law to the issue of the applicability of the attorney-client privilege.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Exceptions*
*Insurance Law > Industry Regulation > Insurance Company Operations > Representatives > Adjusters & Investigators > General Overview*
[HN2] In the insurance context, to the extent that an attorney acts as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client privilege does not apply.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN3] The work product privilege is governed by federal law in a diversity case. The work product privilege applies to materials prepared in anticipation of litigation. *Fed. R. Civ. P. 26(b)(3)*. The mere fact that litigation does eventually ensue, does not, by itself cloak materials prepared by an attorney with the work product privilege.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN4] If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is producible in civil pre-trial discovery. The party seeking to assert the work product privilege has the burden of proving that at the very least some articulable claim, likely to lead to litigation has arisen.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*

[HN5] To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense.

**COUNSEL:** For CHICAGO MEAT PROCESSORS, INC., plaintiff: Glenn E. Heilizer, [COR LD NTC A], Laterza & Heilizer, Chicago, Il.

For MID-CENTURY INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, defendants: William J. Sneckenberg, [COR], Stuart Morris Brody, [COR LD NTC A], William J. Sneckenberg & Associates, Ltd., Chicago, IL.

**JUDGES:** MORTON DENLOW, United States Magistrate Judge. Judge James F. Holderman

**OPINION BY:** MORTON DENLOW

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Chicago Meat Processors, Inc. ("CMP"), moves to compel the production of five [1] documents of its insurer, defendant Mid-Century Insurance Company ("Mid-Century"). Mid-Century has refused to produce these documents claiming attorney-client and work

product privileges. CMP's motion presents the important question of whether and to what extent written communications between an insurance company and their outside counsel are discoverable. The documents at issue were prepared after outside counsel was retained "to assist in the investigation, handling and processing" of an insurance claim, prior to denial of the claim by the insurance company, and prior to the institution of any litigation. The documents were reviewed by the [*2] court in-camera, and the parties' positions fully briefed and orally argued. For the reasons given below, CMP's motion is granted in part and denied in part.

> 1    At the time the motion was filed, thirty-two (32) documents were involved. Since that time, Mid-Century has voluntarily produced twenty-seven (27) documents. Following the oral argument, Mid-Century voluntarily agreed to produce portions of four out of the five remaining documents.

**I. FACTUAL BACKGROUND.**

CMP operates a meat processing plant in Chicago. CMP's business operations require the storage of large quantities of meat inventory at the plant and it maintains several coolers to regulate the temperature of the inventory. (Comp. and Ans. P 6). CMP was insured by Mid-Century under a commercial policy. (Comp. and Ans. P 9, and Ex. A to Ans.).

On Monday, October 10, 1994, CMP reported a loss to Mid-Century claiming that one of the coolers had malfunctioned over the weekend causing the spoilage of certain meat inventory. (Comp. and Ans. P 7). [*3] At the time of the claim there was initial confusion as to whether Mid-Century or defendant Truck Insurance Company ("Truck Insurance") had issued the policy. (Comp. and Ans. P 10). Both companies are part of the Farmers Insurance Group. In November, 1994, Mid-Century retained outside counsel to assist it in the review and investigation of the claim.

On November 28, 1994, the law firm of William J. Sneckenberg & Associates wrote to CMP to advise it that the law firm had been retained "to assist in the investigation, handling and processing" of the CMP claim. (Pl. Mot. To Compel, Ex. 1). In that letter, the law firm advised CMP that it was required "to assist the Company and cooperate with us in any investigation and processing of the claim". Counsel indicated that it would request CMP to produce documents pursuant to a document request and to make its president, Peter Tountas, available for an examination under oath pursuant to the policy. Id.

An investigation of CMP's claim was undertaken by outside counsel in conjunction with the Illinois Commer-

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 4 of 41

Page 3
1996 U.S. Dist. LEXIS 4495, *

cial Claims Office of the Farmers Insurance Group of Companies. (Ans. P 13f). The Illinois Insurance Code requires Mid-Century to conduct [*4] a reasonable investigation of claims based on all available information. *215 ILCS 5/154.6.* The insurance policy requires CMP to cooperate with Mid-America in the investigation of the claims and to submit to an examination under oath in connection with any claim. (Ans. Ex. A). CMP's claim was denied in May, 1995 "predicated upon material misrepresentations made by [CMP's president], including but not limited to, misrepresentations in connection with the issuance of the policy, in connection with the factual statements in the proofs of loss, concerning the loss how it occurred, during the examination under oath, and concerning the nature and extent of the claimed meat and business interruption losses." (Comp. P 15).

CMP initiated this three-count action in July, 1995 against Mid-Century and Truck Insurance. Count I is a claim against Mid-Century for breach of contract and vexatious and unreasonable delay in the processing of its claim within the meaning of *215 ILCS 5/155.* Count II is an action for fraud against Mid-Century and Truck Insurance in the handling and processing of the claim. Count III is an action against Truck Insurance for intentional interference with contract. Count [*5] I has been answered and motions to dismiss are pending on Counts II and III.

The five documents (#2, 6, 20, 23, 25) which are being withheld from production are described in Mid-Century's privilege log (Ex. A to Mid-Century's Response) as follows:

> **Document 2.** Correspondence sent to William J. Sneckenberg & Assoc. from client requesting legal advice and assistance dated 11/9/94.
>
> Basis for Non-Production: Attorney-Client Privilege;
>
> **Document 6.** Correspondence sent to client from William J. Sneckenberg & Assoc. dated 12/13/94 with enclosures.
>
> Basis for Non-Production: Attorney-Client privilege;
>
> **Document 20.** Correspondence to Thomas Smith, Vice-President-Commercial Claims from W.C. Bonifas, Director Commercial Claims, regarding claim dated 4/4/95 with enclosure.
>
> Basis for Non-Production: Attorney-Client Privilege;

> **Document 23.** Correspondence sent to client from William J. Sneckenberg & Assoc. Dated 4/18/95.
>
> Basis for Non-Production: Attorney-Client Privilege; and
>
> **Document 25.** Correspondence between Jim Radecki, Commercial Claims Manager and W.C. Bonifas, Director-Commercial Claims dated 5/3/95 and 5/5/95 with [*6] enclosures.
>
> Basis for Non-Production: Attorney-Client Privilege and Work-Product Doctrine.

According to Mid-Century, the ultimate decision to deny CMP's claim was made by Paul A. Augustine ("Augustine"), Central Zone Manager for Commercial Claims, who approved the denial of the claim based upon the recommendation of Jim Radecki ("Radecki"), Commercial Claims Manager, and based upon information, advice and opinions presented to him by Radecki and Todd Brooks ("Brooks"), Supervisor of Property Claims (Mid-Century Resp. Ex. B and C). On May 3, 1995, Radecki requested approval of his decision to deny coverage of the CMP claim and Augustine granted that approval on May 5. Therefore, all of the documents involved in the motion, were created on or before the final decision was made to deny the CMP claim.

## II. THE ATTORNEY-CLIENT PRIVILEGE PRIOR TO THE DENIAL OF AN INSURANCE CLAIM.

Federal jurisdiction of this action is founded on diversity of citizenship. *28 U.S.C. § 1331.* [HN1] *Rule 501 of the Federal Rules of Evidence* requires the court to apply State law to the issue of the applicability of the attorney-client privilege. Accordingly, the court shall apply Illinois law in determining [*7] the scope of the attorney-client privilege. *Dawson v. New York Life Insurance Co., 901 F. Supp. 1362, 1366 (N.D. Ill. 1995).*

The Illinois Supreme Court has adopted a narrow control group test for the privilege. *Consolidated Coal Company v. Bucyrus-Erie Company, 89 Ill. 2d 103, 432 N.E.2d 250, 59 Ill. Dec. 666 (1982);* *Dell v. Board of Education, Township High School District 113, 32 F.3d 1053, 1065, n.26* ("Illinois uses the 'control group' test to determine whether an employee shares the attorney-client privilege of an employer."). The Supreme Court noted that the purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor. However, the Court was concerned that the privilege could be used as an ab-

solute bar to discovery of relevant and material facts in the corporate context, given the large number of employees, frequent dealings with lawyers and masses of documents. *Consolidated, 432 N.E.2d at 256.* "That result, in our judgment, is fundamentally incompatible with this State's broad discovery policies looking to the ultimate ascertainment of the truth [cites omitted] which we continue to find [*8] essential to the fair disposition of a lawsuit." *Id. at 257.* "Its potential to insulate so much material from the truth-seeking process convinces us that the privilege ought to be limited for the corporate client to the extent reasonably necessary to achieve its purpose." Id.

[HN2] In the insurance context, to the extent that an attorney acts as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client privilege does not apply. See, *Mission National Company v. Lilly, 112 F.R.D. 160, 163 (D. Minn. 1986)* (fire loss claim) ("To the extent that [outside counsel] acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of the plaintiff, outside the scope of the asserted privileges"); *Allendale Mutual Insurance Company v. Bull Data Systems, Inc., 152 F.R.D. 132, 137 (N.D. Ill. 1993)* (fire loss claim) ("The fact that the material was produced originally by a lawyer is irrelevant if, as is the case here, the material reflects ordinary insurance information."). *Dawson v. New York Life Insurance Co., 901 F. Supp. 1362, 1367 [*9] (N.D. Ill. 1995)* (attorney-client privilege did not attach where attorneys were acting more as "couriers of factual information" rather than "legal advisors").

The public policy issue behind this result is that insurance companies, which are in the business of reviewing, processing and adjusting claims, should not be permitted to insulate the factual findings of its claims investigation by the involvement of an attorney to perform such work. Therefore, the factual results of such an investigation are discoverable in cases challenging the denial of the claim, to the same extent as if such factual investigation were conducted by its own adjusters or claims department. See also, *Harper v. Auto-Owners Insurance Company, 138 F.R.D. 655 (S.D. Ind. 1991)* (fire loss) (documents prepared by outside counsel hired five days after fire to monitor progress of case and to conduct examination under oath of insureds were not subject to the attorney-client privilege to the extent that the attorney acted as claims adjuster, claims process supervisor, claims investigation monitor, and not as legal advisor). The foregoing cases are consistent with the concerns raised by the Illinois [*10] Supreme Court in *Consolidated Coal* to limit the scope of the attorney-client privilege.

## III. THE ATTORNEY WORK PRODUCT PRIVILEGE PRIOR TO THE DENIAL OF AN INSURANCE CLAIM.

CMP also relies upon the attorney work product privilege as an additional basis for withholding document number 25. [HN3] The work product privilege is governed by federal law in a diversity case. *Dawson, 901 F. Supp. at 1367.* The work product privilege applies to materials prepared "in anticipation of litigation...", *Fed. R.Civ. P. 26(b)(3).* The mere fact that litigation does eventually ensue, does not, by itself cloak materials prepared by an attorney with the work product privilege. *Binks Manufacturing Co. v. National Presto Industries, Inc., 709 F.2d 1109, 1118 (7th Cir. 1983).* [HN4] If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is producible in civil pre-trial discovery. *Id. at 1119.* The party seeking to assert the work product privilege has the burden of proving that at the very least some articulable claim, likely to lead to litigation has arisen. Id. [*11] As the court in *Binks* noted, it is often difficult to determine with precision when a particular attorney's work is "in anticipation of litigation" rather than "an investigative report developed in the ordinary course of business."

The work performed by outside counsel in this case appears largely to have been the type of report which one would expect an insurance company to have prepared in the ordinary course of its business as required by the Illinois Insurance Code and anticipated by the policy. On the other hand, as the investigation came towards a conclusion, the final report contains some mental impressions, conclusions, opinions and possible legal theories which represent attorney work product and which are deserving of protection.

## IV. MID-CENTURY HAS NOT WAIVED THE ATTORNEY-CLIENT PRIVILEGE IN ITS ANSWER.

CMP asserts that Mid-Century waived its attorney-client privilege by denying CMP's claim. This argument is rejected because Mid-Century has not raised as an affirmative defense reliance on counsel in support of its defense to the good faith claim. In *Lorenz v. Valley Forge Insurance Company, 815 F.2d 1095 (7th Cir. 1987),* the plaintiff sued its insurer for [*12] breach of contract and bad faith in denying an insurance claim. Plaintiff claimed that a memorandum sent to the defendant by its former attorney was subject to disclosure claiming the attorney-client privilege had been waived by voluntarily injecting its good faith in the settlement

negotiations as a material issue in the case. The court rejected this argument stating (*815 F.2d at 1097*):

> [HN5] To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense.

In the instant case, Mid-Century has simply denied CMP's allegations of bad faith. This denial is insufficient to waive the privilege. See also, *Dawson, 901 F. Supp. at 1369*; *Sylgab Steel & Wire Corp. v. Imoco--Gateway Corp., 62 F.R.D. 454 (N.D. Ill. 1974)* (attorney-client privilege not waived during bargaining); *Dorr-Oliver, Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1011-2 (N.D. Ill. 1993)* (Defendants good faith reliance on opinion of counsel as a defense waives attorney-client privilege). [*13] Mid-Century must recognize that it cannot have it both ways. It cannot seek refuge in consultation with counsel as evidence of their good faith, yet prevent CMP from discovering the contents of the communication. To this point, Mid-Century has not raised its reliance on counsel as a defense and the privilege, to the extent it exists, has not been waived. However, if good faith reliance on counsel does become an affirmative defense, this discovery matter should be revisited.

## V. PRODUCTION ORDER.

## IT IS THEREFORE ORDERED:

Applying the foregoing principles to the facts of this case, Defendant, Mid-Century Insurance Company, shall produce to plaintiff, Chicago Meat Processors, Inc., the following documents, or portions indicated, within ten (10) days of receipt of this order by counsel:

> **Document 2.** Entire document Reason: This document was produced in the ordinary course of business for claim evaluation and at this point,; the attorney was functioning primarily as claim process supervisor.

> **Document 6.** Produce following portion of letter: Everything through the first two paragraphs on page 1 of letter. Produce tile last paragraph of page 2 of letter [*14] through the remainder of letter. Reason: Produced in ordinary course of

business for claim evaluation. Redact paragraphs 3 and 4 on first page and paragraphs 1 and 2 on second page beginning with word "In" and ending with word "appreciated." Reason: Attorney-client privilege. Mid-Century has voluntarily produced all three pages of attachments.

> **Document 20.** Produce entire document. Reason: Prepared in ordinary course of business for claims evaluation. Mid-Century has voluntarily produced the one page attachment.

> **Document 23.** Produce fax cover page. Produce entire six-page letter with following exceptions which may be redacted:

> 1) page 1, paragraph 2, last sentence beginning with word "His" and ending with word "testify."

> 2) page 2, paragraph 3, beginning with word "In" and ending with word "defense."

> 3) page 3, paragraph 1, last three sentences beginning with word "Tountas" and ending with word "innocent."

> 4) page 3, paragraph 2 beginning with word "We" and ending with word "1995."

> 5) page 5, paragraph 3, last two sentences beginning with word "We" and ending with word "Hartford."

> 6) page 5, paragraph 4, last sentence beginning with [*15] word "Using" and ending with a dollar figure.

> 7) The Conclusion appearing on pages 5 and 6.

> Reason: The letter should be produced because it was primarily a factual presentation produced in the ordinary course of business for claims evaluation purposes. The deleted portions constitute attorney work product reflecting the attorney's mental impressions.

> **Document 25.** May 3, 1995 letter. Produce everything through first sentence of second paragraph ending with word "claim." Produce everything beginning with fourth paragraph at end of first page to end of letter beginning with word

"Please." Reason: Prepared in the ordinary course of claims evaluation. Redact the remainder. Reason: Containing attorney-client privilege and work product information.

May 5, 1995 attachment: Mid-Century has voluntarily produced.

April 18, 1995 attachment: Same as document 23 above. So Ordered this 9th Day of April, 1996.

**ENTER:**

**MORTON DENLOW**

**United States Magistrate Judge**

Counsel shall have ten (10) days from the date of service to file objections to this Order with the Honorable James F. Holderman. The district judge shall consider such objections to determine [*16] whether the magistrate judge's order is "clearly erroneous or contrary to law." See *Fed.R.Civ.P. 72(a)*; *28 U.S.C. 636(b)(1)(A)*.

LEXSEE 1999 U.S. DIST. LEXIS 20901



Caution
As of: Nov 12, 2007

### AMICUS COMMUNICATIONS, L.P., Plaintiff, v. HEWLETT-PACKARD COMPANY, INC, Defendant.

### Misc. No. 99-0284 HHK/DAR

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

### *1999 U.S. Dist. LEXIS 20901*

### December 3, 1999, Decided

**DISPOSITION:** [*1] Non-Party, Opposing Counsel's Motion to Quash the Subpoena to Maurice U. Cahn by Defendant Under *FED. R. CIV. P. 45(c)(3)(A)* (Docket No. 1) DENIED; and Cross-Motion of Hewlett-Packard Company, Inc. to Compel Attendance at Deposition and Production of Documents and/or Privilege Log (Docket No. 4) GRANTED, and Non-party Cahn's Motion to Strike Defendant's Cross-Motion to Compel (Docket No. 5) DENIED AS MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In pending patent litigation action, non-party, co-counsel for plaintiff, filed a motion to quash subpoenas ad testificandum and duces tecum served upon him by defendant. Defendant opposed the motion, and filed a cross-motion to compel attendance at a deposition and production of documents. Non-party moved to strike defendant's cross-motion.

**OVERVIEW:** In a pending trademark infringement action, defendant requested discovery from non-party, co-counsel for plaintiff. Non-party filed a motion to quash the subpoenas ad testificandum and duces tecum. Defendant opposed the motion, and filed a cross-motion to compel attendance at a deposition and production of documents. Defendant argued that it sought to depose non-party concerning pre-litigation facts that were neither privileged communications nor protected work product, and that any credible claim of privilege for the documents sought by defendant have been knowingly and repeatedly waived. Non-party moved to strike defendant's cross-motion. The court denied non-party's

motion to quash and granted defendant's motion to compel. The court found that non-party failed to demonstrate that the testimony and documents sought by defendant were protected by either the attorney-client or work product privilege. Additionally, the court found that the discovery sought by defendant from non-party was relevant, non-privileged and not obtainable from other sources.

**OUTCOME:** The court denied non-party's motion to quash and granted defendant's motion to compel. The court found that non-party failed to demonstrate that testimony and documents sought by defendant were protected by either the attorney-client or work product privilege. Further, the court denied non-party's motion to strike defendant's cross-motion as moot.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > General Overview*
*Criminal Law & Procedure > Discovery & Inspection > Depositions*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN1] A party is not precluded from taking the deposition of patent prosecution counsel simply because that counsel was chosen notwithstanding his personal knowledge of the underlying facts.

*Civil Procedure > Discovery > General Overview*

[HN2] When a party employs a counsel to represent it in a case where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN3] Generally, work performed by an attorney to prepare and prosecute a patent application does not fall within the parameters of the work-product protection.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN4] To come within the umbrella of the work-product doctrine, a document must have been prepared in anticipation of litigation or for trial, and that the privilege is not extended to preparation for ex parte proceedings such as patent proceedings.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
[HN5] For purposes of determining whether documents come within the umbrella of the work-product doctrine, a litigant must demonstrate that documents were created with a specific claim supported by concrete facts which would likely lead to litigation in mind, not merely assembled in the ordinary course of business or for other nonlitigation purposes.

**COUNSEL:** For MAURICE U. CAHN, Non Party: Maurice Ulman Cahn, CAHN & SAMUELS, LLP, Washington, DC.

**JUDGES:** DEBORAH A. ROBINSON, United States Magistrate Judge.

**OPINION BY:** DEBORAH A. ROBINSON

**OPINION**

**MEMORANDUM ORDER**

The above-captioned miscellaneous matter arises from a discovery dispute in a civil action pending in the United States District Court for the Western District of Texas. Non-party Maurice U. Cahn, co-counsel for plaintiff in the action pending in the Western District of Texas, moves to quash a subpoena as testificandum and duces tecum served upon him by defendant on the ground that "the subpoena, on its face seeks attorney

client privileged communications and attorney work product without any showing of propriety or need." Non-Party, Opposing Counsel's Motion to Quash [*2] the Subpoena to Maurice U. Cahn by Defendant Under *FED. R. CIV. P. 45(c)(3)(A)* (Docket No. 1).

Defendant opposes non-party Cahn's motion, and moves to compel both his attendance at a deposition and the production of documents or a privilege log. Cross-Motion of Hewlett-Packard Company, Inc. to Compel Attendance at Deposition and Production of Documents and/or Privilege Log (Docket No. 4). In the memorandum in support of its motion and in opposition to non-party Cahn's motion, defendant maintains that Cahn

> is a percipient witness, in some instances the sole percipient witness, to non-privileged pre-litigation facts and communications that are highly relevant to [the pending] trademark infringement action[.] On behalf of [plaintiff,] Mr. Cahn obtained the service mark registration for the mark PAVILION that is at issue in the suit. Both the Complaint and the Counterclaim in the Texas action interpose allegations that put events during the prosecution of the registration directly at issue in the proceeding. Both Mr. Cahn' client, ACLP, and Defendant/Counterclaimant Hewlett-Packard Company, Inc. ("H-P") identified Mr. Cahn as a witness in the Texas action prior to the [*3] time he even applied for admission *pro hac vice* in connection with that litigation.

Memorandum of Points and Authorities (1) in Opposition to Motion by Maurice U. Cahn to Quash Subpoena and (2) in Support of Hewlett-Packard Company's Cross-Motion to Compel Attendance at Deposition and Production of Documents and/or Privilege Log ("Defendant's Memorandum") at 1. Defendant states that it seeks to depose Cahn "concerning pre-litigation facts that are neither privileged communications nor are protected work product[,]" and that "any credible claim of privilege for the documents HP seeks . . . has been knowingly and repeatedly waived." Defendant's Memorandum at 1-2. [1]

> 1  Defendant further explains that it "does not intend to depose Mr. Cahn in connection with his role as tertiary co-counsel in the Texas action or with respect to the events occurring in the adversarial opposition proceeding[,]" and that the deposition "will be limited to the prosecution of

the trademark application and the other topics identified herein[.]" Defendant's Memorandum at 15.

[*4] Non-party Cahn has moved to strike defendant's cross-motion. See Motion to Strike Defendant's Cross-Motion to Compel (Docket No. 5). In his reply to defendant's opposition to his motion to quash the subpoena, non-party Cahn tacitly concedes that he obtained the service mark registration for the mark which is at issue in the Texas litigation, but maintains that "because the language of the registration is established, regardless of the undersigned's understanding, impressions, or contentions, his testimony about the meaning of the trademark registration does not make him a necessary witness." Reply of Non-Party, Opposing Counsel to Defendant's Opposition to the Motion to Quash the Subpoena to Maurice U. Cahn by Defendant Under *FED. R. CIV. P. 45(c)(3)(A)* at 3. Non-party Cahn offers no authority in support of his contention that his role as co-counsel in the Texas litigation insulates him from discovery with respect to the service mark registration proceedings. See Reply Memorandum of Hewlett-Packard Company, Inc. in Support of Cross-Motion to Compel; Memorandum in Opposition to Mr. Cahn's Motion to Strike the Cross-Motion at 1.

## DISCUSSION

Upon consideration [*5] of the motions and the memoranda in support thereof, non-party Cahn's motion to quash the subpoena will be denied, and defendant's motion to compel will be granted, for the reasons offered by defendant. More specifically, the undersigned observes that several courts have allowed the depositions of patent prosecution counsel, and have refused to uphold such counsel's blanket invocation of attorney-client privilege. See, e.g., *United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245, 249 (D.Kan. 1995); Hay & Forage Indus. v. Ford New Holland, Inc., 132 F.R.D. 687, 689-90 (D.Kan. 1990).* [2] Indeed, the United Phosphorus court held that [HN1] a party was not precluded from taking the deposition of patent prosecution counsel simply because that counsel was chosen "notwithstanding his personal knowledge of the underlying facts[.]" That court concluded that

[HN2] when a party employs a counsel to represent it in a case where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested.

*United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. at 249.* [*6]

2   The undersigned finds that Cahn's reliance upon the decision of the Eighth Circuit in Shelton v. American Motors Co. is misplaced, in that the court considered a claim of attorney-client privilege in a circumstances in which the lawyer whose deposition was sought had no factual, pre-litigation knowledge relevant to the pending action, and who "had nothing to do with this lawsuit except to represent her client." See *Shelton v. American Motors Co., 805 F.2d 1323, 1330 (8th Cir. 1986).* In this action, it is undisputed that non-party Cahn has factual, pre-litigation knowledge.

Nor can the attorney work product privilege be construed as broadly as non-party Cahn urges. [HN3] "Generally, work performed by an attorney to prepare and prosecute a patent application does not fall within the parameters of the work-product protection[.]" *In re Application of Minebea Co., 143 F.R.D. 494, 499 (S.D.N.Y. 1992).* Questions of patent prosecution counsel regarding his "thought process with respect [*7] to the original patent application" have been allowed. See, e.g., *Oak Indus. v. Zenith Elec. Corp., 687 F. Supp. 369, 374-75 (N.D. Ill. 1988).* Inquiry regarding a patent prosecution attorney's communications with the Patent and Trademark Office has also been allowed. *Hay & Forage Indus. v. Ford New Holland, Inc., 132 F.R.D. at 689-90.* Non-party Cahn has not shown that the "primary motivating purpose" of the trademark registration "was to assist in the pending or impending litigation," and accordingly, the protection of the attorney work product doctrine is not available. See *In re Application of Minebea Co., 143 F.R.D. at 499.*

With respect to documents, it is settled that [HN4] "to come within the umbrella of the work-product doctrine, the document must have been 'prepared in anticipation of litigation or for trial[,]'" and that the privilege "is not 'extended to preparation for ex parte proceedings such as patent proceedings.'" *Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 302 (E.D.N.Y. 1992)* (citations omitted); see *Burroughs Wellcome Co. v. Barr Labs., Inc., 143 F.R.D. 611, 617 (E.D.N.C. 1992).* [*8] In Stryker, the court expressly rejected the proposition "that litigation is a 'possibility' in every patent application." *Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. at 302.* This Circuit has held that [HN5] a litigant

must demonstrate that documents were created "with a specific claim supported by concrete facts which would likely lead to litigation in mind," not merely assem-

bled in the ordinary course of business or for other nonlitigation purposes.

*Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corp., 303 U.S. App. D.C. 316, 5 F.3d 1508, 1515 (D.C. Cir. 1993)* (citations omitted). Non-Party Cahn, by his sweeping conclusion that the subpoena seeks protected work product, has not even attempted to make such showing.

## CONCLUSION

For the foregoing reasons, the undersigned finds that non-party Cahn has failed to demonstrate that the testimony and documents sought by defendant are protected by either the attorney-client or work product privilege. Additionally, the undersigned finds that the discovery sought by defendant from non-party Cahn is relevant, non-privileged and not obtainable from other [*9] sources. It is, therefore, this    day of December, 1999,

**ORDERED** that Non-Party, Opposing Counsel's Motion to Quash the Subpoena to Maurice U. Cahn by Defendant Under *FED. R. CIV. P. 45(c)(3)(A)* (Docket No. 1) is **DENIED**; and it is

**FURTHER ORDERED** that the Cross-Motion of Hewlett-Packard Company, Inc. to Compel Attendance

at Deposition and Production of Documents and/or Privilege Log (Docket No. 4) is **GRANTED**, and that

(1) non-party Cahn shall produce any privilege log with respect to documents responsive to the document subpoena as to which privilege is claimed consistent with the authorities cited herein no later than December 10, 1999;

(2) non-party Cahn shall produce the documents responsive to the document subpoena not withheld in accordance with the foregoing provision no later than December 15, 1999;

(3) non-party Cahn shall appear for a deposition at time agreeable to the parties and Cahn no later than December 22, 1999; and

(4) defendant shall limit the deposition of non-party Cahn to the issues identified by defendant in the memorandum in support of its cross-motion to compel; and it is

**FURTHER ORDERED** that non-party Cahn's Motion [*10] to Strike Defendant's Cross-Motion to Compel (Docket No. 5) is **DENIED AS MOOT**.

December 3rd, 1999

/s/

DEBORAH A. ROBINSON

United States Magistrate Judge

LEXSEE 2002 U.S. DIST. LEXIS 11728



Caution
As of: Nov 06, 2007

**JOHN RAMSEY and PATSY RAMSEY, as Parents and Natural Guardians of
BURKE RAMSEY, a minor, Plaintiffs, -against- NYP HOLDINGS, INC. d/b/a THE
NEW YORK POST, Defendant.**

**00 Civ. 3478 (VM) (MHD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2002 U.S. Dist. LEXIS 11728; 30 Media L. Rep. 2377*

**June 26, 2002, Decided
June 27, 2002, Filed**

**DISPOSITION:**    [*1]  Defendant's motion to compel
production of discovery documents granted in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff parents filed suit
on behalf of their minor son, and claimed that defendant
newspaper libeled the son by suggesting that he had been
involved in the death of his sister. The newspaper moved
to compel production of documents, under *Fed. R. Civ.
P. 26*, created on behalf of the parents regarding the
death. The parents claimed that the documents were ir-
relevant, protected by work-product immunity and, in
some cases, by privilege.

**OVERVIEW:** The newspaper published an article de-
scribing a story from a tabloid publication. According to
newspaper, the tabloid reported that the son was the pri-
mary suspect in the investigation. As framed in their
amended complaint, the parents asserted that the article
falsely stated or implied that the son was guilty of the
murder of his sister. The court held that a non-party
could not invoke the work-product immunity of *Fed. R.
Civ. P. 26(b)(3)* to withhold documents created for the
non-party's benefit. In view of that principle, the investi-
gative documents created on behalf of the parents were
not directly immune from production under *Rule
26(b)(3)* because only the son was an interested party in
the instant lawsuit. To ensure against unfair prejudice to
the parents, the court imposed certain conditions under
that rule to limit both the scope of required production
and the use that defendant could make of the documents
supplied to it. As for the attorney-client privilege, the
listed documents appeared to come within the scope of
that privilege and the court also held that the parents
waived the doctor-patient privilege of their children in
certain respects.

**OUTCOME:** The court granted the newspaper's motion
to compel to an extent. The newspaper was free to con-
duct additional discovery to determine whether the facts
warranted any further challenge to the parents' withhold-
ing of information.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General
Overview*
*Civil Procedure > Discovery > Privileged Matters >
Work Product > General Overview*
[HN1] A non-party cannot invoke the work-product im-
munity of *Fed. R. Civ. P. 26(b)(3)* to withhold docu-
ments created for the non-party's benefit.

*Civil Procedure > Discovery > Methods > General
Overview*
*Civil Procedure > Discovery > Relevance*
*Evidence > Relevance > General Overview*

[HN2] *Fed. R. Civ. P. 26(b)(1)* broadly defines the scope of relevance for discovery purposes. The rule authorizes requests for any information that appears reasonably calculated to lead to the discovery of admissible evidence. *Rule 26(b)(1)*. Moreover, that liberal approach to discovery is accompanied by repeated recognition of the broad discretion lodged in a district court to assess relevance in light of the specific circumstances of each case. In a recent amendment, however, the rule has been reworded in a manner intended to emphasize somewhat more strongly the limits of relevance. Thus, the rule now specifies that relevance is to be judged on the basis of the claims and defenses, rather than the subject matter, of the action.

*Torts > Intentional Torts > Defamation > Elements > Libel*
[HN3] In the context of libel, where a case involves a matter of public interest a plaintiff bears the burden of demonstrating the falsity of a challenged statement.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
[HN4] If a factual question must be answered in order for a plaintiff to prevail on a claim or for a defendant to prevail on a defense, then information that may be helpful in answering that question is relevant for discovery purposes. Although a court is certainly empowered to set limits on discovery to avoid unreasonable burdens on a litigant or on a nonparty, and in doing so may take into account both the degree of relevance of the requested information and the extent of the burden involved in unearthing it, there is no reason to require, as a prerequisite to discovery, that a discovering party demonstrate that he is likely to prevail on the factual dispute. This is particularly true when the information that is most likely to answer the central question is not in that party's control.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN5] A provision of *Fed. R. Civ. P. 26* creates a qualified immunity from compelled disclosure for documents prepared in anticipation of litigation or for trial. *Fed. R. Civ. P. 26(b)(3)*. As further refined by the United States Court of Appeals for the Second Circuit, this rule covers documents prepared because of litigation or its anticipation.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN6] Even if a document comes within the scope of the work-product rule, the immunity from discovery provided by the rule is conditional, and thus may be overcome if the discovering party makes a sufficient showing of need. To obtain access to work-product information, the requesting party must demonstrate that it has a substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. *Fed. R. Civ. P. 26(b)(3)*.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN7] *Fed. R. Civ. P. 26* governs documents and tangible things otherwise discoverable under subdivision (b)(1) of *Rule 26* and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative including the other party's attorney, consultant, surety, indemnitor, insurer, or agent. *Fed. R. Civ. P. 26(b)(1)*.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN8] Federal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under *Fed. R. Civ. P. 26* to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation. Thus, documents prepared by one who is not a party to the present suit are wholly unprotected by *Fed. R. Civ. P. 26(b)(3)* even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit. This conclusion has been adhered to by the United States Supreme Court in dictum, by at least one circuit court and by numerous district courts.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Discovery > Protective Orders*

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 14 of 41

Page 3
2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

[HN9] *Fed. R. Civ. P. 26(c)* gives a United States District Court broad authority, on a showing of "good cause", to preclude or limit discovery or to impose specific conditions on the use and circulation of discovered materials to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense. By its terms, this rule allows protection of non-parties, and defines in very general terms the grounds for such relief as well as the substance of the relief that may be afforded. Not surprisingly, then, a number of courts have recognized the potential of this rule for protecting a nonparty from any unfair prejudice that might be occasioned by the compelled disclosure of what would otherwise qualify as work product.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Insurance Law > Claims & Contracts > Subrogation > General Overview*
[HN10] The wording of the *Fed. R. Civ. P. 26(b)(3)* indicates that the protection extended to a representative's work product covers materials prepared by or for the representative in his representative capacity. *Rule 26(b)(3)* protection is limited to a representative's work product that is created in his representative capacity: Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
[HN11] The applicable test under *Fed. R. Civ. P. 34* is whether a litigant has the ability to obtain the documents on request to a related party, either as a matter of law or as a matter of practical fact.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN12] In regards to work product privilege, a document is created "because of" contemplated or actual litigation if its creation is attributable to that litigation. If the document was created in the ordinary course of business or, more generally, would have been created even if no such litigation had been contemplated or pending, then it is not eligible for protection under the rule.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN13] In a circumstance where documents are created for two separate, if related, purposes, one of which is inconsistent with work-product immunity, a district court is guided by the analysis of the United States Court of Appeals for the Second Circuit, in which the court indicates that documents that would have been created even absent the prospect of litigation are not protected.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN14] With regards to a claim of work product privilege, dual-motivation analysis is frequently required in a litigation context, and in those circumstances the court, or a jury, is typically required to engage in a comparable "but for" assessment.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN15] The requirement for confidentiality under *Fed. R. Civ. P. 26(b)(3)* precludes protection for documents if they or their contents have been disclosed in circumstances that create a sufficiently substantial prospect that those contents will become accessible to the party's adversary or prospective adversary in the pending or contemplated litigation.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN16] Any work-product document containing information the substance of which has been revealed to a district attorney or to the public cannot be protected under *Fed. R. Civ. P. 26(b)(3).*

*Civil Procedure > Discovery > Undue Burdens*
[HN17] To satisfy an aspect of the hardship requirement of *Fed. R. Civ. P. 26(b)(3)*, a defendant must establish either that it can obtain the substantial equivalent only with undue hardship or that it simply cannot obtain the substantial equivalent at all.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN18] Under Colorado law, communications between an attorney or his agent and the client that are undertaken to facilitate the rendering of legal services by the attorney for the client and that are intended to be confidential will be protected unless the substance of the communica-

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

tion is disclosed in circumstances that are inconsistent with the intended confidentiality. *Colo. Rev. Stat. § 13-90-107(1)(b).*

COUNSEL: For JOHN RAMSEY, PATSY RAMSEY, plaintiffs: Mark E. Goidell, Galasso, Langione & Goidell, Melville, NY.

For NYP HOLDINGS, INC., defendant: R. Bruce Rich, Weil, Gotshal & Manges, L.L.P., New York, NY.

JUDGES: MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

OPINION BY: MICHAEL H. DOLINGER

OPINION

*MEMORANDUM & ORDER*

VMICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

John and Patsy Ramsey have filed suit on behalf of their minor son, Burke Ramsey, claiming that defendant NYP Holdings, Inc. libeled Burke by suggesting in a *New York Post* article that he had been involved in the death of his younger sister, JonBenet Ramsey. Discovery has commenced, but the parties are in disagreement over the Ramseys' refusal to turn over large quantities of documents allegedly generated by an investigation sponsored by Mr. and Mrs. Ramsey to determine who was responsible for the death of their daughter. Defendant has moved to compel production, and the Ramseys resist on the asserted grounds that the subject matter of the documents is irrelevant to the issues in this case and that they are protected by work-product immunity and, in some [*2] cases, by the attorney-client privilege and the doctor-patient privilege.

We have received full briefing of the issues and have conducted oral argument. We now grant defendant's motion in substantial part.

*A. Background*

On December 25 or 26, 1996, JonBenet Ramsey, the six-year-old sister of Burke Ramsey, was murdered in the family home in Boulder, Colorado. The crime has not yet been solved.

In the midst of a torrent of publicity and media attention directed to the incident and to the efforts of law-enforcement authorities to find the culprit, defendant published an article in *The New York Post* on May 13, 1999 describing a story from the tabloid publication *The Star.* According to *The Post, The Star* had reported that

Burke Ramsey was the primary suspect in the investigation and that his parents were engaged in negotiations with the District Attorney of Boulder. *The Post,* again seemingly paraphrasing the article in *The Star,* also alluded to the alleged desire of the Boulder prosecutors to charge Mrs. Ramsey with falsifying evidence--specifically a ransom note found at the crime scene--and with attempting to "cover up the murder."

In the wake of the publication [*3] of the article in *The Post,* Mr. and Mrs. Ramsey filed this lawsuit on behalf of their son, seeking damages for the asserted falsities of the article insofar as they pertained to Burke Ramsey. [1] As framed in their amended complaint, they assert that the article falsely stated or implied that Burke was guilty of the murder of his sister and falsely reported that the parents, supposedly aware of their son's guilt, were negotiating some form of resolution of the criminal investigation with the Boulder prosecutors.

> 1   At the same time, the Ramseys filed a parallel lawsuit against Time Warner for the publication of a similar account of the *Star* article on a *Time* website. *Ramsey v. Time Warner Cos.,* 00 Civ. 3477 (VM). Although Time Warner originally joined in the pending motion to compel, it has since settled that lawsuit with the Ramseys.

The parties commenced discovery, but their progress quickly ground to a halt when defendant sought, in substance, all documents in the possession of the Ramseys pertaining [*4] to the death of JonBenet. In response, the Ramseys proffered an affidavit by the Boulder District Attorney denying that Burke was or had been a suspect and further stating that he had not engaged in plea bargaining with the parents premised on any such suspicion. (*See* Affidavit of Alexander M. Hunter, Esq., sworn to Oct. 12, 2000--Ex. A to Declaration of L. Lin Wood, Esq., executed Jan. 30, 2001). Based on that affidavit and the retraction of the original report by *The Star (see* Wood Decl. at Ex. C), the Ramseys took the position that none of the vast quantity of materials that they had assembled in their private investigation of the crime--a horde said to comprise perhaps seventy cartons of papers--was relevant to the issues in this case. They further invoked the work-product rule and the attorney-client privilege to block production of those documents. Finally, they invoked the doctor-patient privilege to preclude production of requested medical records. On related grounds, the Ramseys declined to respond to a number of interrogatories served by defendant.

Faced with these objections to the production of more than 2,400 documents, and with an assertedly inadequate privilege [*5] log for plaintiff, defendant sought intervention by the court. At the conclusion of an extended conference, the court directed the Ramseys to

prepare a more detailed log and authorized defendant to move to compel. (Nov. 28, 2000 Tr. at 19). The logs were duly prepared (*see* Declaration of Douglass M. Maynard, Esq., executed Jan. 16, 2001, at Exs. G & H), and the motion has been fully briefed and argued. In the course of that briefing and oral argument, the parties have compromised some of their differences, including all disagreements about defendant's interrogatories. Nonetheless, the parties are still at loggerheads with respect to most of the requested documents. In this regard, the Ramseys have shifted ground several times in their stated position on relevance, finally returning to the position where they started, that is, arguing that none of the investigative documents come within the scope of relevance defined by the applicable federal rules. As for the work-product immunity and various privileges, they have steadfastly invoked those protections against disclosure.

B. *Analysis*

We start by addressing the relevance question and then turn to issues of work-product and [*6] privilege. For reasons to be noted, we conclude that the Ramseys' argument against relevance is, in large measure, unpersuasive. We also hold, in accordance with the substantial weight of legal authority, that [HN1] a non-party cannot invoke the work-product immunity of *Fed. R. Civ. P. 26(b)(3)* to withhold documents created for the non-party's benefit. In view of that principle, we conclude that the investigative documents created on behalf of Mr. and Mrs. Ramsey are not directly immune from production under *Rule 26(b)(3)* because only Burke Ramsey is an interested party in this lawsuit.

Moreover, even applying a *Rule 26(b)(3)* analysis to the investigative documents, we would deny immunity to those documents, for at least two reasons. First, the Ramseys have not carried their burden of demonstrating that any specific documents were created because of the prospect of litigation. Second, the Ramseys have waived their work-product protection for some of the documents.

Having rejected *Rule 26(b)(3)* protection for the investigative documents, we nonetheless believe that the protective order provisions of *Rule 26(c)* may apply to the same documents. To ensure against unfair prejudice to the Ramseys, [*7] we impose certain conditions under that rule to limit both the scope of required production and the use that defendant may make of the documents supplied to it.

As for the attorney-client privilege, we conclude that the listed documents appear to come within the scope of that privilege, as defined by Colorado law. We also hold that the Ramseys have waived the doctor-patient privilege of their children in certain respects.

In making these rulings, we do not specify which of the approximately 2,000 disputed documents must be produced. Rather, we define the categories of documents for which relevance, work-product and privilege claims are rejected, and also identify the limitations on production that are to be adhered to in making production. In this manner we define the areas in which pertinent discovery may proceed, but leave to the parties in the first instance the task of applying our rulings to the documents in question.

1. *Relevance*

[HN2] *Rule 26(b)(1)* broadly defines the scope of relevance for discovery purposes. *See, e.g., Herbert v. Lando, 441 U.S. 153, 177, 60 L. Ed. 2d 115, 99 S. Ct. 1635 (1979).* The rule authorizes requests for any information that "appears reasonably calculated to lead [*8] to the discovery of admissible evidence." *Fed. R. Civ. P. 26(b)(1).* Moreover, that liberal approach to discovery has been accompanied by repeated recognition of the broad discretion lodged in the district court to assess relevance in light of the specific circumstances of each case. *See, e.g., 6 Moore's Federal Practice § 26.41[2]* at 26-89 & n.15 (3d ed. 1999) (citing cases). In a recent amendment, however, the rule was reworded in a manner intended to emphasize somewhat more strongly the limits of relevance. Thus, the rule now specifies that relevance is to be judged on the basis of the "claims and defenses", rather than the "subject matter", of the action. *See Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes* at 158 (West 2002).

As for the specifics of this case, the Ramseys originally articulated a very narrow view of relevance, a position that, at its most extreme, suggested that only the affidavit of the Boulder District Attorney and, perhaps, the published comments of Mr. and Mrs. Ramsey were pertinent. (Nov. 28, 2000 Tr. at 17-19). In contrast, defendant sought all information in the actual or constructive possession of Burke Ramsey that might shed light [*9] on who murdered JonBenet Ramsey.

Since the Ramseys' initial articulation of their position on relevance, we have seen an array of changes on this point. We briefly summarize them here.

Following our first conference and the start of briefing on the motion, plaintiff's counsel sent a letter to his adversary, with a copy to the court, representing that he had consulted with his clients and that they had agreed to withdraw their relevance objection with respect to the question of who had murdered JonBenet. Counsel did state, however, that some of the documents in dispute were not pertinent to that question, and that plaintiff therefore continued to assert his objection with respect to those documents. (*See* Jan. 18, 2001 letter to defense

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

counsel and the court from L. Lin Wood, Esq., at p. 1--Ex. C to Supplemental Declaration of Jonathan Bloom, Esq., executed Feb. 9, 2001).

Despite these representations, in the briefing thereafter provided by the Ramseys' attorney, he argued that relevance should be limited to whether Burke had murdered his sister--thus apparently precluding production of any documents that do not directly concern Burke--and whether Mrs. Ramsey had forged the note [*10] found at the Ramsey home. (Pltff's Memo at 6-8). When confronted with these apparent inconsistencies at oral argument, counsel wavered at first, and seemed to suggest that the Ramseys were taking no position and that the court should decide as it thought best. (Mar. 16, 2001 Tr. at 8). However, he then reiterated that although his clients were conceding the broader definition of relevancy for purposes of *Rule 26(b)(1)*, he reserved the right to argue that much of the requested information was either of marginal relevance or entirely irrelevant for the purpose of determining whether defendant could demonstrate sufficient need for the materials to overcome work-product protection under *Rule 26(b)(3)*. (*Id.* at 9-12; *see also* Mar. 20, 2001 letter to the court from L. Lin Wood, Esq., at p. 6).

Finally, in a post-argument letter brief, counsel once again argued that none of the requested investigatory information is relevant under *Rule 26(b)(1)*. In seeking to justify this latest shift, counsel offered a potpourri of explanations, including the assertion that the recent amendment of *Rule 26(b)(1)*--a change that counsel had purportedly only learned of on the eve of oral argument--fundamentally [*11] changes the analysis. (*See* Wood Mar. 20, 2001 letter at p. 5). More fancifully, he suggested that his prior letter to his adversary and to the court, waiving the relevance objection, was not really intended to concede relevance but was simply an expression of "sarcasm", and that in any event he was entitled to change positions (again) because defendant had supposedly changed its position on another issue. (*Id.* at p. 5 & nn. 5-6). [2]

2   The issue in question concerned whether Mr. and Mrs. Ramsey are in fact parties to the lawsuit within the meaning of the wording of *Rule 26(b)(3)* or only representatives of their son, who is the real party in interest. It bears noting that the Ramseys have conceded the latter position, as they must in light of the allegations of the complaint. (Pltff's Memo at 9; *but see* Wood Mar. 20, 2001 letter at p. 2 (repudiating concession)). It is pertinent, as we shall see, to the question of whether Mr. and Mrs. Ramsey may invoke the work-product rule to protect documents assertedly created by them or on their behalf in con-

templation of criminal prosecution of them. *See* p. 14-18, *infra*.

[*12]   For present purposes, we simply ignore the Ramseys' serial flip-flops, and assume that they currently would argue that none of the investigatory materials are relevant under *Rule 26(b)(1)*. We reject that argument and conclude that in this case any material that offers, or may lead to, evidence tending to inculpate or exculpate anyone in connection with the murder of JonBenet Ramsey comes within the scope of relevance as defined by amended *Rule 26(b)(1)*.

The complaint cites as a false publication by *The Post* the assertion that Burke was responsible for the death of his sister. As the Ramseys correctly concede, [HN3] because this case involves a matter of public interest the plaintiff bears the burden of demonstrating the falsity of the challenged statement. (Mar. 16, 2001 Tr. at 11). *See, e.g., Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986); Flamm v. American Ass'n of University Women, 201 F.3d 144, 148 (2d Cir. 2001)*. Moreover, even if the burden of proof were allocated to the defendant on this issue, there is no question that the truth or falsity of the proposition that Burke was responsible for JonBenet's death would be an element, [*13] whether of a claim or a defense, in this libel lawsuit. *Accord, e.g., Ramsey v. NYP Holdings, Inc.*, No. 01-WM-555 at 7 (D. Colo. Mar. 25, 2002) (attached to June 14, 2002 letter to the court from R. Bruce Rich, Esq.). Of necessity, then, information that would shed light on whether Burke Ramsey was so involved comes within the purview of *Rule 26(b)(1)* even in its most recent incarnation. It also follows that any information suggesting the involvement of someone other than Burke is pertinent, since such evidence would necessarily point away from Burke. (*See generally* Supplemental Affidavit of G. Bryan Morgan, Esq., sworn to Jan. 26, 2001, at P6--Ex. Q to Wood Decl.).

In seeking to resist this conclusion, the Ramseys have argued--at least some of the time--that in this case it is inappropriate to permit the defendant to engage in discovery in support of a truth defense (or a falsity claim) absent some indication that *The Post* has a good-faith basis for maintaining that its statements were in fact true. Citing the Boulder District Attorney's affidavit and the withdrawal of the original story by *The Star*, the Ramseys have argued that defendant cannot demonstrate a substantial [*14] basis for claiming that the disputed statements were true. (Nov. 28, 2000 Tr. at 17-18; Maynard Decl., Ex. B at p. 3 *et seq.*; Wood Mar. 20, 2001 letter to the court at pp. 6-7 (reasserting plaintiff's original relevance arguments)).

The short answer to this contention is that neither *Rule 26(b)(1)* nor any of the other federal discovery rules

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 18 of 41

Page 7
2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

imposes such an obligation on the discovering party. [HN4] If a factual question must be answered in order for a plaintiff to prevail on a claim or for a defendant to prevail on a defense, then information that may be helpful in answering that question is relevant for discovery purposes. Although the court is certainly empowered to set limits on discovery to avoid unreasonable burdens on a litigant or on a nonparty, and in doing so may take into account both the degree of relevance of the requested information and the extent of the burden involved in unearthing it, there is no reason to require, as a prerequisite to discovery, that the discovering party demonstrate that he is likely to prevail on the factual dispute. *See, e.g., Maher v. Monahan, 2000 U.S. Dist. LEXIS 8321, 2000 WL 777877, *4 (S.D.N.Y. June 15, 2000).* This is particularly true when the information [*15] that is most likely to answer the central question--in this case truth--is not in that party's control. [3] In any event, the Ramseys' argument on this point does not really address the relevance *vel non* of the requested discovery, and is more appropriately dealt with in determining whether, and to what extent, the court should exercise its discretion under *Rule 26(c)* to limit otherwise relevant discovery, an issue we address after considering the effect of the work-product rule.

> 3  We recognize that a newspaper that publishes a story without a basis for judging its truthfulness may fairly be taxed with reckless behavior, although in this case the *Post* article appeared merely to state that another publication had reported certain alleged facts. In any event, however, the truth or falsity of the article will presumably turn on evidence separate from the knowledge or state of mind of the publisher.

## 2. The Work-Product Rule

The Ramseys resist production of the vast majority of the requested documents [*16] on the basis of work-product immunity. According to the Ramseys, most of these documents were generated by an investigation undertaken by their lawyers and by investigators working for the attorneys to assist in defending Mr. or Mrs. Ramsey in the event that either of them was charged with criminal conduct in connection with the death of their daughter. (*See, e.g.,* Supplemental Affidavit of Patrick J. Burke, Esq., sworn to Jan. 25, 2001, at P3--Ex. P to Wood Decl.; Morgan Supp. Aff. at PP3-4, 6--Ex. Q to Wood Decl.). They therefore invoke *Rule 26(b)(3)* to preclude access by defendant to those documents. [4]

> 4  Plaintiff's counsel also identifies certain documents as having been prepared on behalf of Burke Ramsey in anticipation of litigation. (*See* Supplemental Declaration of L. Lin Wood, Esq.,

executed Feb. 14, 2001, at PP7-9). There is no basis on the current record to question the *bona fides* of this invocation of work-product immunity.

[HN5] The pertinent provision of *Rule 26* creates a qualified immunity [*17] from compelled disclosure for documents "prepared in anticipation of litigation or for trial." *Fed. R. Civ. P. 26(b)(3).* As further refined by the Second Circuit, this rule covers documents prepared "because of" litigation or its anticipation. *See United States v. Adlman, 134 F.3d 1194, 1195 (2d Cir. 1998).*

[HN6] Even if the document comes within the scope of the work-product rule, the immunity from discovery provided by the rule is conditional, and thus may be overcome if the discovering party makes a sufficient showing of need. *See, e.g., Bowne of New York, Inc. v. AmBase Corp., 150 F.R.D. 465, 471 (S.D.N.Y. 1993).* To obtain access to work-product information, the requesting party must demonstrate that it "has [a] substantial need of the materials in the preparation of [his] case and that [he] is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Fed. R. Civ. P. 26(b)(3). See, e.g., Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989).*

In challenging the Ramseys' invocation of this rule, defendant argues that (1) the rule does not apply to nonparties, and Mr. and [*18] Mrs. Ramsey are, for this purpose, non-parties; (2) even if the rule is available to the Ramseys, they have not demonstrated that the investigative documents were prepared because of anticipated litigation; (3) with respect to at least some of the documents, the Ramseys have waived any protection by revealing the substance of the documents; and (4) in any event defendant has a sufficiently acute need for the documents to justify rejecting the conditional immunity invoked by the Ramseys. We conclude that defendant's analysis is, for the most part, correct.

In assessing the applicability of the rule, we focus on the language defining its scope. [HN7] It governs "documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial *by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) . . . .*" (Emphasis added). *Fed. R. Civ. P. 26(b)(1).* In light of this wording, the [HN8] federal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under this [*19] rule to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation. [5] Thus, "documents prepared by one who is not a party to the present suit are wholly un-

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 19 of 41

Page 8

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

protected by *Rule 26(b)(3)* even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit." 8 C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure: Civil* § 2024 at 354-56 (2d ed. 1994). *Accord*, 6 *Moore's Federal Practice* § 26.70[4] at 26-218.3. This conclusion has been adhered to by the Supreme Court in dictum, by at least one circuit court and by numerous district courts. *See, e.g., Federal Trade Commission v. Grolier Inc., 462 U.S. 19, 25, 76 L. Ed. 2d 387, 103 S. Ct. 2209 (1983)* (citing 8 Wright & Miller, *Federal Practice and Procedure* § 2024 at 201 (1970)); *In re California Public Utilities Comm'n, 892 F.2d 778, 781 (9th Cir. 1989); Burton v. R.J. Reynolds Tob. Co., 200 F.R.D. 661, 676 (D. Kans. 2001); Go Medical Industs. Pty., Ltd. v. C.R. Bard, Inc., 1998 U.S. Dist. LEXIS 22919, 1998 WL 1632525, *6 (D. Conn. Aug. 14, 1998); [*20] In re Polypropylene Carpet Antitrust Litig., 181 F.R.D. 680, 691 (N.D. Ga. 1998); Hernandez v. Longini, 1997 U.S. Dist. LEXIS 18679, 1997 WL 754041, *2 (N.D. Ill. Nov. 13, 1997); Hunter v. Heffernan, 1996 U.S. Dist. LEXIS 9244, 1996 WL 363842, *4 (E.D. Pa. June 28, 1996); Schultz v. Talley, 152 F.R.D. 181, 184 (W.D. Mo. 1993); Doubleday v. Ruh, 149 F.R.D. 601, 606 (E.D. Cal. 1993); Hawkins v. South Plains Int'l Trucks, Inc., 139 F.R.D. 682, 683-84 (D. Colo. 1991); Polycast Technology Corp. v. Uniroyal, Inc., 1990 U.S. Dist. LEXIS 12444, 1990 WL 138968, *1-2 (S.D.N.Y. Sept. 20, 1990); Gomez v. City of Nashua, 126 F.R.D. 432, 434 n.1 (D.N.H. 1989); Chaney v. Slack, 99 F.R.D. 531, 533 (S.D. Ga. 1983); Galambus v. Consolidated Freightways Corp., 64 F.R.D. 468, 473 (N.D. Ind. 1974). Cf. In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 924 (8th Cir.), cert. denied, 521 U.S. 1105 (1997).*

> 5    Courts occasionally apply *Rule 26(b)(3)* analysis to work-product objections by a non-party who is subject to a subpoena, but in those cases, the parties typically have not argued the inapplicability of that rule to a non-party's own work-product. *See, e.g., e Speed, Inc. v. The Board of Trade of the City of Chicago, 2002 U.S. Dist. LEXIS 7918, 2002 WL 827099, *2 (S.D.N.Y. May 1, 2002).*

[*21] Although the cited wording of the rule is not entirely free from ambiguity, the language most comfortably fits the interpretation adopted by this substantial body of decisional law. Moreover, the Advisory Committee Notes make clear that the focus of the rule is on the competitive balance between the litigants, a concern not directly implicated by discovery from a non-party. Thus, the Notes state that "the requirement of a special showing for discovery of trial preparation materials reflects the view that each side's informal evaluation of its case should be protected, that each side should be en-

couraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side." *Fed. R. Civ. P. 26(b)(3), Advisory Committee Notes* at 144. Given the language of the rule and the rationale for it, we see no compelling reason to deviate from the consistent holding of the caselaw.

Notwithstanding this conclusion, we note, as have some of the cited authorities, that our reading poses a potential complication for the policy that is embodied in the rule. As the Advisory Notes point out and the federal courts have observed, the [*22] work-product rule is principally designed to provide the attorney and his consultants with an area of privacy in which to develop their personal approach to an actual or anticipated lawsuit, with the intention that an adversary not be permitted to poach from their work, unless the adversary can make an adequate showing of need. *See Upjohn Co. v. United States, 449 U.S. 383, 396, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981); Hickman v. Taylor, 329 U.S. 495, 510, 91 L. Ed. 451, 67 S. Ct. 385, 34 Ohio Op. 395-11 (1947); Adlman, 134 F.3d at 1196-97.* If a non-party and his counsel have engaged in such preparation for their own litigation or anticipated litigation, then permitting the resultant work product to be discovered by a party in a separate lawsuit involves a somewhat comparable invasion of the attorney's work-space. Moreover, in some circumstances it could create a competitive distortion in the non-party's own litigation, since the trial preparation materials that he and his attorney created could ultimately end up in the hands of his adversary in his own lawsuit.

Notwithstanding this concern, the potential harm from treating *Rule 26(b)(3)* as inapplicable to non-party witnesses is far less acute than the adverse [*23] effect of compelling disclosure of work product between adversary parties. First, disclosure from a nonparty does not distort the competitive balance between a plaintiff and a defendant, since neither reaps the benefits of the other's labors; rather, both may obtain the fruits of the labors of the non-party's litigation team. [6] Second, even if such poaching from a non-party is deemed undesirable--and the courts have recognized that the result may involve some potential for harm to the non-party--there is an alternative approach to deal with that concern.

> 6    This distinction illuminates the rationale for the caselaw that has held that a party may withhold in one lawsuit the work product that it has created or caused to be created because of another lawsuit in which it has been involved or anticipates being involved, *See, e.g., Grolier, 462 U.S. at 26.* If this were not the rule, then the party's adversary in one suit could obtain an unfair advantage irrespective of whether the produc-

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 20 of 41

Page 9
2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

ing party created the material for the current law-suit or for another litigation.

[*24]  [HN9] *Rule 26(c)* gives the District Court broad authority, on a showing of "good cause," to pre-clude or limit discovery or to impose specific conditions on the use and circulation of discovered materials "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense . . . ." By its terms, this rule allows protection of non-parties, and defines in very general terms the grounds for such relief as well as the substance of the relief that may be af-forded. Not surprisingly, then, a number of courts have recognized the potential of this rule for protecting a non-party from any unfair prejudice that might be occasioned by the compelled disclosure of what would otherwise qualify as work product. *See, e.g., In re California Pub-lic Utilities Comm'n, 892 F.2d at 781* & n.2; *Doubleday, 149 F.R.D. at 607 n.6; Basinger v. Glacier Carriers, Inc., 107 F.R.D. 771, 772 (M.D. Pa. 1985)* (non-party likely to be joined as party); *see also Schultz, 152 F.R.D. at 185*. The parties in this case appear to agree with this assessment, and we therefore will address the appropriate limits to be imposed under this rule [*25] to minimize any unfair prejudice to Mr. and Mrs. Ramsey once we have completed our assessment of *Rule 26(b)(3)*.

Although the Ramseys acknowledge the potential utility of *Rule 26(c)*, they nonetheless pursue their argu-ment that *Rule 26(b)(3)* applies here. Thus, they assert that, even if a non-party may not invoke that rule, they nonetheless come within its scope because they are rep-resentatives of Burke. Alternatively, they argue that if they are non-parties for this purpose, it necessarily fol-lows that the defendant has chosen the wrong route by which to seek production of the investigative documents. We disagree on both counts.

As noted, the senior Ramseys appear in this case as representatives of their minor son. *See Fed. R. Civ. P. 17(c)*. They assert claims only for injuries to him and seek relief only on his behalf. Thus, they are not parties in their own capacity, a point that they have conceded (Pltff's Memo at 9), even though they criticize defendant for assertedly changing its position on this point, perhaps for tactical advantage on the work-product issue. [7] None-theless, they note that they are "representatives" of their son, and they point out that, by its own terms, [*26] *Rule 26(b)(3)* protects materials "prepared in anticipation of litigation or for trial by or for another party or *by or for that party's representative* (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) . . . ." (Emphasis added). Based on this wording and their status as "representatives" of Burke, they argue that the rule protects their investigatory materials, which were prepared in anticipation of criminal litigation against them personally. (Pltff's Memo at 9).

[7]  We see no basis for criticizing defendant on this issue, since defendant's early reference to the parents as "plaintiffs" was entirely understand-able shorthand in view of the Ramsey parents' representative status in this lawsuit. In any event, defendant's current position on the legal status of the Ramseys is plainly correct, as the Ramseys now admit, and defendant's purported change of position--if such there was--did not prejudice the plaintiff.

We believe that the Ramseys misconstrue the perti-nent provision. [*27]  [HN10] The wording of the rule indicates that the protection extended to a representa-tive's work product covers materials prepared by or for the representative in his representative capacity. Indeed, the obvious rationale for the rule, as worded, is to protect the trial preparation process by extending qualified im-munity to the efforts of the litigant and those others who either assist him or have a legal interest in the litigation. *See, e.g., United States v. Adlman, 68 F.3d 1495, 1500-01 (2d Cir. 1995); United Coal Cos. v. Powell Const. Co., 839 F.2d 958, 966-67 (3d Cir. 1988)* (trial prepara-tion documents of insurer with subrogation rights are protected even though insurer is not named party); *Spra-gue v. Director, Office of Workers' Comp. Progs., 688 F.2d 862, 870 (1st Cir. 1982)* (doctor's letter protected because it was prepared at request of party's attorney acting on party's behalf); *Niagra Mohawk Power Corp. v. Stone & Webster Engin. Corp., 125 F.R.D. 578, 586 (N.D.N.Y. 1989)* (consultants that made reports at request of party in anticipation of litigation were "representa-tives" of that party and their reports were protected [*28] as work product). This policy would not be advanced, however, by protecting a representative's work product that is undertaken in anticipation of the representative's own separate litigation. Indeed, such an approach would create an arbitrary distinction between non-party wit-nesses and litigants' representatives, since the non-party witness cannot invoke *Rule 26(b)(3)* to protect work product created for his own litigation, whereas the repre-sentative could invoke the rule even if he too created trial preparation materials purely for his own lawsuit. It is not surprising, then, that the Advisory Committee Notes make clear that *Rule 26(b)(3)* protection is limited to a representative's work product that is created in his repre-sentative capacity: "Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or prepara-tion for trial by or for a party or any representative *acting on his behalf.*" *Fed. R. Civ. P. 26(b)(3), Advisory Com-mittee Notes* at 145 (emphasis added).

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 21 of 41

Page 10

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

In sum, the fact that Mr. and Mrs. Ramsey are appearing here as the representatives [*29] of their son does not entitle them to invoke *Rule 26(b)(3)* to protect those documents that were created to assist them in their own contemplated litigation, that is, in a possible criminal prosecution of one or the other of them. Thus, the bulk of the investigative documents in dispute are simply not protected by *Rule 26(b)(3)*.

As an alternative argument, Mr. and Mrs. Ramsey assert that if they are not deemed to be parties for purposes of *Rule 26(b)(3)*, then defendant cannot obtain their documents by way of a *Rule 34* document request, but rather must proceed by subpoena, which would be enforceable in their district of residence, the Northern District of Georgia. The short answer to this argument is that *Rule 34* is the proper mechanism to seek documents within the custody or control of Burke Ramsey, and his parents' own documents surely satisfy that requirement. [HN11] The applicable test is whether the litigant has the ability to obtain the documents on request to a related party, either as a matter of law or as a matter of practical fact. *See, e.g., Riddell Sports, Inc. v. Brooks, 158 F.R.D. 555, 558 (S.D.N.Y. 1994); Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 (S.D.N.Y. 1992).* [*30] In view of Burke's relationship with his parents, we have not the slightest doubt that the Ramseys, in their individual capacities, would make available to Burke, through themselves as his representatives, any documents in their control that would assist his case. Indeed, their counsel has conceded as much. (*See* Wood Jan. 18, 2001 letter at p. 2). It necessarily follows that they cannot withhold from defendant other documents that they control on the pretext that those documents do not belong to Burke.

Having rejected the applicability of *Rule 26(b)(3)*, we further observe that, even if we were to conclude otherwise, we would find that the Ramseys have failed to sustain their substantive burden under *Rule 26(b)(3)*. Specifically, they do not demonstrate that the investigative documents were created "because of" anticipated litigation.

As explained by the Second Circuit in *Adlman*, [HN12] a document is created "because of" contemplated or actual litigation if its creation is attributable to that litigation. If the document was created in the ordinary course of business or, more generally, would have been created even if no such litigation had been contemplated or pending, then it is [*31] not eligible for protection under the rule. *See Adlman, 134 F.3d at 1202.*

In support of their work-product claim, the Ramseys proffer the affidavits of their attorneys, each of whom represents that he undertook the investigative efforts that resulted in the creation of the disputed documents solely to anticipate and prepare for the possibility that either of

the parents might be prosecuted in connection with the murder of JonBenet. (Supp. Burke Aff. at P3--Ex. P to Wood Decl.; Supp. Morgan Aff. at PP3, 4 & 6--Ex. Q to Wood Decl.). If those representations are credited, then the Ramseys will be deemed to have satisfied their *prima facie* burden for demonstrating the applicability of the work-product principle.

The problem with the Ramseys' assertion that they caused the investigative documents to be created because of the prospect that either of them might be charged with a crime is that they have repeatedly offered a somewhat different explanation for sponsoring the investigation. In numerous public statements, interviews and even a book that they authored, they have insisted that they decided to use their apparently substantial resources to pursue an exhaustive [*32] investigation in order to discover who killed their daughter, apparently because they concluded that the local law-enforcement authorities were not doing an adequate job. (*See* Declaration of Jonathan Bloom, Esq., executed Jan. 16, 2001, at Ex. B (excerpts from the Ramseys' book *The Death of Innocence); id.*, Ex. C. (deposition of John Ramsey in *Miles v. Ramsey, 31 F. Supp. 2d 869 (1998)* at 71)). Although this purpose and that of self-defense in the event of a prosecution are not mutually exclusive--indeed, the Ramseys suggest that they were early targets of police suspicion (*see, e.g., id.*, Ex. B at 107)--they are distinct. Indeed, it is entirely plausible that bereaved parents, struggling with the unsolved violent death of a child and viewing the local police as inept, might choose to employ their own assets to pursue an investigation even if there were not a hint of a suspicion that the parents themselves were involved in the murder.

In view of this state of the record, we believe that both the Ramseys' own original explanation and the one now proffered by their attorneys are plausible under the circumstances. Indeed, the Ramseys' counsel has conceded this dual motivation. [*33] (Mar. 16, 2001 Tr. at 58-61). As a result, we are left with [HN13] the conclusion that the documents were created for two separate, if related, purposes, one of which is inconsistent with work-product immunity. [8] In such a circumstance, we are guided by the analysis of the Second Circuit in *Adlman*, in which the court indicated that documents that would have been created even absent the prospect of litigation are not protected. *134 F.3d at 1202.* Since the Ramseys, as the proponents of work-production protection, bear the burden of proving the facts material to the application of the work-product rule, *Fed. R. Civ. P. 26(b)(5); see also United States v. Construction Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir.), cert. denied, 519 U.S. 927, 136 L. Ed. 2d 213, 117 S. Ct. 294 (1996),* they are necessarily required to demonstrate that the contested documents would not have been created but for the con-

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

cern about prosecution, that is, that they would not have been created simply to serve the parents' desire to find their daughter's murderer. [9]

> 8  We recognize that, theoretically, the Ramseys might construct an argument that, if they had located the killer, they could have sued him for causing the wrongful death of their child, thus defining another "anticipation of litigation" scenario. They do not advance this suggestion, perhaps because it would still not avoid their dilemma, since the most salient motivation for a parent to do as they have done is to seek justice for his or her child through the criminal prosecution of the murderer of the child. We also note that such a prosecution would presumably not satisfy the "anticipation of litigation" test of *Rule 26(b)(3)* since the Ramseys would not be parties to the prosecution.

[*34]

> 9  Plaintiff suggests that in dual-motive cases work-product protection automatically applies. (*See* Pltff's Memo at 21 (citing *inter alia Boss Mfg. Co. v. Hugo Boss AG, 1999 U.S. Dist. LEXIS 987, 1999 WL 47324, *4 (S.D.N.Y. Feb. 1, 1999)*). We read *Adlman* as distinguishing between (a) the motive for the creation of a document, and (b) its intended or actual use. Thus, the rule protects documents if they were created because of litigation (the motive) even if they are intended for use or actually used for a purpose other than to assist the litigation (the intended or actual use). The cited passage in *Boss* simply notes that if the motive for creation of the document involved litigation, then the fact that the document was intended for a non-litigation use did not bar protection. In contrast, here we consider whether the Ramseys' documents were created because of litigation, and we read *Adlman* as suggesting that if they would have been created even without the prospect of litigation, then the motive requirement is not met.

We recognize that this form of analysis leads the parties, and the court, [*35] into a hypothetical inquiry that necessarily involves some degree of speculation. That said, such an inquiry appears to be mandated by the standards elucidated in *Adlman* and is, in any event, unavoidable in assessing most work-product claims since the rule itself defines its protection in terms of the subjective purposes of the creator of the documents. *See, e.g., In re Kidder Peabody, 168 F.R.D. 459, 462-66 (S.D.N.Y. 1996)*. Although in most cases the assessment of the reasons for the creation of a document is reasonably straightforward, that is not the case when there is more than one reason for its creation. Nonetheless, such

[HN14] dual-motivation analysis is frequently required in a litigation context, and in those circumstances the court, or a jury, is typically required to engage in a comparable "but for" assessment. *See, e.g., Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 108 (2d Cir. 2001); NLRB v. G&T Terminal Packaging Co., 246 F.3d 103, 116 (2d Cir. 2001); Diesel v. Town of Lewisboro, 232 F.3d 92, 108 (2d Cir. 2000)*.

In this case the Ramseys have entirely failed to address this issue, even though [*36] their attorney conceded that their investigation was instigated by the twin motives evidenced in the current record. Thus, we have no meaningful evidence that if the Ramseys had not fallen under suspicion, they would refrained from causing the creation of any, some or all of the documents that they currently withhold on work-product grounds. This gap constitutes a failure of proof by the Ramseys, and would preclude us from ordering that any of these documents be withheld from production under *Rule 26(b) (3)* even if that rule could otherwise be invoked by Mr. and Mrs. Ramsey.

Apart from these grounds for rejecting the work-product claim advanced by the Ramseys, we see an additional basis for concluding that at least some of the asserted work-product documents are not immune from discovery. This involves the Ramseys' waiver of confidentiality for at least a few documents.

[HN15] The requirement for confidentiality under *Rule 26(b) (3)* precludes protection for documents if they or their contents have been disclosed in circumstances that create a sufficiently substantial prospect that those contents will become accessible to the party's adversary or prospective adversary in the pending or contemplated [*37] litigation. *See, e.g., Bowne, 150 F.R.D. at 479*. Such disclosure has occurred here.

The Ramseys have disclosed elements of their investigation both to the public and to the Boulder District Attorney. Both forms of disclosure are antithetical to the work-product protection that they seek to invoke. In this context, disclosure to the District Attorney is disclosure to their contemplated adversary, and disclosure to the public--whether in the form of books, articles, media interviews, press conferences, press releases or similar public pronouncements--is tantamount to disclosure to the District Attorney.

The principal issue between the parties on the waiver question is the scope of the waiver. Defendant argues for a subject matter waiver (Deft's Memo at 19-20; Deft's Reply Memo at 14-16), and plaintiff appears to suggest that protection is waived only for the precise document or portion of a document that has been disclosed. (Pltff's Memo at 23-26).

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

In the absence of a showing that the Ramseys have been making selective disclosure, that is, by revealing only favorable portions of documents and withholding unfavorable ones--and there has been no such showing--we see [*38] no basis for a broad subject-matter waiver based on disclosures in a non-judicial setting. *See, e.g., In re von Bulow, 828 F.2d 94, 103 (2d Cir. 1988); In re Kidder Peabody, 168 F.R.D. at 472-73. See generally 6 Moore's Federal Practice § 26.70[6] [c]* at 26-228 & n.92 (citing cases). Nonetheless, we also reject plaintiff's definition of waiver. To the extent that the Ramseys have disclosed portions of a document, or at least its substance, they cannot withhold the balance of the document insofar as it concerns the same subject as the disclosed segment of the document. *See, e.g., Bowne, 150 F.R.D. at 484-86. See also Fullerton v. Prudential Ins. Co., 194 F.R.D. 100, 104 (S.D.N.Y. 2000).* Indeed, the difficulty with the Ramseys' position is highlighted by plaintiff's suggestion that if the Ramseys disclosed solely the conclusion of a forensic study--for example, a handwriting analysis--the substance of the report need not be produced because the disclosure was *de mimimis*. (Pltff's Memo at 24). The conclusions from forensic testing are of course the heart of such a document, and its public revelation waives [*39] any protection for the entire document and any underlying materials on which the report was based. Although a party may successfully argue against disclosure of the balance of a document if only a minor or inconsequential part has been revealed, plaintiff makes no showing that this is the case with respect to any specific document of which the Ramseys have revealed some portion of the contents.

In sum, [HN16] any work-product document containing information the substance of which has been revealed to the District Attorney or to the public cannot be protected under *Rule 26(b) (3)*.

Finally, we briefly address defendant's argument that it has a pressing need for the investigative documents and that this need trumps the protection otherwise offered by *Rule 26(b) (3)*. In fact, the immunity offered by that rule must yield when a party adequately demonstrates that it requires access to those documents in order to prepare its case. In this instance, defendant asserts that the central question posed by this lawsuit concerns whether Burke Ramsey bore any responsibility for the death of his sister. Noting that the Ramseys have undertaken a very extensive investigation over a period of years into the [*40] question of who murdered their daughter, defendant argues that unless it obtains access to the fruits of that investigation, it will be required to attempt, in substance, to duplicate the Ramseys' efforts. Defendant suggests that such a project would be extremely time-consuming and costly, and that in pursuing it, defendant would labor under a major handicap because of the passage of time since the incident, thus virtually ensuring that memories will have faded. Plaintiff argues that this scenario is exaggerated and that in any event, to lay a foundation for this position, defendant must attempt to interview or depose those individuals who supplied information to the Ramseys' representatives in order establish whether they are still able to provide sufficient information.

We view defendant's argument as a tad too facile. In its broadest scope, it implies that, for purposes of defending itself here, defendant would be required to duplicate the Ramseys' efforts over the years to uncover their daughter's killer. Although in its role as an institutional journalist, *The Post* may wish to retrace all of these investigatory steps--in effect, peeking behind the public relations curtain [*41] that the Ramseys have hung--the defendant's litigative need for information is more circumscribed. To the extent that documents may reflect on the possible guilt or innocence of Burke--either by pointing directly towards or away from his involvement or by pointing towards or away from some other persons's involvement, those documents contain information that is plainly of great importance to the defendant's case. Otherwise stated, defendant has a "substantial need" for this information. As for defendant's argument that this information, if embodied in the Ramseys' documents, is not readily accessible to defendant without production of the documents, we view that proposition as not fully established on the current record.

[HN17] To satisfy this aspect of the hardship requirement of *Rule 26(b) (3)*, defendant must establish either that it can obtain the substantial equivalent only with undue hardship or that it simply cannot obtain the substantial equivalent at all. For purposes of obtaining the key information--that is, witness statements [10] and forensic testing reports--we find it obvious that defendant would have to undertake an unreasonably arduous effort during the discovery period to [*42] obtain by its own efforts the substantial equivalent of the information that the Ramseys have apparently compiled over the years. Moreover, in view of the years that have passed since the tragedy of December 1996, we question whether any witness accounts that might currently be obtained would be nearly as accurate as the versions that they proffered to the Ramseys' representatives years ago.

> 10   In referring to the statements of witnesses, we note that the Ramseys' counsel appeared at one point during oral argument to suggest that he understood the term "witness" to refer only to those individuals who may have witnessed the murder of JonBenet. (Mar. 16, 2001 Tr. at 50). We obviously use the term in its far broader and more natural sense, that is, to refer to individuals

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 24 of 41

Page 13

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

who have information of possible pertinence to the investigation. To avoid ambiguity, we also emphasize that the term "statement" is not intended to be limited to documents that are signed by the source of the information or that reiterate in the witness's words what he told an investigator. Any document that describes or summarizes the gist of what a witness has told an investigator comes within this category.

[*43] This observation does not, however, lead to the conclusion that defendant has satisfied the "undue hardship" or "substantial equivalent" tests. As noted, the District Attorney of Boulder County has apparently been conducting an active investigation since the time of the murder, and defendant has sought to obtain discovery from the office of the prosecutor by a subpoena served last year. (*See* Supp. Bloom Decl. at PP2-4). Although the District Attorney resisted the subpoena, we have been advised that the District Court for the District of Colorado recently upheld the defendant's position in that discovery foray, and that production by the District Attorney is imminent. (*See* June 14, 2002 letter to the court from R. Bruce Rich, Esq., referring to *Ramsey*, No. 01-WM-555). Assessment of defendant's need depends on what is produced by the prosecutor, and thus determination of that question is premature. Moreover, in any event, resolution of this issue appears to be unnecessary at this stage in view of our preceding rulings regarding the discoverability of most of the contested documents from plaintiff.

### 3. *The Effect of Rule 26(c)*

For reasons that we have noted, we view [*44] the protective-order provisions of *Rule 26(c)* as offering a degree of protection to a non-party whose trial preparation materials are demanded by a litigant. In this case we believe that since the Ramseys cannot assert the work-product immunity of *Rule 26(b)(3)*, the provisions of *Rule 26(c)*--which directs us to grant relief that would avoid *inter alia* "oppression"--authorize us to impose certain limitations on the scope of required disclosure and its handling in order to prevent unfair prejudice to the Ramseys.

First, although the unavailability of *Rule 26(b)(3)* to a non-party witness leaves at potential risk so-called core attorney work product--that is, the analytical work of the attorney in evaluating his case--the policy of giving the most stringent protection to such materials, *see, e.g.*, 6 *Moore's Federal Practice § 26.70[5][e]* at 26-223 to 225, dictates that they need not be disclosed here. Indeed, we understand defendant's counsel to have abjured any interest in such documents or portions of documents even if otherwise called for by defendant's document requests. (Deft's Reply Memo at 18 n.8; Mar. 16, 2001

Tr. at 23-24). Accordingly, any documents or portions [*45] of documents that contain segregable analytical material authored by an attorney--as distinguished from factual work product--need not be produced unless it or its equivalent was previously provided to the Boulder District Attorney or disclosed to the public.

Second, to the extent that the Ramseys authorized the creation of the investigative documents at least in part to facilitate their defense in the event that either was charged by the Boulder prosecutors, we see a potential danger to them if these materials are released to the defendant with no restriction on their use. In that event, we view it as quite possible that portions of the information may come into the hands of the District Attorney, to the detriment of the Ramseys' legal position. This concern suggests that, except for documents the contents of which have been shared with the District Attorney or disclosed to the public by the Ramseys, the investigative documents produced pursuant to court order should be subjected to a protective order limiting their production to defendant's trial counsel and other personnel assisting them and precluding the disclosure of the documents or their use by defendant's counsel other than [*46] for purposes of this litigation. This conclusion is further fortified by our concern that a libel defendant not be permitted to use its own allegedly defamatory conduct as the trigger for litigation which it then uses as a means of ferreting out further information from the arguably injured party for subsequent publications. [11]

> 11 We respect the *First Amendment* policy favoring free access by the press to information of public interest or concern. That policy underlies the adjustment of the respective burdens of proof when a publication is sued for libel, *see, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 279, 11 L. Ed. 2d 686, 84 S. Ct. 710 at 710-80 (1964)*, and the presumption against the sealing of court proceedings. *See, e.g., Brown v. Artuz, 283 F.3d 492, 499 (2d Cir. 2002); Bowden v. Keane, 237 F.3d 125, 128-29 (2d Cir. 2001); Ayala v. Speckard, 131 F.3d 62, 68-69 (2d Cir.) (en banc), cert. denied, 524 U.S. 958, 141 L. Ed. 2d 747, 118 S. Ct. 2380 (1997)*. Nonetheless, when a member of the press is a litigant, he has no right to demand that the court processes triggered by his conduct will be made available to him for journalistic endeavors irrespective of the legitimate privacy interests of his adversary.

### [*47] 4. *The Attorney-Client Privilege*

Plaintiff and his parents have asserted the attorney-client privilege to withhold a number of documents from production. There appears to be no dispute that Colorado

Case 1:07-mc-00450-RMU    Document 6-21    Filed 11/19/2007    Page 25 of 41

Page 14

2002 U.S. Dist. LEXIS 11728, *; 30 Media L. Rep. 2377

law governs the privilege in this case (Pltff's Memo at 15-16 & n.35), and that law justifies the Ramseys' invocation of the privilege.

[HN18] Under Colorado law, communications between an attorney or his agent and the client that are undertaken to facilitate the rendering of legal services by the attorney for the client and that are intended to be confidential will be protected unless the substance of the communication is disclosed in circumstances that are inconsistent with the intended confidentiality. *See Colo. Rev. Stat. Ann. § 13-90-107(1)(b)* (West 2002); *see also B.B. v. People, 785 P.2d 132, 139 (Colo. 1990); Miller v. District Court, 737 P.2d 834, 838 (Colo. 1987).* Given that standard, the Ramseys' privilege claims appear adequately grounded in general, although the privilege cannot be applied to documents created by people who are not party to the privileged relationship and also cannot apply to any document the substance of which has been [*48] disclosed to anyone who is not a party to the privileged relationship. *See, e.g., Wesp v. Everson, 33 P.3d 191, 197 (Colo. 2001); Gordon v. Boyles, 9 P.3d 1106, 1123,* 29 Colo. Law. No. 11 247 (Colo. 2000).

As for the adequacy of the Ramseys' showing with respect to the specific documents, some confusion was generated at the outset by an absence of certain details in the plaintiff's privilege log. Nonetheless, supplemental logs and plaintiff's motion papers and subsequent correspondence have filled in some of the informational gaps, particularly with regard to the identification of individuals referred to in the logs. (*See, e.g.,* Maynard Decl. at Exs. G & H; Mar. 19, 2001 letter from L. Lin Wood, Esq. to deft's counsel). Given this state of affairs, we see no basis for directing disclosure of documents identified as subject to the privilege, except for those that do not qualify as still confidential and those few documents for which plaintiff is unable to identify the author or recipient. Defendant is of course free to seek further information pertinent to the privilege claims by follow-up discovery, and may later reassert its challenge to the withholding of any documents [*49] if further discovery demonstrates a basis for such a challenge.

5. *Doctor-Patient Privilege*

The remaining dispute concerns defendant's demand for production of certain medical records pertaining to the two Ramsey children. In the face of the Ramseys' invocation of the doctor-patient privilege, defendant contends principally that the protection of the privilege was waived by virtue of (1) the family's production to the

District Attorney of medical records and reports pertaining to the children, and (2) the public disclosure of the contents of some findings by the children's physician in the course of a press interview. (Deft's Memo at 21, 22-23; Deft's Reply Memo at 15-17 & n.7).

The parents' decision to disclose the substance of the physician's findings about abuse and the production of medical records and reports to the District Attorney plainly waive any privilege for those documents.[12] Accordingly, we reject the assertion of that privilege with respect to the records reviewed by the doctor to assert his publicly-expressed opinion and with respect to any records and reports provided to the District Attorney.

> 12   Although the patient is normally the holder of the privilege and thus is the only person entitled to waive its protection, since the children were minors it was the parents who controlled the privilege.

[*50] In so ruling, we again advert to *Rule 26(c)* to impose certain limitations on the use of the documents ordered produced. Because of the sensitivity of the subject of these records, they are to be held by counsel only and are to be used solely for purposes of this litigation.

*CONCLUSION*

For the reasons noted, we grant defendant's motion to compel to the extent noted. The parties are to confer as necessary in order to agree as to which withheld documents--whether or not on plaintiff's logs--must be produced under the rulings that we have made. If there are any unresolved disagreements about specific documents, the parties may apply to the court for a ruling.

As noted in the body of our decision, defendant is free to conduct additional discovery to determine whether the facts warrant any further challenge to plaintiff's withholding of information. That inquiry and all other fact discovery is to be completed by October 31, 2002.

Dated: New York, New York

June 26, 2002

SO ORDERED.

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE



In Re: STUDENT FINANCE CORPORATION, Debtor; CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION, Plaintiff v. CAREER PATH TRAINING CORPORATION, et al. Defendants

MISC. DOCKET NO. 06-MC-69, Case No. 02-11620-JBR (Bankr. D. Del.), Adversary Proceeding, No. 04-56414 (Bankr. D. Del)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2006 U.S. Dist. LEXIS 86603

November 29, 2006, Decided

November 29, 2006, Filed; November 30, 2006, Entered

**COUNSEL:** {*1} For CAREER PATH TRAINING CORPORATION, ET AL, Defendant: GERALD E. BURNS, LEAD ATTORNEY, ELIZABETH LUENING LONG, SUZANNE MARIE SWEENEY, KLETT ROONEY LIEBER & SCHORLING PC, PHILADELPHIA, PA.

For ROYAL INDEMNITY COMPANY, Movant: ALAN S. GILBERT, LEAD ATTORNEY, SONNENSCHEIN, NATH & ROSENTHAL, CHICAGO, IL; PETER F. VAIRA, LEAD ATTORNEY, VAIRA & RILEY PC, PHILADELPHIA, PA.

For SONNENSCHEIN NATH & ROSENTHALL LLP, Movant: ALAN S. GILBERT, LEAD ATTORNEY, SONNENSCHEIN, NATH & ROSENTHAL, CHICAGO, IL; PETER F. VAIRA, LEAD ATTORNEY, VAIRA & RILEY PC, PHILADELPHIA, PA; ROBERT W. GIFFORD, LEAD ATTORNEY, SONNENSCHEIN NATH & ROSENTHAL, NEW YORK, NY.

**JUDGES:** MARY A. McLAUGHLIN, J.

**OPINION BY:** MARY A. McLAUGHLIN

**OPINION:**
*MEMORANDUM AND ORDER*

McLaughlin, J.

November 29, 2006

This is a miscellaneous action to enforce a subpoena issued from this Court, seeking the production of documents relevant to an adversary bankruptcy proceeding pending in the District of Delaware. The movant here, Career Path Training Corp. ("Career Path"), is a defendant in the adversary action. Career Path seeks documents from a private investigation firm, The James Mintz Group ("the Mintz Group"), retained by the attorneys for the largest creditor {*2}

in the bankruptcy, Royal Indemnity Co. ("Royal"). The Mintz Group, Royal, and Royal's attorneys (collectively "the respondents") have all filed oppositions to the motions to compel and have cross-moved for a protective order on the ground that the material sought is all protected attorney work product. Because none of the respondents is a party to the underlying adversary action, this raises the complicated issue of whether the protection against disclosure of attorney work product may be asserted by third parties.

*I. BACKGROUND*

The underlying bankruptcy litigation here is that of Student Finance Corporation ("SFC"), a company that provided student loans for trade schools, principally truck driver training schools. SFC would make or purchase educational loans, pool them together, and then sell them to investors as asset backed securities. n1

- - -Footnotes- - -1

n1 Declaration of Alan S. Gilbert ("Gilbert Decl.") at P4, attached as Exhibit 1 to the Response of Sonnenschein, Nath, & Rosenthal LLP, Royal Indemnity Company, and the James Mintz Group to the Motion of the Career Path Schools to Overrule Objections to Subpoena and Compel Compliance with Subpoena and Cross-Motion for a Protective Order (Docket No. 5), hereinafter "Respondent's Opposition."

- - -End Footnotes- - -
{*3} A. *SFC's Bankruptcy*

In the spring of 2002, SFC was forced into involuntary bankruptcy by its creditors. This bankruptcy is pending as *In re Student Finance Corp.*, No. 02-11620 (Bankr.





D. Del.). The bankruptcy was precipitated by allegations that SFC had fraudulently inflated the performance of its loans and disguised the true rate of default in its loan pools by misrepresenting students' eligibility for, and ability to repay, the loans, and by allegedly making payments on the loans out of SFC's own funds. In addition, many of the trucking schools whose students received SFC loans allegedly participated in the fraud by submitting false information about the loans and by making loan payments out of school funds or out of funds provided by SFC. n2

- - -Footnotes- - -2

n2 Gilbert Decl. at PP6-9; Declaration of Charles A. Stanziale, Jr. As Chapter 7 Trustee of Student Finance Corporation ("Stanziale Decl.") at P2, attached as Exhibit 4 to Respondent's Opposition.

- - -End Footnotes- - -

Once SFC's alleged fraud was discovered and the true condition {*4} of SFC's loans became known, many of the loans went into default. A large number of these loans were insured against default by Royal Indemnity Company. These defaulted loans led to over $500 million in claims against Royal, which made it by far the largest creditor in SFC's bankruptcy. n3

- - -Footnotes- - -3

n3 Gilbert Decl. at PP10-11; Stanziale Decl. at P3, 5.

- - -End Footnotes- - -

### B. The Mintz Group's Investigation

In May 2003, Royal's attorneys, the law firm of Sonnenschein, Nath & Rosenthal ("Sonnenschein"), hired The Mintz Group, a firm of professional investigators, to investigate both SFC and the trucking schools whose students had received SFC loans. The purpose of the investigation was to gather information in preparation for possible litigation that Royal contemplated bringing against both SFC and the trucking schools.

The investigation was supervised and directed by Sonnenschein and involved interviews with SFC employees, as well as employees and former students of the truck driving schools. The investigation also involved the collection {*5} and review of public records including FOIA results, website reports, Lexis/Nexis searches, and asset searches. n4

- - -Footnotes- - -4

n4 Gilbert Decl. at PP21-22; Declaration of Andrew B. Melnick ("Melnick Decl.") at PP2-3, 5, 7, attached as Exhibit 2 to the Respondent's Opposition.

- - -End Footnotes- - -

### C. The Trustee's Lawsuit Against Royal and the Subsequent Settlement Agreement

In June of 2003, Royal moved for the appointment of a bankruptcy trustee. In November 2003, a trustee was appointed, and that same month, the trustee instituted an adversary proceeding against Royal. Around the same time (the record is unclear as to exactly when), Royal sued SFC and several trucking schools, and was itself sued by several creditors. n5

- - -Footnotes- - -5

n5 Gilbert Decl. at PP12-14, 22.

- - -End Footnotes- - -

In or about October 2004, the Trustee and Royal settled the adversary proceeding between them. As part of {*6} the court-approved settlement, Royal agreed to pay $4,900,000 to the Trustee and in return received a $1,900,000 administrative claim to be paid out of the proceeds of claims by the estate against third parties. n6

- - -Footnotes- - -6

n6 October 12, 2004, Settlement Agreement between Student

Finance Corporation Trustee and Royal Indemnity Company (hereinafter "Settlement Agreement") at P2, attached as Exhibit G to the Motion of the Career Path Schools to Overrule Objections to Subpoena and Compel Compliance with Subpoena (Docket No. 1) (hereinafter "Career Path's Motion"), also attached as Exhibit 1 to Attachment A of the Gilbert Decl.

- - -End Footnotes- - -

As part of the settlement, the Trustee agreed to file lawsuits against the trucking companies and other third parties involved with SFC to recover money for the estate. n7 If the Trustee decided not to bring an action against a third party, the settlement agreement gave



Royal the right to do so on behalf of the estate at its own cost, subject to court approval. In addition, the Trustee and Royal {*7} agreed to enter into a litigation agreement giving each other access to privileged information concerning the estate's claims. n8

- - -Footnotes- - -7

n7 Gilbert Decl. at P16; Settlement Agreement at P7.

8

n8 *Id.*

- - -End Footnotes- - -

The agreement also gave Royal rights over the Trustee's ability to settle claims against third parties. The Trustee agreed to confer with Royal in good faith before agreeing to any settlement, and if Royal opposed settling, the Trustee was required to give Royal the opportunity to prosecute the claim on behalf of the estate, as long as Royal guaranteed to the estate that the recovery would not exceed the rejected settlement. n9 The bankruptcy court approved the settlement agreement on October 29, 2004.

- - -Footnotes- - -9

n9 Settlement Agreement at P12.

- - -End Footnotes- - -

D. *The Current Adversary Action and the Subpoena at Issue*

On November 1, 2004, the Trustee brought an adversary {*8} proceeding against Career Path to recover allegedly fraudulent transfers from SFC. This matter is pending as *Stanziale v. Career Path Training Corp.*, No. 04-56414 (Bankr. D. Del.). On July 28, 2005, Career Path served a subpoena *duces tecum* on the Mintz Group, issued from this district court, requiring it to produce documents in the adversary action.

The subpoena sought ten categories of documents, all pertaining to the Mintz Group's investigation into SFC and the trucking schools, including Career Path. The ten categories sought documents concerning, referring or relating to, in whole or in part: 1) any investigations into the Career Path;

2) any communications to or from the Mintz Group regarding Career Path;

3)-4) Career Path, including documents obtained from third parties;

5) the Mintz Group's investigative file;

6) any investigation performed by the Mintz Group regarding SFC;

7) SFC's business dealings with any person that provided truck driving training or education;

8) communications between the Mintz Group and the Trustee regarding SFC;

9) communications between the Mintz Group and Royal regarding SFC; and

10) {*9} any fees charged or payments received for work or services referred to in the foregoing. n10

- - -Footnotes- - -10

n10 July 28, 2005 Subpoena to James Mintz Group Inc. (hereinafter "Subpoena"), attached as Exhibit A to Career Path's Motion.

- - -End Footnotes- - -

E. *The Current Miscellaneous Action*

On April 12, 2006, Career Path filed this motion, seeking to compel responses to the subpoena. The Mintz Group, joined by Sonnenschein and Royal opposed the motion to compel and cross-moved for a protective order on the ground that the material sought was investigative material prepared at the direction of Sonnenschein in anticipation of litigation and was therefore protected as attorney work product.

Career Path countered by arguing that attorney-work product may be asserted only by parties and that neither the Mintz Group, nor Royal, nor Sonnenschein is a party to the underlying adversary action. Career Path also argued that, even if the material could be protected as attorney work product, the respondents had waived that privilege by submitting {*10} an inadequately detailed privilege log. The Mintz Group, Royal and Sonnenschein responded by denying that work product protection was limited to parties and arguing that, even if it were, they should be considered parties. In the alternative, if work product protection did not apply, they argued that the material requested should be protected from disclosure under **FRCP 26(c)** as oppressive and unduly burdensome to produce.



Because the parties' briefing focused exclusively on whether work product protection was available to non-parties, the Court ordered supplemental briefing on whether, if work-product protection were available, it would apply to protect the documents at issue here from disclosure. The parties disagree as to whether the Mintz Group has submitted an adequate privilege log and whether Career Path has made an adequate showing of need for the documents to overcome work product protection, if it exists.

F. *The Documents at Issue*

Career Path concedes that the documents it requested essentially comprise the Mintz Group's entire investigative file for work performed for Sonnenschein and Royal concerning SFC and the truck driver {*11} training schools. n11 The Mintz Group has stated that these files amount to 66 Redweld (R) folders and several loose folders and 622 electronic files. The paper file alone is alleged to constitute eighteen linear feet of stacked documents. The Mintz Group has provided a 10 page index listing in summary fashion the contents of each folder, but has not provided an index of the electronic documents. n12

- - -Footnotes- - -11

n11 The Career Path School's Opposition to the Amended Cross-Motion for a Protective Order (Docket No. 10) (hereinafter "Career Path's Opposition") at 2, P5.

12

n12 Declaration of Johan Buys (hereinafter "Buys Decl.") at PP3-4, attached as Exhibit 3 to Respondent's Opposition.

- - -End Footnotes- - -

The Mintz Group has represented that all of the work reflected in the investigative file was performed at Sonnenschein's request and was communicated solely to counsel. An affidavit provided in support of their motion states that "[n]early every document in each of the folders is annotated with the investigators' handwritten comments, {*12} handwritten post-it notes, or colored flags or highlighters" and that "[m]any of the handwritten comments suggest follow-up actions for further investigation or supply details of conversations between the investigator and subject." n13

- - -Footnotes- - -13

n13 *Id.* at P5; Index attached to Buys Decl. at 1.

- - -End Footnotes- - -

In their briefing, the parties identify four categories of documents at issue:

1) Attorney notes and memoranda;

2) Investigators' memoranda and reports to Sonnenschein, including "action lists" for the investigators;

3) Interview notes and scripts prepared by investigators;

4) Public records, including FOIA results, FOIA requests, news articles, court documents and deposition transcripts, website reports and Lexis/Nexis and asset searches. n14

- - -Footnotes- - -14

n14 Categories 1, 2, and 4 are given in Career Path Schools' Supplemental Brief regarding Work Product Issues (hereinafter "Career Path's Supp. Br.") (Docket No. 16) at 6. Categories 2, 3, and 4 are given in Buys Decl. at P6

- - -End Footnotes- - -

{*13} The Mintz Group also refers to a category of "miscellaneous correspondence" which constitute 15% of the electronic files at issue, but for which it has not prepared an index or a privilege log. In the course of briefing this matter, Career Path has stated it will no longer seek to discover materials prepared by an attorney for the respondents or asset searches performed on individuals or entities other than Career Path, itself. n15

- - -Footnotes- - -15

n15 Career Path's Supp. Br. at 3.

- - -End Footnotes- - -

II. *LEGAL ANALYSIS*

Resolving this matter requires analysis of at least two distinct issues: 1) whether non-parties in the position of the Mintz Group, Royal, and Sonnenschein may assert the attorney work product privilege; and 2) if so, whether the material sought to be protected is, in fact, work product and whether Career Group has made a sufficient showing to overcome the privilege.

A. *Are the Mintz Group, Royal, and Sonnenschein Entitled to Assert the Attorney Work Product Privilege?*

The work product privilege protects "the confidentiality {*14} of papers prepared by or on behalf of attorneys in anticipation of litigation." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991), citing *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 91 L. Ed. 451 (1947). Its purpose is to allow lawyers to prepare for litigation "free from unnecessary intrusion by opposing parties and their counsel." *Hickman* at 511. The work product privilege is not absolute, and work product can be produced upon a showing that the party seeking discovery has a substantial need for the materials and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003).

1. *The History of the Work Product Privilege*

Determining whether the work product privilege is available to the third-party respondents in this case requires an examination of its development. The history of the work product privilege begins with the U.S. Supreme Court's 1947 decision in *Hickman v. Taylor*. Prior to that decision, federal courts had taken a variety of approaches to protecting {*15} information prepared or gathered by an adversary or his representatives in preparation for litigation, some refusing to allow discovery of such information on grounds of relevance, hearsay or privilege, others allowing such information to be produced. Wright, Miller & Kane, 8 *Federal Practice & Procedure* § 2021 at 313-15 (3d ed. 1994). In *Hickman*, the Supreme Court resolved the issue by recognizing a qualified protection from discovery for attorney work product.

At issue in *Hickman* were witness statements taken by an attorney for a ferry company sued under the Jones Act for the death of a sailor. The plaintiff had served interrogatories asking whether witness statements had been taken and requesting that they be produced. The district court, finding the statements unprotected by attorney-client privilege, had ordered their production and held the defendant and the attorney in contempt for refusing to comply. The circuit court reversed, finding the material to be the "work product of the lawyer" and therefore privileged from discovery. *Id.* at 499-500.

On appeal, the Supreme Court began by analyzing which discovery rule was implicated by the plaintiff's request. The {*16} Court noted that the plaintiff had believed he was proceeding under **Federal Rule of** **Civil Procedure 33**, which governs interrogatories, but that the district court based its contempt order on both **Rule 33** and **Rule 34**, which governs production of documents, and that the circuit court had grounded its analysis in **Rule 26**, which allows depositions to be taken by testimony or written interrogatories. The Court concluded that none of these three approaches was the proper procedural vehicle for compelling the production of the witness statements taken by the defendants' attorney. The Court held that neither **Rule 33** nor **Rule 34** was applicable because they allowed discovery only against adverse parties, not against a party's attorney or agent. The proper procedure, the Court held, would have been for the plaintiff to take the attorney's deposition under **Rule 26** and attempt to force him to produce the witness statements through a subpoena duces tecum in accordance with **Rule 45**. *Id.* at 501-505.

The Court declined, however, to decide the case on this procedural irregularity and proceeded to recognize a qualified work product privilege. The Court concluded {*17} that "neither **Rule 26** nor any other rule dealing with discovery contemplates production under such circumstances," because the requested discovery was "simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties." *Id.* at 510. Absent a showing that production of attorney work product was "essential to the preparation of one's case," discovery should not be permitted. *Id.* Moreover, where work product disclosed an attorney's mental impressions and thinking, the Court doubted that any showing of necessity could ever be made. *Id.* at 512-13.

According to the *Hickman* court, the purpose of the work product privilege was to protect the ability of an attorney to perform his necessary duties for his clients. In performing his duties, "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Were the work product of a lawyer "open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's {*18} thoughts, heretofore inviolate, would not be his own." *Id.* at 510-11.

The *Hickman* decision did not address whether the work product privilege it announced was limited to parties. Although the work product at issue was created by an attorney for a party, the language of the opinion is ambiguous. The Court refers to the purpose of the privilege as protecting attorneys from unnecessary intrusion "by opposing parties and their counsel." *Id.* at 510. Yet, the Court also broadly speaks of work

product being exempt from discovery under all of the applicable federal rules: "neither Rule 26 nor any other rule dealing with discovery contemplates production under such circumstances." *Id.* at 509. Because the Court concluded that the work product at issue in *Hickman* could only have been properly requested through a Rule 45 subpoena duces tecum, the Court's sweeping language suggests it contemplated the work product privilege applying to such subpoenas, arguably including those directed to third parties.

After *Hickman*, federal courts disagreed over how to interpret the work product privilege. Although few courts in the aftermath of the decision directly addressed whether {*19} the privilege applied to third parties, those that did reached differing conclusions. *Compare Shepherd v. Castle*, 20 F.R.D. 184, 187 (W.D. Mo. 1957) (holding that *Hickman* did not apply to a subpoena duces tecum issued under Rule 45 to a witness not a party to the action) *with Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 557-558 (2d Cir. 1967) (holding that *Hickman* applied to protect materials prepared by a third party in anticipation of separate but related litigation with the party that had subpoenaed them).

In part to create a more uniform interpretation of the privilege, protection for attorney work product was codified into the Federal Rules of Civil Procedure in 1970 as Rule 26(b)(3). *See generally* 8 *Federal Practice & Procedure* at § 2023; *United Coal Companies v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988) (work product privilege governed by uniform federal standard embodied in Rule 26(b)(3)). Rule 26(b)(3) provides in pertinent part:

Subject to the provisions of subdivision (b)(4) of this rule [governing expert discovery], a party may obtain discovery of documents and tangible things {*20} otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

By its terms, the work product privilege embodied in Rule 26(b)(3) does not apply to third parties, protecting only documents "prepared in anticipation of litigation or for trial by or for another party." Neither the amended Rule itself nor the Advisory Committee Notes for the 1970 revisions explain why the Rule's work product protection was limited only to parties. n16

- - -Footnotes- - -16

n16 The limitation may be an artifact of the Rule's development. The Notes explain that the revisions to Rule 26 attempted to harmonize the work product doctrine of *Hickman v. Taylor* with then-existing requirement under Rule 34 that discovery could be had from another party only for "good cause." The revisions accomplished this by doing away with the "good cause" requirement, but adding a requirement based on *Hickman* that discovery of trial preparation materials may be had only on a special showing of need. Because the "good cause" requirement that Rule 26(b)(3) was intended to supercede was limited to parties, it may be that the Rule 23(b)(3) was also so limited. Alternatively, the drafters may have decided to limit the scope of the Rule to parties to best further the work product privilege's purpose of protecting the attorney's adversary role in a system of open discovery, which the Notes describe as the "the view that each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side." Advisory Committee Notes to the 1970 Amendment to Rule 26.

- - -End Footnotes- - -

{*21} The enactment of Rule 23(b)(3) has been described by the United States Court of Appeals for the Third Circuit as only "partially codifi[ng]" the *Hickman* work product privilege. *Sporck v. Pell*, 759 F.2d 312, 316 (3d Cir. 1985); *see also In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003) (work product doctrine "codified in part" in Rule 26(b)(3)). In at least one respect, federal courts have uniformly extended the work product privilege beyond the terms of Rule 26(b)(3). Although Rule 26(b)(3) is expressly limited to "documents and other tangible things," federal



courts have not hesitated to extend the privilege to oral statements that embody an attorney's mental impressions or work product. *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003) ("It is clear from *Hickman* that work product protection extends to both tangible and intangible work product."); *United States v. 266 Tonawanda Trail*, 95 F.3d 422, 428 n.10 (6th Cir. 1996) ("When applying the work product privilege to . . . nontangible information, the principles enunciated in {*22} *Hickman* apply, as opposed to **Rule 26(b)(3) of the Federal Rules of Civil Procedure**, which applies only to 'documents and tangible things.'"); *Alexander v. F.B.I.*, 192 F.R.D. 12, 17 (D.D.C. 2000) (same); 8 *Federal Practice & Procedure* § 2024 at 337.

After the 1970 amendments, the provisions of the Federal Rules of Civil Procedure affecting work product remained unchanged until 1991. In that year, **Rule 45** was amended to streamline subpoena practice and "clarify and enlarge" the protections available to persons subpoenaed. Advisory Committee Notes to the 1991 Amendment to Rule 45. One of the many changes to the Rule was the addition of **subparagraph 45(c)**, which for the first time specified the protections available to persons subject to subpoenas. Prior to the amendment, **Rule 45** had incorporated the provisions of **Rule 26**, stating that subpoenas to produce documents were subject to the provisions of **Rule 26(c)**. Fed. R. Civ. P. 45(d)(1) (1990). In the 1991 revisions, this express reference to **Rule 26** was deleted and the protections available to those receiving a subpoena were spelled {*23} out in **subdivision 45(c)**. That subdivision expressly provides that "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . . (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies." **Rule 45(c)(3)(A)**. The Advisory Committee Notes explain that subdivision 45(c) was "not intended to diminish rights conferred by **Rules 26-37** or any other authority" and that **subparagraph 45(c)(3)** was intended to "track[] the provisions of **Rule 26(c)**."

### 2. *Is Royal a "Party" for Purposes of Asserting the Work Product Privilege under Rule 26(b)(3)*

Before beginning to analyze whether third parties may assert the work product privilege, the Court must first dispense with the respondents' initial argument that Royal should be considered a party to the underlying adversary action and therefore entitled to assert work product protection under **Rule 26(b)(3)**. Royal argues it should be considered a party to the adversary action for two reasons: because, as a creditor, it is a party to SFC's bankruptcy and because its settlement agreement with the bankruptcy trustee gives it an interest in the

litigation. Neither {*24} of these arguments is persuasive.

Royal's status as a creditor in SFC's bankruptcy does not make it a party to the underlying adversary action here. The adversary proceeding was brought by the bankruptcy trustee against Career Path. No creditor, including Royal, is a party to that action. Under **Federal Rule of Bankruptcy Procedure 7024**, Royal could have sought to intervene in the adversary action pursuant to the terms of **Federal Rule of Civil Procedure 24** and become a party to the action, but it did not do so. Merely being a creditor in the related bankruptcy proceeding does not give Royal any of the rights or obligations of a party to the adversary action. Just as Royal had no obligation as a creditor to answer the complaint or serve initial disclosures, it has no right as a creditor to assert work product privilege under **Rule 26(b)(3)**.

Royal's settlement agreement does not alter Royal's status as a non-party for purposes of **Rule 26(b)(3)**. The settlement agreement gives Royal an interest in the litigation and certain rights with respect to the trustee, including the right to be consulted concerning settlement {*25} of adversary claims and under certain conditions the right to take over claims and prosecute them on behalf of the estate. It does not, however, purport to make Royal a party to adversary actions brought by the trustee. Although the settlement agreement might provide the basis for Royal to move to intervene in the adversary action, in the absence of such a motion being made and granted, the agreement does not make Royal a party.

Royal also cannot be considered a "party's representative" entitled to assert work product protection under **Rule 26(b)(3)**. **Rule 26(b)(3)** protects only work product prepared by a party's representative in its representative capacity. *Ramsey v. NYP Holdings, Inc.*, No. 00-cv-3478, 2002 U.S. Dist. LEXIS 11728, 2002 WL 1402055 at *8 (S.D.N.Y. June 27, 2002), *citing* the Advisory Committee Notes to **Rule 26(b)(3)** (**Subdivision (b)(3)** protects materials prepared in anticipation of litigation "by or for a party or any representative *acting on his behalf*") (emphasis added). Even if Royal could be considered in some way the trustee's representative by virtue of their settlement agreement, the investigative file at issue here was prepared over a year before the settlement agreement {*26} was reached. The file was therefore not prepared on the trustee's behalf and Royal cannot be considered the trustee's representative for purposes of invoking **Rule 26(b)(3)**.

### 3. *As Non-Parties, Can the Respondents Nonetheless Assert the Work Product Privilege?*



Having determined that Royal is a third party to the underlying adversary action, the Court now turns to the central issue presented by the respondents' motion to quash: Can the work product privilege be asserted by those who are not parties to the underlying action for which the information is sought?

### a. Prior Decisions Addressing the Issue

The U.S. Court of Appeals for the Third Circuit has never addressed this issue. Those courts that have considered it have, with very few exceptions, concluded that the language of **Rule 26(b)(3)** protecting only parties' work product precludes non-parties from asserting the privilege. *See, e.g., In re Subpoena served on the Cal. Pub. Util. Comm'n*, 892 **F.2d 778, 780-81 (9th Cir. 1989);** *In re Polypropylene Carpet Antitrust Litig.*, 181 **F.R.D. 680, 691 (N.D. Ga. 1998).** n17

- - -Footnotes- - -17

n17 *See also **Ramsey**,* 2002 U.S. Dist. LEXIS 11728, 2002 WL 1402055 at *6 (collecting cases); c.f. *Hunter v. Heffernan*, No. 2:94cv5340, 1996 U.S. Dist. LEXIS 9244, 1996 WL 363842 (E.D. Pa. June 28, 1996) (stating, in dicta, that "[d]ocuments prepared by nonparties to the present litigation are unprotected" by the work product privilege); 8 *Federal Practice and Procedure* § 2024 at 206-07) ("Documents prepared for one who is not a party to the present suit are wholly unprotected by **Rule 26(b)(3)** even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit.")

- - -End Footnotes- - -

{*27} Although none states so directly, these cases implicitly view **Rule 26(b)(3)** as the sole source of authority for protecting work product from discovery. Because "the language of the rule makes clear that only parties and their representatives may invoke its protection," courts are "not free to suspend the requirement." *Cal. Pub. Util. Comm'n* at 781. Even in cases where leaving third party work product unprotected would cause hardship or inequity or frustrate the policy behind the privilege, courts have been largely unwilling to extend the doctrine beyond the terms of **Rule 26(b)(3).** *See, e.g., Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 246-47 (C.D. Cal. 1993). In *Loustalet*, even though a third-party had anticipated being involved in the litigation at issue and was a party

in "closely related lawsuits," it was not permitted to assert the work product privilege because it was not a party or a party's representative as required by **Rule 26(b)(3).** *Id.* at 247.

A handful of decisions, however, have allowed third parties to assert work product privilege despite the limiting language of **Rule 26(b)(3).** *See **Abdell v. City of New York**,* No. 05 Civ. 8453, 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313 (S.D.N.Y. Sept. 14, 2006); {*28} *Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 772-73 (M.D. Pa. 1985). n18

- - -Footnotes- - -18

n18 There are also a handful of reported cases that assume, without discussion or analysis, that third parties can assert the work product privilege. *See, e.g., **National Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co., Inc.**,* 967 **F.2d 980 (4th Cir. 1992)** (quashing a third party subpoena on work product grounds); *In re Sealed Case*, 272 U.S. App. D.C. 314, 856 F.2d 268, 273 (D.C. Cir. 1988) (same). Because these cases never address the limiting language in **Rule 26(b)(3)** or provide any explanation for the basis of a third party's assertion of the privilege, they are not helpful to the Court's analysis here.

- - -End Footnotes- - -

Although both reach the same conclusion, *Abdell* and *Basinger* provide different rationales for extending the privilege to non-parties. In *Abdell*, the court held that although **Rule 26(b)(3)** was limited to parties, "the work {*29} product doctrine as articulated in [*Hickman*] is broader than **Rule 26(b)(3)**" and could provide independent authority for protecting third party work product. 2006 U.S. Dist. LEXIS, [WL] at *3. In *Basinger*, the district court relied on the general authority of **Rule 26(c)** permitting protective orders "for good cause shown" to extend **Rule 26(b)(3)** to non-parties who were potential defendants in the underlying litigation. *Id.* at 772.

*Abdell* concerned plaintiffs suing for wrongful arrest who sought to subpoena a processing form from the district attorney's office, which was not a party to the suit. Considering the district attorney's motion to quash, the court held that work product protection for a third party might be authorized under *Hickman*. To determine if *Hickman* applied, the court analyzed whether protecting the requested material would further the three purposes for the work product privilege articulated in *Hickman*: preventing discovery

from chilling an attorney's ability to prepare his legal theories and strategies; preventing an opponent from free-loading off his adversaries' preparation, and preventing disruption of ongoing litigation. Finding that the form at issue {*30} was drafted with the understanding that it was ordinarily discoverable in a criminal case and that there were no pending criminal proceedings, the court held that none of the three purposes of *Hickman* was implicated by the production of the document and that the form was therefore not protected from discovery. 2006 U.S. Dist. LEXIS 66114, [WL] at *3-4.

In *Basinger*, the district court considered a subpoena issued by a plaintiff in a personal injury auto accident case, seeking the investigative file of the insurer of the tavern where the defendant had been drinking before the accident. Because the tavern was not a party, **Rule 26(b)(3)** did not apply. Nonetheless, finding that the insurer had prepared the file in anticipation of possible litigation with the plaintiff and that the tavern could still be sued, the court held that work product protection identical to that in **Rule 26(b)(3)** could be authorized by the broad protective order provision of **Rule 26(c)**. **Rule 26(c)** authorizes protective orders when required by justice to prevent oppression or undue burden, and the court held that it would be "unduly 'burdensome' and therefore, unjust, to require a non-party to deliver [work product] to a party who {*31} may subsequently join the non-party in the litigation." *Id.* at 772; *see also In re Polypropylene,* 181 F.R.D. at 692 (issuing a protective order under **Rule 26(c)** to protect third party documents that "would constitute attorney work product as defined by **Rule 26(b)(3)** if [the third party] was a party to this litigation").

*b. Asserting the Work Product Privilege in this Case*

After considering the varying approaches taken by the other courts to have addressed the issue, as well as the history of the work product doctrine and the text of the applicable rules, the Court concludes that the respondents may assert the work product privilege here.

As third parties, the respondents cannot invoke work product protection under **Rule 26(b)(3)**. That rule is limited by its terms to work product prepared by a party or its representative, and as discussed above, neither Royal nor Sonnenschein nor the Mintz Group is a party to the underlying adversary action here or is a party's representative.

**Rule 26(b)(3)**, however, is not the only means for asserting work product protection in federal courts. The rule is only a partial codification of the work product privilege, *Sporck*, 759 F.2d at 316, {*32} and

therefore leaves room for the privilege to be asserted outside its terms in appropriate cases. Courts have extended the work product privilege beyond the strict terms of **Rule 26(b)(3)** to protect intangible work product outside the "documents and tangible things" protected by the rule. *See Real Property*, 95 F.3d at 428 n.10. Similarly, the Court believes the privilege may be extended beyond the strict terms of the rule to protect non-parties' work product when doing so accords with the purposes of the privilege set out in *Hickman v. Taylor*.

The court disagrees with those courts that have assumed that **Rule 26(b)(3)** forbids district courts from extending work product protection to third parties. Although **Rule 26(b)(3)** was intended to set out a uniform work product provision for the federal courts, nothing in the text of the rule or its history, or in the relevant advisory committee notes, suggests that it was intended to foreclose the application of the attorney work product privilege outside its terms in appropriate cases.

The source of the Court's authority to extend the work product privilege beyond the terms of **Rule 26(b)(3)** is three-fold. First, **Rule 45** {*33} expressly provides that the court from which a subpoena has issued shall quash or modify the subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies." **Rule 45(c)(3)(A)(iii)**. **Rule 45** does not define what privileges and protections are to be enforced under its terms, but the language is broad enough to include protection against discovery of third-party work product in appropriate cases. Nothing in **Rule 45's** history or text indicates that it was intended to incorporate **Rule 26(b)(3)'s** restriction of work product to parties. The Advisory Committee Notes to the 1991 revisions to the rule indicate that the authority to issue protective orders under **Rule 45** was intended to track the general protective order provisions of **Rule 26(c)**, but do not mention the work product provisions of **Rule 26(b)**.

Second, **Rule 26(c)** authorizes a court to issue a protective order "for good cause shown" to protect "a party or person from annoyance, embarrassment, oppression or undue burden or expense." As found by the *Basinger* and *Polypropylene* courts, this language is sufficiently sweeping to authorize a protective order preventing the undue burden {*34} of disclosing third-party work product in appropriate cases. Indeed, even many of those decisions which refuse to protect third party work product under **Rule 26(b)(3)** recognize that a protective order could issue under **Rule 26(c)** to prevent disclosure of the material. *See Cal. Pub. Util. Comm'n* at 781 n.2; *Ramsey*, 2002 U.S. Dist. LEXIS 11728, 2002 WL 1402055 at *7; 8

*Federal Practice & Procedure* § 2024 at 356 ("To the extent that **Rule 23(b)(3)**, literally read, seems to give insufficient protection to material prepared in connection with some other litigation, the court can vindicate the purposes of the work-product rule by the issuance of a protective order under **Rule 26(c)**.")

Third, *Hickman* itself provides authority to protect work product outside the terms of **Rule 26(b)(3)**, whether as to intangible work product or work product produced by third parties. *Abdell*, 2006 U.S. Dist. LEXIS 66114, 2006 WL 2664313 at *3; *see also* 8 *Federal Practice & Procedure* § 2024 at 355 n.17 (noting that the position that *Hickman* authorizes protection of third party work product "has much to commend itself given the other areas of incomplete codification in **Rule 26(b)(3)**").

Having determined that {*35} the Federal Rules and *Hickman* authorize the Court to protect third party work product in appropriate cases, the Court must determine whether the respondents present an appropriate case.

Here, Career Path's subpoena seeks an investigative file prepared by Royal's attorneys in anticipation of litigation against SFC and the trucking schools with which it did business, including Career Path. In essence, the subpoena seeks to compel discovery of an adversary's work product prepared in anticipation of litigation against the very party issuing the subpoena. Although the exact litigation that Royal anticipated did not occur (because Royal did not sue Career Path directly), the subsequent adversary action by the trustee was brought with Royal's direct involvement. Through its settlement agreement with the trustee, Royal provided funds for the trustee to pursue adversary actions, like this one, against the trucking firms that did business with SFC. Any money collected through these adversary actions would be paid to the estate for the benefit of its creditors, the largest of whom is Royal. In addition to a financial interest in these suits, Royal also received a measure of control over {*36} the litigation, including the right to be consulted on strategy and to share privileged documents and the right, in certain circumstances, to pursue claims on the estate's behalf.

Under these circumstances, disclosure of Royal's work product implicates all the purposes for the privilege articulated in *Hickman*: preventing discovery from chilling attorneys' ability to formulate their legal theories and prepare their cases, preventing opponents from free-loading off their adversaries' preparation, and preventing disruption of ongoing litigation. *Hickman*, 329 U.S. at 511; *Abdell*, 2006 U.S. Dist. LEXIS 66114, [WL] at *3-4. Allowing a defendant in an adversary action brought by the trustee to discover

creditors' attorney work product would impair those attorneys' ability to investigate their clients' potential claims and to develop legal strategies. Allowing such discovery would also enable a defendant to utilize the creditors' investigation as his own and thereby free-ride on "wits borrowed from the adversary." *Hickman* **at 517** (Jackson, J., concurring). Finally, permitting work product discovery could potentially disrupt ongoing litigation by sidetracking adversary actions into collateral proceedings {*37} seeking work product from creditors. In addition, in this case, there is the possibility, albeit remote, that Royal might become a party to the adversary action under the terms of its settlement agreement with the trustee. Under the agreement, if the trustee favors settling with Career Path but Royal objects, then Royal has the right to prosecute the claim on behalf of the estate.

*B. Are the Subpoenaed Documents Work Product and, if so, Has Career Path Made a Sufficient Showing to Overcome the Work Product Privilege?*

Having determined that the respondents may assert the work product privilege, the Court can now turn to determining whether Royal has established that the requested material is in fact work product and, if it has, whether Career Path has made a sufficient showing of need to permit its production.

The work product privilege protects material "prepared by or on behalf of attorneys in anticipation of litigation." *Westinghouse*, 951 F.2d at 1428. It extends to material prepared in anticipation of litigation by an attorney's "investigators and other agents." *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975). Even if {*38} material was prepared in anticipation of another litigation, it will still be protected as work product if the anticipated litigation was related to the proceedings in which the material is to be produced. *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979) (upholding work product protection to material prepared in anticipation of related litigation). Here, the Mintz Group's investigative file was prepared on behalf of Royal's attorneys in anticipation of litigation arising from SFC's bankruptcy, including anticipated litigation against trucking schools like Career Path. The investigative file is therefore covered by the work product privilege.

Even if material is protected attorney work product, it can still be produced if the party seeking discovery shows that it has a substantial need for the materials and that it cannot without undue hardship obtain the substantial equivalent of the materials by other means. *In re Cendant Corp.*, 343 F.3d at 663. There are two levels of protection for attorney work product: "ordinary" work product prepared in anticipation of



litigation by an attorney or the attorney's agent is discoverable only upon {*39} a showing of need and hardship; "core" or "opinion" work product that encompasses "mental impressions, conclusions, opinion or legal theories of an attorney or other representative of a party concerning the litigation is generally afforded near absolute protection from discovery." *Id.* (internal quotation and citation omitted).

The parties' briefing has identified four categories of materials in the requested investigative file. The Court will consider these categories separately.

### 1. *Attorney Notes and Memoranda*

Attorney notes and memoranda are at the center of the "core" work product category generally afforded near absolute protection. Career Path has withdrawn its request to compel production of these documents and they need not be produced.

### 2. *Investigators' Memoranda and Reports to Attorneys*

This category consists of "memoranda prepared by the investigators as reports to Sonnenschein concerning interviews with truck driving school personnel and former students, and SFC-related personnel." Melnick Decl. at P7; Buys Decl. at P6. Like the other documents in the investigation file, these memoranda and reports are alleged to be "annotated with the investigators' handwritten {*40} comments, handwritten post-it notes, or colored flags or highlighters" and that "[m]any of the handwritten comments suggest follow-up actions for further investigation or supply details of conversations between the investigator and subject." Buys Decl. at P5.

To the extent that annotations on the documents reflect the mental impressions and opinions of the investigating agents or the supervising attorneys, they are "core" work product largely immune from discovery, absent a showing of extraordinary need. Even to the extent the documents do not contain such annotations or those annotations can be redacted, "[m]emoranda summarizing oral interviews" may still "indirectly reveal the attorney's mental processes, his opinion work product." *In re Grand Jury Investigation*, 599 F.2d 1224, 1231 (3d Cir. 1979).

Although the Court believes these memoranda may be entitled to heightened protection as "core" work product, it is unnecessary to decide the issue because Career Path has failed to make the showing of substantial need and undue hardship required for even ordinary work product.

There are three categories of witness memoranda at issue: those relating to Career Path {*41} and its

former students and employees, those relating to SFC and its employees, and those relating to other trucking schools and their former students and employees.

### a. *Memoranda re Career Path and its employees and students*

With respect to documents relating to interviews with Career Path's students and former or current employees, Career Path asserts these documents "go to the heart of the trustee's case" against it and "would assist [Career Path] in identifying witnesses and information and information relating to the allegations made by the Trustee." Career Path's Supp. Br. at 8. Career Path asserts that it has substantial need for these memoranda because they were taken closer in time to the events they concern than any statements that could now be obtained from these witnesses and that the statements are therefore presumptively more accurate. Career Path also states the "itinerant nature" of trucking school students makes it difficult to track down these witnesses. Career Path has submitted an affidavit attesting to its unsuccessful efforts to track down three of its former students identified by the trustee as having relevant information. Career Path's Supp. Br. at {*42} 9-10.

Although the Court agrees with Career Path that these memoranda would be relevant to the adversary action, the Court does not believe Career Path has shown it could not obtain substantially equivalent information without undue hardship. These witnesses were Career Path's own former employees and students. Royal had no privileged access or extra information about them, and Career Path could have chosen to interview them at any time. That Career Path delayed in doing so does not establish the substantial hardship necessary to obtain attorney work product. Career Path can obtain this information in the same way as did Royal's investigators. The fact that the memoranda memorialize interviews taken closer to the events in question does not show that Career Path cannot obtain equivalent information. This case does not involve interviews with percipient witnesses to an accident or a sudden crime where a contemporaneous statement might be more reliable.

Finally, Career Path's attestation that it tried and failed to locate three former students identified by the trustee as having relevant information does not show substantial hardship. Although Career Path states in its brief that its {*43} attempt to locate these students was "timely," its affidavit gives no indication as to when this investigation was made. In the face of the likelihood that these witness memoranda contain mental impressions and conclusions of attorneys or their representatives, this showing is insufficient to



prove the undue hardship necessary for production of attorney work product.

### b. *Memoranda re SFC and its employees*

With respect to documents relating to interviews with SFC-related witnesses, Career Path claims this information is necessary to show whether SFC acted with intent to hinder creditors. Career Path argues it cannot obtain this information elsewhere because, due to the current and potential criminal charges from SFC's collapse, "it is likely that key SFC personnel would not give testimony or statements" to Career Path. Career Path believes SFC's principal, Andrew Yao, who has been indicted, and other SFC officials will refuse to be interviewed and will assert their **Fifth Amendment** rights if deposed. Career Path's Supp. Br. at 8, 10.

Career Path's argument that it will not be able to obtain information from SFC personnel due to the pending criminal charges is too speculative to {\*44} establish undue hardship. Career Path has provided no evidence that it ever sought out or interviewed any SFC employee or that any employee refused to speak to Career Path out of fear of the pending criminal investigation. Absent any showing that Career Path has actually encountered the difficulties it assumes, Career Path has not sustained its burden to obtain Royal's work product.

### c. *Memoranda re employees and students of other trucking schools*

With respect to documents relating to interviews concerning other trucking schools, Career Path claims it needs the information to support a "key part" of its defense, that Career Path did not engage in the practices that other schools are alleged to have done. It alleges that locating employees and students of these schools "four years or more after the schools closed" is "next to impossible." Career Path's Supp. Br. at 9-10.

As to these documents, Career Path has shown neither a substantial need nor an undue hardship. Career Path's stated reason for these documents, to show that other schools engaged in activities that it did not, is not compelling. Whether or not other trucking schools engaged in improper activities with SFC is {\*45} of little if any relevance to whether Career Path engaged in those activities. Career Path's alleged hardship is also inadequate. Career Path offers no reason why it is only seeking these documents now "four or more years" after SFC's bankruptcy.

### 3. *Interview Notes and Scripts Prepared by Investigators*

This category of documents is described in an affidavit attached to one of the respondents' briefs.

Melnick Decl. at P7. No description of the category is given other than that it contains "interview notes and scripts prepared by the investigators." Career Path's briefing does not respond to this category separately, but its arguments with respect to memoranda concerning witness statements apply equally here.

Scripts of questions to be used in interviewing witnesses are core attorney work product, reflecting legal strategy and decision-making concerning the important areas of inquiry with particular types of witnesses. As they concern only the questions to be posed to witnesses and not the answers, they have little or no relevance to any issues in the adversary action and need not be produced.

Notes of witness statements may also be core attorney work product, containing the {\*46} investigators' mental impressions of a witness. Unlike memoranda summarizing a witness interview, however, notes of an interview are more likely to contain the note-taker's record of a witness's words and demeanor and less likely to contain detailed analysis or commentary. For the reasons given above in discussing the witness memoranda, the Court believes Career Path has failed to meet its burden to allow production of the notes of witness interviews.

### 4. *Public Records*

This category of documents consists of public records, including FOIA results, FOIA requests, news articles, court documents and deposition transcripts, website reports and Lexis/Nexis searches about Career Path, SFC, or other trucking schools. It also includes asset searches concerning Career Path (Career Path having dropped its request for information about asset searches of other entities).

Career Path suggests that because this information is in the public domain, it is not entitled to work product protection. This is incorrect. Public documents collected by or on behalf of an attorney in anticipation of litigation constitute work product because the choice of selecting which subjects to research and which {\*47} documents to collect represents the attorney's or the agent's mental impressions and legal opinions about the important issues in the actual or anticipated litigation. *See Sporck*, 759 F.2d at 315-16 (holding that the selection and compilation of publically-available and/or previously-produced documents by counsel in preparation for pretrial discovery falls within the highly-protected category of opinion work product). In addition, allowing disclosure of such information without a showing of substantial need would risk allowing opposing counsel to free-ride off an adversary's preparation. *See Hickman*, 329 U.S. at **517**.



Career Path could nonetheless obtain this information upon a showing of substantial need and undue hardship, but it has failed to make the required showing. Although Career Path claims this information would be relevant to central issues in the underlying adversary action, including SFC's solvency and its intent to defraud, it has failed to make any showing as to why it cannot obtain this information itself. By definition, the documents in this category are public and therefore equally available to Career Path as to the respondents. {*48} There is no hardship, and certainly no undue hardship, to requiring Career Path to obtain these documents themselves rather than through the respondent's work product.

### 5. Electronic Documents

In addition to paper documents, the Mintz Group's investigative file also contains electronic documents. Although the respondents do not provide an index of these documents, they have provided a percentage breakdown of these documents into different categories. For the most part these categories track those for paper documents and the same analysis will apply to each category of documents, whether in paper or electronic form. One category of electronic documents, however, is new: a category for "miscellaneous correspondence" consisting of 15% of total, about which the respondents provide no further information.

In the absence of any information about this miscellaneous correspondence, the Court cannot make any findings as to whether it should be produced. Given the extensive briefing of this issue before the Court and the numerous opportunities the respondents have had to provide this information, the Court would be justified in finding the respondents' claims of privilege waived as to {*49} this correspondence. The Court, however, will exercise its discretion and allow the respondents, if they choose, to file a supplemental submission with an index of this correspondence.

An appropriate Order follows.

### ORDER

AND NOW, this 29th day of November, 2006, upon consideration of the Motion to Overrule Objections to Subpoena and Compel Compliance with Subpoena Filed by Career Path Training Corporation ("Career Path") (Docket # 1) and the Cross Motion for Protective Order filed by Sonnenschein Nath & Rosenthal LLP ("Sonnenschein") (Docket # 5), and the oppositions thereto, including supplemental briefing, IT IS HEREBY ORDERED that the Career Path's Motion to Overrule Objections to Subpoena and Compel Compliance is DENIED and Sonnenschein's Cross Motion for Protective Order is GRANTED IN

PART AND DENIED IN PART for the reasons set forth in the accompanying memorandum.

Career Path's Motion to Overrule Objections to Subpoena and Compel Compliance is DENIED and Sonnenschein's Cross Motion for Protective Order is GRANTED as to the following categories of documents within the subpoenaed investigative file:

1) Attorney notes and memoranda;

2) Investigators' memoranda and reports {*50} to Sonnenschein, including "action lists" for the investigators

3) Interview notes and scripts prepared by investigators;

4) Public records, including FOIA results, FOIA requests, news articles, court documents and deposition transcripts, website reports and Lexis/Nexis and asset searches.

5) Electronic documents that fall within categories 1-4.

Career Path's Motion to Overrule Objections to Subpoena and Compel Compliance is DENIED and Sonnenschein's Cross Motion for Protective Order is also DENIED as to the following category of documents within the subpoenaed investigative file:

6) Electronic documents that fall within the respondent's category of "miscellaneous correspondence."

If the respondents wish to continue to assert the attorney work product privilege as to this miscellaneous correspondence, the respondents shall submit an index of these documents showing the author, recipient, copyee, subject and date of each document within twenty (20) days of this Order. Career Path may respond to this index within fifteen (15) days of its production.

BY THE COURT:

MARY A. McLAUGHLIN, J.



LEXSEE

**ANTHONY HOWELL, Plaintiff, - v - CITY OF NEW YORK, et al., Defendants.**

**CV-06-6347 (ERK)(VVP)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 71063*

**September 25, 2007, Decided**
**September 25, 2007, Filed**

**COUNSEL:** [*1] For Anthony Howell, Plaintiff: Wale Mosaku, LEAD ATTORNEY, Law Offices of Wale Mosaku, P.C., Brooklyn, NY.

For City of New York, Police Officer Corrion, (Tax Registration #932491), Defendants: Amy Nkemka Okereke, LEAD ATTORNEY, New York City Law Department, Special Federal Litigation Division, New York, NY; Michael Chestnov, LEAD ATTORNEY, Assistant Corporation Counsel, The City of New York Law Department, New York, NY.

Police Officer Police Officer Walsh, Defendant, Pro se, Brooklyn, NY.

For Police Officer Police Officer Walsh, Defendant: Amy Nkemka Okereke, LEAD ATTORNEY, New York City Law Department, Special Federal Litigation Division, New York, NY.

**JUDGES:** VIKTOR V. POHORELSKY, United States Magistrate Judge.

**OPINION BY:** VIKTOR V. POHORELSKY

**OPINION**

**DECISION AND ORDER**

The defendants in this *section 1983* action have moved for a protective order concerning a portion of a document which they have produced to the plaintiff in redacted form. The document in question was prepared by the Office of the District Attorney, Kings County (the "District Attorney") when that office declined to prosecute the plaintiff on the charges for which he was arrested by the individual defendants. The document was obtained by the defendants [*2] pursuant to a release

signed by the plaintiff which permitted the document to be unsealed pursuant to *section 160.50 of the New York Criminal Procedure Law*. The redaction in question is a line of text designated as the reason for the declination. [1] The plaintiff vigorously opposes the motion.

> 1    The document was also redacted to prevent disclosure of the tax identification number of the arresting officer. That redaction is not in question.

The defendants' principal argument in support of the redaction is that the text is protected by the work-product doctrine. In federal law, the work-product doctrine is now embodied in *Rule 26(b)(3) of the Federal Rules of Civil Procedure*, which gives qualified protection for "documents . . . prepared in anticipation of litigation or for trial by or for another party or by or for that party's representative." It is the burden of the proponent of the work-product doctrine to establish its applicability to information in question. *See, e.g., Mercator Corp. v. United States (In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002), 318 F.3d 379, 384 (2nd Cir. 2003)* (citing *United States v. International Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997); United States v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996);* [*3] *Weber v. Paduano, No. 02 Civ. 3392 (GEL), 2003 U.S. Dist. LEXIS 858, 2003 WL 161340, *3 (S.D.N.Y. Jan. 22, 2003)*. And since bars to disclosure like the work-product doctrine interfere with the public's right to obtain evidence, they are to be strictly construed, *e.g., Trammel v. United States, 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980); In re Grand Jury Subpoenas, 318 F.3d at 384,* and thus "confined within the narrowest possible limits underlying [their] purpose." *United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 504 (2d Cir. 1991)* (citing, *inter alia, In re Grand Jury Subpoena (Shargel), 742 F.2d 61, 62*

*(2d Cir. 1984))*; *accord Int'l Bhd. of Teamsters*, 119 F.3d at 214.

Given these principles, the court has concerns that the defendants have not met the burden of establishing that the redacted material constitutes work product within the definition above for reasons not addressed by either party. First, neither the document in which the statement appears, nor the statement itself, was prepared "in anticipation of litigation or for trial" as required by the Rule. *See Fed. R. Civ. P. 26(b)(3)*. Rather, both were made precisely because there would be *no* litigation or trial. In addition, protecting the statement of reasons for declining [*4] prosecution does not serve the fundamental purpose of the work-product doctrine. "The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning and to prevent one party from piggybacking on the adversary's preparation." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995). The reason for declining to prosecute has nothing to do with "strategic litigation planning" and disclosing the reason does not permit the plaintiff to "piggyback" on an adversary's preparation. To be sure, the reason for declining to prosecute clearly constitutes the "mental impression" and "legal conclusion" of an attorney as the defendants argue, and would therefore be entitled to the highest degree of protection *if* it constitutes work product. *See, e.g., United States v. Adlman*, 134 F.3d 1194, 1197 (2nd Cir. 1998). But strictly construed, and confined within the narrowest limits designed to serve its purpose, the court has doubts whether the work-product doctrine protects this particular mental impression and legal conclusion.

Even if the court were to conclude that the statement in question constituted work product, the court would hesitate to protect it from disclosure [*5] for a separate reason. The document in question was not prepared "by or for another party or by or for that other party's representative" as required by the Rule. *See Fed. R. Civ. P. 26(b)(3)*. In answer to the plaintiff's argument that the defendants are not the proper parties to invoke the work-product doctrine, the defendants' counsel assert that they are legal counsel to the District Attorney in civil rights actions and therefore may properly assert their interests. Putting aside for the moment the question whether the defendants' counsel are also counsel for the District Attorney, [2] the argument begs the question. The District Attorney is simply *not* a party here, and documents prepared by the District Attorney therefore do not fall under the definition of work product as articulated by the Rule. To be sure, some courts have recognized work-product protection for materials that were prepared by nonparties. *See, e.g., Stanziale v. Career Path Training Corp. (In re Student Fin. Corp.)*, Dkt. No. 06-MC-69, 2006 U.S. LEXIS 86603, 2006 WL 3484387 (E.D.

Pa. Nov. 29, 2006); *Thompson v. City of New York*, Dkt. No. 05 Civ. 3082, 2006 U.S. Dist. LEXIS 4797, 2006 WL 298702 (S.D.N.Y. Feb. 7, 2006). Those cases presented factually distinguishable circumstances, however, and numerous [*6] other courts have come to the opposite conclusion. *See Ramsey v. NYP Holdings, Inc.*, Dkt. No. 00 Civ. 3478, 2002 U.S. Dist. LEXIS 11728, 2002 WL 1402055 at *6 (S.D.N.Y. June 27, 2002) (collecting cases); *see also In re Student Finance Corp., 2006 U.S. Dist. LEXIS 86603, 2006 WL 3484387 at *9* (noting that most courts have concluded that *Rule 23(b)(3)* protects only parties' work product and citing cases).

2    The assertion that Corporation Counsel also serve as counsel to the District Attorney is inconsistent with the court's own experience. *See, e.g., Alvarado v. City of New York*, Dkt. No. 04 Civ. 2558, 2006 U.S. Dist. LEXIS 57345 (E.D.N.Y Aug. 5, 2006) (on motion to unseal Queens County grand jury minutes in civil rights action, opposition filed by Queens District Attorney, not Corporation Counsel); *Wilson v. City of New York*, Dkt. No. 06 Civ. 229 (on pending motion to unseal New York County grand jury minutes in civil rights action, opposition to be filed by New York County District Attorney, not Corporation Counsel); *cf. Thompson v. City of New York*, Dkt. No. 05 Civ. 3082, 2006 U.S. Dist. LEXIS 4797, 2006 WL 298702 at *1 (S.D.N.Y. Feb. 7, 2006) (New York County District Attorney asserted work-product doctrine and submitted documents for *in camera* review directly to the court rather than through Corporation [*7] Counsel). Since the District Attorney's Offices in this city typically assert their own interests in protecting information in their possession, an argument could be made that the District Attorney here has waived any protections afforded by the doctrine by permitting disclosure of the information to Corporation Counsel.

The defendants also argue that the redacted information should not be produced because it is irrelevant. That is a question for another day. The defendants have not sought to withhold from discovery, on grounds of irrelevance, the document in which the redacted information appears. [3] It is not the practice of this court to permit parties to selectively excise from otherwise discoverable documents those portions that they deem not to be relevant. To do so would require a finding of "good cause" based on a need "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Fed. R. Civ. P. 26(c)*. No such showing has been made. Whether a malicious prosecution claim may be maintained, as the plaintiff asserts, and whether the redacted information would be relevant to such a claim,

are matters that may be addressed in subsequent proceedings [*8] if such a claim is made. At this point, protection of the excised material based on its lack of relevance is not warranted.

3    Although the defendants argue in their reply letter that the entire declination is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, Def't Letter, Sept. 20, 2007, at 3, a casual review of the declination reveals numerous items of information about the plaintiff's arrest -- including among other things the precinct of arrest, the arresting officer, the time of the arrest, a statement of the reasons for the arrest, and the time of the alleged occurrence -- all of which are likely to be relevant at trial or at least reasonably likely to lead to admissible evidence.

Although the court rejects the defendants' argument that the redaction is justified on grounds of lack of relevance, and has doubts about whether the redacted material constitutes protectible work product, because the issues raised by the court concerning the applicability of work-product protection were not addressed by the parties, the court will afford the parties additional time to submit supplemental letters addressing those issues before reaching a decision. [*9] Any such letters shall be submitted within five business days.

**SO ORDERED:**

VIKTOR V. POHORELSKY

United States Magistrate Judge

Dated: Brooklyn, New York

September 25, 2007